**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–122–838]**

## Certain Softwood Lumber Products from Canada: Notice of Preliminary Results of Antidumping Duty Changed Circumstances Review

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**ACTION:** Notice of preliminary results of antidumping duty changed circumstances review.

**SUMMARY:** On March 27, 2003, the Department of Commerce (the Department) published a notice of initiation of a changed circumstances review to determine whether entries naming Monterra Lumber Mills Limited (Monterra), a Canadian producer of softwood lumber products and an interested party in this proceeding, as manufacturer and exporter should receive the "All Others" cash deposit rate of 8.43 percent. *See Initiation of Antidumping Duty Changed Circumstances Review: Certain Softwood Lumber Products From Canada*, 68 FR 14947 (March 27, 2003) (Initiation Notice). We have preliminarily determined that entries naming Monterra as manufacturer and exporter should receive the "All Others" cash deposit rate of 8.43 percent.

**EFFECTIVE DATE:** July 25, 2003.

**FOR FURTHER INFORMATION CONTACT:** Keith Nickerson or Constance Handley, at (202) 482–3813 or (202) 482–0631, respectively; Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

### Background

As a result of the antidumping duty order issued following the completion of the less-than-fair-value investigation of certain softwood lumber products from Canada, imports of softwood lumber from Monterra, a subsidiary of respondent company Weyerhaeuser Company Limited (Weyerhaeuser), became subject to a cash deposit rate of 12.39 percent (*See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Order: Certain Softwood Lumber Products from Canada*, 67 FR 36068 (May 22, 2002)). On February 4, 2003, Monterra notified the Department that effective December 23, 2002, Weyerhaeuser sold its interest in Monterra to 1554545 Ontario, Inc. (1554545 Ontario), a wholly owned subsidiary of Tercamm Corp., a privately owned Canadian investment company. As a result, Monterra requested that the Department conduct a changed circumstances review in order to conclude that, effective December 23, 2002, it be subject to the "All Others" cash deposit rate of 8.43 percent, rather than Weyerhaeuser's 12.39 percent rate. On March 27, 2003, the Department published a notice of initiation of a changed circumstances review to determine whether entries naming Monterra as manufacturer and exporter should receive the "All Others" cash deposit rate of 8.43 percent.

On April 29, 2003, Monterra, at the request of the Department, submitted additional information and documentation regarding its sale by Weyerhaeuser to 1554545 Ontario. On May 8, 2003, the petitioner[1] submitted comments on the information provided by Monterra and requested that the Department issue a supplemental questionnaire. On May 21, 2003, the Department issued a supplemental questionnaire requesting further details and documentation surrounding the sale and purchase, which was provided by Monterra in its subsequent submission of June 4, 2003. The petitioner did not comment on Monterra's June 4, 2003, submission.

### Scope of the Order

The products covered by this order are softwood lumber, flooring and siding (softwood lumber products). Softwood lumber products include all products classified under headings 4407.1000, 4409.1010, 4409.1090, and 4409.1020, respectively, of the Harmonized Tariff Schedule of the United States (HTSUS), and any softwood lumber, flooring and siding described below. These softwood lumber products include:

(1) coniferous wood, sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding six millimeters;

(2) coniferous wood siding (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, v-jointed, beaded, molded, rounded or the like) along any of its edges or faces, whether or not planed, sanded or finger-jointed;

(3) other coniferous wood (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, v-jointed, beaded, molded, rounded or the like) along any of its edges or faces (other than wood moldings and wood dowel rods) whether or not planed, sanded or finger-jointed; and

(4) coniferous wood flooring (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, v-jointed, beaded, molded, rounded or the like) along any of its edges or faces, whether or not planed, sanded or finger-jointed.

Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the merchandise under investigation is dispositive. Preliminary scope exclusions and clarifications were published in three separate federal register notices.

Softwood lumber products excluded from the scope:

- trusses and truss kits, properly classified under HTSUS 4418.90
- I-joist beams
- assembled box spring frames
- pallets and pallet kits, properly classified under HTSUS 4415.20
- garage doors
- edge-glued wood, properly classified under HTSUS item 4421.90.98.40
- properly classified complete door frames.
- properly classified complete window frames
- properly classified furniture

Softwood lumber products excluded from the scope only if they meet certain requirements:

- *Stringers* (pallet components used for runners): if they have at least two notches on the side, positioned at equal distance from the center, to properly accommodate forklift blades, properly classified under HTSUS 4421.90.98.40.
- *Box-spring frame kits*: if they contain the following wooden pieces - two side rails, two end (or top) rails and varying numbers of slats. The side rails and the end rails should be radius-cut at both ends. The kits should be individually packaged, they should contain the exact number of wooden components needed to make a particular box spring frame, with no further processing required. None of the components exceeds 1" in actual thickness or 83" in length.
- *Radius-cut box-spring-frame components*, not exceeding 1" in actual thickness or 83" in length, ready for assembly without further processing. The radius cuts must be present on both ends of the boards and must be substantial cuts so as to completely round one corner.

[1] The petitioner in this proceeding is the Coalition for Fair Lumber Imports Executive Committee.

• *Fence pickets* requiring no further processing and properly classified under HTSUS 4421.90.70, 1" or less in actual thickness, up to 8" wide, 6' or less in length, and have finials or decorative cuttings that clearly identify them as fence pickets. In the case of dog-eared fence pickets, the corners of the boards should be cut off so as to remove pieces of wood in the shape of isosceles right angle triangles with sides measuring 3/4 inch or more.

• *U.S. origin lumber* shipped to Canada for minor processing and imported into the United States, is excluded from the scope of this order if the following conditions are met: 1) the processing occurring in Canada is limited to kiln-drying, planing to create smooth-to-size board, and sanding, and 2) if the importer establishes to U.S. Bureau of Customs and Border Protection's (BCBP) satisfaction that the lumber is of U.S. origin.[2]

• *Softwood lumber products contained in single family home packages or kits*,[3] regardless of tariff classification, are excluded from the scope of the orders if the following criteria are met:

1. The imported home package or kit constitutes a full package of the number of wooden pieces specified in the plan, design or blueprint necessary to produce a home of at least 700 square feet produced to a specified plan, design or blueprint;
2. The package or kit must contain all necessary internal and external doors and windows, nails, screws, glue, subfloor, sheathing, beams, posts, connectors and if included in purchase contract decking, trim, drywall and roof shingles specified in the plan, design or blueprint;
3. Prior to importation, the package or kit must be sold to a retailer of complete home packages or kits pursuant to a valid purchase contract referencing the particular home design plan or blueprint, and signed by a customer not affiliated with the importer;
4. The whole package must be imported under a single consolidated entry when permitted by the BCBP, whether or not on a single or multiple trucks, rail cars or other vehicles, which shall be on the same day except when the home is over 2,000 square feet;
5. The following documentation must be included with the entry documents:

• a copy of the appropriate home design, plan, or blueprint matching the entry;

• a purchase contract from a retailer of home kits or packages signed by a customer not affiliated with the importer;

• a listing of inventory of all parts of the package or kit being entered that conforms to the home design package being entered;

• in the case of multiple shipments on the same contract, all items listed immediately above which are included in the present shipment shall be identified as well.

We have determined that the excluded products listed above are outside the scope of this order provided the specified conditions are met. Lumber products that the BCBP may classify as stringers, radius cut box-spring-frame components, and fence pickets, not conforming to the above requirements, as well as truss components, pallet components, and door and window frame parts, are covered under the scope of this order and may be classified under HTSUS subheadings 4418.90.40.90, 4421.90.70.40, and 4421.90.98.40. Due to changes in the 2002 HTSUS whereby subheading 4418.90.40.90 and 4421.90.98.40 were changed to 4418.90.45.90 and 4421.90.97.40, respectively, we are adding these subheadings as well.

**Preliminary Results of Changed Circumstances Review**

Pursuant to section 751(b)(1) of the Tariff Act of 1930, as amended (the Act), the Department will conduct a changed circumstances review upon receipt of information concerning, or a request from an interested party of, an antidumping duty order which shows changed circumstances sufficient to warrant a review of the order. Monterra contends that, because it is no longer owned by Weyerhaeuser, it should be subject to the "All Others" cash deposit rate. In accordance with 19 CFR 351.216 (c), due to the change in ownership, the Department found good cause to initiate a changed circumstances review despite the final determination being in existence for fewer than 24 months. Therefore, we initiated a changed circumstances administrative review pursuant to section 751(b)(1) of the Act and 19 CFR 351.216(c) to determine whether entries naming Monterra as manufacturer and exporter should receive the "All Others" cash deposit rate of 8.43 percent.

In reviewing the information provided by Monterra, the Department has preliminarily found that Monterra, as a result of the sale by Weyerhaeuser and purchase by 1554545 Ontario on December 23, 2002, is no longer owned by or in any way affiliated with Weyerhauser and, as a result, should not be subject to Weyerhaeuser's cash deposit rate of 12.39 percent. In addition, we note that during the antidumping duty investigation of certain softwood lumber from Canada, the Department granted an exemption to Weyerhaeuser allowing it to exclude reporting the U.S. sales by Monterra since these sales represented such a small amount of Weyerhaeuser's total U.S. sales.[4] As a result, Monterra's sales had no effect on the calculation of Weyerhaeuser's cash deposit rate of 12.39 percent. Therefore, for the above-stated reasons, we have preliminarily determined that entries naming Monterra as manufacturer and exporter should receive the "All Others" cash deposit rate of 8.43 percent.

We are denying Monterra's request to have the cash deposit rate of 8.43 percent made effective as of December 23, 2002. Because cash deposits are only estimates of the amount of antidumping duties that will be due, changes in cash deposit rates are not made retroactively. *See Certain Hot-Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom: Final Results of Changed-Circumstances Antidumping and Countervailing Duty Administrative Reviews*, 64 FR 66880 (November 30, 1999). However, on May 30, 2003, Monterra requested, during the anniversary month of the publication of the order, an administrative review of those entries to determine the proper assessment rate and receive a refund of any excess deposits. Accordingly, on July 1, 2003, the Department published a notice of initiation of an administrative review of the antidumping duty order on certain softwood lumber products from Canada for 421 companies, including Monterra. (*See Initiation of Antidumping Duty Administrative Review*, 68 FR 39059 (July 1, 2003).)

**Public Comment**

Any interested party may request a hearing within 30 days of publication of this notice. *See* 19 CFR 351.310(c). Any hearing, if requested, will be held 45

[2] As clarified in the Memorandum from Dave Layton, Case Analyst, through Charles Riggle, Program Manager, and Gary Taverman, Office Director, to Bernard Carreau, Deputy Assistant Secretary, concerning the Certain Softwood Lumber from Canada Scope re: Final Scope Ruling in Response to Request by the Coalition for Fair Lumber Imports Executive Committee regarding U.S.-origin Lumber Undergoing Additional Processing, dated January 22, 2003.

[3] To ensure administrability, we clarified the language of this exclusion to require an importer certification and to permit single or multiple entries on multiple days as well as instructing importers to retain and make available for inspection specific documentation in support of each entry.

[4] See Memorandum from Constance Handley, Senior Import Compliance Specialist, to Gary Taverman, Office Director, concerning the Antidumping Duty Investigation of Certain Softwood Lumber from Canada, dated July 16, 2001.

days after the date of publication of this notice, or the first working day thereafter. Interested parties may submit case briefs and/or written comments not later than 30 days after the date of publication of this notice. Rebuttal briefs, which must be limited to issues raised in such briefs or comments, may be filed not later than 37 days after the date of publication of this notice. Parties who submit arguments are requested to submit with the argument (1) a statement of the issue, (2) a brief summary of the argument, and (3) a table of authorities.

Due to the fact that the petitioner has not agreed to the outcome of this proceeding, the Department will conduct this review in accordance with section 351.216(e) of its regulations. Thus, consistent with section 351.216(e) of the Department's regulations, we will issue the final results of this changed circumstances review no later than 270 days after the date on which this review was initiated.

This notice is in accordance with sections 751(b)(1) and 777(I)(1) of the Act and 19 CFR 351.216, 351.221(b), and 351.222(g)(3)(I).

Dated: July 21, 2003.

**Joseph A. Spetrini,**

*Acting Assistant Secretary.*

[FR Doc. 03–19023 Filed 7–24–03; 8:45 am]

**BILLING CODE 3510–DS–S**

---

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

**[Docket No. 021028257–3178–02]**

### NOAA Office of Ocean Exploration Announcement of Funding Opportunity, Fiscal Year 2004

**AGENCY:** Office of Ocean Exploration, National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice.

**SUMMARY:** NOAA's Office of Ocean Exploration (OE) is seeking pre-proposals and full proposals for grants, cooperative agreements, and other financial collaborations to implement OE's mission to expand our knowledge of the ocean's physical, chemical, biological and archaeological characteristics, processes, and resources. OE's mission objectives also include conveying the experience and knowledge gained in all of OE's missions though a structured program of public education and outreach. Many of OE's missions will be accomplished by projects, experiments, and expeditions to unknown, or poorly known, ocean and Great Lakes regions. Consistent with OE's intent to explore and discover, successful OE proposals will be relatively broad-based in terms of their objectives and they may be relatively high-risk. Prospective applicants are encouraged to visit the Ocean Explorer Web site: *http://oceanexplorer.noaa.gov* in order to familiarize themselves with past and present OE activities.

**DATES:** Pre-proposals are required and must be postmarked or received by September 3, 2003. Full proposals must be postmarked or received by October 28, 2003. In the event that these dates fall on a weekend or holiday, the effective date shall be the first working day after the date specified. Email and/or facsimile pre-proposals and/or proposals submissions will not be accepted.

**ADDRESSES:** Send pre-proposals and proposals to NOAA, Office of Ocean Exploration, ATTN: OE Science Program Coordinator, Bldg. SSMC3, Rm. 10221, 1315 East West Highway, Silver Spring, MD 20910. Email and/or facsimile pre-proposals and/or proposals submissions will not be accepted.

**FOR FURTHER INFORMATION CONTACT:** Margot Bohan, OE Science Program Coordinator, or Randi Neff, OE Program Grants Coordinator, NOAA Office of Ocean Exploration, 301–713–9444, facsimile 301–713–4252 or submit inquiries via email to the Frequently Asked Questions address: *oar.oe.FAQ@noaa.gov.* Email inquiries should include the Principal Investigator's name in the subject heading. A copy of this notice, as well as ancillary information, will be posted on the OE Web site *http://www.explore.noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Program Authority

**Authority:** 33 U.S.C. 883d.

Catalog of Federal Domestic Assistance Number: 11.460.

### II. Program Description

*A. Background*

In June 2000, a panel of leading ocean explorers, scientists, and educators developed a national strategy for exploring the oceans, and presented its recommendations in a report entitled, *Discovering Earth's Final Frontier: A U.S. Strategy for Ocean Exploration* (*http://oceanpanel.nos.noaa.gov*). NOAA was selected as the lead Federal agency to guide a national program in ocean exploration and the Office of Ocean Exploration was established in 2001.

*B. Program Mission*

The mission of OE is to search, investigate, and document unknown and poorly known areas of the ocean and Great Lakes through interdisciplinary exploration, and to advance and disseminate knowledge of the ocean environment and its physical, chemical, biological, and historical resources.

### III. Program Notice

*A. Notice Objectives*

The purpose of this announcement is to invite the submission of pre-proposals and full proposals for grants, cooperative agreements, and other financial collaborations whose objectives are to explore the ocean and map its resources, to gain new insights about its physical, chemical, biological, and archaeological characteristics, and its living and non-living resources.

*B. Program Guidance*

*Themes.* Persons submitting proposals may elect to address these preferred themes, developed in part from eight regional workshops of ocean scientists, explorers, and educators from public, private and commercial organizations. Applicants with non-OE-funded shiptime, projects, or other resources may wish to propose supplementing them by the addition of tasks or objectives that are consistent with (and are, therefore, eligible for funding by) the OE program mission. The themes are (in no order of priority):

1. Mapping ocean characteristics and bathymetry;
2. Marine life inventories: vertebrate, invertebrate, macro-organisms and micro-organisms;
3. Marine archaeology;
4. Characterization of benthic and pelagic habitats and ecosystems;
5. Locating and mapping corals (including deep corals);
6. New ocean resources;
7. Passive ocean acoustics;
8. Technology: innovative applications and leveraged development;
9. Outreach: communicating exploration efforts in new and innovative ways to broad audiences.

Workshop reports can be viewed online at *http://explore.noaa.gov/workshops/welcome.html.*

*C. Program Priorities*

The following are requirements for proposals successfully funded by OE.

received a request from petitioner[1] to review Tubos de Acero de Mexico, S.A. ("TAMSA"). On September 25, 2002, we published the notice of initiation of this antidumping duty administrative review with respect to TAMSA. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews, Requests for Revocation in Part and Deferral of Administrative Reviews*, 67 FR 60210 (September 25, 2002). On October 25, 2002, we received a request from petitioner to determine whether antidumping duties have been absorbed during the period of review by respondent TAMSA. TAMSA submitted a November 1, 2002 letter certifying that neither TAMSA, nor its U.S. affiliate, Siderca Corporation, directly or indirectly, exported or sold for consumption in the United States any subject merchandise during the period of review ("POR"). The preliminary results were originally due on May 5, 2003.

**Extension of Preliminary Results of Review**

After analyzing Customs information for the period of review, we preliminarily find that TAMSA is a non-shipper. Therefore, we have issued a memorandum in which we have expressed our intent to rescind this review. *See* Memorandum from Eric Greynolds to Melissa G. Skinner, regarding the *Second Administrative Review of the Antidumping Duty Order on Certain Large Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe from Mexico*, dated April 30, 2003.

To afford interested parties time to comment on the Department's intent to rescind this review, and because it would be impracticable to issue a preliminary determination prior to receiving those comments, we are postponing the preliminary determination by 60 days, until July 7, 2003, in accordance with 751(a)(3)(A) of the Act. *See* Decision Memorandum from Melissa Skinner to Holly A. Kuga, dated May 1, 2003, which is on file in the Central Records Unit, B-099 of the main Commerce Building. We intend to issue the final results no later than 120 days after the publication of the notice of preliminary results of this review.

Dated: May 1, 2003.

**Holly A. Kuga,**

*Acting Deputy Assistant Secretary for Import Administration.*

[FR Doc. 03–11354 Filed 5–6–03; 8:45 am]

BILLING CODE 3510–DS–S

[1] The petitioner is United States Steel Corporation.

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C-122–839]**

## Final Results of Countervailing Duty Expedited Reviews: Certain Softwood Lumber Products from Canada

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**ACTION:** Notice of Final Results of Countervailing Duty Expedited Reviews.

**SUMMARY:** On August 14, 2002, the Department of Commerce (the Department) published in the **Federal Register** its preliminary results of 18 expedited reviews of the countervailing duty order on certain softwood lumber products from Canada for the period April 1, 2000 through March 31, 2001. *See Preliminary Results of Countervailing Duty Expedited Reviews: Certain Softwood Lumber Products from Canada*, 67 FR 52945 (August 14, 2002) (*Preliminary Results*). On November 5, 2002, the Department published its final results for 13 of these 18 expedited reviews. *See Final Results and Partial Recission of Countervailing Duty Expedited Reviews: Certain Softwood Lumber Products From Canada* (67 FR 67388; November 5, 2002) (*Final Results*). Based on our analysis of additional information and verification of the questionnaire responses, we have made changes to the estimated net subsidy rates determined in the *Preliminary Results* for an additional three companies in their expedited reviews. Therefore, these final results for these three expedited reviews differ from the preliminary results. For information on estimated net subsidies, please see the "Final Results of Reviews" section of this notice. In accordance with these final results of reviews, we will instruct the Bureau of Customs and Border Protection (BCBP) to refund all collected cash deposits and waive future cash deposits requirements for each reviewed company as detailed in the "Final Results of Reviews" section of this notice.

**EFFECTIVE DATE:** May 7, 2003.

**FOR FURTHER INFORMATION CONTACT:** Gayle Longest, Office of AD/CVD Enforcement VI, Group II, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, N.W., Washington, D.C. 20230; telephone: (202) 482–3338.

**SUPPLEMENTARY INFORMATION:**

**Background**

On May 22, 2002, the Department published in the **Federal Register** its amended final affirmative countervailing duty determination and countervailing duty order on certain softwood lumber products (subject merchandise) from Canada (67 FR 36070), as amended (67 FR 37775; May 30, 2002). On July 17, 2002, the Department published a Notice of Initiation of Expedited Reviews which covered 73 companies that filed complete and timely review applications. (*See Notice of Initiation of Expedited Reviews of the Countervailing Duty Order: Certain Softwood Lumber Products from Canada*, (67 FR 46955; July 17, 2002) (*Notice of Initiation*).)

As explained in the *Notice of Initiation*, we segregated the 73 applicants into two groups. Group 1 consists of 45 companies that obtain the majority of their wood (over 50 percent of their inputs) from the United States, the Maritime Provinces, Canadian private lands, and Canadian companies excluded from the order, as well as companies that source less than a majority of their wood from these sources and do not have tenure. Group 2 includes 28 companies that source less than a majority of their wood from these sources and have acquired Crown timber through their own tenure contracts.

In our review of the applications in Group 1, we noted that, in order to conduct our analysis, we required only minimal supplemental data for 24 of the 45 companies. The other Group 1 companies required additional information and more extensive analysis. Rather than delaying the process to provide all Group 1 companies the opportunity to submit the necessary information, we issued a short questionnaire to the 24 companies requiring only minimal information and set a short deadline for the response. Of the 24 companies, 18 were able to supply the information by the deadline. We completed our preliminary analysis of those 18 companies, using the Group 1 methodology (see "Methodology" section below). *See Preliminary Results*.

On September 6, 2002, petitioners filed comments to the *Preliminary Results*. Two companies subsequently requested an analysis of whether they benefited from subsidies bestowed on their inputs: Les Bois d'Oeuvre Beaudoin & Gauthier Inc. and Meunier Lumber Company Ltd. Three other companies, Interbois Inc. (Interbois), Les Moulures Jacomau 2000, Inc. (Jacomau), and Richard Lutes Cedar, Inc. (RLC), were verified subsequent to the

preliminary results of expedited reviews. We provided these three companies and petitioners with an opportunity to comment on the verification reports. We received comments on the verification reports from petitioners on October 31, 2002 and rebuttal comments from respondents on November 7, 2002, and November 22, 2002.

During the comment period for these three companies, the Department issued the *Final Results* for 13 of the 18 companies that were included in the *Preliminary Results*. We are continuing to process the other applications in Groups 1 and 2, and have issued questionnaires to both groups. This notice includes the final results of expedited reviews for Interbois, Jacomau and RLC.

**Scope of the reviews**

The products covered by this order are softwood lumber, flooring and siding (softwood lumber products). Softwood lumber products include all products classified under headings 4407.1000, 4409.1010, 4409.1090, and 4409.1020, respectively, of the Harmonized Tariff Schedule of the United States (HTSUS), and any softwood lumber, flooring and siding described below. These softwood lumber products include:

(1) Coniferous wood, sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding six millimeters;

(2) Coniferous wood siding (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, v-jointed, beaded, molded, rounded or the like) along any of its edges or faces, whether or not planed, sanded or finger-jointed;

(3) Other coniferous wood (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, v-jointed, beaded, molded, rounded or the like) along any of its edges or faces (other than wood moldings and wood dowel rods) whether or not planed, sanded or finger-jointed; and

(4) Coniferous wood flooring (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, v-jointed, beaded, molded, rounded or the like) along any of its edges or faces, whether or not planed, sanded or finger-jointed.

Although the HTSUS subheadings are provided for convenience and BCBP purposes, the written description of the merchandise subject to this order is dispositive.

As specifically stated in the Issues and Decision Memorandum accompanying the *Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada* (67 FR 15539; April 2, 2002) (*see* comment 53, item D, page 116, and comment 57, item B-7, page 126), available at *www.ia.ita.doc.gov*, drilled and notched lumber and angle cut lumber are covered by the scope of this order.

The following softwood lumber products are excluded from the scope of this order provided they meet the specified requirements detailed below:

(1) *Stringers* (pallet components used for runners): if they have at least two notches on the side, positioned at equal distance from the center, to properly accommodate forklift blades, properly classified under HTSUS 4421.90.98.40.

(2) *Box-spring frame kits*: if they contain the following wooden pieces - two side rails, two end (or top) rails and varying numbers of slats. The side rails and the end rails should be radius-cut at both ends. The kits should be individually packaged, they should contain the exact number of wooden components needed to make a particular box spring frame, with no further processing required. None of the components exceeds 1" in actual thickness or 83" in length.

(3) *Radius-cut box-spring-frame components*, not exceeding 1" in actual thickness or 83" in length, ready for assembly without further processing. The radius cuts must be present on both ends of the boards and must be substantial cuts so as to completely round one corner.

(4) *Fence pickets* requiring no further processing and properly classified under HTSUS heading 4421.90.70, 1" or less in actual thickness, up to 8" wide, 6' or less in length, and have finials or decorative cuttings that clearly identify them as fence pickets. In the case of dog-eared fence pickets, the corners of the boards should be cut off so as to remove pieces of wood in the shape of isosceles right angle triangles with sides measuring 3/4 inch or more.

(5) *U.S. origin lumber* shipped to Canada for minor processing and imported into the United States, is excluded from the scope of this order if the following conditions are met: 1) the processing occurring in Canada is limited to kiln-drying, planing to create smooth-to-size board, and sanding, and 2) if the importer establishes to BCBP's satisfaction that the lumber is of U.S. origin.

(6) *Softwood lumber products contained in single family home packages or kits*,[1] regardless of tariff classification, are excluded from the scope of this order if the importer certifies to items 6 A, B, C, D, and requirement 6 E is met:

A. The imported home package or kit constitutes a full package of the number of wooden pieces specified in the plan, design or blueprint necessary to produce a home of at least 700 square feet produced to a specified plan, design or blueprint;

B. The package or kit must contain all necessary internal and external doors and windows, nails, screws, glue, sub floor, sheathing, beams, posts, connectors, and if included in the purchase contract, decking, trim, drywall and roof shingles specified in the plan, design or blueprint.

C. Prior to importation, the package or kit must be sold to a retailer of complete home packages or kits pursuant to a valid purchase contract referencing the particular home design plan or blueprint, and signed by a customer not affiliated with the importer;

D. Softwood lumber products entered as part of a single family home package or kit, whether in a single entry or multiple entries on multiple days, will be used solely for the construction of the single family home specified by the home design matching the entry.

E. For each entry, the following documentation must be retained by the importer and made available to the BCBP upon request:

i. A copy of the appropriate home design, plan, or blueprint matching the entry;

ii. A purchase contract from a retailer of home kits or packages signed by a customer not affiliated with the importer;

iii. A listing of inventory of all parts of the package or kit being entered that conforms to the home design package being entered;

iv. In the case of multiple shipments on the same contract, all items listed in E(iii) which are included in the present shipment shall be identified as well.

Lumber products that the BCBP may classify as stringers, radius cut box-spring-frame components, and fence pickets, not conforming to the above requirements, as well as truss components, pallet components, and door and window frame parts, are covered under the scope of this order and may be classified under HTSUS

[1] To ensure administrability, we clarified the language of exclusion number 6 to require an importer certification and to permit single or multiple entries on multiple days as well as instructing importers to retain and make available for inspection specific documentation in support of each entry.

subheadings 4418.90.45.90, 4421.90.70.40, and 4421.90.97.40.

Finally, as clarified throughout the course of the investigation, the following products, previously identified as Group A, remain outside the scope of this order. They are:

1. Trusses and truss kits, properly classified under HTSUS 4418.90;
2. I-joist beams;
3. Assembled box spring frames;
4. Pallets and pallet kits, properly classified under HTSUS 4415.20;
5. Garage doors;
6. Edge-glued wood, properly classified under HTSUS item 4421.90.98.40;
7. Properly classified complete door frames;
8. Properly classified complete window frames;
9. Properly classified furniture.

In addition, this scope language has been further clarified to now specify that all softwood lumber products entered from Canada claiming non-subject status based on U.S. country of origin will be treated as non-subject U.S.-origin merchandise under the countervailing duty order, provided that these softwood lumber products meet the following condition: upon entry, the importer, exporter, Canadian processor and/or original U.S. producer establish to BCBP's satisfaction that the softwood lumber entered and documented as U.S.-origin softwood lumber was first produced in the United States as a lumber product satisfying the physical parameters of the softwood lumber scope.[2] The presumption of non-subject status can, however, be rebutted by evidence demonstrating that the merchandise was substantially transformed in Canada.

### Verification

The Department verified Interbois, Jacomau, and RLC from September 30, 2002, through October 3, 2002. On October 22, 2002, we issued the following reports: *Verification of Interbois, Inc. in the Countervailing Duty Expedited Review of Certain Softwood Lumber Products from Canada* (Interbois Verification Report), *Verification of Les Moulures Jacomau 2000, Inc. in the Countervailing Duty Expedited Review of Certain Softwood Lumber Products from Canada* (Jacomau Verification Report), and *Verification of Richard Lutes Cedar, Inc. in the Countervailing Duty Expedited Review of Certain Softwood Lumber Products from Canada* (RLC Verification Report). We provided these companies and petitioners with an opportunity to comment on the verification reports. We received comments from petitioners and rebuttal comments from respondents.

### Methodology

These final results include companies that obtain the majority of their wood (over 50 percent of their inputs) from the United States, the Maritime Provinces, Canadian private lands, and/or Canadian companies excluded from the order. We calculated company-specific rates based on the Group 1 methodology described in the notice of preliminary results. To obtain the company-specific stumpage benefit, we multiplied the quantity of lumber inputs (except for those specified below) by the province-specific stumpage benefit calculated in the underlying investigation, *i.e.*, the average per-unit differential between the calculated adjusted stumpage fee for the relevant province and the appropriate benchmark for that province. For those provinces, such as British Columbia and Ontario, for which we calculated more than one per-unit benefit in the investigation, we calculated one province-wide per-unit benefit by weight-averaging the previously calculated values by the corresponding volumes of harvested softwood. As indicated in the *Notice of Initiation*, we have not attributed a benefit to (1) logs or lumber acquired from the Maritime Provinces, (2) logs or lumber of U.S. origin, (3) lumber produced by mills excluded in the investigation, or (4) logs from Canadian private land. We divided the stumpage benefit by the appropriate value of the company's sales to determine the company's estimated subsidy rate from stumpage and then added any benefit from other programs to obtain the cash deposit rate for the company.

### Analysis of Comments Received

The issues raised in the comments on the verification reports by interested parties are addressed in the "*Issues and Decision Memorandum: Final Results of Expedited Review of 3 Companies Covered by the August 14, 2002 Notice of Preliminary Results of the Countervailing Duty Expedited Reviews of Certain Softwood Lumber Products from Canada*" (Decision Memorandum), dated concurrently with this notice, which is hereby adopted by this notice. As noted in the Decision Memorandum, we are addressing in these final results those issues that are related to the three companies included in this notice. Other issues, related for instance to whether certain companies benefitted from subsidies bestowed on their inputs or Group 2 methodology, will be addressed in the context of subsequent reviews. A list of the issues which parties have raised, and to which we have responded, all of which are in the Decision Memorandum, is attached to this notice as Appendix I. The Decision Memorandum is on file in the Central Records Unit in room B-099 of the Main Commerce Building. In addition, a complete version of the Decision Memorandum can be accessed directly on the World Wide Web at *http://ia.ita.doc.gov*, under the heading "Federal Register Notices." The paper copy and electronic version of the Decision Memorandum are identical in content.

### Changes Since the Preliminary Results

We amended data for Interbois, Jacomau and RLC based on information obtained during verification. *See* the Interbois Verification Report, Jacomau Verification Report, and RLC Verification Report for a further discussion of such revisions.

### Final Results of Review

We have calculated an individual subsidy rate for each producer/exporter subject to these expedited reviews. For the period April 1, 2000 to March 31, 2001, we determine the net subsidy to be as follows:

| Net Subsidies - Producer/ Exporter | Net Subsidy Rate % |
|---|---|
| Interbois Inc. | 0.88% |
| Les Moulures Jacomau | 0.75% |
| Richard Lutes Cedar Inc. | 0.12% |

Because the rates for these companies are less than one percent *ad valorem*, which is *de minimis*, we determine that these companies are excluded from the countervailing duty order. We will instruct the BCBP to refund all cash deposits of estimated countervailing duties collected on all shipments of the subject merchandise produced and exported by these three reviewed companies. In addition, we will instruct the BCBP to waive cash deposit requirements of estimated countervailing duties on all shipments of the subject merchandise produced and exported by these three companies, entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of these reviews.

This notice covers only those three companies that we have specifically identified herein. We will instruct the BCBP to continue collecting cash deposits for all non-reviewed companies

---

[2] *See* the scope clarification message (t 3034202), dated February 3, 2003, to the BCBP, regarding treatment of U.S. origin lumber on file in the Central Records Unit, Room B-099 of the main Commerce Building.

at the cash deposit rates established in the amended final determination on softwood lumber from Canada, 67 FR 36070 (May 22, 2002), and/or the final results of expedited reviews, 67 FR 67388 (November 5, 2002).

These expedited reviews and notice are issued and published in accordance with section 751(a)(1) and 777(i)(1) of the Tariff Act of 1930, as amended, (19 U.S.C. 1675(a)(1) and 19 U.S.C. 1677(f)(i)).

Dated: April 29, 2003.

**Joseph A. Spetrini,**

*Acting Assistant Secretary for Import Administration.*

## Appendix I - Issues and Decision Memorandum

*Summary and Background*

*Analysis of Comments Received*

*Comment 1:* Verification of RLC's Estimated Input Data

*Comment 2:* Verification of the Origin of RLC's Logs and Lumber

*Comment 3:* Verification of RLC's Estimated Sales Data

*Comment 4:* Interbois' Lumber Output

[FR Doc. 03–11352 Filed 5–6–03; 8:45 am]

BILLING CODE 3510-DS-S

---

## DEPARTMENT OF COMMERCE

## National Institute of Standards and Technology

## Jointly Owned Invention Available for Licensing

**AGENCY:** National Institute of Standards and Technology, Commerce.

**ACTION:** Notice of jointly owned invention available for licensing.

**SUMMARY:** The invention listed below is owned in part by the U.S. Government, as represented by the Department of Commerce. The Department of Commerce's interest in the invention is available for licensing in accordance with 35 U.S.C. 207 and 37 CFR part 404 to achieve expeditious commercialization of results of federally funded research and development.

**FOR FURTHER INFORMATION CONTACT:** Technical and licensing information on this invention may be obtained by writing to: National Institute of Standards and Technology, Office of Technology Partnerships, Attn: Mary Clague, Building 820, Room 213, Gaithersburg, MD 20899. Information is also available via telephone: 301–975–4188, e-mail: *mclague@nist.gov*, or fax: 301–869–2751. Any request for information should include the NIST Docket number and title for the relevant invention as indicated below.

**SUPPLEMENTARY INFORMATION:** NIST may enter into a Cooperative Research and Development Agreement ("CRADA") with the licensee to perform further research on the invention for purposes of commercialization. The invention available for licensing is:

[Docket No.: 98–020US]

*Title:* Ultrasonic Strain Gage Using a Motorized Electromagnetic Acoustic Transducer (EMAT).

*Abstract:* The invention was made jointly by scientists from NIST and the University of Colorado. The invention is jointly owned by the U.S. Government, as represented by the Secretary of Commerce, and the University of Colorado. The U.S. Government's interest is available for licensing. The invention comprises an ultrasonic strain gage using an electromagnetic acoustic transducer (EMAT). Stress causes a rotation of the pure-mode polarization directions of SH-waves and a change in the phase of waves polarized along these certain directions. The device comprises a rotating small-aperture EMAT, connected to a processor, to measure phase and amplitude data as a function of angle. The EMAT is placed on a work piece at the location where the stress is to be measured. The acoustic birefringence Beta is determined from the normalized difference of these phases. From these data, an algorithm calculates values of Beta and Phi. The work piece is then stressed or its stress state is changed. The values are measured again at the same location. Stress is determined from the change in Beta and Phi.

Dated: May 1, 2003.

**Karen H. Brown,**

*Deputy Director.*

[FR Doc. 03–11362 Filed 5–6–03; 8:45 am]

BILLING CODE 3510-13-P

---

## DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

**[I.D. 031303A]**

## Incidental Take of Marine Mammals; Bottlenose Dolphins and Spotted Dolphins

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice of issuance of letters of authorization.

---

**SUMMARY:** In accordance with the Marine Mammal Protection Act (MMPA) and implementing regulations, notification is hereby given that 8 letters of authorization (LOAs) to take bottlenose and spotted dolphins incidental to oil and gas structure removal activities were issued.

**ADDRESSES:** The applications and letters are available for review in the following offices: Office of Protected Resources, NMFS, 1315 East-West Highway, Silver Spring, MD 20910, and the Southeast Region, NMFS, 9721 Executive Center Drive N, St. Petersburg, FL 33702.

**FOR FURTHER INFORMATION CONTACT:** Kimberly Skrupky, Office of Protected Resources, NMFS, (301) 713–2055, ext. 163.

**SUPPLEMENTARY INFORMATION:** Section 101(a)(5)(A) of the MMPA (16 U.S.C. 1361 *et seq.*) directs NMFS to allow, on request, the incidental, but not intentional, taking of small numbers of marine mammals by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region, if certain findings are made and regulations are issued. Under the MMPA, the term "taking" means to harass, hunt, capture, or kill or to attempt to harass, hunt, capture or kill marine mammals.

Permission may be granted if NMFS finds, after notification and opportunity for public comment, that the taking will have a negligible impact on the species or stock(s) of marine mammals and will not have an unmitigable adverse impact on the availability of the species or stock(s) for subsistence uses. In addition, NMFS must prescribe regulations that include permissible methods of taking and other means effecting the least practicable adverse impact on the species and its habitat, and on the availability of the species for subsistence uses, paying particular attention to rookeries, mating grounds, and areas of similar significance. The regulations must include requirements pertaining to the monitoring and reporting of such taking. Regulations governing the taking of bottlenose and spotted dolphins incidental to oil and gas structure removal activities in the Gulf of Mexico were published on August 1, 2002 (67 FR 49869), and remain in effect until February 2, 2004. Issuance of these letters of authorization are based on a finding that the total takings will have a negligible impact on the bottlenose and spotted dolphin stocks of the Gulf of Mexico.

Letters of Authorization were issued to:

(1). Anadarko E&P Company LP of Houston, TX, 77251, on March 19, 2003;