PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In the

# United States Court of Federal Claims

No. 03-2485C (Braden, J.)

FOREST PRODUCTS NORTHWEST, INC.,

*Plaintiff,*

*v.*

UNITED STATES OF AMERICA,

*Defendant.*

Motion for Summary Judgment Under RCFC Rule 56(a) and (c)

A. Woodson Stuart
JONES & STUART, LLP
2300 M Street, NW, Suite 800
Washington, D.C. 20037
Tel: (202) 297-3196
Fax: (202) 338-0270

Date: February 20, 2004

*Attorney for the Plaintiff*

**I. SUMMARY** ....................1

**II. QUESTIONS PRESENTED** ....................2

**III. STATEMENT OF FACTS** ....................2

**IV. STANDARDS OF REVIEW** ....................3

**A. The Summary Judgment Standard** ....................3

**B. The Standard for Reviewing Statutory Interpretations by U.S. Customs** ....................4

**C. The Plaintiff's Burden of Proof in a Customs Classification Case** ....................6

**V. ARGUMENT** ....................6

**A. Classification of Merchandise Under the HTSUS** ....................6

**B. Classification of Edge-Glued Lumber Under Heading 4407, HTSUS, Is Precluded By the Terms of the Heading and Relative Chapter Notes.** ....................7

**C. Headquarters Is Correct that "Edge-Glued Lumber Does Not Meet the Definition of Lumber in Heading 4407."** ....................11

**D. The Mod Act Requires U.S. Customs to Follow Its Own Rulings Unless and Until they Are Revoked or Modified.** ....................12

**VI. CONCLUSION** ....................21

## TABLE OF AUTHORITIES

*Cases*

*Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242 (1986) ............................................................3

*American Bayridge Corp. v. United States,* 35 F. Supp. 2d 922 (Ct. Int'l Trade 1998), *vacated in part without pub. op.*, 1999 WL 997303 (Fed. Cir. Oct. 26, 1999) .......*passim*

*Atkins, Kroll & Co. v. United States,* C.C.P.A. 62 (1963) .....................................................11

*Boen Hardwood Flooring, Inc., v. United States,* 254 F. Supp. 2d 1349 (Ct. Int'l Trade 2002)..........................................................................................6, 11

*Brookside Veneers, Ltd. v. United States*, 847 F.2d 786 (Fed. Cir. 1988)..................................9

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 67 U.S. 837 (1984) ..........4, 5

*David W. Shenk & Co. v. United States*, 960 F. Supp. 363 (Ct. Int'l Trade 1997) ......................3

*Dudley v. United States*, 174 U.S. 670 (1899)..............................................................................12

*E.M. Chemicals v. United States*, 920 F. 2d 910 (Fed. Cir. 1990) .......................................9, 11

*Express Forwarding & Storage Co. v. United States*, 60 Cust. Ct. 511 (1968) ..................10, 12

*F.W. Myers & Co. v. United States*, 345 F. Supp. 1006 (Cust. Ct. 1972)..................................12

*Henry Mast Greenhouses, Inc. v. United States*, 966 F. Supp. 1265 (Ct. Int'l Trade 1995) ..........................................................................................3

*Hewlitt-Packard Co. v. United States,* 189 F.3d 1346 (Fed. Cir. 1999) ..................................11

*Nootka Packing Co. v. United States*, 22 C.C.P.A. 464 (1935)...................................................9

*Precision Specialty Metals, Inc. v. United States,* 182 F. Supp. 2d 1314 (Ct. Int'l Trade 2001)..........................................................................................17, 20

*Sharp Microelectronics Technology, Inc. v. United States*, 122 F.3d 1446 (Fed. Cir. 1997)..........................................................................................................10

*Skidmore v. Swift*, 323 U.S. 134 (1944) .....................................................................4, 5

*Standard Brands Paint Co. v. United States*, 62 C.C.P.A. 72 (1975) .......................................11

*Tidewater Oil Co. v. United States*, 171 U.S. 210 (1898) ....................................................12

*Trans-Atlantic Co. v. United States*, 471 F.2d 1397 (Ct. Cust. & Pat. App. 1973) .....................9

*United States v. Hathaway*, 71 U.S. 404 (1867) ........................................................................12

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .......................................................2, 4, 5

*United States v. Quimby*, 71 U.S. 408 (1867)...........................................................................12

*United States v. Swain & Boggs*, 12 C.C.A. 13 (1923).............................................................11

*Weddell v. HHS*, 23 F.3d 388 (Fed. Cir. 1994)...........................................................................9

*Statutes*

Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202 note:

Chapter 44, Stat. Note 1 .............................................................................................8

Chapter 44, Headings 4401 to 4413.............................................................................7

Heading 4407 ..........................................................................................*passim*

Subheading 4407.10.0000 ...........................................................................................8

Subheading 4407.10.0001 ...........................................................................................8

Subheading 4407.10.0002 ...........................................................................................8

Subheading 4407.10.0015 ...........................................................................................8

Subheading 4407.10.0016 ...........................................................................................8

Subheading 4407.10.0068............................................................................................8

Subheading 4407.10.0069 ...........................................................................................8

Heading 4409...........................................................................................................11

Chapter 44, Headings 4414 to 4420.............................................................................7

Heading 4421 ....................................................................................................1, 7, 8

Subheading 4421.10.0000 ...........................................................................................8

Subheading 4421.90.9700 ....................................................2, 8

Subheading 4421.90.9720....................................................8

Subheading 4421.90.9740....................................................7, 8

General Rules of Interpretation (GRIs)....................................................6

GRI 1 ....................................................6, 10

U.S. Additional Rules of Interpretation (USARIs)....................................................6

USARI 1....................................................6, 7

19 U.S.C. § 1412(a) ....................................................7

19 U.S.C. § 1502(a) ....................................................7

19 U.S.C. § 1502(b) ....................................................7

19 U.S.C. § 1625 (1988) ....................................................13

19 U.S.C. § 1625 (2000) ....................................................12, 14

19 U.S.C. § 1625(c) ....................................................15, 17, 18

19 U.S.C. § 1625(c)(1) ....................................................*passim*

19 U.S.C. § 1625(c)(2)....................................................17

28 U.S.C. § 2639(a)(1)....................................................6

28 U.S.C. § 2640(a)(1)....................................................6

28 U.S.C. § 2643(b) ....................................................6

North American Free Trade Agreement ("NAFTA") Implementation Act,
Pub. L. 103-182, § 623, 107 Stat. 2186 (1993) ....................................................2

Public Law No. 95-410 (1978) ....................................................12

*Treaties*

NAFTA ....................................................7

NAFTA, Title VI ....................................................14

*Court Rules*

Rule 56(c), Rules of the U.S. Court of Federal Claims ........................................................ 1, 3

*Administrative Materials*

19 C.F.R. § 177.9(a) .......................................................................................................

Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) ....................................... *passim*

*Certain Administrative Procedures*, 54 Fed. Reg. 8208 (U.S. Customs 1989) . ........................ 19

C. Ressin, Chief, Penalty Branch, U.S. Customs Service, Getting Informed about Informed Compliance, 4 Global Trade Talk No. 1 (Jan.-Feb. 1994) ....................... 16-17

*Legislative Materials*

H.R. 2512, 102nd Cong. (1991) ........................................................................................14

H.R. 2589, 102nd Cong. (1991) ........................................................................................14

H.R. Conf. Rep. No. 102-1034 (1992) ..............................................................................15

Statement of Administrative Action, NAFTA Implementation Act, H.R. Doc. No. 103-159 (1993) .......................................................................16

*Opening Market Proposals, Auto Trade, and Customs Modernization: Hearings on H.R. 5100 Before the Senate Comm. on Finance,* S. Rep. No. 102-1065 (1992) ..........15

*Customs Modernization and Informed Compliance: Hearings on H.R. 3935 Before the Subcomm. on Trade of the House Comm. On Ways and Means,* H.R. Rep., 102nd Cong. (1992) .........................................................................16

**PLAINTIFF NORTHWEST FOREST PRODUCTS'**
**MOTION FOR SUMMARY JUDGMENT UNDER RULE 56(c)**

COMES NOW Plaintiff, Forest Products Northwest, Inc., doing business as Northwest Forest Products ("NWFP"), and hereby submits this Motion for Summary Judgment, and respectfully requests that said motion be GRANTED, based on the points and authorities set forth in the following brief. A hearing is requested on this motion.

## I. SUMMARY

This is a customs classification case. NWFP began importing rough edge-glued cedar lumber in March 2003 under Heading 4421 of the Harmonized Tariff Schedule of the United States ("HTSUS"). On October 15, 2003, U.S. Customs reclassified NWFP's entries under Heading 4407, HTSUS, and assessed the AD/CVD deposits, because Heading 4407, HTSUS, is one of the tariff headings covered by the AD/CVD orders on certain "softwood lumber" products from Canada. NWFP paid the assessments under protest and filed a Tucker Act claim in this Court because the assessments are not "protestable" and, thus, not subject to judicial review in the U.S. Court of International Trade.

As demonstrated below, there are no genuine issues of material fact to preclude the entry of summary judgment, and U.S. Customs' reclassification decision was clearly arbitrary, capricious, and otherwise not in accordance with law based on the record before the Court in this *de novo* proceeding. Accordingly, NWFP's Motion for Summary Judgment must be GRANTED, and the United States must be ORDERED to refund all payments that NWFP made to U.S. Customs under protest in connection with the subject entries.

## II. QUESTIONS PRESENTED

A. Is "edge-glued lumber," in any form, classifiable under Heading 4407, HTSUS? (No)

B. Does Section 625(c)(1) of the Customs Modernization and Informed Compliance Act of 1993 ("Mod Act"), 19 U.S.C. § 1625(c)(1), preclude U.S. Customs from reclassifying the subject entries of edge-glued lumber under Heading 4407, HTSUS, in view of Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) ("[e]dge-glued lumber does not meet the definition of lumber in . . . heading 4407")? (Yes)

C. Is the subject edge-glued lumber correctly classified in Subheading 4421.90.9700, HTSUS? (Yes)

D. Is the reclassification decision made by U.S. Customs in this case entitled to judicial deference under *United States v. Mead Corp.,* 533 U.S. 218 (2001)? (No)

E. Is Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) entitled to judicial deference under *Mead?* (Yes)

F. Must the United States refund NWFP's payments under protest as unlawfully exacted pursuant to an Act of Congress? (Yes)

## III. STATEMENT OF FACTS

The Proposed Findings of Uncontroverted Fact filed in support of this Motion for Summary Judgment are incorporated by reference as if fully set forth herein. In addition, the Court's attention is directed to the following materials:

A. The photographs of subject merchandise reprinted in the Complaint,

B. the samples of subject merchandise filed on October 23, 2003, which speak for themselves and are authenticated by the declaration attached as Exhibit B to NWFP's Proposed Findings; and

C. the description of the statutory scheme provided to the Court in NWFP's Opposition to Defendant's Motion to Dismiss (Section III.B.) and the administrative and statutory materials cited therein, reprinted as Exhibit 18 thereto).

## IV. STANDARDS OF REVIEW

### A. <u>The Summary Judgment Standard</u>

RCFC Rule 56(c) commands that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Under this standard, "[o]nly disputes over facts that might affect the outcome" can preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986); *see, e.g., David W. Shenk & Co. v. United States,* 960 F. Supp. 363, 365 (Ct. Int'l Trade 1997) (granting summary judgment for importer in customs classification case). Similarly, a dispute concerning a material fact will not preclude the entry of summary judgment if the record is "so one sided" that the issue is not genuine. *Id.; see, e.g., Henry Mast Greenhouses, Inc. v United States,* 966 F. Supp. 1265, 1229 (Ct. Int'l Trade 1995) (granting summary judgment for importer in customs classification case).

Summary judgment is appropriate in this case because: (a) the only relevant facts are the physical characteristics of the merchandise; and (b) the physical characteristics of the merchandise are readily apparent from actual samples provided to the Court. *See,*

*e.g., American Bayridge Corp. v. United States,* 35 F. Supp. 2d 922, 929 (Ct. Int'l Trade 1998) (granting summary judgment for importer of predrilled studs based on the application of an unrevoked Customs Service Ruling to samples filed with the court), *vacated in part on other grounds,* 1999 WL 997303 (Fed. Cir. Oct. 26, 1999). In such cases, the Court's only task is to determine whether the party moving for summary judgment is "entitled to judgment as a matter of law," by applying the relevant tariff terms to the samples before the Court. *See, e.g., id.* ("Even though there are differences in the factual positions advanced by each party, summary judgment is appropriate in this action because there are no genuine issues of material fact in dispute. The parties agree on the physical characteristics . . . of the imported merchandise, but dispute the classification. Thus, the material facts . . . are not at issue.") (collecting cases).

**B. The Standard for Reviewing Statutory Interpretations by U.S. Customs.**

In *United States v. Mead Corp.,* 533 U.S. 218 (2001), the Supreme Court finally addressed whether the highly deferential standard of review applied, under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), to agency statutory interpretations that are embodied in regulations and formal adjudicatory determinations, applies to interpretations of the HTSUS by U.S. Customs embodied in informal interpretive rulings. The Court answered in the negative, holding that such judicial deference would be inappropriate given the nature of such rulings. *See id.* ("a tariff classification [ruling] has no claim to judicial deference under *Chevron,* there being no indication that Congress intended such a ruling to carry the force of law"). Accordingly, the Court held that the minimal deference standard articulated in *Skidmore v. Swift,* 323 U.S. 134 (1944), is the appropriate standard of review for such rulings.

Under the *Mead-Skidmore* standard, the weight accorded to a Customs Service Ruling:

> "depends upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

*Mead,* 533 U.S. at 218 (quoting *Skidmore,* 323 U.S. at 140).

The classification decision under review in this case is not embodied in a Customs Service Ruling and, in any event, sets forth **<u>no reasoning</u>**. The decision also conflicts with Customs Service Headquarters Ruling 087616 (Aug. 20, 1990). Thus, the decision *sub judice* is clearly entitled to **<u>no deference under *Mead*</u>**. To the contrary, Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) is entitled to deference under *Mead,* because it is a "ruling" and contains persuasive reasoning, namely, that edge-gluing is not among the manufacturing processes enumerated in Heading 4407, HTSUS, to describe the merchandise covered thereby.

Moreover, even *Chevron* deference is inappropriate in cases where, as here, the controlling statutory language is clear and unambiguous with respect to the precise question at issue, namely, the correct tariff classification of edge-glued lumber. *See Bayridge,* 35 F. Supp. 2d at 935-36 ("When a court reviews an agency's construction of a statute it must, in the first instance, discern whether Congress has directly spoken to the precise question at issue. 'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'") (quoting *Chevron,* 467 U.S. at 842).

### C. The Plaintiff's Burden of Proof in a Customs Classification Case

In a customs classification case, the importer's only burden is to demonstrate that U.S. Customs' classification is not "correct." *See* 28 U.S.C. § 2639(a)(1). The Court then may decide the "correct" classification *de novo,* on the basis of the record made in the Court, and without remanding to U.S. Customs for an original determination. *Bayridge,* 35 F. Supp. 2d at 930 (citing 28 U.S.C. §§ 2640(a)(1) & 2643(b)).

For the foregoing reasons, this case is fit for summary judgment, no deference is owed to the classification decision made by U.S. Customs, and NWFP only needs to show that U.S. Customs' classification was incorrect to prevail on its Tucker Act claim.

## V. ARGUMENT

### A. Classification of Merchandise Under the HTSUS

The classification of merchandise under the HTSUS is governed by the General Rules of Interpretation ("GRIs") and the U.S. Additional Rules of Interpretation ("USARIs"). These rules are meant to be applied in sequence until the correct classification of the merchandise is clear. Because the HTSUS is so carefully crafted, the vast majority of classification cases, including this one, are determined by application of GRI 1 and USARI 1.

GRI 1 provides that classification "shall be determined according to the terms of the [relevant] headings and any relative section or chapter notes." This has been interpreted to mean that merchandise is classifiable in a heading only if "the terms of the heading and any relative section or chapter notes" provide a "complete and accurate description" of the merchandise. *Boen Hardwood Flooring, Inc., v. United States,* 254 F. Supp. 2d 1349, 1359-60 (Ct. Int'l Trade 2002). Thus, under GRI 1, merchandise that is

more than what is described in a tariff provision cannot be classified in that provision. *See id.*.

USARI 1 reads in relevant part as follows:

> (a) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use.

USARI 1 codifies longstanding Supreme Court case law holding that, with few exceptions not relevant here, the "actual use" to which a particular entry is applied after importation is irrelevant to its classification.[1]

**B. Classification of Edge-Glued Lumber under Heading 4407, HTSUS, Is Precluded By the Terms of the Heading and Relative Chapter Notes.**

This case concerns the classification of merchandise in Chapter 44, HTSUS. The first part of Chapter 44, HTSUS (Headings 4401 to 4413) provides for "wood" in various raw and semi-processed forms, including what is commonly referred to as "timber" and "lumber." The rest of Chapter 44 specifies various further manufactured wood products or "Articles of wood" (Headings 4414 to 4420), and then has a catch-all provision for unspecified "Other articles of wood" (Heading 4421).

The two competing tariff provisions here are Subheading 4421.90.9740, HTSUS/3.3% *ad valorem,*[2] where NWFP classified its edge-glued lumber at entry, and

---

[1] The Court's attention is directed to the comprehensive discussion of this case law set forth in NWFP's Motion *In Limine* to exclude argument or evidence relating to the actual use of the merchandise whose tariff classification is at issue in this refund action.

[2] This is the "general rate of duty." The general rate of duty applies to imports from countries that do not have a "special rate of duty" for the classification in question. Under the North American Free Trade Agreement, imports from Canada and Mexico now enjoy a special duty rate of "free" for all tariff classifications. However, customs officers are not allowed to classify identical merchandise differently based on its country of origin, *see* 19 U.S.C. § 1412(a); *id.* § 1502(a), let alone disregard Headquarters rulings, *see* 19 U.S.C. § 1502(b). One of the most Kafkaesque aspects of this case is that the Department of Justice is defending an interpretive position taken by lower-level officials within U.S. Customs that clearly

Subheading 4407.10.0068, HTSUS/free, where U.S. Customs reclassified the merchandise.

Heading 4407, HTSUS, reads in relevant part as follows:

| | | | |
|---|---|---|---|
| 4407 | | Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm: | |
| 4407.10.00 | 00 | Coniferous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Free |
| | 01 | Finger jointed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | | Other: | |
| | 02 | Treated with paint, stain, creosote, or other preservative . . . . | |
| | | Not treated: | |
| | 15 | Mixtures of spruce, pine, and fir ("S-P-F") . . . . . . . . . . . . . | |
| | 16 | Mixtures of western hemlock and amabilis fir ("hem-fir") . . | |
| | | Other: | |
| | * * * | * * * | |
| | | Western red cedar: | |
| | 68 | Rough . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | 69 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

Heading 4421, HTSUS, reads in relevant part as follows:

| | | | |
|---|---|---|---|
| 4421 | | Other articles of wood: | |
| 4421.10.00 | 00 | Clothes hangars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.2% |
| 4421.90 | | Other: | |
| * * * | * * * | * * * | |
| 4421.90.97 | | Other: | 3.3% |
| | 20 | Pencil slats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | 40 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

The only section or chapter note that addresses the classification of edge-glued lumber is Statistical Note 1 to Chapter 44. This chapter note states, in no uncertain terms, that Heading 4407, HTSUS "**does not include wood that** has been dressed or surfaced by planing on one or more edges or faces or **has been edge-glued**." Emphasis added.

conflicts with categorical instructions from Headquarters that edge-glued lumber may not be classified under Heading 4407, HTSUS, period. *See* Customs Service Headquarters Ruling 087616 (Aug. 20, 1990).

As indicated above, U.S. Customs has recognized this limitation in its rulings. *See* Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) ("[e]dge-glued lumber does not meet the definition of lumber in . . . heading 4407").

Applying the terms of the relevant headings and legal notes here, it is immediately apparent that the government's reclassification of NWFP's entries under Heading 4407 was incorrect. It cannot be seriously disputed that the subject merchandise fits the literal description of "wood . . . that has been edge-glued" as those terms are used in common speech.[3] And it is well-established that, unless a term is specially defined in the tariff schedules, "the term is to be construed in accordance with its common and popular meaning." *E.M. Chemicals v. United States,* 920 F.2d 910, 913 (Fed. Cir. 1990). In ascertaining common meaning, the Court may rely upon its own personal knowledge and experience and also may consult dictionaries and technical publications. *See Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789 (Fed. Cir. 1988); *Trans-Atlantic Co. v. United States,* 471 F.2d 1397, 1398 (Ct. Cust. & Pat. App. 1973). If this intrinsic evidence of legislative intent does not yield a clear answer, the Court may consider expert testimony and other extrinsic materials. *See id.; see also Weddell v. HHS,* 23 F.3d 388, 391 (Fed. Cir. 1994) ("Under the traditional rule of statutory interpretation, courts must look first to intrinsic evidence of intent (*i.e.,* the textual language) alone. If it is clear what those words would mean in the mouth of a normal speaker of English, . . . that intent will be imputed to the legislature and be enforced notwithstanding conflicting

[3] It should be noted that, absent an express limitation, tariff provisions (including exclusions) that define merchandise by a name rather than a description ("*eo nomine* provisions") — such as the exclusion of "edge-glued lumber" from Heading 4407 in the notes to Chapter 44, HTSUS — must be interpreted broadly as including **all** forms of the named article. *Nootka Packing Co. v. United States,* 22 C.C.P.A. 464, 467, 470 (1935).

agency pronouncements, or extrinsic evidence of a contrary intent.") (citations and internal quotation marks omitted).

To the extent that resort to extrinsic evidence of meaning is necessary in this case, the material submitted by NWFP in support of this motion clearly establishes that the subject merchandise is "edge-glued lumber" as that term is defined by experts in lumber industry terminology and related tariff classification nomenclature. *See* Pl.'s Prop. Find. Uncont. Fact, Ex. C (expert report of Kenneth G. Weigel); *see also* Compl. Ex. 3 (technical specifications on the glue used by NWFP); *id.* Exs. 4-6 (industry publications showing examples of edge-glued lumber similar to the lumber imported by NWFP and its uses).

Accordingly, edge-glued lumber cannot be classified under Heading 4407, HTSUS, because of the explicit and unambiguous terms of the chapter notes relative to Heading 4407, HTSUS. *See* GRI 1, HTSUS; *Sharp Microelectronics Technology, Inc. v. United States,* 122 F.3d 1446, 1461 (Fed. Cir. 1997) (rejecting argument based on extrinsic evidence that conflicted with the plain meaning of the terms of the HTSUS); *see also Express Forwarding & Storage Co. v. United States,* 60 Cust. Ct. 511, 516-17 (1968) (neither the courts nor U.S. Customs may "expand" a tariff provision, "under the guise of a 'liberal' construction, beyond the plain meaning of the terms used").

Moreover, GRI 1 would preclude the classification of edge-glued lumber under Heading 4407, HTSUS, even in the absence of any exclusionary section or chapter notes. As discussed below, edge-glued lumber cannot be classified under Heading 4407, HTSUS, because edge-gluing is not among the manufacturing processes allowed by the terms of the heading.

### C. **Headquarters Is Correct that "Edge-Glued Lumber Does not Meet the Definition of Lumber in Heading 4407."**

As U.S. Customs correctly observed in Customs Service Headquarters Ruling 087616 (Aug. 20, 1990), "[e]dge-glued lumber does not meet the definition of lumber in . . . heading 4407," HTSUS. This reasoning may be terse, but it is charged with meaning to the trained ear because of its allusion to a longstanding doctrine of customs classification law, called the "more than" doctrine. As applied in the lumber context, this doctrine holds that subjecting wood sawn lengthwise to a manufacturing process other than resawing lengthwise, planing, sanding, end-jointing (*e.g.,* finger jointing), or continuous shaping along the edges or faces (*e.g.,* tonguing and grooving) is "more than" lumber and must be classified as an article of lumber. *See, e.g., Standard Brands Paint Co. v. United States,* 62 C.C.P.A. 72, 75-76 (1975) (molding cut to specific lengths with 45 degree mitered ends "more than mere molding" and thus properly classified as picture frame parts, not bulk picture frame moldings);[4] *accord Boen Hardwood Flooring, Inc., v. United States,* 254 F. Supp. 2d 1349, 1359-60 (Ct. Int'l Trade 2002) (edge-glued wood is more than mere lumber, because edge-gluing is not among the manufacturing processes enumerated in Headings 4407 and 4409, HTSUS); *see also Atkins, Kroll & Co. v. United States,* 50 C.C.P.A. 62, 47 (1963) (affirming government's position that cross-cutting sticks to adapt them for use as broom handles transformed the duty free sticks into dutiable **broom handles**); *United States v. Swain & Boggs,* 12 C.C.A. 13, 14-15 (1923) (affirming government's position that mere cross-cutting of softwood lumber to adapt it

[4] Where the text of a tariff provision has undergone only "minor changes" from prior tariff schedules, "the high values of uniformity and predictability . . . counsel courts [and Customs] to credit prior decisions interpreting the . . . provision." *Hewlett-Packard Co. v. United States,* 189 F.3d 1346, 1349 (Fed. Cir. 1999) (citation and internal quotation marks omitted); *see also E.M. Chems., Inc. v. United States,* 923 F. Supp. 202, 207 n.5 (Ct. Int'l Trade 1996) (judicial precedent under prior tariff schedules "should be considered instructive in interpreting similar or the same nomenclature" in later tariff schedules).

for use in making bed crates of a particular design transformed the duty free lumber into dutiable **crate components**); *F.W. Myers & Co. v. United States,* 345 F. Supp. 1006, 1008 (Cust. Ct. 1972) (affirming government's position that mere cross-cutting of lumber to adapt it for use as bed frames transformed the duty free lumber into dutiable **bed frame components**);[5] *see also Express Forwarding,* 60 Cust. Ct. at 516-17.

In sum, under well-established case law, edge-glued lumber is "more than" lumber, and would not be classifiable under Heading 4407, HTSUS, even in the absence of the explicit statutory exclusion of edge-glued lumber from classification under Heading 4407, HTSUS, set forth in the notes to Chapter 44, HTSUS.

### D. The Mod Act Requires U.S. Customs to Follow Its Own Rulings Unless and Until they Are Revoked or Modified.

The Mod Act was enacted as part of the North American Free Trade Agreement ("NAFTA") Implementation Act, Pub. L. 103-182, § 623, 107 Stat. 2186 (1993). Section 623 of the NAFTA Implementation Act substantially amended Section 625 of the Tariff Act of 1930 ("the Tariff Act"), 19 U.S.C. § 1625 (2000), which had been added to the Tariff Act by Public Law 95-410 (1978). Though revolutionary at the time, the original Section 625 merely required U.S. Customs to make **all** of its rulings and decisions publicly available — not simply the binding Customs Service Decisions that the agency decided to publish in the *Customs Bulletin.* The original Section 625 provided as follows:

[5] The cited decisions were based on a number of old Supreme Court decisions that remain good law today. *See Tidewater Oil Co. v. United States,* 171 U.S. 210, 214-15, 217 (1898) (affirming government's position that merely cross-cutting boards to size for use in making packing boxes of a particular design substantially "transformed" the duty free lumber into dutiable **packing box components**) (distinguishing *Dudley v. United States,* 174 U.S. 670, 672 (1899)); *United States v. Hathaway*, 71 U.S. 404, 408 (1867) (affirming government's position that mere cross-cutting of softwood lumber to adapt it for use in making pipes and hogsheads transformed the duty free lumber into dutiable **barrel components**); *United States v. Quimby*, 71 U.S. 408, 408 (1867) (affirming government's position that mere cross-cutting of softwood lumber to adapt it for use as shovel handles transformed the duty free lumber into dutiable **shovel handles**).

> Within 120 days after issuing any precedential decision (including any ruling letter, internal advice memorandum, or protest review decision) under this chapter with respect to any customs transaction, the Secretary shall have such decision published in the *Customs Bulletin* or shall otherwise make such decision available for public inspection.

19 U.S.C. § 1625 (1988). Under the original Section 625, then, U.S. Customs had to make public its "unpublished" Customs Service Rulings. However, only Customs Service Decisions were "binding" on U.S. Customs under the existing statutory scheme. The agency could revoke or modify Customs Service Rulings retroactively and without prior notice to affected importers. *See Bayridge,* 35 F. Supp. 2d at 936-37. Thus, while importers could access Customs Service Rulings as a result of Section 625, they still could not rely on them, because they could be revoked or modified at any time without prior notice. *See id.* The inability of importers to rely on Customs Service Rulings was greatly exacerbated by the agency's practice of almost never proceeding by "binding" Customs Service Decisions.

The amendments to Section 625 completed the revolution begun in 1978 by precluding U.S. Customs from revoking or modifying Customs Service Rulings retroactively and without prior notice to importers of substantially identical merchandise. The amended Section 625 reads in relevant part as follows:

> (a) Within 90 days after the date of issuance of any interpretive ruling (including any ruling letter, or internal advice memorandum) or protest review decision under this chapter with respect to any customs transaction, the Secretary shall have such ruling or decision published in the *Customs Bulletin* or shall otherwise make such ruling or decision available for public inspection.
>
> * * *
>
> (c) Modification and revocation
>
> A proposed interpretive ruling or decision which would--

> (1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
>
> (2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;
>
> shall be published in the *Customs Bulletin.* The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.
>
> . . .

19 U.S.C. § 1625 (2000).

Though enacted as part of NAFTA, the Mod Act had been proposed three years earlier in two different forms: A bill drafted by the Joint Industry Group ("JIG"), H.R. 2512, 102nd Cong. (1991); and a bill drafted by U.S. Customs, H.R. 2589, 102nd Cong. (1991). *Bayridge,* 35 F. Supp. 2d at 938. The agency's bill proposed no amendments to Section 625 of the Tariff Act. The JIG's version, however, proposed amendments to Section 625 to implement its concept of "informed compliance" and abolish the historic (if arbitrary) power U.S. Customs had to revoke or modify the classification and treatment of particular merchandise retroactively (*i.e.,* with respect to merchandise entered but not liquidated before the revocation or modification). *See Bayridge,* 35 F. Supp. 2d at 936-38. After months of negotiations to reconcile some 75 differences, the two bills were consolidated and the consolidated bill, including JIG's proposed amendments to Section 625, was eventually enacted as Title VI of NAFTA in 1993. *Id.*

In defining the basic policy of this historic reform legislation,[6] the Conference Committee adopted the term "informed compliance," which it defined as follows:

> "Informed compliance" is premised on the belief that **importers have a right** to be informed about Customs rules and regulations, as well as interpretive rulings and other directives, and **to expect certainty that Customs will not unilaterally change the rules without providing importers with proper notice and an opportunity to respond**.

H.R. Conf. Rep. No. 102-1034, at 1208 (1992) (emphasis added).

The Conference Committee based its definition of "informed compliance" on the combined testimony by JIG and U.S. Customs offered in support of the legislation. For example, Assistant Commissioner Samuel H. Banks acknowledged that the key evil to be remedied by the new Section 625(c) was the inability of importers to rely on rulings, even ones specifically addressed to them:

SEN. MOYNIHAN: What is informed compliance?

MR. BANKS: Informed compliance is really an effort. And it was almost a demand from the industry. **We [must] do a better job of telling them what the trade rules are.** There are so many different trade agreements out there today, **it is very confusing for certain people to comply.**

SEN. MOYNIHAN: Yes

MR. BANKS: **I mean, if they want to completely, honestly comply, it is still very difficult.** And so they have asked us can we provide better information for those companies on what are the trade rules? What are the appropriate tariff classifications and duty regulations and admissibility requirements for their goods? . . . So this is really a shared responsibility. **It is a requirement that they live by the rules, but it is a requirement that we better explain the rules to them so that they can operate efficiently.**

---

[6] *See Bayridge,* 35 F. Supp. 2d at 938 ("It is clear to the Court from both the change to the statute and the goals of the industry and Customs that the Mod Act was meant to alter fundamentally the entire statutory scheme.") (citing, *inter alia,* testimony that the legislation would effect the broadest reforms of U.S. Customs law since 1789 and U.S. Customs' acknowledgment that over 50 percent of the Customs Regulations would have to be revised to implement the Mod Act).

*Opening Market Proposals, Auto Trade, and Customs Modernization: Hearings on H.R. 5100 Before the Senate Comm. on Finance,* S. Rep. No. 102-1065, at 66 (1992).

The prepared remarks Mr. Banks submitted for the record described "informed compliance" this way:

> Informed compliance is a term that was first used by the trade community. Under informed compliance, the trade community needs to know and be able to obtain advice about Customs rules and procedures; and **<u>the trade community needs certainty that those rules and procedures will not be changed suddenly.</u>**

*Id.* at 84. Responding to a question from Senator Moynihan asking if the proposed legislation signaled a move away from an adversarial relationship, JIG Chairman Aaron Cross said yes, stating that the "legislation implies that the historic adversarial relationship between industry and the Customs Service is not going to serve our interests, the United States' interests, as we go into the 21st century." *Id.* at 67. Cross also called Section 625(c) "informed compliance in its finest manifestation." *Id.* at 99.

To implement the Mod Act reforms, U.S. Customs promised Congress to overhaul the Customs Regulations, acknowledging "that 'over 50 percent" would have to be "revised," including the regulations "with respect to . . . rulings procedures." Statement of Administrative Action, NAFTA Implementation Act, H.R. Doc. No. 103-159, at 680E (1993); *see also Customs Modernization and Informed Compliance: Hearings on H.R. 3935 Before the Subcommittee on Trade of the House Committee on Ways and Means,* H.R. Rep., 102nd Cong., at 97 (1992) (Statement of Commissioner of Customs Carol Hallett) (acknowledging that the "modernization" and "informed compliance" would require regulatory "changes and new procedures relating to . . . [the] modification and revocation of prior interpretive rulings"); *see also* C. Ressin, Chief, Penalty Branch, U.S. Customs Service, Getting Informed about Informed Compliance, 4

Global Trade Talk No. 1 (Jan.-Feb. 1994) ("Customs recognizes that importers and exporters . . . need certainty that Customs and procedures will not be suddenly changed without giving the affected parties proper notice of the change and an opportunity to respond; and expect Customs to facilitate international trade while at the same time ensuring that its laws, regulations, rulings, and procedures are enforced fairly and uniformly.").

Despite its promise to Congress, and the preparation of draft implementing regulations approved by the trade community, *see Bayridge,* 35 F. Supp. 2d at 936-38, U.S. Customs refused to promulgate the regulations and, when pressed by importers of Canadian lumber products in 1998, the agency actually tried to persuade Judge Barzilay that the Mod Act did not require any changes to its ruling regulations. *See id.* at 940-41. After thoroughly examining the history set forth above, Judge Barzilay emphatically rejected this argument, calling it "absurd." *Id.* at 940.

Judge Barzilay also rejected the government's attempt to nullify the Mod Act's reforms, contrary to the clear and unambiguous language of the statute, through various narrowing interpretations. For example, the government argued unsuccessfully that Section 625(c) was optional and merely gave U.S. Customs the "discretion" to revoke or modify its rulings in accordance with the procedure set forth therein. *See id.* at 936 & 939. The government also argued unsuccessfully that Customs Service Rulings apply only to the individual who requested the ruling, and that no one else is entitled to have their entries classified in accordance with the ruling prior to its revocation or modification under Section 625(c)(1). *See id.* at 941; *see also Precision Specialty Metals, Inc. v. United States,* 182 F. Supp. 2d 1314, 1326 (Ct. Int'l Trade 2001) (rejecting the

government's argument that to establish a "previous treatment" under Section 625(c)(2), importers had to satisfy establish a "uniform and established practice" across many ports over many years involving many importers, as defined in its pre-Mod Act regulations).

Similarly, in this case, the government presumably will come up with similar arguments, such as the argument that importers cannot rely on interpretive statements in Customs Service Rulings issued to others unless their **merchandise** is **completely** identical (as opposed to the statutory standard of "substantially identical transactions"). According to this view, importers are not required to follow, and are not entitled to reply upon, the categorical instruction in Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) that "edge-glued lumber" **of any form** may not be classified under Heading 4407, HTSUS.

Such an argument would be no less absurd than the arguments rejected by Judge Barzilay in *Bayridge.* As indicated above, the whole point of Section 625(c) is to allow importers to rely on Customs Service Rulings in the same way they are able to rely on court decisions, under the doctrine of *stare decisis,* unless and until those decisions are overruled. Indeed, any such argument would be belied by the many publications by U.S. Customs warning importers that they had better follow classification instructions contained in Customs Service Rulings issued to others, even if they do not involve identical merchandise, or they will be subject to penalties for negligent misclassification. *See* S. Rep. No. 103-361, at 71 (1993) ("reasonable care" requires importers to follow **all** relevant rulings); U.S. Customs Service, What Every Member of The Trade Community Should Know About: Reasonable Care: A Checklist for Compliance (January 1998) ("Have you consulted the tariff schedules, Customs' Informed Compliance publications,

court cases **<u>and/or Customs rulings</u>** to assist you in describing and classifying [your] merchandise?") (emphasis added).[7]

The government also may argue that Section 625(c)(1) is not implicated here, because U.S. Customs has not issued an "interpretive ruling or decision" in connection with the subject entries. Like the other arguments spelled out above, such an argument would exalt form over substance, because NWFP filed a properly-supported request for an interpretive ruling with the National Import Specialist for lumber products, Mr. Paul Garretto. While the request was still pending, Mr. Garretto conferred with the local Import Specialist, Ms. Lorisa Hubsch, and told her to issue a CF-29 containing a decision, without any reasoning, reclassifying NWFP's entries under Heading 4407, HTSUS. *See* Compl. Ex. 2. These facts create the appearance that the National Import Specialist, aware that he could not issue the desired interpretive ruling to NWFP because of Section 625(c)(1) without formally revoking or modifying, *e.g.,* Customs Service Headquarters Ruling 087616 (Aug. 20, 1990),[8] and allowing NWFP's entries to liquidate as entered, deliberately attempted to circumvent the Mod Act and nullify the clear rights NWFP has under that landmark legislation.

---

[7] As the Supreme Court noted in *Mead,* 533 U.S. 218, even before the Mod Act, U.S. Customs was required to follow Customs Service Rulings in the same way, and to the same extent, that a court is bound to follow prior court decisions under the doctrine of *stare decisis. See id.* at 220 (quoting 19 C.F.R. § 177.9(a) ("In the absence of a change of practice or other modification or revocation which affects the principle of the ruling set forth in the ruling letter, that principle may be cited as authority in the disposition of transactions involving the same circumstances."); *see also Certain Administrative Procedures,* 54 Fed. Reg. 8208, 8211 (U.S. Customs 1989) (proposed rule) (because a ruling "represents the official position of the Customs Service" regarding the classification of a particular type of merchandise, "compliance" with all applicable law "clearly requires that any importer with knowledge of an official position of the Customs Service regarding the proper classification of the particular merchandise he is entering follow that classification").

[8] Since this ruling was issued in 1990, U.S. Customs has issued numerous rulings classifying various forms of edge-glued lumber as "articles of wood," and not a single ruling classifying any form of edge-glued lumber as mere "lumber." The rulings addressing the merchandise most similar to NWFP's were cited to no avail in NWFP's ruling request. *See* Pl.'s Resp. and Opp. to Def.'s Mot. to Dismiss Exs. 7 & 8.

In any event, the reclassification announced in the CF-29 fits the literal description of Section 625(c)(1) because it is an "interpretive decision," and U.S. Customs could not issue the decision lawfully under Section 625(c)(1) without formally revoking or modifying **all** of its many rulings holding that edge-glued lumber cannot be classified in Heading 4407, HTSUS, and allowing all past entries to liquidate as entered. *See Bayridge,* 35 F. Supp. 2d at 935-36, 942 (recognizing that the terms of Section 625(c) clearly and unambiguously entitles importers to rely upon Customs Service Rulings addressing "substantially identical transactions" unless and until those rulings are revoked or modified *mutatis mutandis*). Thus, the government's assessment of cash deposits against NWFP, based on its interpretive decision, was unlawful under the Mod Act in addition to being incorrect as a matter of substantive tariff classification law.

The Mod Act will become a monument to legislative futility, and a cruel hoax, if U.S. Customs is allowed to circumvent its clear and unambiguous commands by trickery and evasion. The Court of International Trade has made this point twice now, and U.S. Customs still doesn't get it. This Court should follow the lead of the Court of International Trade in *Bayridge* and *Precision Specialty Metals* and reject this latest attempt by U.S. Customs to repeal the Mod Act by administrative fiat.

## VI. CONCLUSION

There are no genuine issues of material fact, and NWFP is entitled to judgment as a matter of law on its Tucker Act refund claim. Accordingly, NWFP's Motion for Summary Judgment must be GRANTED.

Respectfully submitted,

Date: February 20, 2004

/s/*A. Woodson Stuart*

A. Woodson Stuart, Esq.
JONES & STUART, LLP
2300 M Street, NW, Suite 800
Washington, D.C. 20037
Tel: (202) 297-3196
Fax: (202) 338-0270

*Attorney for Plaintiff NWFP*