REPLY IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE*

In the

# United States Court of Federal Claims

No. 03-2485C (Braden, J.)

FOREST PRODUCTS NORTHWEST, INC.,

*Plaintiff,*

*v.*

UNITED STATES OF AMERICA,

*Defendant.*

Reply in Support of Plaintiff's Motion *In Limine*

A. Woodson Stuart
JONES & STUART, LLP
2300 M Street, NW, Suite 800
Washington, D.C. 20037
Tel: (202) 297-3196
Fax: (202) 338-0270

Date: March 2, 2004

*Attorney for the Plaintiff*

**I. INTRODUCTION**..........1

**II. ARGUMENT**..........1

**A. NWFP's Motion *In Limine* Is Unopposed and Properly Granted on that Basis Alone.**..........1

**B. The Government's "No Recognized Commercial Identity or Use" Argument Is Irrelevant and Incorrect.**..........4

**C. Use Is "Irrelevant" to Classification in this Case.**..........8

**D. Mr. Garretto's Unsigned Declaration Is not Properly Before the Court and Should Be Disregarded.**..........13

**III. CONCLUSION**..........20

## TABLE OF AUTHORITIES

*Cases*

*American Bayridge Corp. v. United States,* 35 F. Supp. 2d 922 (Ct. Int'l Trade 1998), *vacated in part without pub. op.*, 1999 WL 997303 (Fed. Cir. Oct. 26, 1999) .............10

*American Textile Mfrs. Institute v. Donovan,* 452 U.S. 490 (1981) ..........................................14

*Arbor Foods, Inc. v. United States,* 9 C.I.T. 119 (1985)..........................................................6

*Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204 (1988) ........................................................14

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ................................................14

*Commerical Aluminum Cookware v. United States,* 938 F. Supp.875 (Ct. Int'l Trade 1996).........................................................................................8

*Dudley v. United States,* 174 U.S. 670 (1899) ...................................................................11, 12

*Esco Manufacturing Co. v. United States,* 393 F.Supp. 608 (Cust. Ct. 1975)...........................12

*Estate of Detwiler v. Offenbecher,* 728 F. Supp. 103 (S.D.N.Y. 1989).....................................16

*Evers v. General Motors,* 770 F.2d 984 (11th Cir. 1985).........................................................16

*General Twine Corp. v. United States,* 42 Cust. Ct. 121 (1959) ...............................................12

*Hawaiian Motor Co. v. United States,* 473 F. Supp. 787 (Cust. Ct. 1979) ...........................3, 12

*Heartland By-Products, Inc. v. United States,* 264 F.3d 1126 (Fed. Cir. 2001)....................7, 14

*Heartland By-Prods., Inc. v. United States*, 223 F. Supp. 2d 1317 (Ct. Int'l Trade 2002).....................................................................................1, 9

*Heartland By-Products, Inc. v. United States,* 74 F. Supp. 2d 1324 (Ct. Int'l Trade 1999).........................................................................................7

*In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 187 (2nd Cir. 1987), *cert denied,* 487 U.S. 1234 (1988).....................................................................16

*In re Orthopedic Bone Screw Prod. Liab. Litig.* 1996 WL 900345 (E.D. Pa. 1996)..................16

*Key Pharmaceuticals v. Hercon Labs.*, 161 F.3d 709 (Fed. Cir. 1998)....................................8

*Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 1997 WL 757706 (D.N.J. 1997) ................16

*Magone v. Luckemeyer*, 139 U.S. 612 (1891) ...................................................................1, 2, 3

*Mercantile Stores Co. v. United States*, 36 Cust. Ct. 354 (1957) ......................................*passim*

*Merritt v. Welsh*, 104 U.S. 694 (1881) ..................................................................................*passim*

*Michaelian & Kohlberg, Inc. v. United States*, 22 C.C.P.A. 551 (1935)...............................6, 13

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333 (7th Cir. 1989)......................16

*Mita Copystar America v. United States*, 21 F.3d 1079 (Fed. Cir. 1994)....................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983)..............14

*Nootka Packing Co. v. United States*, 22 C.C.P.A. 464 (1935)................................................12

*Piester v. IBM*, 929 F. Supp. 595 (D.R.I. 1996) .......................................................................16

*Pistorino & Co. v. United States*, 287 F.Supp. 978 (1968)...........................................11, 12, 19

*Reed v. Binder*, 165 F.R.D. 424 (D.N.J. 1996) ..........................................................................16

*Salgado v. General Motors*, 1997 WL 106282 (N.D. Ill. 1997)...............................................16

*Savannah Sugar Ref'g Corp. v. United States*, 20 C.C.P.A. 272 (1932) .................................6

*Schott Optical Glass, Inc. v. United States*, 750 F.2d 62 (Fed. Cir. 1984) .................................8

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947)..............................................................................14

*Tidewater Oil Co. v. United States*, 171 U.S. 210 (1898)........................................................18

*United States v. Aetna Explosives Co.*, 256 U.S. 402 (1920) ....................................................6

*United States v. Citroen*, 223 U.S. 407 (1911) .......................................................................*passim*

*United States v. Levitt*, 26 Fed. Cas. 919 (D. Mass. 1842) ...................................................5, 13

*United States v. Quon Quon*, 46 C.C.P.A. 70 (1959) ...........................................................*passim*

*Statutes*

Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202 note:

Section XVI, Gen. Note 2, HTSUS ....................10

Chapter 44, Stat. Note 1 ....................9, 13

Heading 4407 ....................8, 9, 13

Subheading 4415.20.0000....................12

Heading 4418....................8

Heading 4421 ....................13

Chapter 84....................10

Chapter 85....................10

Subheading 9817.00.50....................10

General Rule of Interpretation 2(a)....................18

U.S. Additional Rule of Interpretation 1(a) ....................11

28 U.S.C. § 1746....................13, 15

*Court Rules*

Rule 7.1, Rules of the U.S. Court of Federal Claims....................13

Rule 7.2, Rules of the U.S. Court of Federal Claims ....................13

Rule 56(a), Rules of the U.S. Court of Federal Claims ....................14

Rule 56.1(a), Rules of the U.S. Court of Federal Claims ....................14

Rule 56(e), Rules of the U.S. Court of Federal Claims ....................15

Rule 802 *et seq.*, Federal Rules of Evidence ....................16

Rule 910(a)(1), Federal Rules of Evidence....................14

Rule 910(7), Federal Rules of Evidence....................14

Rule 1003, Federal Rules of Evidence ........ 14

Rule 1004(3), Federal Rules of Evidence ........ 14

Rule 1005, Federal Rules of Evidence ........ 14

*Administrative Materials*

Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) ........ 13

Customs Service Ruling G86397 (Feb. 15, 2001) ........ 10

COMES NOW Plaintiff, Forest Products Northwest, Inc., doing business as Northwest Forest Products ("NWFP"), by and through its attorneys, JONES & STUART, LLP, and A. Woodson Stuart, Esq., 2300 M Street, NW, Suite 800, Washington, D.C. 20037, Tel: (202) 297-3196, Fax: (202) 338-0270, and respectfully submits this reply in support of its Motion *In Limine*, and states the following:

## I. INTRODUCTION

While the government argues that NWFP's *in limine* motion is "premature," it proceeds to dump willy-nilly into the record the very irrelevant and inflammatory material that NWFP is seeking to exclude in its Motion *In Limine* and to keep private in its co-pending motion for a protective order. Such sharp practices would be bad enough if they were not part of a broader pattern of incivility and disrespect the law and this Court's authority. But they are. *See, e.g., Heartland By-Prods., Inc. v. United States*, 223 F. Supp. 2d 1317, 1331-32 (Ct. Int'l Trade 2002) (Ex. A). For this reason, and for the reasons set forth below, the NWFP's Motion *In Limine* should be granted summarily.

## II. ARGUMENT

### A. NWFP's Motion *In Limine* Is Unopposed and Properly Granted on that Basis Alone.

It is not entirely clear why the government characterizes its response to NWFP's Motion *In Limine* as an "opposition," and (improperly) fills the record with material related to post-importation processing and the condition of the subject merchandise after such processing, in view of its statement that "[w]e do not dispute Forest Products' assertion that, as a fundamental principle of classification [sic], merchandise is to be classified in its condition as imported." Def.'s Resp. to Pl.'s Motion *In Limine* at 7. That

is all NWFP is saying in its Motion *In Limine*.[1] The quoted statement amounts to a concession that argument and evidence related to post-importation processing and the condition of the merchandise after such processing is legally irrelevant and "properly excluded" from the evidentiary record in this case. *Magone v. Luckemeyer,* 139 U.S. 612, 614 (1891).

The government states in its brief that "[c]ontrary to [NWFP]'s assertion, *Magone* did not address exclusion of evidence at trial," but instead "discussed what particular jury instructions would be excluded" and that "the question of exclusion of jury instructions is irrelevant" at this stage of the proceedings. Def's Resp. to Pl.'s Motion *In Limine* at 5 n.1. This is not correct.

In *Magone*, the Supreme Court held that the importer's addition of an imperceptible amount of cotton to wool thread removed garments made from the thread from the tariff provision for garments made "wholly of wool," regardless of the fact that the "purpose of introducing the cotton . . . was to change the classification of the goods." 139 U.S. at 614. In the course of its ruling, the Court had occasion to address an evidentiary objection to testimony at trial concerning the commercial identity and use of the garments made from the thread and, specifically, whether they were regarded as "all wool" garments in the trade. The lower court sustained the objection, and the Supreme Court affirmed:

> It is assigned for error, that the court sustained the objection to a question put by the defendant to a witness, as to whether the goods in question were bought and sold in this country as all-wool goods. The objection was made on the ground that the question was irrelevant. We think that the question was properly excluded. Judgment affirmed.

[1] *See* Pl.'s Mot. *In Limine,* Proposed Order (seeking the exclusion of "any argument or evidence . . . regarding the post-importation processing of the subject merchandise or the form or condition of the merchandise after such processing").

*Id.* In this passage, the Supreme Court is clearly saying that evidence of the recognized commercial identity and use of imported merchandise is "properly excluded" as "irrelevant" to its customs classification. The Court's discussion of the jury instructions occurs earlier in its opinion, in connection with an entirely different assignment of error. *See id.* Thus, what the government says about *Magone* is clearly false and should be disregarded.

Moreover, the government simply ignored the other controlling precedent cited by NWFP, *Hawaiian Motor Co. v. United States*, 473 F. Supp. 787 (Cust. Ct. 1979), where the court excluded evidence of the actual use intended by the importer as "irrelevant on the issue of chief use" and not "properly . . . considered by the court in connection with classification of the imported merchandise." *Id.* at 788.

Finally, the government is ignoring the important public policy behind the rule that post-importation events are irrelevant to customs classification outside of the context of actual use provisions. As Judge Michel explained in *Mita Copystar America v. United States*, 21 F.3d 1079 (Fed. Cir. 1994):

> It is well settled law that merchandise is classified according to its condition when imported. *United States v. Citroen*, 223 U.S. 407, 414-15 (1911). If the rule were otherwise, not only could the same product be subject to different duty rates depending on its intended end use, but **<u>Customs would be flooded with affidavits or other evidence of differing intended uses</u>**. Moreover, Customs would have **<u>no way of determining whether the merchandise was actually used</u>** for its alleged intended purpose after importation. . . . [There is nothing] in the instant tariff provision that suggests that it is proper to refer to [events] after importation for purposes of classifying merchandise.

*Id.* at 1082 (emphasis added). Thus, the position on actual use taken by U.S. Customs in the Canadian lumber area, if applied generally, not only would destroy the uniformity,

certainty, and predictability that the rule of *Citroen* is supposed to have established, **but would cause the entire administrative system to crash**.[2]

Moreover, even if the Department of Homeland Security could handle the load, given the current threat of international terrorism, it is bad public policy to adopt a rule that would require the diversion of substantial agency resources to conducting end-use investigations of every entry of merchandise that comes into the United States.

In sum, the government has conceded the premise of NWFP's Motion *In Limine*, and that premise is based on a solid foundation of policy and precedent. NWFP's motion should be granted on that basis alone, without regard to the argument and evidence that the government improperly appended to its "opposition" to the motion.

### B. The Government's "No Recognized Commercial Identity or Use" Argument Is Irrelevant and Incorrect.

Despite its ultimate concession to the contrary, the government argues at pages 6-7 of its brief that "[t]he use of Forest Products' wood after importation is relevant for classification purposes because the processing involved in this case is an artifice and in its condition as imported, the wood has no recognized commercial identity or use." This argument is not relevant to any of the issues presently before the Court, because NWFP has not requested the exclusion of argument or evidence relating to the existence or non-existence of a recognized commercial use for the subject merchandise in its condition as imported. Indeed, NWFP itself has submitted argument and evidence of the existence of

---

[2] Contrary to the government's suggestion, the *Citroen* Court **rejected** the argument that the importer had engaged in "artifice or disguise" in unstringing her pearl necklace prior to importation solely to avoid the duty on jewelry. The Court merely acknowledged the truism, in *obiter dicta*, that duties cannot be avoided lawfully by "artifice or disguise." The same can be said of *Merritt v. Welsh*, 104 U. S. 694 (1881), and *Mercantile Stores Co. v. United States*, 36 Cust. Ct. 354 (1956). The courts in both of those cases ruled for the importer and merely acknowledged the truism, in *obiter dicta*, that duties cannot be avoided lawfully by "artifice or disguise."

a recognized commercial use for the subject merchandise. *See* Pl.'s Mot. *In Limine* at 9-10; Compl. ¶¶ 14-17 and Exs. 3-6. Thus, the argument recited at pages 6 through 9 of the government's brief is not relevant to the motion presently before the Court. It belongs in the government's opposition to NWFP's Motion for Summary Judgment, which is due on March 22, 2004.

This government's gratuitous argument is also a *non sequitur*: The conclusion that NWFP's edge-glued lumber has no recognized commercial identity or use in its imported condition does not follow from the premise that NWFP is ripping the lumber along the glue line after importation. The case law set forth in NWFP's Motion *In Limine* clearly establishes that: (1) "actual use" and "recognized commercial identity or use" are analytically distinct concepts; and (2) the actual use to which an entry of merchandise is applied cannot alter its recognized commercial identity or use at importation. *See* Pl.'s Mot. *In Limine* at 2-10.

For example, in *United States v. Levitt*, 26 Fed. Cas. 919 (D. Mass. 1842), the fact that the importer melted down the lead busts after importation did not mean that they were not commercially recognized as "busts of metal" at importation.

In *United States v. Citroen*, 223 U.S. 407 (1912), the fact that the importer restrung the matched set of drilled pearls after importation did not mean that they were not commercially recognized as "drilled pearls" at importation.

In *Mercantile Stores Co. v. United States*, 36 Cust. Ct. 354 (1956), the fact that the importer removed the lace from its articles after importation did not mean that the articles were not commercially recognized as "articles made in part of lace" at importation, even though the lace was poorly fastened.

And in *Michaelian & Kohlberg, Inc. v. United States*, 22 C.C.P.A. 551 (1935), the fact that the importer expected buyers to remove the embroidered dragon from its rugs after importation did not mean that the articles were not commercially recognized as genuine "embroidered articles" at importation, even though the embroidery was poorly fastened.[3]

The foregoing analysis is confirmed by an examination of the only three reported cases of which NWFP is aware, all involving the use of additives in liquids, in which the government has succeeded in establishing the lack of any commercially recognized identity or use for imported mixture.[4] In each of these cases, the test was whether there was any recognized commercial use for the liquid in its imported condition --- not whether the importer removed the additive after importation.

Moreover, these three cases are inapposite here, because edge-gluing lumber involves a substantial and costly manufacturing process that cannot be readily reversed, and there is no genuine dispute that the subject edge-glued lumber would be commercially recognized as such in the trade. *See id.*; Compl. Ex. 3; Expert Report and Declaration of Kenneth G. Weigel, ¶ 20; *see also Quon*, 46 C.C.P.A. at 73 (citing "cases involving **different** articles tends more to obscure the issue than to answer it") (emphasis in original).

---

[3] Contrary to the suggestion at page 8 of the government's brief, none of the cases just cited involved the importation of intermediate articles (*i.e.*, parts) to avoid a duty on ultimate articles, and the government has not explained how that makes a difference when the "fundamental principle of classification" that the government concedes makes any form of post-importation processing irrelevant, not just post-importation processing of intermediate articles into ultimate articles.

[4] The three cases are: *United States v. Aetna Explosives Co.*, 256 U.S. 402 (1920), *aff'g* 9 C.C.A. 298, 306 (1919), *Savannah Sugar Ref'g Corp. v. United States*, 20 C.C.P.A. 272 (1932), and *Arbor Foods, Inc. v. United States*, 9 C.I.T. 119 (1985). *But see Merritt v. Welsh*, 104 U. S. 694 (1881).

Contrary to the government's suggestion, the court in *Heartland By-Products, Inc. v. United States*, 264 F.3d 1126 (Fed. Cir. 2001), did not hold that the imported mixture had no recognized commercial identity or use in its imported condition and therefore was a mere "artifice or disguise" within the meaning of the *Citroen dicta*. The Federal Circuit ruled for the government on a narrower ground and did not reach that issue. *See id.* ("We . . . uphold the classification of the syrup under 1702.90.10/20 HTSUS. In view of that holding, we need not address the other arguments raised by the parties on appeal.").

The Federal Circuit had good reason not to reach the issue: The government had not put in any affidavit or other evidence below to support its argument that there was no recognized commercial identity or use for the subject merchandise in its imported condition, and the Federal Circuit would have had no choice but to affirm Judge Barzilay's decision on that issue. *See Heartland By-Products, Inc. v. United States*, 74 F. Supp. 2d 1324, 1337-38 (Ct. Int'l Trade 1999) ("Customs had no record evidence on which to conclude that the sugar syrup produced in its condition in Canada was not at an intermediate stage of production. In fact, the record evidence shows that the process of combining granular raw sugar with molasses, adding water and heating is common in sugar refining operations.").[5]

While Senior Judge Friedman cited the *Citroen dicta* in his concurrence, there was no evidentiary foundation in the record to support its application in the case before him. In other words, all of the authority cited by the government to support its argument

---

[5] Judge Barzilay's opinion (attached hereto as Ex. B) contains a scholarly discussion of the history of the *Merritt-Worthington* doctrine and its application to the facts before her. *See* 74 F. Supp. 2d at 1338-44. This discussion was not disturbed in any way by the Federal Circuit's decision to reverse Judge Barzilay's judgment on a different ground. This Court is therefore free to consult the discussion in evaluating the government's virtually-identical argument in this case.

that NWFP has engaged in "artifice or disguise" in this case is either *dicta* from a case where the government lost that precise argument (*Citroen*, *Merritt*, and *Mercantile Stores*) or double *dicta* in an opinion that has no legal force or effect as precedent (Judge Friedman's concurrence in *Heartland*).

In short, the three exceptional cases in which the government has succeeded in establishing the lack of any commercially recognized identity or use do not support the government's position in this case.

**C. Use Is "Irrelevant" to Classification in this Case.**

The government's argument, at page 7 of its brief, that "courts have consistently considered use" in determining classification, is inconsistent with the government's concession that classification is to be determined by the condition of the merchandise as imported. Accordingly, this argument should be disregarded.

The government's argument that use is relevant to classification under Heading 4407, HTSUS, also should be disregarded because it is inconsistent with the position taken by the government and accepted by Judge Barzilay in *American Bayridge Corp. v. United States*, 35 F. Supp. 2d 922 (Ct. Int'l Trade 1998), *vacated in part without pub. op.*, 1999 WL 997303 (Fed. Cir. Oct. 26, 1999). *See* Pl.'s First Citation of Supp. Auth. in Supp. Mot. *In Limine* Ex. A ("neither heading 4407 nor heading 4418 are 'use' provisions, the statutory language does not expressly turn on 'use,' and implying 'use' restrictions . . . is strongly disfavored in the judicial decisions") (citing *Commercial Alum. Cookware v. United States*, 938 F. Supp. 875, 883 (Ct. Int'l Trade 1996)); *see also Key Pharms. v. Hercon Labs.*, 161 F.3d 709, 715 n.1 (Fed. Cir. 1998) (recognizing the doctrine of judicial estoppel and collecting cases); *Schott Optical Glass, Inc. v. United States*, 750 F.2d 62, 64 (Fed. Cir. 1984) (applying the doctrine of *stare decisis* to the

United States in a customs case); *cf. Heartland By-Prods., Inc. v. United States,* 223 F. Supp. 2d 1317, 1331-32 (Ct. Int'l Trade 2002) (admonishing U.S. Customs for disregarding the court's decision before the appellate process was complete).

Even if the government's argument that actual use is relevant to classification in this case is considered, the only authority cited, *United States, v. Quon Quon Co.,* 46 C.C.P.A. 70 (1959), stands for no more than the unexceptionable proposition that an *eo nomine* provision for parts of a specified article impliedly includes all merchandise principally used as parts for the specified article. *See id.* at 72-73. Before addressing this case in more depth, a brief review of the different types of tariff provisions is necessary to avoid confusion.

There are five basic types of tariff provisions: (1) Descriptive; (2) "actual use"; (3) "principal use"; (4) *"eo nomine"*; and (5) "*eo nomine* by use." Each of these will be described briefly in turn.

1. *Descriptive Provisions*

A descriptive provision is one that describes merchandise in terms of the material from which it is made or the manufacturing processes to which the material has been subjected. Heading 4407, HTSUS, is a classic example of a descriptive provision,[6] as the government successfully argued in *Bayridge. See* Pl.'s First Citation of Supp. Auth. Ex. A. Neither the "actual use" of the merchandise by the importer, nor the "principal use" of merchandise with the same physical characteristics in the industry generally, is relevant to classification under a descriptive provision. The exclusion of "wood that . . . has been

[6] "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm: . . . ."

edge-glued" from Heading 4407, Stat. Note 1, Ch. 44, HTSUS, is probably most accurately described as a descriptive provision.

2. *Actual Use*

Under an "actual use" provision, identical merchandise can be classified differently depending on the actual end use to which the merchandise is applied. For example, to promote agriculture, Congress has expressly provided duty free treatment for "machinery, equipment and implements to be used for agricultural or horticultural purposes." Subheading 9817.00.50, HTSUS. This provision covers all "machinery, equipment and implements" actually used "for agricultural or horticultural purposes," even if the actual use is not the only use or even the principal use of the items in the United States generally at the time of importation and the items are more completely, accurately, and specifically described in another HTSUS heading (*e.g.*, automobiles). As the correctly argued in *Bayridge*, actual use provisions are disfavored in the law and may not be found by implication. It is for the same reasons that even when explicit, actual use provisions are narrowly construed. For example, in Customs Service Ruling G86397 (Feb. 15, 2001), U.S. Customs classified certain electric fence energizers actually used on farms and ranches under the *eo nomine* provision for "electric fence energizers" rather than Subheading 9817.00.50, HTSUS, on the ground that energizers do not fit the literal description of "machinery, equipment and implements."

3. *Principal Use*

Principal use provisions cover merchandise that is suitable for use solely or principally in a specific application. For example, General Note 2 to Section XVI, HTSUS, states that, subject to certain exclusions found in other notes, machine parts that

are not more specifically provided for in Chapters 84 and 85, HTSUS, are to be classified in the same provision as the machine for which they are parts, if the items are "suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading . . . ."

Classification in principal use provisions is **not** determined by the actual use of a particular entry (after further modification or otherwise), but by the most frequent use of such merchandise in its imported condition not counting actual uses that destroy the very feature that suits the merchandise to its principal use. *See, e.g.*, *Pistorino & Co. v. United States*, 287 F. Supp. 978, 985 (1968) ("The nature of the alternative uses of the imported shapes presented by plaintiff, i.e., as jacks, spreaders, and sliders, is the principal area in which the evidence presented at the rehearing has proved enlightening. We are now able to conclude that to the extent that such uses are prevalent they are in negation of the peculiarities of design possessed by the importations."); *see also* U.S. Additional Rule of Interp. 1(a), HTSUS ("a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States **at, or immediately prior to, the date of importation**, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use.") (emphasis added). Thus, unlike actual use provisions, principal use provisions are not as disfavored and sometimes are found by implication. This topic is addressed in the discussion of *eo nomine* provisions below.

4. *Eo Nomine*

*Eo nomine* provisions describe merchandise "by name," usually one used in the trade. The provisions for "lumber" in pre-HTSUS tariff schedules furnish a relevant

example. *See, e.g., Dudley v. United States,* 174 U.S. 670 (1899). *Eo nomine* designations are broadly construed as encompassing all forms of the named article, including both raw and highly processed forms. *Nootka Packing Co. v. United States,* 22 C.C.P.A. 464, 467, 470 (1935); *see, e.g., Dudley,* 174 U.S. 670.

The actual use to which a particular entry is applied after importation is irrelevant to classification under an *eo nomine* designation providing for the merchandise by name (unless Congress explicitly states otherwise). A slightly different rule obtains with respect to principal use, however. Some *eo nomine* designations imply or connote a particular principal use. These are called "*eo nomine* by use" designations. *See, e.g., Quon*, 46 C.C.P.A. at 72-73.

5. *"Eo Nomine by Use"*

An "*eo nomine* by use" provision designates merchandise by a name indicative of use. *See, e.g., Esco Manufacturing Co. v. United States,* 393 F. Supp. 608, 610-11 (Cust. Ct. 1975) (provision for "Chrismas tree lights"). Examples of such provisions include Subheading 4415.20.0000, HTSUS, which provides for "Pallets, box-pallets and other load boards; pallet collars."

As the government has correctly observed, "use is an important consideration in determining the scope of a designation by name" that is indicative of a particular use. *General Twine Corp. v. United States,* 42 Cust. Ct. 121, 134 (1959); *accord Quon,* 46 C.C.P.A. at 72-73. The government is incorrect, however, in suggesting that the word "use" in this context means "actual use." *See, e.g., Hawaiian Motors,* 473 F. Supp. at 788 (actual use is "irrelevant" on the issue of principal use, and not "properly . . .

considered by the court in connection with classification of the imported merchandise"); *Pistorino*, 287 F. Supp. at 986 (same).

6. *Quon Is Inapposite.*

The principle that "use is an important consideration in determining the scope" of an "*eo nomine* by use" provision has no application here. The only relevant *eo nomine* designation in this case is "edge-glued lumber." However, "edge-glued lumber" is a term used by U.S. Customs that does not appear anywhere in the competing tariff headings (Headings 4407 and 4421, HTSUS). *Compare* Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) ("[e]dge-glued lumber does not meet the definition of lumber in . . . heading 4407," HTSUS) *with* Stat. Note 1, Ch. 44, HTSUS (heading 4407 does not include "wood that has been . . . edge glued").

In sum, like the provisions at issue in *Levitt* ("busts of metal"), *Mercantile Stores* ("articles made in part of lace"), *Michaelian* & *Kohlberg* ("embroidered articles"), the phrase "wood that has been edge-glued" is a descriptive provision that does not imply or connote any particular use. Thus, *Quon* has no relevance here, and even if it did, it would not allow the introduction of argument or evidence relating to the **actual** use of the subject entries.

**D. Mr. Garretto's Unsigned Declaration Is not Properly Before the Court and Should Be Disregarded.**

The declaration filed by Mr. Garretto is not signed and therefore is not valid under 28 U.S.C. § 1746. Accordingly, the document does not qualify as an "affidavit" within the meaning of RCFC Rules 7.1 and 7.2 and is not properly before the Court.

In addition to being invalid, there are a number of other reasons why most, if not all, of Mr. Garretto's unsigned declaration should be disregarded.

1. *An Agency Decision May Be Upheld Only on the Basis of Reasoning Articulated by the Agency in its Decision.*

It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency in its decision and that, accordingly, courts may not accept appellate counsel's *post hoc* rationalizations for the decision or mere litigating positions unsupported by agency rulings and regulations. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988); *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *American Textile Mfrs. Institute v. Donovan*, 452 U.S. 490, 539 (1981); *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962); *SEC v. Chenery Corp.*, 332 U.S. 194, 196-197 (1947).[7] The classification decision under review in this case is embodied in a CF-29. *See* Compl. Ex. 2. This decision recites no findings or conclusions and sets forth no reasoning at all. It is therefore invalid as a matter of administrative law.[8] Mr. Garretto cannot be allowed to supply this omission by filing a declaration in judicial review proceedings --- especially when the omission appears to have been deliberate. What Mr. Garretto deliberately fails to mention is that he directed the local import Specialist, Lorisa Hubsch, to issue the CF-29 without opinon even though he had a request for a formal classification ruling covering the same entries pending before him. *See* Pl.'s Opp. Mot. Dismiss at 6-7. This presumably was done in

[7] Contrary to the government's suggestion, NWFP's Motion for Summary Judgment is supported by properly-authenticated duplicates of all the material documents in the administrative record, *see* Fed. R. Evid. Rule 901(a)(1) & (7), Rule 1003, Rule 1004(3)and Rule 1005, in accordance with the procedure set forth in RCFC Rule 56(a) and Rule 56.l(a).

[8] Contrary to the government's suggestion, no judicial deference of any kind is owed to an agency decision that contains no reasoning. *See* Pl.'s Mot. for Summ. J. at 4-5. The Federal Circuit's decision in *Heartland* is clearly distinguishable on that basis (and also because the tariff provisions at issue in *Heartland* were ambiguous). Indeed, as *Bowen* and the other decisions cited above on page 13 indicate, an agency decision that contains no reasoning cannot be sustained. In this case, that means the Court should set aside the agency's classification decision and determine the correct classification on its own based on the record before the Court. *See* Pl.'s Mot. for Summ. J. at 6.

an attempt to avoid the restrictions on issuing interpretive rulings that have the effect of modifying a prior ruling. *See* Pl.'s Mot. for Summ. J. at 19; Compl. ¶¶ l0, 25, 35 & 42. Contrary to Mr. Garretto's suggestion, it was because of this action that NWFP withdrew its ruling request --- not because of the allegedly "sloppy" nature of the edge-gluing on the samples submitted to him with the request. Mr. Garretto must not be aware that **identical samples**, cut from identical pieces, have been duly filed in this case and are **before the Court**. These samples speak for themselves and clearly contradict Mr. Garretto's asseveration that the gluing is either "sloppy" or "temporary."

2. *Mr. Garretto Is not Competent to Testify About What Other People Have Seen or Heard.*

In addition to relying on his copy of the samples before the Court, Mr. Garretto cites the following samples of subject merchandise in his unsigned declaration: (a) samples collected by field officers from unidentified entries, *see* Garretto Decl. ¶ 11; and (b) samples that other field officers supposedly saw on a "visit" made to NWFP's facilities under false pretenses, *id.* ¶ 9; *see* Pl.'s Opp. to Def.'s Mot. to Dismiss at 5. On information and belief, these samples are substantially identical to the samples before the Court. However, neither NWFP nor the Court has any way of knowing on this record, because Mr. Garretto has chosen not to file the samples or even photographs of the samples.[9]

Affidavits and declarations not only must be signed, but must be made on personal knowledge and must set forth facts that would be admissible in evidence. *See* 28 U.S.C. § 1746; RCFC Rule 56(e). Mr. Garretto apparently has no personal knowledge

---

[9] Ironically, Mr. Garretto recently refused to issue a ruling to NWFP on a completely different edge-glued lumber product on the ground that NWFP failed to submit a sample of every dimensional variation it might be importing under the ruling. He would never accept *ipse dixit* in a declaration as a substitute for samples and photographs, yet expects this Court to do so.

of the samples referred to in paragraphs 9 and 11 of his unsigned declaration. *See* Garretto Decl. ¶ 11 (noting that the samples are in Blaine, Washington). And while he has personal knowledge of what people who have seen the samples told him, their statements constitute inadmissible hearsay because they are being offered to prove the truth of the matter asserted and no exception to the hearsay rule applies. *See* Fed. R. Evid. 802 *et seq.*

In addition, Mr. Garretto's unsigned declaration is clearly deficient under the law governing the form and content of expert submissions. Courts routinely strike expert declarations that are conclusory or fail to disclose fully the underlying bases of the opinions stated. *See, e.g., Mid-State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989); *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 187, 193 (2nd Cir. 1987), *cert. denied*, 487 U.S. 1234 (1988); *Evers v General Motors,* 770 F.2d 984, 986 (11th Cir. 1985); *Estate of Detwiler v. Offenbecher,* 728 F. Supp. 103, 140 (S.D.N.Y. 1989).[10]

3. *Mr. Garretto Is not Qualified to Provide an Expert Legal Opinion.*

Mr. Garretto states in his unsigned declaration that NWFP has engaged in "artifice" or "disguise." *See* Garretto Decl. ¶¶ 12-13. These are legal conclusions based on the interpretation of judicial decisions. While Mr. Garretto mentions that he has been a Commodity Specialist since 1976 and issues "rulings" in that capacity, he apparently is not even an attorney --- let alone an expert on the *Merritt-Worthington* doctrine, **which**

[10] For decisions excluding experts at trial based on deficient expert disclosures, see, e.g., *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 1997 WL 757706, at *10 (D.N.J. 1997); *Salgado v. General Motors*, 1997 WL 106282 at *2 (N.D. Ill. 1997); *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996); *Piester v. IBM*, 929 F. Supp. 595, 599 (D.R.I. 1996); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 1996 WL 900345, at *3 (E.D. Pa. 1996).

**<u>he apparently rejects</u>**. It is perhaps not surprising, therefore, that rulings issued by non-lawyer commodity specialists (as opposed to rulings issued by the Office of Regulations and Rulings) virtually never cite or take account of judicial decisions, even when they are controlling and are cited by importers. This is a case in point. Mr. Garretto could not have cared less about the *Merritt-Worthington* doctrine when NWFP cited it to him, or else he would not have had Ms. Hubsch issue the CF-29 effectively mooting NWFP's ruling request.

In short, even if he had disclosed fully the underlying basis of his legal opinion, Mr. Garretto would not be qualified to opine that NWFP engaged in "artifice" and "disguise" as those terms are used in the judicial decisions discussed above and in NWFP's Motion *In Limine.*

4. *Mr. Garretto's Technical Opinion Regarding Commercial Identity and Use Has no Credibility.*

In his unsigned declaration, Mr. Garretto makes self-serving statements[11] denying the commercial identity and use of the subject merchandise. These statements are contradicted by overwhelming evidence in the record --- which Mr. Garretto does not even address, let alone rebut with counter-evidence.

First, Mr. Garretto says that the NWFP used a "temporary gluing process" and that this can be seen in "the condition of the glue line" on the sample. *See* Garretto Decl. ¶¶ 9 & 12. The Court can see for itself that Mr. Garretto is misstating the facts by examining the samples in the record, because they are cut from the same pieces as the samples Mr. Garretto is purporting to describe.

---

[11] It should be noted that Mr. Garretto is the person whose decision is under review, and he has a substantial personal and professional investment in the case that is properly considered by the Court in assessing his credibility.

Second, Mr. Garretto states in paragraph 6 of his unsigned declaration that "[i]n the trade, edge-glued wood is manufactured with narrow wood boards that first have been kiln dried, planed, and sawn to various sizes with the intent of eliminating defects" and suggests that this is the only form of edge-glued lumber with a recognized commercial identity or use. NWFP has established beyond any peradventure of doubt, by objective evidence, that this suggestion is totally false. *See* Pl.'s Mot. *In Limine* at 9-10; Compl. ¶¶ 14-17 and Exs. 3-6.

For example, rough cedar panels of the same dimensions as the larger dimension pieces of subject merchandise have a recognized commercial identity and use as cedar "sign blanks," which are intermediate articles used in the manufacture of cedar signs. *See* Compl. Ex. 5 (promotional literature from manufacturer of cedar sign blanks). The smaller dimension pieces likewise have a recognized commercial identity and use as blanks for trim board, shelving, and the like. *Compare id.* Ex. 6 (promotional literature from manufacturer of edge-glued lumber).

Indeed, NWFP actually demonstrated this use by making a finished panel using the subject rough green cedar panels. *See* Compl. at 6 (photograph of subject merchandise after it has been kiln dried and surfaced on all four sides to make panels suitable for use as trim board, shelving, and the like). The fact that NWFP imports unfinished "blanks," rather than finished trim board, shelving, and the like, does not make the imported merchandise any less recognizable as "edge-glued lumber" in the trade. *See Tidewater Oil Co. v. United States*, 171 U.S. 210, 214-15, 217 (1898) (distinguishing between "intermediate" and "ultimate" articles of wood); *see also* General Rule of Interp. 2(a), HTSUS ("Any reference in a heading to an article shall be taken to

include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article."); *see also Pistorino,* 287 F. Supp. at 985 ("A carpenter can not hang a door until it is fitted to the opening and until there are grooves cut to admit the butts or hinges. Yet it would not do to say that a door is not known to the trade as such and dealt in every day, and that it would not be, if appearing in a tariff act, easily recognizable. An ax helve must be fitted before it is inserted in the ax, but that it is an ax helve, known as such, whenever it meets the eye, is apparent.") (citation and internal quotation marks omitted).

Third, Mr. Garretto's assertion that lumber has to be dried before gluing, *see* Garretto Decl. ¶¶ 5-6, is belied by the finished 1 ¼ inch board that NWFP made with the subject merchandise and filed with the Court on October 23, 2003. *See* Compl. at 6 (photograph of the board with a ruler). Mr. Garretto's assertion that lumber has to be dried before gluing is also belied by the technical specifications published by the glue manufacturer, which indicate that Mira-Lok is **specifically designed for use on "green lumber**." *See* Compl. Ex. 3.

Fourth, Mr. Garretto is incorrect that "ripping" the subject merchandise after importation changes its recognized commercial identity or use as imported. *See* Garretto Decl. ¶ 8. Ripping an imported chair apart and using it for firewood, for example, would not make the imported merchandise any less a chair at the time of importation. And if the duty on firewood were high enough, it would make perfect sense from a commercial perspective to start importing chairs for use as firewood. *See id.* Mr. Garretto's apparent belief that there would be something wrong with doing so is a legal opinion that has been repeatedly rejected by the Supreme Court. *See, e.g., Merritt v. Welsh,* 104 U. S. 694, 704

(1881) ("Great stress [was] laid on the charge that sugars are manufactured in dark colors on purpose to evade our duties. Suppose this is true; has not a manufacturer a right to make his goods as he pleases? If they are less marketable, it is his loss; if they are not less marketable, who has a right to complain? If the duties are affected, there is a plain remedy. Congress can always [change the law]. . . . . So long as . . . the goods are truly invoiced and freely and honestly exposed to the officers of customs for their examination, no fraud is committed . . . .").

In sum, Mr. Garretto's declaration is invalid, incompetent, incredible, and should be disregarded. Alternatively, NWFP should be afforded an opportunity to cross-examine Mr. Garretto and the field officers referenced in his declaration.

## III. CONCLUSION

The condition of NWFP's merchandise after post-importation processing is irrelevant to its customs classification, and the government has conceded as much. Accordingly, NWFP's Motion *In Limine* should be GRANTED.

Respectfully submitted,

Date: March 2, 2004

s/*Andrew Woodson Stuart*

A. Woodson Stuart, Esq.
JONES & STUART, LLP
2300 M Street, NW, Suite 800
Washington, D.C. 20037
Tel: (202) 279-3196
Fax: (202) 338-0270

*Attorney for Northwest Forest Products*