**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

**Document Links:**

Start of Document
**DISPOSITION:**
**CASE SUMMARY**
**PROCEDURAL POSTURE:**
**OVERVIEW:**
**OUTCOME:**
**CORE TERMS:**
**LexisNexis (TM) HEADNOTES - Core Concepts -**
**COUNSEL:**
**JUDGES:**
**OPINIONBY:**
**OPINION:**

SHEPARD'S®

*223 F. Supp. 2d 1317, *; 2002 Ct. Intl. Trade LEXIS 23, **; SLIP OP. 2002-22*

**Heartland By-Products,** Inc., Plaintiff, v. United States of America, Defendant, and United States Beet Sugar Association, Defendant-Intervenor.

Court No. 99-09-00590

UNITED STATES COURT OF INTERNATIONAL TRADE

223 F. Supp. 2d 1317; 2002 Ct. Intl. Trade LEXIS 23; SLIP OP. 2002-22

February 26, 2002, Decided

**DISPOSITION:** [**1] Plaintiff's motion for entry of judgment denied and case dismissed.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff sugar syrup importer challenged the order of defendant United States which revoked its prior advance tariff ruling, resulting in a substantially increased tariff for the importer's syrup. The United States Court of Appeals for the Federal Circuit reversed the lower court's decision which found the revocation unlawful, and the importer moved after remand for entry of judgment limiting application of the higher tariff.

**OVERVIEW:** The importer contended that the higher tariff was applicable only to entries after the appellate court's mandate issued, and that the United States improperly liquidated entries at the higher duty rate prior to the mandate. The United States argued that the court's declaratory judgment jurisdiction to review the classification ruling under 28 U.S.C.S. § 1581(h) was limited to entries dated prior to the court's original decision reversing the revocation. The international trade court first held that, since both the revocation order and the importer's claim for relief expressly contemplated prospective entries, the court had jurisdiction to bind the United States to the lower tariff with regard to entries after its decision. Further, the United States did not request a stay of the decision, and thus it remained binding until the appellate mandate issued. However, in view of the importer's pending protests concerning allegedly improper liquidation of entries by the United States prior to the mandate, the determination of the applicability of the higher tariff to specific entries was more properly resolved in the protest process.

**OUTCOME:** The importer's motion for entry of judgment was denied and the case was dismissed.

**CORE TERMS:** custom, revocation, importation, liquidation, classification, collateral estoppel, protest, import, declaratory judgment, binding, civil action, customs service, importer, judicial review, imported, duty, secretary, jurisdictional, judicata,

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

international trade, entry of judgment, merchandise, caselaw, conclusive, issuance, declaratory, valuation, new cause of action, original case, pre-importation

**LexisNexis (TM) HEADNOTES - Core Concepts -** Hide Concepts

International Trade Law > Imports & Exports > Notices of Determination

HN1 See 19 U.S.C.S. § 1625(c).

International Trade Law > Dispute Resolution

HN2 28 U.S.C.S. § 1581(h) allows for actions to be heard prior to importation of the goods involved only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review.

International Trade Law > Dispute Resolution

HN3 See 28 U.S.C.S. § 1581(h).

International Trade Law > Dispute Resolution

HN4 28 U.S.C.S. § 2643(c)(1) grants broad power to the United States Court of International Trade, specifying that in addition to money judgments, the court has the power to order any other form of relief that is appropriate in a civil action, including, but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition.

International Trade Law > Dispute Resolution

HN5 See 28 U.S.C.S. § 2643(c)(4).

International Trade Law > Dispute Resolution

HN6 The cause of action under 28 U.S.C.S. § 1581(h) was not created to allow judicial review of general interpretative rulings issued by the Secretary of Treasury whenever there is a likelihood of an effect on importations. The language of the law speaks to rulings which determine the fate of specific importations of specific goods.

International Trade Law > Imports & Exports > Classification of Merchandise
International Trade Law > Dispute Resolution

HN7 28 U.S.C.S. § 1581(a), which provides for appeal following a denied protest was, and remains, the preferred route to the United States Court of International Trade for classification contests. 28 U.S.C.S. § 1581(h) comes into play only when the traditional route will inflict irreparable harm on a plaintiff, and when the case is concrete enough that any decision will be ripe for review.

Civil Procedure > Justiciability > Case or Controversy

HN8 The constitutional definition of a "case" in U.S. Const. art. III is a claim brought before the courts for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs.

Civil Procedure > Justiciability > Case or Controversy
Civil Procedure > Remedies > Declaratory Relief

HN9 The threshold test for when a dispute becomes a case under U.S. Const. art. III, is when it is found to be an actual controversy. The difference between an abstract question and a controversy under the Declaratory Judgment Act is one of degree. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Civil Procedure > Remedies > Declaratory Relief

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

HN10 A declaratory judgment is a statutory remedy for the determination of a justiciable controversy where the plaintiff is in doubt as to his legal rights, i.e., a binding adjudication of the rights and status of litigants even though no consequential relief is awarded. Such judgment is conclusive in a subsequent action between the parties as to the matters declared and, in accordance with the usual rules of issue preclusion, as to any issues actually litigated and determined.

International Trade Law > Dispute Resolution

HN11 It is the nature of the practice of the United States Court of International Trade that, with few exceptions, the authority to rule on a decision by the Customs Service will be invoked only once a product has entered the United States.

Civil Procedure > Preclusion & Effect of Judgments > Collateral Estoppel

HN12 Under the judicially developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation.

Civil Procedure > Preclusion & Effect of Judgments > Res Judicata

HN13 Under res judicata, a final judgment on the merits bars further claims by parties or their privies on the same cause of action.

International Trade Law > Imports & Exports > Classification of Merchandise

HN14 The rule that each new entry is a new cause of action does not apply in all customs cases. Instead it is limited to classification cases where the new entries differ such that the Customs Service cannot rely on previous rulings to deny an importer the opportunity to raise new facts.

Governments > Courts > Judicial Precedents

HN15 Under stare decisis courts refuse to examine legal issues previously decided in another case.

International Trade Law > Imports & Exports > Classification of Merchandise

HN16 Stare decisis is validly applied in a classification case concerning imports, as well as the exception that a party can challenge a previous decision if it is clearly erroneous.

International Trade Law > Dispute Resolution

HN17 Decisions of the United States Court of International Trade are binding on the Customs Service, and the contention that every new entry is a new cause of action is narrowly applied.

Civil Procedure > Justiciability > Case or Controversy

HN18 In order for a case to qualify as an actual case, and not an advisory opinion, it must involve a true legal issue between opposing parties and have the ability to render conclusive relief within the case at issue. It cannot be used to settle a legal issue merely for advantage in a separate cause of action.

International Trade Law > Dispute Resolution

HN19 28 U.S.C.S. § 1581(h) creates an exception to the usual requirements that administrative remedies must be exhausted, and any duties owed be paid prior to seeking relief. Consistent with the constitutional requirements of declaratory judgment jurisprudence, the exception is available only when plaintiffs show irreparable harm in cases which determine the fate of specific importations of specific goods. It speaks to specific contemplated import transactions which contain identifiable merchandise and which will feel the impact of the ruling with virtual certainty.

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

International Trade Law > Dispute Resolution

HN20 The traditional rule that each entry is a new cause of action does not obtain in the case where the initial cause of action encompasses prospective entries. To force an importer to seek relief under 28 U.S.C.S. § 1581(h) to establish its rights, and then force it to litigate again when it seeks to enforce those rights with actual entries, would make § 1581(h) superfluous as an avenue of relief. It is also contrary to the requirements for a valid declaratory judgment case.

International Trade Law > Dispute Resolution

HN21 In certain circumstances it is possible for the Customs Service to limit, but not abrogate, a decision of the United States Court of International Trade. However, this is not a wholesale waiver, but an exception. Once the judiciary has spoken to a law, in the absence of congressional action, parties to the dispute are bound by the court's decision. The fact that one of the parties to the litigation is the government does not exempt it from complying with the law as interpreted by the judicial branch. It is the purpose of the United States Court of International Trade to adjudicate and settle disputes between private individuals and the government. Having waived sovereign immunity, the government is bound the judiciary branch's decisions.

International Trade Law > U.S. Court of International Trade Rules

HN22 The rules of the United States Court of International Trade provide for a party to stay the execution of a decision pending appeal. Ct. Int'l Trade R. 62. In fact, there is a specific rule exempting the United States from posting a bond when it is the appellant. Ct. Int'l Trade R. 62(d). In the absence of a request by one of the parties the decision of the court is binding.

Civil Procedure > Entry of Judgments > Stay of Proceedings & Supersedeas

HN23 The vitality of a judgment is undiminished by pendency of the appeal. Unless a stay is granted either by the court rendering the judgment or by the court to which the appeal is taken, the judgment remains operative. To be sure, for as long as the appellate court retains its mandate it maintains jurisdiction over the case, and thus the power to alter the mandate. But non-issuance of the mandate by the appellate court has no impact on the trial court's powers to enforce its unstayed judgment since the latter court has retained that power throughout the pendency of the appeal.

Civil Procedure > Preclusion & Effect of Judgments > Law of the Case Doctrine

HN24 An opinion of the appeals court is not final until it issues its mandate. Fed. R. App. P. 41(c). This rule is confirmed in the caselaw. Even if the appeals court issues a decision without the mandate, it is still open and subject to change. In some cases the initial decision has been withdrawn and changed prior to the mandate's issuance. It is important to understand that unless specifically directed, the parties cannot rely on the decision as final until the mandate issues. Once the mandate is issued, the court of appeals relinquishes jurisdiction over the case back to the trial court for further proceedings consistent with the mandate.

**COUNSEL:** Mayer, Brown, Rowe & Maw, (Simeon M. Kriesberg), Andrew A. Nicely, Eldad Z. Malamuth, and Serko & Simon, David Serko, Daniel J. Gluck, Jerome L. Hanifin for Plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General; John J. Mahon, Acting Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, Department of Justice (Aimee Lee); Karen P. Binder, Office of Assistant Chief Counsel, International Trade Litigation, Customs Service, (Yelena Slepak) and Allan Martin, Associate Chief Counsel, Customs Service, (Ellen Daly), of counsel, for Defendant.

Wilmer, Cutler & Pickering, (Lewis J. Liman), Rick A. Bierschbach, for Defendant-Intervenor.

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

American Association of Exporters and Importers, (John P. Simpson, President) Amicus Curiae.

**JUDGES:** Judith M. Barzilay, Judge.

**OPINIONBY:** Judith M. Barzilay

**OPINION:**

[*1320] **BARZILAY, JUDGE:**

I. INTRODUCTION

This case is one of first impression for two important issues. First, the court is asked to determine the scope of its jurisdiction under 28 U.S.C. § 1581(h)(1994), review of pre-importation rulings. [**2] Second, the court is asked to interpret the application of the 60 day grace period provided by 19 U.S.C. § 1625(c)(1999) to an importer when a ruling by the United States Customs Service ("Customs") changes the tariff treatment of imported merchandise.

The court has before it a motion for Entry of Judgment on behalf of **Heartland By-Products,** Inc. ("Heartland"). *See Mem. of Points and Authorities in Supp. of Pl.'s Mot. for Entry of J.* (December 13, 2001) ("Pl.'s Br."). This motion comes as a consequence of the disposition by the Court of Appeals for the Federal Circuit of an earlier decision by this court. ***Heartland By-Products,*** *Inc. v. United States*, 264 F.3d 1126 (Fed. Cir. 2001). The original complaint challenged a revocation ruling by the Customs Service which would have increased the tariff duty owed on Heartland's primary import 10,000 percent. *Revocation of Ruling Letter & Treatment Relating to Tariff Classification of Certain Sugar Syrups*, 33 Cust. Bull. No. 35/36 at 41 (Sept. 8, 1999)("Revocation"). This court considered the original case on an expedited basis and held the Revocation contrary to law. ***Heartland By-Products,*** *Inc. v. United States*, 23 C.I.T. 754, 74 F. Supp. 2d 1324 (1999). [**3] That decision was reversed by the Court of Appeals for the Federal Circuit after a two year interval.

In the meantime, Plaintiff imported thousands of entries relying on this court's decision. The Customs Service liquidated those entries, in some cases prior to the date the appeals court announced its decision. *Pl.'s Br.* at 1. In response to Customs' actions, Plaintiff filed protests with Customs and asked this court to enter a judgment, pursuant to 19 U.S.C. § 1625(c), specifying the time of application for the higher duty rate to be 60 days after the decision of the Court of Appeals became final. Plaintiff also challenges Customs' authority to liquidate entries at the higher duty rate prior to the time when the Federal Circuit issued its mandate. Defendant responds that the court lacks jurisdiction over liquidation of the entries because the original case was brought under 28 U.S.C. § 1581(h) which is limited to pre-importation review. Defendant also claims that the 60 day notice period provided by 19 U.S.C. § 1625(c) expired in 1999.

The court finds that 28 U.S.C. § 1581(h) does [**4] confer subject matter jurisdiction on this court to consider issues applicable to actual entries, which were the contemplated entries considered when the court first took jurisdiction. The court, however, declines to exercise this jurisdiction at this point, to permit issues of fact to be resolved at the administrative level regarding the status of the entries, the rates of final liquidation and whether the Customs Service properly extended any of the entries. In addition, deferring adjudication of the application of 19 U.S.C. § 1625(c) will allow the court to consider the full scope of relief requested by Plaintiff.

II. PROCEDURAL HISTORY

The Plaintiff is a sugar refiner that imports sugar syrup from Canada and refines the syrup into liquid sucrose. Prior to beginning business operations, Heartland sought an advance ruling from Customs [*1321] to determine the imported product's classification and duty rate under the Harmonized Tariff Schedule of the United States ("HSTUS"). *New York Ruling Letter* 810328. Based upon this ruling Heartland, in 1997, began importing the syrup into the United States for refining.

Customs Headquarters published a notice of proposed [**5] revocation of the *New York Ruling Letter in Customs Bulletin* Volume 33, No. 22/23 dated June 9, 1999, after domestic trade associations, the United States Cane Sugar Refiners' Association, the United States Beet Sugar Association and their member companies filed a petition under 19 U.S.C. § 1516 and/or 19 U.S.C. § 1625 seeking reclassification of Heartland's sugar product. *Heartland*, 74 F. Supp. 2d at 1328. On September 8, 1999, Customs issued a final notice revoking the *New York Ruling*. In the absence of any other action the Revocation would have taken effect November 8, 1999, under 19 U.S.C. § 1625(c), which provides that, "the final ruling or decision shall become effective 60 days after its date of publication." n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The full text of 19 U.S.C. § 1625(c) reads:

> HN1 (c) **Modification and revocation**
> A proposed interpretive ruling or decision which would--

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

(1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
(2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;

shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**6]

In light of the 60 day effective date this court heard Heartland's challenge to the Revocation on an expedited schedule. The court took jurisdiction under 28 U.S.C. § 1581(h), HN2 which allows for actions to be heard prior to importation of the goods involved only if, "the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review." On October 19, 1999, this court issued an opinion and order finding the Revocation to be contrary to law. Because the court was able to reach a decision before the 60 day time limit elapsed, any application of the Revocation was prohibited. No preliminary injunction was necessary to limit Customs' behavior, because the court's decision resting on § 1581(h) jurisdiction applied to all prospective entries contemplated by the ruling. These two factors, the expedited review and jurisdiction under § 1581(h), frame the issues currently before the court. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The full text of 28 U.S.C. § 1581(h) reads:

HN3 (h) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**7]

On August 30, 2001, the Court of Appeals for the Federal Circuit issued a decision reversing this court's decision. On December 11, 2001, the Federal Circuit issued its mandate formally relinquishing it of jurisdiction of the case and returning jurisdiction to this court for any further [*1322] action, including entry of judgment. At some point between the announcement of the decision and the mandate, Customs commenced to liquidate or reliquidate entries, liquidation of which may have been extended pending conclusion of judicial consideration. n3 Under normal circumstances entry of judgment by this court is a routine ministerial act; however, Plaintiff has raised two serious questions. First, after the revocation ruling was upheld by the Federal Circuit at what point may Customs apply the higher rate of duty? Second, may Customs begin liquidating entries before this court issues an entry of judgment upon receipt of the Federal Circuit mandate?

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Whether the entries at issue in this motion were properly extended is not certain. *See Oral Arg. Tr.* at 8, 36.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**8]

III. DISCUSSION

Plaintiff makes several appeals for relief with its motion for entry of judgment. The essential point to all of the claims is that any application of the Revocation must apply to entries, not liquidations, made sometime after December 11, 2001, when the appeal decision became final. Specifically, Heartland argues:

1) 19 U.S.C. § 1625(c) expressly requires that importers be provided with 60 days advance notice of change to any

interpretive ruling that has been in effect for 60 days or more.

2) That it is improper to apply the upheld Revocation retroactively to entries imported after publication of the Revocation, but prior to the Federal Circuit's decision.

3) This court can delay the effective date of the Revocation by a reasonable period even in the absence of a statute requiring a notice period.

4) Retroactive application of the Revocation to Heartland is prevented by Customs' regulations.

5) The court should supplement the 60 day notice period with an additional period of time, so as to restore Heartland to a position it would have had absent Customs' acting prematurely.

Defendant contends that the court cannot [**9] rule on the questions presented by Plaintiff for three jurisdictional reasons. First, Defendant claims that, because the original case was brought under 28 U.S.C. § 1581(h), there are no "designated entries which were before this Court" and that subsection (h) is applicable only to "prospective entries." *Def.'s Opp. to Pl.'s Mot. for Entry of J.* at 11 (January 7, 2002) ("Def.'s Br."). Second, consideration of the § 1625(c) issue is beyond the scope of the mandate. *Id.* at 16. Third, Defendant claims that for the Plaintiff to sustain its claim of improper liquidation it must re-establish jurisdiction under § 1581(h) or (i). *Id.* at 9. Defendant contends the facts could not support that jurisdiction, therefore, the case must be dismissed to be brought under § 1581(a), after a protest has been filed by the importer and denied by Customs.

The court begins its analysis with Defendant's first point directly relating to the specific jurisdiction of this court under § 1581 (h). The court rests its analysis on the history of § 1581(h) and its context within general federal law and customs law, and concludes that it does confer jurisdiction on this court [**10] to adjudicate entries that come before it pursuant to § 1581(h). To do otherwise would render subsection (h) meaningless as an avenue of relief (*See* 28 U.S.C. § 2643(c)(1)) and unconstitutional as an advisory opinion. The jurisdictional analysis distills into three questions. Who and what are subject to the court's jurisdiction in this matter, and how long does that jurisdiction last?

[*1323] A. What is properly before this court?

To understand the scope and authority conferred on this court by § 1581(h) it is necessary to place it in context. This context includes the Customs Courts Act of 1980 ("1980 Act"), which for the first time provided for declaratory judgment power by the Court of International Trade, the history of declaratory judgments in American law and the long-standing rules of Customs law in the United States. *See* Pub. L. No. 96-417, 94 Stat. 1727 (1980).

**1980 Act**: The United States Customs Court formerly constituted under Article I became an Article III court in 1956. 28 U.S.C. § 251. However, even after 1956 the court remained limited in its remedial power and scope of jurisdiction relative to general [**11] jurisdiction district courts. The 1980 Act instituted dramatic changes in the power and procedures of the court, and reflecting such, changed the name from the United States Customs Court to the United States Court of International Trade. Prior to 1980, the court's lack of full remedial powers often created jurisdictional nightmares, where Plaintiffs could not have their case adequately considered by any single court, and so found themselves without an adequate remedy before the Customs Court and without the right to adjudicate before general jurisdiction district courts. The House Report to the 1980 Act discussed the problem at length.

> With the growth in international trade, the number of suits in the district courts and subsequent dismissals for want of jurisdiction have increased. Congress is greatly concerned that numerous individuals and firms, who believe they possess real grievances, are expending significant amounts of time and money in a futile effort to obtain judicial review of the merits of their case.
>
> H.R.7540 corrects these inequities by revising the statutes to clarify the present status, jurisdiction and powers of the Customs Court. The Customs Courts Act of 1980 [**12] creates a comprehensive system of judicial review of civil actions arising from import transactions, utilizing the specialized expertise of the United States Customs Court and the United States Court of Customs and Patent Appeals. This comprehensive system will ensure greater efficiency in judicial resources and uniformity in the judicial decision making process.
>
> The bill also assures aggrieved parties better access to judicial review of a civil action arising out of an import transaction. Such access is not presently assured due to jurisdictional conflicts caused by the ill-defined division of jurisdiction between the Customs Court and the federal district courts. Most importantly, H.R. 7540 perfects the status of the Customs Court by providing it with all the necessary remedial powers in law and equity possessed by other federal courts established under article III of the Constitution.

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

H. Report No. 1235, 96th Cong., 2d Session, at 19-20 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3729, 3731.

The 1980 Act was a fundamental change in the judiciary's relationship to Customs law. n4 "The Act clarified and expanded the [*1324] jurisdiction of the United States Customs Court from both [**13] a substantive and remedial standpoint." *Litigation Before the United States Court of International Trade*, Hon. Edward D. Re, Preface to Title 19 U.S.C.A. p. XXV. The first listed goal of the 1980 Act was to provide an "explicit grant of all judicial powers in law and equity to the Court of International Trade . . .thereby completing the full transformation of the Customs Court to an article III court." 1980 U.S.C.C.A.N. at 3739.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 The dramatic change from the traditionally limited nature of the Customs Court is seen in other sections of the legislative history, for instance the effect of remand authority:

> Subsection (b) is a new provision that empowers the Court of International Trade to remand the civil action before it for further judicial or administrative proceedings. In granting this remand power to the court, the committee intends that the remand power be co-extensive with that of a federal district court. In addition, this subsection authorizes the court to order a retrial or rehearing to permit the parties to introduce additional evidence.
>
> Subsection (b) has particular impact on civil actions brought pursuant to section 515 or 516 of the Tariff Act of 1930. Under existing law, for example, in a civil action commenced under the court's jurisdiction to entertain cases involving the classification or valuation of merchandise, if the plaintiff succeeds in demonstrating that the original decision of the customs service was incorrect but is unable to establish the correct classification or valuation, the court dismisses the civil action. In effect, the court holds in favor of the United States even though the plaintiff has demonstrated that the challenged decision of the Customs Service was erroneous. Subsection (b) would permit the court in this situation to remand the matter to the Customs Service to make the correct decision or to schedule a retrial or rehearing so that the parties may introduce additional evidence.

1980 U.S.C.C.A.N. at 3772.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**14]

To provide a framework for this new power, Congress amended the statutes that govern the jurisdiction and powers of the court. *See e.g.,* 28 U.S.C. §§ 1581, 1582, 1583, 2643. Traditionally, the Customs Court was unable to consider any claim before all administrative remedies were exhausted. In addition, it could not issue injunctions, writs of mandamus or other equitable remedies. ***HN4*** 28 U.S.C. § 2643(c)(1) issued a broad grant of power to the Court of International Trade, specifying that in addition to money judgments, the court has the power to "order any other form of relief that is appropriate in a civil action, including, but not limited to declaratory judgments, orders of remand, injunctions and writs of mandamus and prohibition." ***HN5*** Paragraph (4) of § 2643(c), restricted this broad grant. "In any civil action described in section 1581(h) of this title, the Court of International Trade may only order the appropriate declaratory relief."

Section 1581(h) is an extraordinary instrument, and a significant exception to the procedural requirements traditionally placed on those challenging a decision by Customs. Historically, in order to [**15] challenge a decision like the Revocation at issue in this case, it was necessary for a party to exhaust remedies available through the administrative agency by filing a protest with Customs. *See Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1551 (Fed. Cir. 1988). Exhaustion in such a case also requires plaintiffs to pay any duties owed on the entries in question before filing with this court. *See Am. Air Parcel Forwarding Co., Ltd. v. U.S.,* 6 C.I.T. 146, 150, 573 F. Supp. 117, 120 (1983), *aff'd* 718 F.2d 1546 (Fed. Cir. 1983). Section 1581(h) allows for bypassing these procedural and monetary burdens in specific and narrow circumstances, namely, if the importer can demonstrate that it "would be irreparably harmed unless given an opportunity to obtain judicial review prior to [an] importation." n5 In such cases the court may exercise jurisdiction; however, [*1325] as noted above, its remedial power is limited to that of declaratory judgment.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 That Congress understood the burden and explicitly wanted to spare a narrow class of plaintiffs the hardship of exhaustion of remedies is clear in the House Report specifying the exceptions including those,

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

> in a civil action, pursuant to proposed section 1581(h), to contest a ruling by the Secretary of the Treasury, or the refusal by the Secretary to issue or change a ruling be commenced prior to exhaustion of one's administrative remedies. The court is authorized to permit this exception if the party commencing the action can demonstrate that he would be irreparably harmed if forced to exhaust his administrative remedies in following the traditional route prior to judicially challenging the Secretary's ruling or lack thereof.
>
> The Committee believes this provision is essential in light of the grant of jurisdiction under proposed section 1581(h). Without this exception to the exhaustion rule, proposed section 1581(h) would well be rendered meaningless.

1980 U.S.C.C.A.N. at 3769.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**16]

In *Pagoda Trading Co. v. United States*, Judge Watson provided background as to the purpose and scope of § 1581(h). 6 C.I.T. 296, 577 F. Supp. 22 (1983).

> HN6 The cause of action under § 1581(h) was not created to allow judicial review of general interpretative rulings issued by the Secretary of Treasury whenever there is a likelihood of an effect on importations. The Court reads the language of the law as speaking to rulings which determine the fate of specific importations of specific goods. The Court also reads the legislative history as speaking to specific contemplated import transactions which contain identifiable merchandise and which will feel the impact of the ruling with virtual certainty.

*Id.* 577 F. Supp. at 24 (citations omitted).

In this context it is clear that Congress intended § 1581(h) to apply in a limited number of cases. HN7 Section 1581(a), which provides for appeal following a denied protest was, and remains, the preferred route to this court for classification contests. Subsection (h) comes into play only when the traditional route will inflict irreparable harm on a plaintiff, and when the case is concrete enough that [**17] any decision will be ripe for review. The legislative history also makes clear that Congress did not intend for subsection (h) to replace jurisdiction under (a), and, therefore, limited the scope of relief under (h) to declaratory judgment, explicitly precluding injunctive relief.

> Subsection (c)(4) is the third exception to the general grant of remedial powers found in subsection (c)(1). Under this provision, the Court of International Trade may only grant declaratory relief in a civil action commenced under proposed section 1581(h) to review a ruling by the Secretary of the Treasury or the refusal by the Secretary to issue or change a ruling. It is the Committee's belief that declaratory relief is the appropriate remedy for this type of action. To permit injunctive relief would encourage persons to bring suit under proposed section 1581(h) rather than pursuing traditional methods of challenging the secretary's ruling or a lack thereof. As such, the Committee feared that the exception would become the rule and did [not] intend to create such a major shift in trade policy.

1980 U.S.C.C.A.N. at 3773, with correction noted at 126 Cong. Rec. 26555 (1980), (statement of Rep. [**18] Rodino).

**Declaratory Judgments in American Law**: Declaratory relief is of relatively recent vintage in federal law. It was not until 1937, after the passage of the Declaratory Judgment Act (28 U.S.C. § 2201), that the Supreme Court decided it was permissible for a statute to confer declaratory judgment jurisdiction on the judiciary. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 81 L. Ed. 617, 57 S. Ct. 461 (1937). The Court was careful to state that it would grant, "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 241. While the Court recognized the new power, it was careful to point to constitutional limitations that would need to be heeded.

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

> We have thus recognized the potential for declaratory judgment suits to fall outside HN8 the constitutional definition of a [*1326] "case" in Article III: a claim "brought before the court(s) for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress or punishment of wrongs. [**19] "

*Calderon v. Ashmus*, 523 U.S. 740, 746, 140 L. Ed. 2d 970, 118 S. Ct. 1694 (1998) (quoting *Fairchild v. Hughes*, 258 U.S. 126, 129, 66 L. Ed. 499, 42 S. Ct. 274 (1922). HN9 The threshold test for when a dispute becomes a 'case' under Article III, is when it is found to be an actual controversy. In *Maryland Casualty Co., v. Pacific Coal & Oil Co.*, the Supreme Court stated that the difference between an abstract question and a controversy under the Declaratory Judgment Act is one of degree.

> Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Maryland Casualty Co., v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 85 L. Ed. 826, 61 S. Ct. 510 (1941) (citations omitted).

In *Calderon*, the Supreme Court was even more specific as to the kinds of actions that do not satisfy the actual controversy test of adverse parties, a real dispute of an immediate nature and eligibility for conclusive relief. There, the Court denied the plaintiff the ability to seek a "declaratory judgment [**20] to litigate a single issue in a dispute that must await another lawsuit for complete resolution." 523 U.S. at 748. The Court in *Calderon* looked for guidance to an earlier patent case, *Coffman v. Breeze. See Calderon*, 523 U.S. at 746 *citing* *Coffman v. Breeze Corps.*, 323 U.S. 316, 89 L. Ed. 264, 65 S. Ct. 298 (1945). In *Coffman,* a patent holder requested the Court to declare the Royalty Adjustment Act unconstitutional and to enjoin his licensee from paying accrued royalties to the government. However, the constitutionality of the act would arise as an issue only if the patent holder sued to recover the royalties, and the licensee raised the act as an affirmative defense. The Court held there was no justiciable question until the patent holder sued, and the licensee actually raised the affirmative defense. *Coffman*, 323 U.S. at 324. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Related to the issue of actual controversy is a prudential notion of ripeness, which often turns on similar facts and questions. *See e.g., Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 18 L. Ed. 2d 681, 87 S. Ct. 1507 (1967).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**21]

The foregoing indicates that when Congress conferred the power to issue declaratory judgments on this court it was not an empty exercise. It was a jurisdictional grant with real effect and clear caselaw governing its use. n7 Congress also was clear that if it did grant this authority to the court it did not want it to be meaningless, despite its narrow application.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 *Black's Law Dictionary* defines HN10 Declaratory Judgment as the following: Statutory remedy for the determination of a justiciable controversy where the plaintiff is in doubt as to his legal rights. A binding adjudication of the rights and status of litigants even though no consequential relief is awarded. Such judgment is conclusive in a subsequent action between the parties as to the matters declared and, in accordance with the usual rules of issue preclusion, as to any issues actually litigated and determined. *Black's Law Dictionary* 409 (6th ed. 1990) (parenthetical references and citations omitted).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**Customs Law Jurisprudence**: Invocations [**22] of § 1581(h) by this court subsequent to the passage of the 1980 Act confirmed a narrow but binding use of jurisdiction under the subsection, consistent with the legislative history and declaratory judgment caselaw. n8 However, like other provisions in the law that grant declaratory relief, [*1327] subsection (h) must hew to a fine distinction between when a case is specific enough to be considered an actual case for judicial review, and when it is still not concrete enough to settle an actual dispute between adverse parties. In order to understand the scope and

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

power conferred on this court by § 1581(h), another factor must be added that provides context to the case at bar. The fundamental shift in the power of this court initiated by the 1980 Act, and the real and extraordinary authority to issue declaratory judgments recognized in *Aetna,* must be weighed against a history of customs law practice dating back to the beginning of this nation. The issue can be summarized by analysis of the following sentence from Defendant's brief:

> Because this action considers only the basis and merits of the revocation ruling for pre-importation and does not encompass any entries, the CIT cannot [**23] rightfully rule on Heartland's motion.

*Def.'s Br.* at 4, n. 4. *HN11* It is the nature of this court's practice that, with few exceptions, the authority to rule on a decision by the Customs Service will be invoked only once a product has entered the United States. This is not a coincidence of statutory construction. It is a product of years of Customs decisions, most of which pre-date this court's transition to an Article III court.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 *See e.g., Pagoda Trading Co.*, 577 F. Supp. at 24 (jurisdiction can be invoked only when ruling is specific as to merchandise plaintiff intends to import); *Am. Air Parcel Forwarding*, 5 C.I.T. 8, 557 F. Supp. 605, 608 (jurisdiction is not available for "internal advice" ruling as it related to product already imported); *Nat'l Juice Products Ass'n. v. United States*, 10 C.I.T. 48, 628 F. Supp. 978 (1986) (country of origin ruling could be challenged under § 1581(h) when plaintiffs clearly intended to produce and import product described in the ruling).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**24]

The touchstone case, from 1927, illustrates how the judiciary has treated Customs cases differently from other civil actions. In *United States v. Stone & Downer Co.*, the Supreme Court held that a prior judgment determining the classification of goods and the duty upon their importation was not "res judicata" (in this case meaning the modern day collateral estoppel or issue preclusion) upon another importation of the same kind of goods by the same importer. United States V. Stone & Downer Co., 274 U.S. 225, 47 S. Ct. 616, 71 L. Ed. 1013 (1927). The court's exception to this application of estoppel was note-worthy not only because it distinguished classification cases from other civil actions, but even from other revenue cases brought against the government, such as tax cases. *See e.g., C.I.R. v. Sunnen*, 333 U.S. 591, 92 L. Ed. 898, 68 S. Ct. 715 (1948).

*Stone & Downer* provides the strongest precedent that each new entry is a new cause of action. *See e.g., Boltex Mfg. Co., L.P., v. United States*, 24 C.I.T. , , 140 F. Supp. 2d 1339, 1346 (2000). This principle underlies the government's position in this case that § 1581(h) does not provide jurisdiction to cover entries imported after [**25] this court's decision because there were no entries before the court in the original adjudication. Even if there were, the government would argue, each entry would be a new cause of action, beyond the scope of the current Heartland case. n9 Before the court recognizes such a [*1328] broad reading of this precedent, which would undermine Congress' intent as to § 1581(h), it must examine the rationale behind the *Stone & Downer* case and the significant subsequent narrowing of the principle by statute and caselaw.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 A different reading of Defendant's term "not before the court" could be that in Customs cases the court is essentially acting in rem, and unless it has jurisdiction over some physical property it cannot exercise jurisdiction. Yet this concept does not have any specific caselaw to support it, is contrary to the court's use of equity power in other cases and would make § 1581(h) absolutely meaningless. *See e.g., Queen's Flowers de Colombia, v. United States*, 20 C.I.T. 1122, 947 F. Supp. 503 (1996)(enjoining collection of antidumping duty deposits at importation for certain entries to be imported in the future). Therefore, the court will focus its attention on the argument that each entry is its own cause of action, and, therefore, entries dated after the court's decision of October 19, 1999 are not before the court because they are new causes of action.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**26]

*Stone & Downer* involved importations of wool fleece and yarn. 274 U.S. at 229. A similar case between the same parties with similar merchandise had been decided in the government's favor. *Id.* The question before the Supreme Court was the res judicata effect of the previous ruling. The Court held that in classification cases there would not be res judicata. The Court relied on two rationales. First, the Court granted deference to the rule established by the Court of Customs Appeals (predecessor to the Court of Appeals for the Federal Circuit) when that court was the final appellate body on customs matters. Second, the Court found wisdom in the rule itself:

> The business of importing is carried on by large houses between whom and the government there are

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

innumerable transactions as here, for instance, in the enormous importations of wool, and there are constant differences as to the proper classifications of similar importations. The evidence which may be presented in one case may be much varied in the next.

*Id.* 274 U.S. 225 at 235-36. The Court was concerned that a decision would create binding law between one house and Customs that would [**27] be applied to another house, without giving the second house a chance to litigate any distinguishing elements. Therefore, the Court limited the broader rule of collateral estoppel in customs cases. "There of course should be an end of litigation as well in customs matters as in other tax cases, but circumstances justify limiting the finality of the conclusion in customs controversies to the identical importation." *Id* 274 U.S. 225 at 235. Subsequent cases expanded the use of collateral estoppel in tax revenue cases, but not in customs revenue cases. *See e.g., United States v. De Messimy,* 16 U.S. Cust. Appls. 150, 152 T.D. 42781 (1928). n10 The courts did apply res judicata (modern claim preclusion) principles to cases which involved the same cause of action as in a prior suit. In such cases the courts equated cause of action with entries, and claims decided in previous cases involving the same entries could not be re-litigated. *See e.g., United States v. Edward M. Poons* [*1329] *Co. of Kobe Inc.*, 18 C.C.P.A. 283 (1930).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 Collateral estoppel is the more specific term for binding parties to a determination essential to a previous case that the party was able to litigate on the merits. It is a species of the larger category of principles embodied in the phrase res judicata. Opinions of several decades ago, however, simply use the broad term "res judicata." Over time they have been given specific meanings. The Restatement of Judgments 2d equates the term res judicata to claim preclusion, and collateral estoppel to issue preclusion. The linguistic change is noted in Kenneth C. Davis, *Administrative Law of the Eighties: 1989 Supplement to Administrative Law Treatise*, § 21:8 at 408, (1989):

> The Court said in *[United States v.] Mendoza*, 464 U.S. 154, 158, 78 L. Ed. 2d 379, 104 S. Ct. 568: ***HN12*** "Under the judicially developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation. . . . Collateral estoppel, like the related doctrine of res judicata, serves to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourages reliance on adjudication." Then the Court said in footnote 3:
>
> ***HN13*** "Under res judicata, a final judgment on the merits bars further claims by parties or their privies on the same cause of action. . . . The Restatement of Judgments speaks of res judicata as 'claim preclusion' and of collateral estoppel as 'issue preclusion.' (Citing *United States v. Mendoza,* 464 U.S. at 165 (1984)).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**28]

*J.E. Bernard & Co., Inc. v. United States* further constrained the impact of the exception to collateral estoppel in Customs cases. 66 Cust. Ct. 545, 324 F. Supp. 496 (1971). *Bernard* was an appeal for reappraisement in a valuation case. Judge Maletz, after recounting in greater detail the history of collateral estoppel outlined above, distinguished *Stone & Downer* from *Bernard*, pointing out that *Stone & Downer* was a classification case, and *Bernard* a valuation case. The court thereby limited the reach of *Stone & Downer's* exception to collateral estoppel:

> Collateral estoppel is applicable in reappraisement litigation. . . .[in these cases] the name of the nominal plaintiffs, the parties are the same, the cases involve identical merchandise, the same purchase price, the same exporter and importer, and arise out of the same contract of sale. The only distinction between the two cases is that different importations are involved and, therefore, two causes of action.

324 F. Supp. at 502-3. The court then explains the impact of applying collateral estoppel. "In short, given the circumstances here, collateral estoppel requires [**29] that the prior judgment be conclusive." *Id.* at 503.

Therefore, in this case when Defendant invokes the phrase "no entries before the court" it must be seen as a shorthand for judicial rules that governed Customs practice prior to the 1980 Act. It also is clear that, contrary to the government's assertion, ***HN14*** the rule that each new entry is a new cause of action does not apply in all Customs cases. Instead it is limited to classification cases where the new entries differ such that Customs cannot rely on previous rulings to deny an importer the opportunity to raise new facts. This principle is not a broad jurisdictional limitation of the court's power in Customs cases, so that it requires the court to have jurisdiction over specific entries before it can rule on matters concerning

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

those entries. It is simply a specific exception to traditional rules of res judicata in certain classification decisions. *Bernard* established that in valuation cases Customs is bound by this court's decisions even as to entries that are prospective. Since *Bernard*, and the 1980 Act, the court has found collateral estoppel applicable in classification cases where a plaintiff sought to apply collateral [**30] estoppel against Customs, when Customs applied regulations governing classification of goods deemed invalid by this court. *See* *Gulfstream Aerospace Corp. v. United States,* 21 C.I.T. 1083, 981 F. Supp. 654 (1997).

In addition to the collateral estoppel cases, the court has consistently applied the principle of stare decisis to previously litigated legal issues, even in classification cases. ***HN15*** Under stare decisis courts refuse to examine legal issues previously decided in another case. In *Schott Optical Glass, Inc. v. United States*, the Federal Circuit confirmed ***HN16*** the validity of stare decisis as applied in a classification case, as well as the exception that a party can challenge a previous decision if it is clearly erroneous. 750 F.2d 62, 64 (1984). When read together with the collateral estoppel cases, *Schott Optical Glass* establishes that ***HN17*** decisions of this court are binding on Customs, and the contention that every new entry is a new cause of action is narrowly applied.

Defendant makes an additional argument about the scope of the court's power under § 1581(h) and the lack of entries before the court, that "judicial review is available only for prospective [**31] transactions." *Def.'s Br.* at 10. Defendant buttresses its point by citing to the legislative [*1330] history that states subsection (h) covers "contemplated transactions" and a case where § 1581(h) was not available because the goods had already been imported. *Id.* at 11 (citing 1980 U.S.C.C.A.N. 3729, 3758; *Dennison Mfg. Co. v. United States*, 12 C.I.T. 1, 3, 678 F. Supp. 894, 897 (1988). Defendant contends the normal protest and denial process under § 1581(a) is the only avenue to relief, because "there were no specific, designated entries before this Court." *Def.'s Br.* at 11. In essence the government contends § 1581(h) jurisdiction lasts only as long as no product is imported, and expires once any importation takes place.

Having placed § 1581(h) in the appropriate context, the court can now directly address the question of what did the court have jurisdiction over when it took the case in 1999. The government argues that subsection (h) only covers prospective entries, and therefore can never apply to an actual entry, even when the actual entry was the prospective entry contemplated by the court when it took jurisdiction of the case, and by the ruling that was [**32] the subject of Plaintiff's complaint.

**The Scope of § 1581(h)**: The government is attempting to make a semantic (nearly metaphysical) argument that when the court takes jurisdiction under § 1581(h) the power of that decision lasts only as long as the entries remain prospective. As soon as a prospective entry becomes an actual entry by importation of the goods into the United States, the court's power ends. This cannot be true if the court's jurisdiction under § 1581(h) is to have any meaning or effect. The history of the 1980 Act and the history of declaratory judgments lead to the certain conclusion that any judgment by this court under § 1581(h) must resolve a real legal issue between adverse parties, and must be applicable to future actual entries (as opposed to present hypothetical entries). The statutory and caselaw does not say differently, and to the degree it does, it is overruled by the 1980 Act.

The government's argument has conflated the timeline for litigation. While the jurisdictional predicate for § 1581(h) requires that the entries be prospective, this must be distinguished from the effect of a judicial decision which can only be useful if it is applied [**33] to real entries. The entire rationale for pre-importation review under § 1581(h) is that Customs will be bound to apply the court's decision on the adjudicated ruling to future entries. Defendants argue that because subsection (h) is for settling legal issues prior to importation, the result of that judicial inquiry cannot apply to those importations once they enter the country. Not only is this illogical, it is contrary to the clear intent of the statute. It is also potentially unconstitutional. Accepting Defendant's argument would render § 1581(h) unconstitutional as calling for the court to issue merely an advisory opinion in a matter not a case or controversy as discussed *supra*.

The judiciary's struggle to balance the use of declaratory judgment with the constitutional mandate that it hear only actual cases or controversies indicates that the 1980 Act did not, and could not, limit the reach of a judicial decision under § 1581 (h) only to rulings, but never to actual entries. ***HN18*** In order for a case to qualify as an actual case, and not an advisory opinion, it must involve a true legal issue between opposing parties and have the ability to render conclusive relief within the [**34] case at issue. It cannot be used to settle a legal issue merely for advantage in a separate cause of action. *See e.g.,* *Calderon*, 523 U.S. 740 at 747, 140 L. Ed. 2d 970, 118 S. Ct. 1694.

***HN19*** With § 1581(h) Congress created an exception to the usual requirements that administrative remedies must be exhausted, and any duties owed be paid prior to seeking relief. Consistent with the constitutional [*1331] requirements of declaratory judgment jurisprudence, the exception is available only when plaintiffs show irreparable harm in cases "which determine the fate of specific importations of specific goods." *Pagoda Trading Co.,* 6 C.I.T. 296, 577 F. Supp. 22 at 24. It speaks "to specific contemplated import transactions which contain identifiable merchandise and which will feel the impact of the ruling with virtual certainty." *Id.*

When this court took jurisdiction under § 1581(h) in the original *Heartland* decision, it had the power to issue a legally binding decision. That decision would determine the correctness of the Revocation. The decision was not merely advisory, it had practical, concrete application. In this case, it was applicable to the Revocation and to all entries contemplated by the

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

Revocation and at [**35] issue in the litigation. In such cases it is not the court that frames the issue and designates entries at stake. It is the importer that requests an advance ruling and Customs that determines how broad the ruling will be. HN20 The traditional rule that each entry is a new cause of action does not obtain in the case where the initial cause of action encompasses prospective entries. To force an importer to seek relief under § 1581(h) to establish its rights, and then force it to litigate again when it seeks to enforce those rights with actual entries, would make § 1581(h) superfluous as an avenue of relief. It is also contrary to the requirements for a valid declaratory judgment case under the Supreme Court's decision in *Calderon*.

Having established that decisions of this court grounded in the jurisdiction of § 1581(h) can have binding application to subsequent entries, the next issue is to determine which parties are bound, and for how long.

B. Who is bound by the decision?

Under normal circumstances it is not necessary to inform parties to cases that they are bound by the decision of the court. However, implicit in the Government's brief is the idea that Customs law, [**36] and therefore the Customs Service, is subject to distinct laws and rules, which render normal litigation practice inapplicable. To some extent this is true. HN21 In certain circumstances it is possible for the Customs Service to limit (but not abrogate) a decision of this court. *See* *Boltex v. United States*, 140 F. Supp. 2d 1339 at 1346; 19 C.F.R. § 177.10(d) (1998). However, this is not a wholesale waiver, but an exception. Once the judiciary has spoken to a law, in the absence of congressional action, parties to the dispute are bound by the court's decision. n11 The fact that one of the parties to [*1332] this litigation is the government does not exempt it from complying with the law as interpreted by the judicial branch. It is the purpose of this court to adjudicate and settle disputes between private individuals and our government. Having waived sovereign immunity, the government is bound the judiciary branch's decisions. While there are exceptions to this rule, none of them are present in this case. The government was bound by the original unstayed *Heartland* decision of this court, as much as Heartland is bound by the Federal Circuit's reversal.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 The issue of agency non-acquiescence has surfaced before. For example, in the first half of the 1980's the Social Security Administration refused to acquiesce to district and circuit court opinions. Often an agency will apply certain court decisions only within the circuit that issues them. *See* Samuel Estreicher and Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 Yale L.J. 679 (1989). Obviously, circuit specific rulings are not applicable in Customs cases because the CIT is a court of national jurisdiction. A federal district court addressing the issue stated the following:

> Our system of constitutional government is undoubtedly a unique and complex one, with three distinct branches of government with independently derived legal authority and substantially separate functions--the legislature, to enact the law; the judiciary, to interpret the law; and the executive (and its administrative agencies), to enforce the law. Undoubtedly, too, the lines of separation between these functions are not always clear-cut. The judiciary necessarily exercises enforcement-related functions as an incident of its interpretive and adjudicative activities, while the executive, particularly in the modern era of elaborate administrative agency regulation of a multitude of commercial, social, economic, scientific and employment-related affairs, is permitted to exercise a degree of interpretive authority in its enforcement of the law. However, only a fundamental reordering of this constitutional balance would permit the [Social Security Administration] to exercise the power to which it claims an entitlement in this case. The fundamental principles of our constitutional scheme, as articulated in decisions such as *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803) (judicial determination of constitutionality of congressional legislation), *Cooper v. Aaron*, 358 U.S. 1, 17-19, 78 S. Ct. 1401, 1409-10, 3 L. Ed. 2d 5, 19 (1958) (state executive and legislative officials' duty to obey federal court decisions), and *United States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) (judicial determination of scope of presidential power), *establish the authority of federal courts to render decisions which bind all other participants in our constitutional system of government.*

*Stieberger v. Heckler*, 615 F. Supp. 1315, 1356-57 (S.D.N.Y. 1985) (emphasis added) *rev'd on other grounds, Stieberger v. Bowen*, 801 F.2d 29 (2d Cir. 1986)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[**37]

C. How Long are the Parties Bound?

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

HN22 The Rules of the U.S. Court of International Trade provide for a party to stay the execution of a decision pending appeal. USCIT R.62. In fact, there is a specific rule exempting the United States from posting a bond when it is the appellant. *See* USCIT R.62(d). In the absence of a request by one of the parties the decision of the court is binding. n12 As explained by the Court of Appeals for the District of Columbia in another case involving review of agency action,

> HN23 the vitality of that judgment is undiminished by pendency of the appeal. Unless a stay is granted either by the court rendering the judgment or by the court to which the appeal is taken, the judgment remains operative. To be sure, for as long as the appellate court retains its mandate it maintains jurisdiction over the case, and thus the power to alter the mandate. But non-issuance of the mandate by the appellate court has no impact on the trial court's powers to enforce its unstayed judgment since the latter court has retained that power throughout the pendency of the appeal.

*Deering Milliken, Inc. v. Fed. Trade Comm'n*, 207 U.S. App. D.C. 384, 647 F.2d 1124, 1129 (D.C. Cir. 1978). [**38]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 Requesting a stay is not the only option open to Customs in the face of an adverse ruling. Any product falling under the Revocation could be subject to at least three actions by Customs. First, Customs could apply the pre-Revocation rate, consistent with the decision of this Court. Second, under 19 U.S.C. § 1504(b) and (c), Customs could extend liquidation pending the outcome of the appeals process, making clear its intent to apply the Revocation if it is upheld by the Federal Circuit. Third, Customs could flout the decision of this court, liquidate the entries and risk punitive action by this court. It is unclear, but, at least until August 30, 2001, Customs may have chosen the second option and extended liquidation pending the outcome of the judicial process. Apparently some entries were given the pre-Revocation rate. It is the actions Customs took after August 30, 2001 that raise the most serious questions and problems.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Under the Federal Rules of Appellate Procedure, HN24 an opinion [**39] of the appeals court is not final until it issues its mandate. Fed. R. App. P. 41(c). This rule is confirmed in the caselaw. Even if the appeals court issues a decision without the [*1333] mandate, it is still open and subject to change. *See* *Bryant v. Ford Motor Co.*, 886 F.2d 1526 (9th Cir. 1989) (vacating a prior en banc opinion in light of new legislation). In some cases the initial decision has been withdrawn and changed prior to the mandate's issuance. It is important to understand that unless specifically directed, the parties cannot rely on the decision as final until the mandate issues. *See* *T.S. Alphin v. Henson*, 552 F.2d 1033, 1035 (4th Cir. 1977). Once the mandate is issued, the court of appeals relinquishes jurisdiction over the case back to the trial court for further proceedings consistent with the mandate. *See e.g.,* *United States v. Cote*, 51 F.3d 178, 181-82 (9th Cir. 1995).

Defendant quotes *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, for the proposition that "when a judgment for the plaintiff is reversed. . . the only matters that remain for the district court are to dismiss the complaint and enter the judgment in the [**40] docket." 137 F.3d 1475, 1483 (Fed. Cir. 1998). The government failed to include the important sentence that immediately precedes the one quoted: "As an initial matter, every appellate court judgment vests jurisdiction in the district court to carry out some further proceedings." *Id.*

In light of the relevant caselaw, the Federal Rules of Appellate Procedure, and the Rules of this court, it is clear the decision of this court remains binding and enforceable until the issuance of the mandate. Any action by Customs that applies the Revocation prior to the issuance of the mandate directly flouts the authority of this court over rulings under § 1581(h). This court's October 1999 decision that the Revocation is contrary to law remains binding on Customs until the issuance of the mandate by the Federal Circuit. Had Customs not acted precipitously with regard to at least some liquidations, thus eliciting Plaintiff's motion, this matter would have concluded at that time.

D. Application of § 1581(h) and disposition of motion.

In summary, while the Court of International Trade remains one of limited jurisdiction, the 1980 Act fundamentally changed the jurisdictional [**41] reach and remedial powers of the court. The legislative and case histories detailed above confirm that § 1581(h) is a significant grant of jurisdiction to the court. It allows for pre-importation review of certain cases, if the requirements for irreparable harm can be shown.

When the court hears a case under § 1581(h), it has the power to issue a binding opinion that covers the entries contemplated by the ruling at issue. In the absence of "specific contemplated import transactions" which will apply a ruling with "virtual certainty" jurisdiction under § 1581(h) is not available. *See* *Pagoda Trading Co.*, 6 C.I.T. 296, 577 F. Supp. 22 at 24. Failure of litigants and the court to identify the relevant contemplated import transactions presents the prospect of an

**Reply in Supp. Pl.'s Mot. In Limine, Ex. A**

unconstitutional advisory opinion, and prudential concerns of ripeness. Once the class of contemplated imports is defined by the importers and Customs, the scope of the jurisdiction the court will exercise is set. Often this class will be defined by the ruling the government issues. A decision reached in an § 1581(h) cases is binding in that case, and a party is not required to file a new case to enforce that decision.

The [**42] court's decision binds the parties as long as it remains in place, or a motion is granted to stay the decision. In a routine case when the decision is reversed the original decision is binding until a mandate from the appeals court issues. Even in cases of reversal the district court still retains jurisdiction to settle collateral issues, such as attorney fees. *See White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 102 S. Ct. 1162, 71 [*1334] L. Ed. 2d 325 (1982). Nevertheless, with a traditional case, this court relinquishes jurisdiction over parties and issues with entry of judgment following a mandate.

This, however, is not a typical case. The court has extended its jurisdiction well past reception of the mandate to consider the Plaintiff's motion. In addition, Plaintiff is seeking uncommon relief by asking the court to rule on the purpose and meaning of 19 U.S.C. § 1625(c) when that issue was not adjudicated in the original proceeding. Plaintiff's motion requests that the judgment order implementing the mandate of the Federal Circuit specify that the higher Tariff Rate Quota rate applies only to entries following a 60-day notice period after the issuance of the Federal [**43] Circuit's mandate, and perhaps even further to 60 days after this court's disposition of Plaintiff's motion. *Pl.'s Br.* at 2.

At issue are four categories of import entries arranged chronologically: those imported before the Federal Circuit opinion of August 30, 2001, those between August 30 and December 11, 2001, those between December 11, 2001 and disposition of the Plaintiff's motion, and those entered after disposition of the motion. Parallel to the entries are the instances and dates for liquidation, which also can be divided into the four time periods above.

The court clearly has jurisdiction over some of these entries, specifically those entered and liquidated prior to December 11, 2001. It is not at all clear that the court could rule on the application of the higher tariff rate to liquidations, let alone entries, after December 11, 2001. The effective date of the Revocation was not an issue disputed in the original case. It is an issue created by arguably premature Customs' actions against Heartland. Therefore, the court should consider this matter only if necessary to enforce its, or the appellate, decision. There is an obvious link between the restoration of the Revocation [**44] by the Federal Circuit, and determining the effective date of its application. Plaintiff, however, has not to date established to the satisfaction of the court a significant nexus between the original decision of this court and its request for relief under § 1625(c) sufficient to warrant the maintenance of extraordinary jurisdiction to grant that relief to all entries Plaintiff claims are at issue in the case.

The court then has the option of ruling on the applicability of § 1625(c) on some of the entries covered by the Plaintiff's motion. However, the court would not be able to consider all the relief the Plaintiff is requesting. In addition, the factual record is not clear. At oral argument the status of the liquidation process was uncertain. *Oral Arg. Tr.* at 8, 36. If Customs had properly extended pursuant to its statutory authority under 19 U.S.C. § 1504(b), there would be no issue with regard to those entries. For the court to maintain jurisdiction to settle the application of § 1625(c) to new entries, and those with uncertain liquidation status, requires adjudication of both new law and new facts distinct in nature from the original case. *See* [**45] Fed. R. Civ. P.15; CIT R.15., (providing for supplemental pleadings, allowed at the discretion of the court); *See also* 28 U.S.C. § 1367 (providing for supplemental jurisdiction by district courts over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.) n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n13 *See e.g., Ammex, Inc. v. United States*, 193 F. Supp. 2d 1325, 2002 Ct. Intl. Trade LEXIS 21 (CIT 2002) (Motion for order to show cause why defendant should not be held in contempt denied, but noting if Customs attempted to attach or evade a court's judgment, the court could exercise jurisdiction over such behavior under its inherent enforcement powers and as an extension of its jurisdiction to hear a plaintiff's original complaint.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*1335] The court declines to exercise its jurisdiction under § 1581(h) as there is a better alternative available in this case. Plaintiff already has filed protests on liquidations by Customs of entries, some of which occurred [**46] while this court's decision of October 19, 1999 was still in force. Other liquidations occurred after the mandate issued on December 11, 2001. If denied, these protests will soon be ripe for adjudication under § 1581(a). n14 This allows the court to consider Plaintiff's claims relating to the 60 day notice provision of § 1625(c) on the more traditional jurisdictional grounds of § 1581(a). n15 Should the court decide that the 60 day period applies to entries after the mandate it would then have all the entries squarely before it, preventing any further gaming of the process by parties. The protest process would also allow for development of a factual record so the court can be specific in its application of § 1625(c). If the Plaintiff's protests are denied, then Plaintiff is free to file a suit with this court. Heartland may not be required to pay the liquidated duties on all the entries it seeks to adjudicate. Customs in the past has been willing to suspend liquidation pending the outcome of a case. *See Oral Arg. Tr.* at 39. Waiting to hear arguments with regard to the 60 day notice provision is advantageous in another way. Through the protest process the parties have a chance [**47] to reach an equitable solution to the problem without resorting to further judicial intervention. Without commenting further on the merits of each party's substantive claims relating to § 1625(c) and

the unfortunate timing of Customs' liquidations, the court has urged both sides to explore ways to bring this litigation to a conclusion, sooner rather than later. n16

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 If Customs grants the protests, Plaintiff will have gained much of the relief it seeks here through the administrative process.

n15 Plaintiff argues that the court could also take jurisdiction under 28 U.S.C. § 1581(i). *Reply Mem. of Points and Authorities in Supp. of Pl.'s Mot. for Entry of J.* (January 16, 2002) at 25. However, § 1581(i) is not appropriate when another avenue is available.

n16 *See Oral Arg. Tr.* at 40.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In this case, to maintain jurisdiction under § 1581(h), or extend it under § 1581(i), when another more comprehensive avenue is available is unwise. The court cannot overlook the fact [**48] that the Federal Circuit has determined the higher duty rate is the legally correct one. It is therefore difficult for the Plaintiff to make out a strong case that it is being severely prejudiced by its application sooner rather than later. The court originally found the extraordinary jurisdiction of § 1581(h) appropriate because the Revocation would have destroyed Heartland's long-term arrangements. Now the Federal Circuit has settled the long-term outlook of the company's current business. As for the remaining questionable liquidations by Customs, those are better handled by the traditional protest process and appeal to this court under § 1581(a). This is especially true in light of Customs' recent decision to liquidate at the lower rate on some of the protested entries. *See Oral Arg. Tr.* at 9. It is conceivable that some cases originally brought under § 1581(h), even after a reversal, may necessitate the court's maintenance of jurisdiction after a mandate has issued. That necessity is not present in this case.

IV. CONCLUSION

For the foregoing reasons, the court declines to extend jurisdiction of this case and Plaintiff's Motion for Entry of Judgment is denied. Therefore, [**49] consistent with the mandate of the Court of Appeals for Federal Circuit in Appeal # 00-1287, -1289, [*1336] dated December 11, 2001, reversing the decision of this court dated October 19, 1999, there is nothing further for the court to determine in this matter and the case is dismissed. Judgment will be entered accordingly.

Dated: , New York, NY

Judith M. Barzilay

Judge

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.
Your use of this service is governed by Terms & Conditions . Please review them.

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

LexisNexis™ by Credit Card
Home | LexisNexis™ by Credit Card | Bookstore | Products & Services | Sign Off

View: Full | Cite Documents Purchased | New Search Auto-Cite® | Shepard's® View in Printable Form

Your browser settings may prevent your return to this document. Please print or download this document before selecting another.

**Document Links:**

Start of Document
DISPOSITION:
CASE SUMMARY
PROCEDURAL POSTURE:
OVERVIEW:
OUTCOME:
CORE TERMS:
LexisNexis (TM) HEADNOTES - Core Concepts -
COUNSEL:
JUDGES:
OPINIONBY:
OPINION:

SHEPARD'S®

*23 C.I.T. 754, *; 74 F. Supp. 2d 1324, **;*
*1999 Ct. Intl. Trade LEXIS 106, ***; SLIP OP. 99-110*

Heartland By-Products, Inc., Plaintiff, v. United States of America, Defendant, and United States Beet Sugar Association, Defendant-Intervenor.

Court No. 99-09-00590

UNITED STATES COURT OF INTERNATIONAL TRADE

23 C.I.T. 754; 74 F. Supp. 2d 1324; 1999 Ct. Intl. Trade LEXIS 106; SLIP OP. 99-110

October 19, 1999, Decided

**DISPOSITION:** [***1] Plaintiff's Motion for Judgment Upon an Agency Record granted.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff, sugar manufacturer, moved for judgment upon an agency record, seeking pre-importation review of a ruling issued by defendant, United States Customs Service, revoking a prior classification ruling issued to plaintiff relating to plaintiff's sugar syrup product.

**OVERVIEW:** Defendant-intervenor, an association of beet sugar refiners, filed a petition with defendant, United States Customs Service (Customs), seeking tariff reclassification of plaintiff's sugar syrup. Customs proposed to revoke its tariff classification for plaintiff's sugar product and issue a new classification. Plaintiff went to court seeking a pre-importation review of Customs' proposed revocation. Plaintiff moved for judgment on the agency record. The court granted plaintiff's motion and declared Customs' reclassification unlawful. Plaintiff proved by clear and convincing evidence that the reclassification would subject its sugar syrup to a prohibitive tariff-rate quota, thereby preventing plaintiff from importing the product and effectively forcing it to close its doors. The proposed increase in duties of 7,000 percent, which would result from the revocation of its current classification, would have raised plaintiff's costs and forced plaintiff's three main customers to arrange long-term commitments with

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

other suppliers.

**OUTCOME:** Plaintiff's motion for judgment upon an agency record granted; defendant's rationale for classifying plaintiff's sugar syrup in a manner inconsistent with the plain meaning of the controlling statute was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

**CORE TERMS:** sugar, syrup, customs, molasses, classification, importer, imported, merchandise, subheading, solid, raw, duty, soluble, classified, non-sugar, refining, sucrose, quota, importation, sugar cane, tariff, heading, rate of duty, beet, abuse of discretion, artifice, capricious, record evidence, combining, granular

**LexisNexis (TM) HEADNOTES - Core Concepts -** Hide Concepts

International Trade Law > U.S. Court of International Trade Rules

*HN1* Under the Harmonize Tariff Schedule of the United States and its General Rules of Interpretation, classification of goods in the tariff schedule are governed by the following principles: 1. The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, for legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, mutatis mutandis, to the above rules, on the understanding that only subheadings at the same level are comparable. For the purposes of this rule, the relative section, chapter and subchapter notes also apply, unless the context otherwise requires.

International Trade Law > U.S. Court of International Trade Rules
Administrative Law > Judicial Review > Standards of Review > Standards Generally

*HN2* 28 U.S.C. S. § 2640(e) (1994) provides that in any civil action not specified in this section, the court shall review the matter as provided in 5 U.S.C. S. § 706. 5 U.S.C. S § 706(2)(A) provides that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions of law found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

International Trade Law > U.S. Court of International Trade Rules
Administrative Law > Judicial Review > Standards of Review > Standards Generally

*HN3* The scope of review is limited to the administrative record. See 28 U.S.C. S. § 2640(e); 5 U.S.C. S. § 706.

International Trade Law > U.S. Court of International Trade Rules
Administrative Law > Judicial Review > Reviewability > Jurisdiction & Venue

*HN4* See 28 U.S.C.S. § 1581(h) (1994).

International Trade Law > U.S. Court of International Trade Rules
Administrative Law > Judicial Review > Reviewability > Jurisdiction & Venue

*HN5* Four requirements for invoking the jurisdiction of the Court of International Trade under 28 U.S.C. S. § 1581(h): (1) judicial review must be sought prior to importation of goods; (2) review must be sought of a ruling, a refusal to issue a ruling or a refusal to change such ruling; (3) the ruling must relate to certain subject matter; and (4) irreparable harm must be shown unless judicial review is obtained prior to importation.

International Trade Law > U.S. Court of International Trade Rules
Administrative Law > Judicial Review > Reviewability > Jurisdiction & Venue

*HN6* When a jurisdictional issue is raised, the burden rests on the plaintiff to prove that jurisdiction exists.

International Trade Law > U.S. Court of International Trade Rules

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

Administrative Law > Judicial Review > Reviewability > Jurisdiction & Venue

*HN7* 28 U.S.C. S. § 2639(b) provides in any civil action described in 28 U.S.C.S. § 1581(h), the person commencing the action shall have the burden of making the demonstration required by such section by clear and convincing evidence.

International Trade Law > U.S. Court of International Trade Rules
Administrative Law > Judicial Review > Reviewability > Jurisdiction & Venue

*HN8* Irreparable harm is that which cannot receive reasonable redress in a court of law. In making this determination, what is critical is not the magnitude of the injury, but rather its immediacy and the inadequacy of future corrective relief. To fulfill its burden, plaintiff must set forth sufficient documentation to support its allegations in establishing the threat of irreparable harm.

International Trade Law > U.S. Court of International Trade Rules
Administrative Law > Judicial Review > Reviewability > Jurisdiction & Venue

*HN9* Irreparable harm may be sufficiently shown in instances where the harm is less drastic than a total shutdown. Severe disruption of business operations can constitute irreparable injury under certain circumstances.

International Trade Law > U.S. Court of International Trade Rules

*HN10* The General Rules of Interpretation for the Harmonize Tariff Schedule require that the tariff classification process begin with the terms of the headings and section and chapter notes.

International Trade Law > U.S. Court of International Trade Rules

*HN11* When a tariff term is not defined, commercial meaning prevails.

International Trade Law > U.S. Court of International Trade Rules
Administrative Law > Judicial Review > Standards of Review > Standards Generally

*HN12* In a case brought under 28 U.S.C.S. § 1581(a) the court reviews customs decision de novo on the record. In a case brought pursuant to 28 U.S.C. S. § 1581(h) the agency record is reviewed and the standard of review is different.

International Trade Law > Tariff Act of 1930

*HN13* A description of an article's chief use is required only when germane to the relevant classification. 19 C.F.R. § 177.2(b)(2)(ii).

International Trade Law > Tariff Act of 1930
International Trade Law > Imports & Exports

*HN14* A manufacturer has the right to fashion goods to avoid the burden of high duties, coincidentally, in a sugar case.

International Trade Law > U.S. Court of International Trade Rules

*HN15* Absent a use provision, an article is to be classified in its condition as imported.

International Trade Law > U.S. Court of International Trade Rules

*HN16* Merchandise is classified in its condition as imported thereby precluding classification as unmixed products.

International Trade Law > U.S. Court of International Trade Rules

*HN17* Importer has the right to stop a legitimate manufacturing process at an artificial point and import the merchandise to obtain the lowest rate of duty.

International Trade Law > U.S. Court of International Trade Rules

*HN18* General Interpretive Rule 10(c) provides that an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it.

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

**COUNSEL:** Mayer, Brown & Platt (Simeon M. Kriesberg, Kathryn Schaefer, Andrew A. Nicely), and Serko & Simon (David Serko, Daniel J. Gluck) for Plaintiff.

David W. Ogden, Acting Assistant Attorney General; Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office; Commercial Litigation Branch, Civil Division, Department of Justice (Aimee Lee); Karen P. Binder, Office of Assistant Chief Counsel, International Trade Litigation, Customs Service, (Yelena Slepak) and Allan Martin, Associate Chief Counsel, Customs Service, (Ellen Daly), of counsel, for Defendant.

Wilmer, Cutler & Pickering (Lewis J. Liman, Robert C. Cassidy, Jr.), for Defendant-Intervenor.

**JUDGES:** Judith M. Barzilay, Judge.

**OPINIONBY:** Judith M. Barzilay

**OPINION:** [*754]

[**1326] **OPINION**

**BARZILAY, JUDGE:**

**I. INTRODUCTION**

This matter is before the court pursuant to Plaintiff's Motion for a Preliminary Injunction or in the alternative, for Judgment Upon an Agency Record pursuant to USCIT R. 56.1. n1 Plaintiff seeks pre-importation review of a ruling issued by the United States Customs Service ("Customs") revoking a prior classification ruling issued to Plaintiff. [***2] *See Revocation of Ruling Letter and Treatment Relating to Tariff Classification of Certain Sugar Syrups*, 33 Cust. Bull. No. 35/36 at 41 (Sept. 8, 1999) ("Final Notice"). The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(h) (1994). n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 On September 22, 1999, the Court heard oral argument on an Order to Show Cause why an expedited briefing schedule on Plaintiff's Motion for a Preliminary Injunction should not issue. Following negotiations, the parties agreed to deem Plaintiff's Motion for a Preliminary Injunction as one for Judgment Upon an Agency Record as well ("*Pl.'s Br.*"). Pursuant to the parties' agreement, on September 24, the court entered an extremely expedited briefing schedule which was designed to allow a final determination on the merits by October 15. On October 14, 1999, the Court heard oral argument on the merits and issued a ruling from the bench following the hearing. This opinion further explains the reasons for the decision.

n2 Plaintiff moved to strike the Declaration of David Williams, *Def.'s Mot. To Dismiss and Mem. in Supp. of the United States' Resp. in Opp'n to Pl.'s Mot. For J. on the Agency R., and/or in the Alternative, Mot. For Prelim. Inj., and in Support of the United States' Mot. To Dismiss the Action* at Attachment 1 ("*Def.'s Br.*"), and the Declaration of Jeffrey Robinson, *Def.-Intervenor's Mem. in Supp. of its Mot. To Dismiss and in Opp'n to Pl.'s Mot. For a Prelim. Inj and to Pl.'s Mot. For J. on the Agency R*. at Annex 24 ("*Def.-Intervenor's Br.*"), since they were not part of the agency record. To the extent the Court considers these submissions it does so narrowly and not as support or explanation for the agency's decision. Accordingly, Plaintiff's motion is denied. Plaintiff has also requested attorney's fees, expenses and court costs under the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994). The Court finds this request premature at the present time, *see* 28 U.S.C. § 2412(d)(1)(B), and thus does not address it.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***3]

**II. BACKGROUND**

Plaintiff, a sugar refiner, imports sugar syrup from Canada and refines the syrup into liquid sucrose. The sugar syrup is derived from sugar cane and sugar beets and contains more than six percent soluble non-sugar solids. Before undertaking business operations, Plaintiff sought an advance ruling from Customs pursuant to the provisions of 19 C.F.R. § 177 [*755] (1995). n3 On [**1327] May 15, 1995, Customs issued New York Ruling Letter ("NYRL") 810328 classifying the merchandise under subheading 1702.90.40 of the Harmonized Tariff Schedule of the United States ("HTSUS") (1995) n4, with a .7 cents per liter general [**1328] rate of duty and a .2 [*756] cents per liter special rate of duty if the goods qualify as North American Free Trade Agreement ("NAFTA") originating goods. Administrative Record File I, Doc. 3 ("AR I(3)").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The general provision, 19 C.F.R. 177.1, provides:

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

> It is in the interest of the sound administration of the Customs and related laws that persons engaging in any transaction affected by those laws fully understand the consequences of that transaction prior to its consummation. For this reason, the Customs Service will give full and careful consideration to written requests from importers and other interested parties for rulings or information setting forth, with respect to a specifically described transaction, a definitive interpretation of applicable law, or other appropriate information. Generally, a ruling may be requested under the provisions of this part only with respect to prospective transactions--that is, transactions which are not already pending before a Customs Service office by reason of arrival, entry, or otherwise.

*Id.* A ruling letter is defined as "a ruling issued in response to a written request therefor and set forth in a letter addressed to the person making the request or his designee." *Id.* at 177.1(d)(1).

The person requesting the ruling is to submit the request in the form of a letter. *See* 19 C.F.R. 177.2(a). Letters requesting classification must comport with the provisions of 19 C.F.R. 177.2(b)(2)(ii), which in relevant part state:

> If the transaction involves the importation of an article for which a ruling as to its proper classification under the provisions of the Harmonized Tariff Schedule of the United States is requested, the request for a ruling should include a full and complete description of the article and whenever germane to the proper classification of the article, information as to the article's chief use in the United States, its commercial, common, or technical designation, and, where the article is composed of two or more materials, the relative quantity (by weight and by volume) and value of each.

*Id.* [***4]

n4 *HN1* The provisions of the HTSUS at issue are as follows:

General Rules of Interpretation

Classification of goods in the tariff schedule shall be governed by the following principles:

1. The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions[.]

****

6. For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the above rules, on the understanding that only subheadings at the same level are comparable. For the purposes of this rule, the relative section, chapter and subchapter notes also apply, unless the context otherwise requires.

Chapter 17

*Additional U.S. Notes*

****

5. The aggregate quantity of sugars, syrups and molasses entered, or withdrawn from warehouse for consumption . . . during any fiscal year, shall not exceed in the aggregate an amount (expressed in terms of raw value), not less that 22,000 metric tons, as shall be established by the Secretary [of Agriculture].

| Heading/Subheading | Article Description |
|---|---|
| 1702 | Other sugars, including chemically pure lactose, maltose, glucose and fructose, in solid form; sugar syrups not containing added flavoring or coloring matter; artificial honey, whether or not mixed with natural honey; caramel: |
| | **** |

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

| | |
|---|---|
| 1702.90 | Other, including invert sugar: |
| | Derived from sugar cane or sugar beets: |
| | Containing soluble non-sugar solids (excluding any foreign substances that may have been added or developed in the product) equal to 6 percent or less by weight of the total soluble solids: |
| | **** |
| 1702.90.10 | Described in additional U.S. note 5 to this chapter and entered pursuant to its provisions |
| 1702.90.20 | Other<1> |
| | **** |
| 1702.90.40 | Other |
| | **** |

<1> See subheadings 9904.17.08-9904.17.16.

****

| | |
|---|---|
| 9904.17.08 | Sugars, syrups and molasses, provided for in subheading 1702.90.20: |
| | If entered during the effective period of safeguards based upon value: |
| | **** |
| 9904.17.16 | If entered during the effective period of safeguards based upon quantity announced by the Secretary of Agriculture |

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***5]

Plaintiff began its refining operations in the middle of 1997. The process Plaintiff uses to refine the sugar syrup into liquid sucrose, while proprietary, may be described in general terms. Before arriving in the United States, the sugar syrup is manufactured according to Heartland's specifications. The process involves adding raw granular sugar, dry form sucrose, to molasses. Water is added and the material is then heated and agitated dissolving the dry form sucrose and forming a definable, homogeneous sugar syrup. *See* AR I(26) at 3. After being transported to the plant in Taylor, Michigan, the syrup is pumped into storage tanks and the following steps occur. First, the syrup is placed in a vacuum pan to induce the crystallization of sucrose. Next, the massecuite, a slurry of crystals and syrup, is subjected to centrifugal force to separate the crystals from the syrup. Finally the crystals are subjected to a number of steps making them suitable to sell as liquid sucrose for use in the production of cereal, ice cream, candy and other food applications. The sucrose content of the liquid sucrose is several percentage points higher than the syrup in its condition as imported. Some [***6] of the residue, which is molasses, is sold for use in animal feed, some is lost in the process and some is returned to Canada.

On January 14, 1998, Defendant-Intervenor, United States Beet Sugar Association, filed a petition with Customs under 19 U.S.C. § 1516, suggesting alternatively that Customs had the option to proceed under 19 U.S.C. § 1625, seeking reclassification of the sugar syrup. n5 AR I(1). Customs [**1329] chose the latter option, and on June 9, 1999, issued notice of its intent to revoke NYRL 810328 and invited comments pursuant to 19 U.S.C. § 1625(c)(1) on proposed Headquarter Ruling ("HQ") 961273. *See Proposed Revocation of Ruling Letter and Treatment Relating to Tariff Classification of Certain Sugar Syrups*, 33 Cust. Bull. No. 22/23 at 52 ("Preliminary Notice"). Because of this procedural mechanism, Plaintiff was forced to obtain Defendant-Intervenor's submission through a Freedom of Information Act request. Following an extension of the comment period to August 9, 1999, on September 8, 1999, Customs published a notice of revocation, which pursuant to 19 U.S.C. § 1625 [***7] makes HQ 961273 effective on November 8, 1999, sixty days following [*757] publication. *See* Final Notice at 41. Plaintiff then sought relief in this court as previously described. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

n5 Section 1516 provides that an interested party may inquire into, among other things, the classification of imported merchandise and file a petition setting forth the rate of duty it believes proper. *See* 19 U.S.C. § 1516(a). If the Secretary of the Treasury determines the classification is incorrect, the statute directs him to determine the correct classification. *See id.* at § 1516(b). If the Secretary determines the classification is correct he is directed to notify the petitioner who then has thirty days to contest the decision. *See id.* at § 1516(c). Upon receipt of such notice, the Secretary must publish his determination and the petitioner's desire to contest it, and furnish the petitioner with sufficient information to enable a challenge to the liquidation of one entry. *See id.* No time limits are imposed on the Secretary to make his initial decision.

Section 1625 provides at least a thirty day comment period for modification or revocation of a prior interpretive ruling or decision in effect for at least sixty days. *See* 19 U.S.C. § 1625(c)(1). Once the comment period closes, the Secretary is directed to publish a final ruling within thirty days. *See id.* Sixty days following publication of the final ruling or decision it becomes effective. *See id.* [***8]

n6 In its complaint, Plaintiff included a count alleging that Customs abused its discretion by permitting political considerations to dictate the reclassification. As emphasized at oral argument held October 14, 1999, the Court views this case as one dealing solely with the proper classification of Plaintiff's imported product. Therefore, none of the allegations, on both sides, of improper political activity entered into the Court's deliberations or decision. In addition, because the Court holds for Plaintiff on the classification issue, it need not, and does not, consider two of Plaintiff's other claims: Count III, that Customs violated the law by proceeding under 19 U.S.C. § 1625 rather than under 19 U.S.C. § 1516; Count V, that Customs violated the law by failing to demonstrate a compelling reason for its revocation.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**III. STANDARD OF REVIEW**

*HN2* 28 U.S.C. § 2640(e) (1994) provides that "in any civil action not specified in this section, the [court] shall review the matter as provided in [ 5 U.S.C. § 706]. [***9] " (28 U.S.C. § 1581(h) is not specified therein). *Id.* 5 U.S.C. § 706(2)(A) provides, in relevant part, that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions of law found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* *HN3* The scope of review is limited to the administrative record. *See* 28 U.S.C. § 2640(e); 5 U.S.C. § 706.

**IV. DISCUSSION**

*A. Plaintiff Has Met Its Burden of Demonstrating by Clear and Convincing Evidence That the Court Has Jurisdiction Pursuant to 28 U.S.C. § 1581(h).*

Plaintiff asserts that the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(h) with respect to declaratory relief and § 1581 (i) with respect to injunctive relief. Defendant concedes jurisdiction with respect to § 1581(h) but challenges jurisdiction under § 1581(i). Defendant-Intervenor contests jurisdiction under both § 1581(h) and (i), and argues that the Court may only exercise jurisdiction pursuant to § 1581(a). [***10] Because of the differing positions of each party in this case, the Court finds it necessary to address the issue of jurisdiction in detail. The Court exercises jurisdiction under § 1581 (h), and will grant relief accordingly, thus the need for a preliminary injunction is moot.

*HN4* Section 1581(h), Title 28, United States Code, provides:

> The [court] shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, . . . or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to [**1330] obtain judicial review prior to such importation.

28 U.S.C. § 1581(h) (1994). The Court of Appeals for the Federal Circuit outlined *HN5* four requirements for invoking the jurisdiction of this Court under 28 U.S.C. § 1581(h):

> (1) judicial review must be sought prior to importation [***11] of goods;
> (2) review must be sought of a ruling, a refusal to issue a ruling or a refusal to change such ruling;
> [*758] (3) the ruling must relate to certain subject matter; and

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

(4) irreparable harm must be shown unless judicial review is obtained prior to importation.

*American Air Parcel Forwarding Co. v. United States*, 718 F.2d 1546, 1551-52 (Fed. Cir. 1983), *cert. denied*, 466 U.S. 937, 80 L. Ed. 2d 458, 104 S. Ct. 1909 (1984).

Defendant does not claim that the Court lacks jurisdiction under § 1581(h). Between the other parties to this action, there is no dispute as to the first three requirements of jurisdiction under this section. Defendant-Intervenor challenges only Heartland's claim of irreparable injury. "When HN6 a jurisdictional issue is raised, the burden rests on the plaintiff to prove that jurisdiction exists." *Manufacture de Machines du Haut-Rhin v. von Raab*, 6 C.I.T. 60, 62, 569 F. Supp. 877, 880 (1983) (citing *United States v. Biehl & Co.*, 3 C.I.T. 158, 160, 539 F. Supp. 1218, 1220 (1982)). Plaintiff must demonstrate irreparable harm by a clear and convincing evidence standard. n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 HN7 28 U.S.C. § 2639(b) provides: "In any civil action described in section 1581 (h) of this title, the person commencing the action shall have the burden of making the demonstration required by such section by clear and convincing evidence."

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - HN8 [***12]

Irreparable harm is that which "cannot receive reasonable redress in a court of law." *Manufacture de Machines du Haut-Rhin*, 6 C.I.T. at 64, 569 F. Supp. at 881-82 (quoting BLACK'S LAW DICTIONARY 706-707 (5th ed. 1979)). "In making this determination, what is critical is not the magnitude of the injury, but rather its immediacy and the inadequacy of future corrective relief." *National Juice Products v. United States*, 10 C.I.T. 48, 53, 628 F. Supp. 978, 984 (1986) (citations omitted). To fulfill its burden, Plaintiff must "set forth sufficient documentation to support its allegations in establishing the threat of irreparable harm." *Thyssen Steel Co., Southwestern Division of Thyssen, Inc. v. United States*, 13 C.I.T. 323, 326, 712 F. Supp. 202, 204 (1989) (citing *718 Fifth Avenue Corp. v. United States*, 7 C.I.T. 195, 198 (1984)).

Plaintiff asserts that implementation of the revocation of NYRL 810328 will destroy its business. *Compl.* P 9 (citing Affidavit of Gregory Kozak ("Kozak Aff.")). Plaintiff claims that the reclassification of Heartland's sugar syrup as per HQ 961273 will subject the sugar syrup to a prohibitive tariff-rate [***13] quota ("TRQ"), thereby preventing Heartland from importing the product and effectively forcing it to close its doors. *Id.*

Plaintiff has provided sufficient documentation to clearly and convincingly establish jurisdiction under § 1581(h). Attached to its brief is the affidavit of the President of Heartland, Gregory Kozak, detailing the extent of business disruption that Heartland will suffer if it is unsuccessful in its legal challenge. The proposed increase in duties of 7000 percent, which will result from the revocation of NYRL 810328, will raise Heartland's costs, and force Heartland's three main customers to arrange long-term commitments with other suppliers. Kozak Aff. P. 13-16. n8 [*759] Heartland will additionally have to abandon its transport and supply arrangements. *Id.* P 20. The company will thereby be forced to lay off all of its sixty employees trained to work in the Taylor, [**1331] Michigan plant, and completely cease production. *Id.* P 17, 21-23.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 Heartland has supplied the Court with documentation of the loss of its customers in the form of letters from its customers indicating their plans to take their business elsewhere if the original classification is not restored. *See Pl.'s Br.* at Confidential Annex 6-8.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***14]

The fatal blow that reclassification will deal to Heartland certainly suffices as "irreparable injury." Not only will failure to obtain review prior to importation sound the death knell for Heartland's business, but the injury will, as evidenced by the aforementioned documentation, occur immediately. Future corrective relief will be inadequate, as even if Heartland prevails on the classification ruling, its main customers will have made long-term supply arrangements with other sugar producers.

Precedent indicates that HN9 irreparable harm may be sufficiently shown in instances where the harm is less drastic than a total shutdown. As this court in *National Juice* stated, "severe disruption of business operations can constitute irreparable injury under certain circumstances." 10 C.I.T. at 54, 628 F. Supp. at 984. In *National Juice*, this court held that the plaintiffs had demonstrated irreparable harm by showing that they would be "unable to use foreign manufacturing concentrate and . . . [unable] to satisfy all of their customer's [sic] orders for retail orange juice products." *Id.* Additionally, in *American Frozen Food Institute, Inc. v. United States*, this [***15] court held irreparable injury to be established when "plaintiffs have

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

presented evidence that they will lose substantial sums of money from the destruction of stockpiled non-complying labelling." 18 C.I.T. 565, 570, 855 F. Supp. 388, 393 (1994). Neither of the plaintiffs in either case established evidence of total business destruction and yet this court held irreparable injury to be sufficiently established. As Plaintiff in this case has shown documented evidence that its doors will be forced to close barring revocation of the reclassification, the Court holds that Plaintiff has more than met its burden of providing evidence of irreparable harm, and therefore jurisdiction under § 1581 (h) is proper.

[*760] Defendant-Intervenor argues that Heartland has not "made such a 'clear showing' that its case falls within the 'limited circumstances' of Section 1581(h)." *Def.-Intervenor's Br.* at 11 (citations omitted). It asserts that because Heartland "does not claim that it would be placed in bankruptcy or that it would suffer irreparable reputational harm . . . [its] claims of irreparable harm are hollow at best and misleading at worst." *Id.* at 12-13. Yet Plaintiff "may, but [***16] need not, demonstrate that it would suffer multiple forms of irreparable harm." *CPC International, Inc. v. United States*, 19 C.I.T. 978, 980, 896 F. Supp. 1240, 1243 (1995). Defendant-Intervenor may therefore not successfully disprove this court's jurisdiction under § 1581(h) merely by reciting other forms of irreparable harm which Plaintiff has *not* stated in support of its claim.

Defendant-Intervenor's only challenge to the reason Plaintiff has given the Court as a basis for jurisdiction is the mere assertion that its parent corporation, E.D. & F. Man Group can absorb the increased costs that Heartland will suffer if the sugar syrup is not reclassified. *Id.* at 12-13. This argument is meritless for several reasons. First, Heartland's parent company is not a party to this case, and Defendant-Intervenor cannot successfully challenge a party's showing of irreparable harm by making assertions based on the potential financial abilities of a nonparty. The Court agrees with Plaintiff that asking the Court to hold a nonparty parent company responsible for the losses of a subsidiary party to the case is essentially asking the Court to pierce the corporate veil. *Pl.* [***17] *'s Reply Mem. of Points and Authorities in Supp. of Pl.'s Mots. For J. on the Agency R. and for a Prelim. Inj.* at 46 ("*Pl.'s Reply*"). The Court is well aware of the general rule that the corporate entity should be recognized absent specific exceptional circumstances. As the Federal Circuit stated, "the corporate form is not to be lightly cast aside." *3 D Systems, Inc. v. Aarotech Lab., Inc.*, 160 F.3d 1373, 1380 (Fed. Cir. 1998) (citing *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990)). [**1332] Defendant-Intervenor has provided no evidence nor does the record reflect exceptional circumstances or reasons why the corporate veil should be pierced in this case.

Second, even if the Court were is a position to pierce the corporate veil and hold the corporation responsible for the potential costs to Heartland, Defendant-Intervenor has provided no documentation that Heartland's parent company could prevent the harm Heartland claims to suffer. Defendant-Intervenor speculates that E.D. & F. Man Group can absorb the increased costs to Heartland; such speculation simply does not refute Plaintiff's sworn and signed documentary evidence [***18] establishing jurisdiction under § 1581(h). Thus, it is the Court's determination that jurisdiction is properly exercised under § 1581(h).

*B. Plaintiff's Product Is Properly Classified under the Plain Meaning of Subheading 1702.90.40 HTSUS. Therefore, Customs' Proposed Revocation Is Not in Accordance with Law.*

Heartland's imported sugar syrup is properly classified in HTSUS 1702.90.40. The plain language of the tariff provision describes the imported product. HTSUS 1702.90.40 covers sugar syrups not containing added flavoring or coloring matter . . . containing soluble non-sugar solids greater than 6 percent by weight of the total soluble solids. Using the classic and long-standing principles of tariff classification which start with the application of the General Rules of Interpretation ("GRI") in the order in which they appear and following through with case law developed by the Supreme Court, courts of appeal, this court and its predecessor courts, there can be little doubt that the correct classification of Heartland's syrup is within HTSUS 1702.90.40.

As described to Customs in Heartland's ruling request dated April 18, 1995, Plaintiff's product is a sugar syrup whose [***19] components are sugar, [*761] water and soluble non-sugar solids. The syrup is exclusively of sugar beet and/or cane sugar origin, approximately 70 percent by weight of dissolved solids and approximately 30 percent by weight of water. The production process includes the combining of granular raw sugar n9 with molasses, of cane or beet origin, to produce a brown sugar of approximately 93 percent polarity. This sugar is then dissolved in hot water to produce a simple syrup. AR I (37-38).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 Petitioners and Defendant-Intervenor here have described the product as refined beet or cane sugar, water and molasses. *See* AR I(1) at 1. However, there is no other record support for this statement and Defendant-Intervenor admitted at oral argument that plaintiff's description of its product is not controverted.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*HN10* GRI 1 requires that the classification process begin with the terms of the headings and section and chapter notes. Included within Heading 1702 is "sugar syrups not containing added flavoring or coloring matter." Plaintiff's [***20] product is a sugar syrup "whose components are sugar, water and soluble non-sugar solids." AR I(37).

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

Although the term "syrup" is not specifically defined in the Harmonized Tariff itself, there is no doubt as to its meaning and that Plaintiff's product falls within it. According to the Concise Oxford Dictionary, syrup is "water (nearly) saturated with sugar" or "condensed sugar cane juice, part of this remaining uncrystallized at various stages of refining." (7th ed. 1987). The Explanatory Notes n10 to heading 1702 also define and explain the term sugar syrup in note 1702(B) as follows:

(1) **Simple syrups** obtained by dissolving sugars of this Chapter in water.

(2) **Juices and syrups** obtained during the extraction of sugars from sugar [**1333] beet, sugar cane, etc. These may contain pectin, albuminoidal substances, mineral salts, etc., as impurities.

(3) **Golden syrup**, a table or culinary syrup containing sucrose and invert sugar. Golden syrup is made from the syrup remaining during sugar refining after crystallization and separation of refined sugar, or from cane or beet sugar, by inverting part of the sucrose or by the addition of invert sugar.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 The Explanatory Notes to the HTS have often been used to interpret HTS Subheadings. *See* *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1366 (Fed. Cir. 1998) (citing *Lonza, Inc. v. United States*, 46 F.3d 1098, 1109 (Fed. Cir. 1995)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***21]

Special note should be taken of number (3) above, "Golden Syrup," as Customs has attempted to change the classification on the grounds that molasses is a foreign substance within the meaning of the words "excluding any foreign substances that may have been added" (item 1702.90) when counting what soluble solids should be counted toward the 6 percent by weight. As number (3) above makes clear, Golden Syrup is a recognized table syrup made from molasses ("the syrup remaining during sugar refining after crystallization and separation of refined sugar") or from cane or beet sugar.

In addition, the record demonstrates that the commercial meaning of the term sugar syrup includes Heartland's product. *See* AR V(17) Statement of James C.P. Chen; Statement of Jean-Pierre M. Monclin; Statement of Michael B. Inkson; and Statement of Roger J. Crain. *HN11* When a [*762] tariff term is not defined, commercial meaning prevails. *Lynteq, Inc. v. United States*, 976 F.2d 693, 697 (Fed. Cir. 1992). Therefore, clearly Heartland's product is syrup within the meaning of heading 1702.

Plaintiff's syrup does not contain any added flavoring or coloring matter. The record reflects that this issue was [***22] discussed at a meeting held July 29, 1998 with Plaintiff's representatives and certain Treasury officials which resulted in a letter dated August 26, 1998 from Plaintiff's counsel explaining in great detail that the molasses added to the raw sugar in Plaintiff's processing cannot be considered added flavoring or coloring within the terms of the tariff. *See* AR II(1) at 1-4. n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 Customs and Defendant-Intervenor do not pursue this issue in the case at bar.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Continuing to apply GRI 1 and 6 n12 to the syrup leads to item 1702.90.40 because it is derived from sugar cane or sugar beet (1702.90) and has more than 6 percent soluble non-sugar solids (equal to or less than 6 percent would lead to 1702.90.10 or .20) and is not invert molasses (which would lead to 1702.90.35).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 The application of GRI 6 requires comparison of co-equal subheadings and classification according to notes relating to such subheadings. There are no relevant subheading notes to consider in this case.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***23]

Factually, there is no doubt that Heartland's product contains more than 6 percent "soluble non-sugar solids." A test

conducted by the Customs laboratory pursuant to an investigation, *see* AR I(6)(i), found the syrup more than 6 percent by weight of soluble non-sugar solids. Therefore, plaintiff's product fits the descriptive language of subheading 1702.90.40 and pursuant to its plain language is properly classified within it. n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n13 The provision uniquely and accurately describes Heartland's product and is clearly an *eo nomine* provision. *See* 2 CUSTOMS LAW AND ADMINISTRATION § 53.3 (3rd ed. 1999) and cases collected therein. Customs does not argue that the provision is a use provision, but does contend that use should be considered when classifying Plaintiff's syrup because the importation is an artifice. *Def.'s Br.* at p. 42. The Court does not agree. *See* discussion, *infra*.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Both Customs and Defendant-Intervenor argue, albeit on different grounds, that the molasses is a foreign substance [***24] in relation to the syrup under the terms of 1702.90 HTSUS "containing soluble non-sugar solids (excluding any foreign substances that may have been added or developed in the product)." If so considered, the soluble non-sugar solids in the molasses would be disregarded in determining the percentage of such solids in the syrup itself bringing the percentage to less than [**1334] 6 percent thus preventing classification in subheading 1702.90.40.

As Plaintiff completely and lucidly explained in its brief, there is no factual nor legal support for Customs' conclusions that molasses should be considered a foreign substance for purposes of classification of the sugar syrup. As a matter of fact and, as Plaintiff's experts confirmed, the molasses used in the production of Plaintiff's syrup is made from cane or beet as is the granular sugar. The sugar, the molasses and the resulting syrup all have the same chemical ingredients, including impurities that occur naturally in sugar.

[*763] Customs was simply wrong to conclude, as it did in its revocation ruling:

> We believe that molasses with its impurities is a foreign substance and excluded in determining the 6% rule of subheading 1702.90.1000, HTSUS. [***25] . . . The addition of the molasses to the sugar is a foreign substance containing impurities in producing the sugar syrup and, therefore, we exclude the molasses with impurities in calculating the 6% rule.

Final Notice at 53. There is ample record evidence contradicting this conclusion. *See e.g.*, AR V(17) Statement of James C.P. Chen at P 4-6; Statement of Jean-Pierre M. Monclin at P 7-8; Statement of Michael B. Inkson at P 8-12; Statement of Roger J. Crain at P 6.

Defendant-Intervenor argues that molasses is foreign with regard to the sucrose that remains when molasses is removed from raw sugar during the refining process. *Def.-Intervenor's Br.* at 49. But Defendant-Intervenor misunderstood the basic process engaged in by Plaintiff to create its imported syrup. As it is raw sugar, which itself contains molasses, that is combined with additional molasses to create Heartland's syrup, the molasses cannot be considered foreign.

As Plaintiff correctly points out, its syrup, molasses and raw sugar are all composed of the same chemical ingredients in varying proportions. *Pl.'s Reply* at 16; *see also* AR V(17) Statement of James C.P. Chen; Statement of Michael B. Inkson [***26] (sugar experts stating that molasses cannot be said to be a foreign substance in relation to sugar). Therefore, neither substance can be considered foreign in relation to the other. Defendant-Intervenor also contends that molasses must be considered a foreign substance for purposes of this classification exercise or other portions of the sugar cane product could be included to make up the 6 percent solids. However, Defendant-Intervenor ignores the modifier "soluble." Cane leaves and bagasse would never fit the description "soluble non-sugar solids" and, therefore, cannot be compared to molasses when determining which non-sugar solids should be considered foreign substances.

The foreign substances argument is also not in accordance with law. It cannot be reconciled with the language of HTSUS or the Explanatory Notes. The word "foreign" appears in subheading 1702.90 modifying sugar syrups derived from sugar cane or sugar beets.

> Containing soluble non-sugar solids (excluding any *foreign substances* that may have been added or developed in the product) equal to 6 percent or less by weight of the total soluble solids.

There is ample record evidence that Customs' interpretation [***27] of "foreign substances" to include anything that is itself "derived from sugar cane or sugar beets" is unreasonable and an abuse of discretion.

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

In the revocation, Customs stated "molasses is not sugar derived from the refining of sugar cane or beets" and that the "mixture of molasses with sugar is not a refining process for raw sugar, and the addition of water [*764] to such a mixture does not create a 'sugar syrup' derived from a refining process from sugar cane or sugar beet." Final Notice at 52-53. However, Customs *sua sponte* added the word "refining." HTSUS 1702.90 refers simply to "derived from sugar cane or sugar beets." Thus, so long as a sugar or a syrup is "derived from sugar cane or sugar beets," it fall within HTSUS 1702.90. By the same token, so long as a "substance" is [**1335] "derived from sugar cane or sugar beets," as the molasses used in Heartland's sugar syrup surely is, it cannot be "foreign" to HTSUS 1702.90.

The ENs for heading 1702 further refute Customs' position that molasses is "foreign." One of EN 1702(B)'s illustrations of sugar syrups covered by heading 1702 is described as follows:

2. **Juices and syrups** obtained during the extraction of sugars from sugar beet, [***28] sugar cane, etc. These may contain pectin, albuminoidal substances, mineral salts, etc., as impurities.

EN 1702(B) (emphasis in original). By expressly including within heading 1702 a syrup containing "pectin, albuminoidal substances, mineral salts, etc., as impurities," the EN directly contradicts Customs' position that such impurities in molasses render molasses a substance "foreign" to sugar syrup. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 Customs seems to have abandoned the argument advanced in its revocation that molasses must be a "foreign" substance under subheading 1702.90 because "molasses syrups are classified in heading 1703" not in heading 1702, since the revocation held classification within subheading 1702.90.10/20.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Customs also argues that the molasses must be considered foreign because "if something is added or developed in the product that artificially increases the soluble non-sugar solids, that addition is a 'foreign substance' for purposes of subheading 1702.90." *Def.'s Br.* at 51. This argument is based on a misunderstanding [***29] of Plaintiff's pre-importation process and the case law dealing with artifice or deceit. Record evidence shows a clear commercial purpose for combining molasses with raw sugar in the refining process. *See* AR V(17) Statement of Jean-Pierre M. Monclin at P 6 ("In sugar processing such mixing of molasses with granular sugar is common practice... it is the principal way to adjust stream purity during crystallization."); Statement of Michael B. Inkson at P 13 ("Mixing molasses with higher purity streams [granular or liquid] is quite common in the production of sugar products. The process is designed to produce final sugar products of particular polarity."). Customs' characterization of Plaintiff's adding of molasses to its sugar syrup as an artifice or deceit is not supported by case law. *See* discussion, *infra*.

Therefore, the Court can sustain none of the arguments presented by Customs or Defendant-intervenor that molasses should be considered a foreign substance for the purpose of classifying Plaintiff's sugar syrup.

[*765] *C. The Record Evidence Does Not Support Classifying the Sugar Syrup Outside the Plain Meaning of Subheading 1702.90.40 HTSUS*.

As discussed above, [***30] the sugar syrup in question is properly classified under the plain meaning of subheading 1702.90.40 HTSUS, and Customs' classification of the syrup outside of the plain meaning is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. n15 Customs and Defendant-Intervenor argue that the sugar syrup is not classified within the plain meaning of subheading 1702.90.40 HTSUS in several ways. First, they argue that the legislative intent of the relevant HTSUS provisions is to prevent anything that competes with raw or refined sugar from entering outside of the quota. Second, they argue that the sugar syrup is not to be classified in its condition as imported because the process is an artifice or deceit. Accordingly, use may be consulted since the judicial precedent recognizes an exception to the general rule that an article is to be classified in its [**1336] condition as imported. Third, although neither defend the position, Customs reasoned that the sugar syrup in question would have fallen under the quantitative restrictions of Tariff Schedules of the United States ("TSUS") and thus properly are classified within the quantitative restriction of the HTSUS.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n15 *HN12* In a case brought under 28 U.S.C. § 1581(a) the court reviews Customs decision *de novo* on the record before the court. In a case brought pursuant to 28 U.S.C. § 1581(h) the agency record is reviewed and the standard of review is different. *See* discussion, *infra*. Even though the classification decision itself is a legal question, *see* *National Advanced Sys. v. United States*, 26 F.3d 1107, 1109 (Fed. Cir. 1994), the procedural posture of this case requires a discussion of why the agency action cannot be sustained under the applicable standard of review.

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***31]

1. The Legislative History Does Not Demonstrate a Clear Legislative Intent to Exclude the Sugar Syrup at Issue.

As discussed *supra*, Customs argues that while falling into the literal language of subheading 1702.90.40 HTSUS, the sugar syrup falls outside the spirit of the statutory provision because the purpose is to subject those products that compete directly with sugar to a quantitative quota restriction. In support of this proposition Customs refers to a 1937 hearing held before the Subcommittee of the House Committee on Agriculture. A witness testified that excluding sugar syrups with greater than a certain percentage of soluble non-sugar solids would allow syrup of cane juice to enter while barring other syrups that could be refined into products competing with raw and refined sugar. *See Sugar: Hearings on H.R. 5236 Before the Subcommittee of the House Committee on Agriculture*, 75th Cong. 41-44 (1937). Furthermore the witness testified that it was "practically impossible to define sugar sirup of cane juice satisfactorily for the purpose of administering quotas and taxes." *See id.* at 44.

From this discussion, Customs and Defendant-Intervenor draw the conclusion [***32] that any sugar syrup that competes with domestic raw or refined sugar must be classified in a provision that has a quantitative limitation, even if the product falls within the express and unambiguous [*766] language of a subheading not subject to such restrictions. Structurally and as a matter of sound statutory interpretation this argument fails.

Structurally, two provisions within Chapter 17 of the HTSUS explicitly allow competing sugar to enter without being subject to quantitative restrictions. Subheadings 1703.10.30 HTSUS and 1703.90.30 HTSUS both allow molasses to enter which is imported for commercial extraction of sugar or for human consumption. Additionally, not all sugar products are subject to TRQs such as: lactose syrup (1702.11.00 HTSUS); unblended glucose syrups (1702.30.40 HTSUS and 1702.40.40 HTSUS); unblended fructose syrups (1702.60.40 HTSUS); invert molasses (1702.90.35 HTSUS). Two things are thus apparent from the current quota scheme under the HTSUS. One is that Congress did not intend to exclude all competing sugar products from entry without quantitative limitations. Another is that the HTSUS is fundamentally different from prior tariff law in the way it addresses [***33] sugar products.

As a matter of sound statutory interpretation the argument that the legislative history controls the express language of the statute also fails. For one thing, the legislative history cited here involves the testimony of one witness with the interrogatories of two members of Congress. To take this bit of legislative history and give it more weight than the statutory language would contravene longstanding principles detailing legislative history's proper weight. Further, it is not clear that the legislative intent Customs and Defendant-Intervenor propose is the only one. *See* *Robert G. Lynch Co. v. United States*, 49 C.C.P.A. 74, 79 (1967) (noting that "the intent of Congress throughout the history of tariff legislation on sugar since 1913 has been to assess duties on the basis of the polariscopic sugar degree content, not upon the ultimate or intended use of the sugar."). The legislative history accompanying the enactment of the HTSUS states that it is meant to be revenue neutral and that the "enactment of the tariff and quota treatment provided in this subtitle is intended to supersede and replace existing treatment as a matter of domestic law." [***34] *See* H.R. CONF. REP. NO. 100-576, at 548 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1581. When presented with many different Congressional intents [**1337] and one clearly worded statutory provision, the better course is to follow the language of the statute. If Congress wishes to place the sugar syrup in question under quota it is free to do so through duly enacted legislation. However, Customs, as an executive agency may not; its role is to interpret and apply the HTSUS, *see* H.R. CONF. REP. NO. 100-576, at 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582. In this case its interpretation and application was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

[*767] 2. Customs' Determination That Plaintiff Engaged in Artifice or Deceit Is Not Supported by the Record Evidence Nor Is it a Correct Application of Judicial Precedent, and Thus Is Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Not in Accordance with Law.

Customs and Defendant-Intervenor argue that because molasses remains after the sugar syrup is refined following importation, and since some of the molasses is then returned to Canada, Plaintiff has engaged in artifice [***35] or deceit. The Court does not agree.

First, Plaintiff, pursuant to the provisions of 19 C.F.R. § 177, obtained an advance ruling on the classification of the merchandise. Neither Customs nor Defendant-Intervenor dispute that the submissions to Customs were legitimate. Rather, the claim is made that Plaintiff's failure to describe the post-importation processing deprived Customs of relevant information, and thus constituted artifice or deceit. However, the regulation clearly states that *HN13* a description of an article's chief use is required only when germane to the relevant classification. *See* 19 C.F.R. § 177.2(b)(2)(ii) (1999). Since, as discussed *supra*, subheading 1702.90.40 HTSUS (nor for that matter subheadings 1702.90.10 and 1702.90.20 HTSUS) is not a use provision, Plaintiff was not required by the express language of the regulation to describe the sugar syrup's use. Furthermore, Customs had the opportunity to request an additional description, including a description of use when it asked for samples, and did not do so.

Second, following an investigation, the sugar syrup's use was conclusively made known to Customs and in an internal memorandum it was determined to be [***36] correctly classified within subheading 1702.90.40 HTSUS. *See* A.R. at IV(9). The memorandum states the principle of classification law that a good is to be imported in its condition as imported and that Customs cannot consider what happens to the goods once they are legally imported. *See id.* Moreover, the memorandum states that the entire process is legal under the ruling. n16 *See id.*

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 While the Court does not consider this internal memorandum with respect to the ultimate classification of the merchandise, it is relevant on the issue of artifice or deceit. Customs' rationale was that it did not have critical information on the sugar syrup's use at the time it issued the initial ruling and that it reconsidered its position in light of information brought to its attention in the petition. The memorandum, written prior to the filing of the petition, directly contradicts Customs' rationale and is considered by the court for the limited purpose of whether the agency was deceived. As the memorandum indicates, the initial decision would have been unaffected if use had been, although not required to be, described.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***37]

Third, Customs had no record evidence on which to conclude that the sugar syrup produced in its condition in Canada was not at an intermediate stage of production. n17 In fact, the record evidence shows [**1338] that the process of combining granular raw sugar with molasses, adding water [*768] and heating is common in sugar refining operations. *See* AR V(17) Statement of James C.P. Chen, P 5; Statement of Jean-Pierre M. Monclin, P 6 ("In sugar processing, such mixing of molasses with granular sugar is common practice."); Statement of Michael B. Inkson, P 13 ("The Customs Service seems to have the misconception that the mixing of granular sugar and molasses is somehow abnormal. To the contrary, mixing molasses with higher purity streams (granular or liquid) is quite common in the production of sugar products."). Raw sugar's core is almost pure (99.6-99.8) sucrose, while the surface of the crystal is covered with a partially dried syrup containing much less sucrose. *See* James C.P. Chen & Chung Chi Chou, CANE SUGAR HANDBOOK 485 (12th ed. 1993). Molasses, which contains much less sucrose, is combined with the raw sugar in the desired amount to obtain the final product. *See* AR V(17) Statement [***38] of James C.P. Chen, P 5; Statement of Jean-Pierre M. Monclin, P 4, 6; Statement of Michael B. Inkson, P 13. It is noteworthy that Customs does not contest the general principle that combining raw sugar with molasses to adjust the purity is a common practice, yet it proceeds in what can only be characterized as a circular argument that in this case the process is designed to avoid the quantitative limitation. n18

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n17 Both Customs and Defendant-Intervenor recognize that goods may legitimately be imported at various stages of manufacturing or processing, even if at an artificially interrupted point, to obtain lower rates of duties. *See Def.'s Br.* at 34; *Def.-Intervenor's Br.* at 36.

Customs asked the Plaintiff repeatedly for what commercial use the product had in its condition as imported without removing molasses. This question ignored the evidence Plaintiff submitted that combining raw sugar with molasses was a legitimate step in the refining process. Additionally, as discussed *infra*, the use of the merchandise was irrelevant to the proper classification.

n18 The Court addresses the Defendant's brief in the discussion of the caselaw holding an importer has the right to fashion his or her merchandise to obtain the lowest rate of duty available, *infra*.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***39]

Moreover, the record evidence does not contain a single submission stating that the combination of *raw* sugar with molasses is not an intermediate step in the refining process. Notably, the submissions that mention the process at all state or imply that combining *refined* sugar with molasses is not a legitimate commercial practice. *See* AR I(1) Petition of January 14, 1998 at 1; II(20) Letter of September 25, 1998, from Sen. Kent Conrad, *et al.* V(1), (2), (4), (14). The Court has no reason to address that contention since the ruling letter request makes it clear, as well as does the record evidence, that Plaintiff's process combines granular raw sugar with molasses. n19 If the Defendant-Intervenor had information that the process described by the Plaintiff was incorrect, it was obliged to include such information on the agency record. Customs improperly based its decision on conclusory assertions that refined not raw sugar was used to prepare the syrup. In its second chance, through the Robinson declaration, the Defendant-Intervenor again failed to include any information that refined sugar is used, nor, apparently, could it obtain an expert statement that the process [***40] of refining raw sugar with molasses is an illegitimate commercial process. Based on the record evidence, Customs had no basis to conclude that combining raw sugar with molasses was not a legitimate step in a refining operation. Accordingly, for each of the three reasons discussed above, Customs' determination that the process Plaintiff employs "is not a genuine step in manufacturing or production of an article []," *see* Final Notice at 44, is [*769] arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n19 The Robinson declaration, although not on the agency record, is remarkable for what it does not say more than what it does. In the declaration, both the premise and conclusion are based on the process of combining *refined* sugar with

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

molasses. *See Def.-Intervenor's Br.* at Annex 24, Declaration of Jeffrey Robinson, P 4, 7-8, 13-15.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

As a result of its flawed finding on the genuineness of the manufacturing process, Customs incorrectly applied the abundant judicial precedent [***41] holding that an article must be classified in its condition as imported. Customs noted that an importer "should be allowed to choose to import its merchandise at any step that obtains the most favorable treatment[]" and that "if the syrup was further used in its condition as imported, in the next step in producing [**1339] an article of commerce, this may satisfy the tariff engineering concept." *See* Final Notice at 44-45. Customs clearly stated its position: "that the processing in this case is not legitimate tariff engineering. But rather, it is merely 'disguise or artifice' intended to escape a higher rate of duty such as a quota tariff rate." Final Notice at 45. Customs had no basis to conclude that Plaintiff engaged in artifice or deceit to obtain a favorable classification of its merchandise and its application of the relevant judicial precedent governing tariff engineering as applied to the facts before it was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

The Supreme Court first announced the principle that HN14 a manufacturer has the right to fashion goods to avoid the burden of high duties, coincidentally, in a sugar case. *See* *Merritt v. Welsh*, 104 U.S. 694, 701, 26 L. Ed. 896 (1881). [***42] n20 At the time, the duty was assessed on sugar based on its color. The collector of the port of New York, defendant, claimed "that color was imparted to the sugars in the course of manufacture, by the use of an extra quantity of lime . . . or by the introduction of molasses . . . ." *Id.* at 696 (the trial court found the evidence inadmissible). The Court went on to state the issue as whether "(supposing the sugars are not artificially colored for the purpose of avoiding duties *after* being manufactured) their dutiable quality is to be decided by their actual color . . . or by their saccharine strength . . . ." *Id.* at 700 (emphasis added). In fact, the Court remarked "if the manufacturer uses . . . bleaching processes in order to make his sugars more salable, why may he not omit to do so in order to render them less dutiable; nay, why may he not employ an extra quantity of molasses for that purpose?" *Id.* at 704. The Court noted that if color was added to the sugar following manufacture that "might be a different matter." *Id.* at 705. In this case, on the agency record before the Court, there is no evidence that [***43] *refined* sugar is combined with molasses to produce the sugar syrup, and thus the limitation on the Court's holding is not applicable.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n20 The Court sees no reason, nor has it been presented with one by Customs, to distinguish between duties and quota restrictions. The effect of the TRQ is to impose a higher rate of duty on subject merchandise entering over the quota. Thus, the principle of fashioning merchandise to obtain the lowest rate of duty applies equally to fashioning merchandise to avoid a provision that will subject the merchandise to a TRQ.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

After determining that Congress had clearly adopted a color test, the Court had this to say:

> Perhaps Congress may have acted under a mistaken idea that color would always indicate quality. Perhaps, up to the time that the law [*770] was passed, as the processes of manufacture had been conducted, color was an approximate, or general indication of quality. Suppose this to be so, does it derogate from the fact that color was the standard which Congress, with the [***44] lights which it had, saw fit to adopt? Does it not tend to fortify that fact? If it be found by experience that the standard is a fallacious one, can the executive department supply the defects of the legislation? Congress alone has the authority to levy duties. Its will alone is to be sought.

*Id.* at 700. In this case, Congress has provided a clear and unambiguous test: the quantity of soluble non-sugar solids. Following the Supreme Court in *Merritt*, this Court will not disturb Congress' will.

Furthermore, the Court set out the exception to the rule that an importer has the right to fashion his or her merchandise to obtain the lowest rate of duty "so long as no deception is practised, so long as the goods are truly invoiced and freely and honestly exposed to the officers of customs for their examination, no fraud is committed, no penalty is incurred." *Id.* at 704. As discussed above, Plaintiff obtained an advance ruling describing the sugar syrup and its manufacturing process, and a subsequent investigation revealed that Plaintiff was complying with the terms of the [**1340] advance ruling. Thus, Plaintiff's practice does not fall within the exception [***45] announced in *Merritt*. The Supreme Court, the Federal Circuit and its predecessor, and this court and its predecessor have repeatedly reaffirmed the principle in *Merritt*.

In *United States v. Schoverling*, 146 U.S. 76, 36 L. Ed. 893, 13 S. Ct. 24 (1892), an importer entered gunstocks and colluded with another firm to import the barrels separately to avoid the higher rate of duty assessed on fully assembled shotguns..

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

The Court dismissed the United States' argument that the transaction was a fraud upon the statute by stating that "the intent of the importers to put the gunstocks with barrels separately imported, so as to make here completed guns for sale, cannot affect the rate of duty on the gunstocks as a separate importation." *Id.* at 81 (citing *Merritt*, 104 U.S. 694); *see also Seeberger v. Farwell*, 139 U.S. 608, 610, 35 L. Ed. 297, 11 S. Ct. 650 (1891) (holding that mixing just enough cotton with wool to secure a lower rate of duty with no valid commercial purpose for the addition was within the importer's legal right).

In *United States v. Citroen*, 223 U.S. 407, 413-416, 56 L. Ed. 486, 32 S. Ct. 259 (1912), [***46] the issue was whether pearls, which had been drilled with holes and strung for display, were properly classified as jewelry, at a higher duty rate, or pearls. Relying on the plain language of the statute, the Court found that the pearls had to be classified as pearls in their natural state, not strung or set. *See id.* at 424. Once again, the Court used the analysis in *Merritt* that "when the article imported is not the article described as dutiable at a specified rate, it does not become dutiable under the description because it has been manufactured or prepared for the express purpose of being imported at a lower rate." *Id.* at 415 (citing *Merritt*, 104 U.S. at 704; *Seeberger*, 139 U.S. 608, 611, 35 L. Ed. 297, 11 S. Ct. 650).

[*771] On repeated occasions the United States Court of Customs Appeals and its successor courts have applied the *Merritt* principle. *See United States v. Hannevig*, 10 Ct. Cust. 124, 128 (1920) (holding that engine parts later used to make engines were properly classified as parts); *United States v. International Forwarding Co.*, 15 Ct. Cust. 198, 201 (1927) [***47] (holding that an importer could import one large blanket at a lower duty rate even if it later made it into two smaller ones); *Corporacion Argentina de Productores de Carnes v. United States*, 32 C.C.P.A. 175, 184 (1945) (holding that the addition of a enough cereal to dog food to place it in a tariff provision with a lower rate of duty was within the importer's right to fashion merchandise to obtain a lower rate of duty), n21 *Robert G. Lynch Co. v. United States*, 49 C.C.P.A. 74, 80 (1962) (stating that in deciding the proper classification of the merchandise the importer's motivation was immaterial and ultimately affirming the finding that the merchandise was raw sugar dyed green); *accord Fries Bros. v. United States*, 4 Treas. Dec. 850, 852-54 (1901) (recognizing the principle that importers have the right to fashion merchandise to obtain the lowest rate of duty and that classification is decided on the merchandise at the time of importation but applying the exception that if something is [**1341] added *after* manufacture it may be disregarded); *Pasadena Firearms Co. v. United States*, 56 Cust. Ct. 331, 337, Cust. Dec. 2645 (1966) (holding [***48] that the importer's intent to combine pistol barrels and frames imported in separate shipments was irrelevant to the correct classification).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n21 *Corporacion Argentina* provides the legal answer to Customs' questions posed as to why Plaintiff does not add enough molasses so that at the end of the refining process there is no excess. As the court noted, the addition of the cereal held the meat together, thus serving a satisfactory food purpose. *See Corporacion Argentina*, 32 C.C.P.A. at 181-82. Customs does not dispute that combining granular raw sugar and molasses serves a valid purpose of adjusting the polarity of a sugar product, but argued that in this case the amount of molasses added was specifically for the purpose of exceeding the 6 % requirement. Under the reasoning in *Corporacion Argentina*, adding enough molasses to exceed the 6% threshold is acceptable just as were the actions of the importer who "was careful to try to add that quantity [of cereal] which was regarded as substantial by the customs officials." *Id.* at 185 (plaintiff had sought advice beforehand as well).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***49]

Customs incorrectly applied the *Merritt* line of precedent to the evidence on the record. On repeated occasions courts have accepted artificial steps in the manufacturing process done to obtain the lowest rate of duty. Removing the string from pearls which were later restrung, colluding to import gunstocks separate from barrels later combined, adding sufficient amounts of cotton and cereal without any corresponding commercial purpose are all processes designed to obtain lower duty rates. Plaintiff's process, as described by the evidence on the agency record falls squarely within such practices. There was uncontroverted evidence on the record that Plaintiff's manufacturing process was common in sugar refining operations, but even if it were not, the motive of the importer in fashioning his or her merchandise is simply not a relevant inquiry. In fact, to the extent motive is relevant, an importer who intends to fashion merchandise solely for the purpose of obtaining the lowest rate of duty is within his or her legal right. Customs' disregard or misinterpretation, it matters not which, of the *Merritt* line of precedent [*772] was arbitrary, capricious, an abuse of discretion, and otherwise [***50] not in accordance with law.

Equally well established precedent, from the same sources as above, state that HN15 absent a use provision, an article is to be classified in its condition as imported. n22 In *Worthington v. Robbins*, the Supreme Court first annunciated the principle that goods are to be classified in their condition as imported. *See Worthington*, 139 U.S. 337, 341, 11 S. Ct. 581, 35 L. Ed. 181 (1891). The merchandise at issue was white hard enamel, which had various uses. *Id.* at 340. However, in the condition in which it was imported it could only be used, and in fact was used, to make watch faces. *Id.* Customs and the Defendant-Intervenor attempt to distinguish this case and others that build upon it on the ground that the products at issue have a recognized commercial identity regardless of subsequent use. *See e.g. Dwight v. Merritt*, 140 U.S. 213, 219, 35 L. Ed. 450, 11 S. Ct. 768 (1891) (applying the rule in *Worthington* to determine the correct classification of the merchandise); *Schoverling*, 146 U.S. at 82 (holding that the dutiable classification of gunstocks must be made on their condition as imported); *Citroen*, 223 U.S. at 414-15 [***51] (noting the well established rule that classification of articles must be determined on their condition as imported); *accord United States v. Irwin*, 78 F. 799, 801 (2d. Cir. 1897) (applying the rule in *Worthington* to gunstocks and barrels imported on the same ship and determining that in their condition as imported they

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

were breach loading shotguns); *accord* *United States v. Winkler-Koch Eng'g. Co.*, 41 C.C.P.A. 121, 122 (1953) (noting "it is academic that the classification of merchandise for duty purposes is governed by its condition as imported . . . ."); *Rico Import Co. v. United States*, 12 F.3d 1088, 1090 (1993) (holding that despite alleged uses articles must be classified in their condition as imported); *Mita Copystar America v. United States*, 21 F.3d 1079, 1082 (1994) (noting the well settled principle of law that *HN16* merchandise is classified in its condition as imported thereby precluding classification as unmixed products because the fact that the substances had to be mixed prior to use was not relevant); *accord* *Cook v. United States*, 49 Cust. Ct. 11, 13 (1962) (holding that wheat unfit for [***52] human consumption at the time of importation though later used in an article fit for human consumption must be classified in its condition as imported); *Pasadena Firearms*, 56 Cust. Ct. [**1342] at 334 (applying *Worthington* to the separate importation of pistol frames and barrels that the importer later combined); *Peter J. Schweitzer Div., Kimberly-Clark Corp. v. United States*, 57 Cust. Ct. 9, 13 (1966) (holding that flax straw was specifically enumerated without qualification as to use and despite stipulation that it was to be used for paper making, it had to be classified in its condition as imported); *Hardwood Manufacturing Co. v. United States*, 7 C.I.T. 288, 292 (1984) (holding that absent a use provision, the article had to be classified on its condition as imported).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n22 That the competing provisions of the HTSUS are not use provisions is not disputed by the parties. Rather, Defendant and Defendant-Intervenor claim use can be looked at because of artifice or deceit, which as discussed above, is incorrect.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***53]

[*773] From the line of cases above, Customs and Defendant-Intervenor admit that an *HN17* importer has the right to stop a legitimate manufacturing process at an artificial point and import the merchandise to obtain the lowest rate of duty. Based on the record it compiled, Customs had no basis to conclude that Plaintiff was not engaged in such a practice. All of the evidence suggested it was doing exactly that. The record evidence indicates and does not contradict that combining raw sugar with molasses is a legitimate step in the refining process. Additionally, it is undisputed that Plaintiff operates a refining operation in the United States which employs a substantial number of people. *See e.g.* *Schoverling*, 146 U.S. at 80 (noting that importing gun barrels and stocks promoted use of domestic labor). Thus, Plaintiff's operation falls directly within the line of cases which hold that an importer has the right to stop production at the most favorable time for duty purposes. Accordingly, Customs determination that it was appropriate to look at the sugar syrup's use following importation was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. [***54]

Against the overwhelming number of cases holding that an importer may fashion his or her merchandise to obtain the lowest rate of duty and that an article is to be classified in its condition as imported, two cases are cited as authority for the proposition that quota avoidance schemes are disallowed by the courts. Customs reliance on *Savannah Sugar Refining Corp. v United States* is misplaced. *See* Final Notice at 45, 50-51. As the court stated, the only important issue was whether "the imported merchandise [was] a sugar sirup within the meaning of paragraph 502 . . . either directly or by virtue of the similitude provision . . . ." *Savannah Sugar Refining Corp.*, 20 C.C.P.A. 272, 277 (1932). Because the court in *Savannah Sugar Refining* was attempting to determine whether the article in question was sugar syrup within the meaning of the tariff provision, it did not engage in the analysis set forth in the *Merritt* line of cases, nor in the *Worthington* line and, therefore, should not be followed. Furthermore, there is no evidence in the opinion that the article was at an intermediate stage of processing, which, as discussed *supra*, is the case [***55] before this Court. Finally, Customs urges the Court to ignore the holding of the case and to employ the analysis set forth in dictum. *See Def.'s Br.* at 49. For reasons that need no explanation, the Court declines this invitation.

Customs relies also on *Arbor Foods, Inc. v. United States*, 9 C.I.T. 119, 607 F. Supp. 1474 (1985), which is readily distinguishable. *See* Final Notice at 51. In that case, the importer mixed pure sugar of Canadian origin with corn syrup solids of United States origin in a warehouse designated as a foreign trade zone ("FTZ"). *See* *id.* at 120, 607 F. Supp. at 1476. The importer then brought the mixture from the FTZ territory into United States Customs territory, which were separated only by a yellow line. *See id.* After the product entered United States Customs territory the importer simply screened out the corn syrup solids and returned them to the FTZ territory for the next "importation." *See id.* The [*774] court recognized the principle that duty must be assessed on an article in its condition as imported but because the relevant tariff provision was one in which chief use was incorporated, found the principle did not [***56] apply. *See* *id.* at 122, 607 F. Supp. at 1477. Since the doctrine of chief use required following an item into the commerce of the United States, it was [**1343] appropriate for Customs to demand evidence of the possible uses of the product. *See id.*

It is clear that in the case before the Court a much different process is employed and a different analysis required. First, the sugar syrup in question can not be screened to obtain its constituent parts. Next, the evidence on the record demonstrates that combining raw sugar with molasses is a legitimate step in refining sugar. As noted by Customs in its brief, the sugar is in raw form before it enters the United States, while the final product is liquid sucrose. *See Def't Br.* at 18. In *Arbor Foods*, no transformation occurred, the product before and after importation was identical. Finally, while a great deal of the molasses is returned to Canada, some is sold for animal feed and some is lost in the process. n23 Furthermore, the molasses must be reconstituted prior to being used again. Since the process is different, the analysis must be that of the *Merritt* and *Worthington* line of cases. While it may be that [***57] Plaintiff interrupts the refining operation at an artificial point, or at one

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

that other refiners do not, this fact alone does not matter since this is the importer's right in fashioning merchandise to obtain the lowest rate of duty. Finally, the *Arbor Foods* court employed a chief use analysis which is not relevant in the present case.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n23 Plaintiff submitted sales invoices to Customs showing the sales of animal feed. Customs noted in the Final Notice that any sales were *de minimis* or fugitive uses. Regardless, the sale of some of the molasses is yet another reason this case is unlike *Arbor Foods*.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Another principle on which Customs relied was that courts may disregard a substance added to a product for a legitimate commercial purpose, even though substantial, in order to classify the merchandise. *See* Final Notice at 45, 50. In support of this principle, Customs cites *Aetna Explosives Co. v. United States*, 9 Ct. Cust. 298 (1919) and *Varsity Watch Co. v. United States*, 34 C.C.P.A. 155 (1947). [***58]

In *Aetna Explosives*, 9 Ct. Cust. at 299. the importer added twenty percent of sulphuric acid to nitric acid for the purpose of protecting the iron tank cars in which the acid was shipped. The importer desired only to import nitric acid, but the rules of the Interstate Commerce Commission required the addition of the sulphuric acid and the amount. *See id.* The merchandise was classified as a chemical mixture, subject to a higher rate of duty than nitric acid. *See id.* The court stated that the true rule was that "the introduction of a quantity of sulphuric acid solely for the purpose of rendering the transportation of nitric acid safe, and which does not result in a usable mixture, is more in the nature of an act of shipment than an admixture . . . ." *Id.* at 306. The court applied the principle that in such circumstances, "the construction of the statute [*775] most favorable to the importer is to be adopted." *Id.* at 307 (citation omitted).

*Aetna Explosives* is wholly inapplicable to the present case. First, it does not fall within the controlling *Merritt* or *Worthington* line of precedent. In *Aetna Explosives* the [***59] importer added the sulphuric acid not of its volition but to comply with regulations. In this regard, *Aetna Explosives* has nothing at all to do with importers fashioning merchandise to obtain the lowest rate of duty. *See* 9 Ct. Cust. at 306 ("It is . . . neither a usable mixture *nor one which the importer purposely, as a process of manufacture, started to make such*.") (emphasis added). Furthermore, the court analyzed the term "mixture" in the statute and determined that the addition of the sulphuric acid did not fit the definition. *See id.* Finally, the court supported its holding by referring to a principle of construction that ambiguities in a tariff/revenue statute are resolved in favor of the importer. The court's qualification further limits the relevance of *Aetna Explosives* to the present case.

In *Varsity Watch*, the importer of watch cases added an amount of gold so small that it was difficult to obtain a quantitative analysis. *See* *Varsity Watch*, 34 C.C.P.A. [**1344] at 157. The importer claimed that the gold should have been disregarded under the rule *de minimis non curat lex*, the law does not concern itself with trifles. Relying on the [***60] plain language of the statute, the court found that Congress intended to include all watch cases containing gold, no matter how small the amount. *See* *id.* at 163. Because the importer intended to add the gold to enhance the value of the watch, and the addition was not accidental, unintentional or undesired, the court found that the rule of *de minimis non curat lex* did not apply.

Customs cited *Varsity Watch* for its summation of the cases applying the *de minimis* rule. The *Varsity Watch* court noted:

> that certain amounts of an ingredient, although substantial, may be ignored for classification purposes depending upon many different circumstances, including the purpose which Congress sought to bring about *by the language used* and whether or not the amount used has really changed or affected the nature of the article and, of course, its salability.

34 C.C.P.A. at 162-63 (emphasis added). In the statute under consideration, Congress has employed a test, the very nature of which requires deciding the amount of soluble non-sugar solids present. If the syrup contains greater than six percent, the syrup falls under subheading 1702.90.40 [***61] HTSUS, if it does not, under subheading 1702.90.10 HTSUS. In this instance, the statute has concerned itself not with trifles, but with an exact measurement. Moreover, like *Corporacian Argentina*, the importer has fashioned the merchandise to obtain the lower rate of duty. *See* *Corporacion Argentina*, 32 C.C.P.A. at 185. Accordingly, to the extent Customs relied on the *de minimis* rule to exclude the soluble non-sugar solids contained in the molasses its action was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

[*776] Since the record evidence demonstrates that Plaintiff did not engage in artifice or deceit to obtain the initial ruling under subheading 1702.90.40 HTSUS and the long line of judicial precedent illustrates that Plaintiff engaged in legitimate tariff engineering, classifying the sugar syrup outside of the plain meaning of the statute was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

3. The TSUS Provisions Are Not Relevant In Determining the Correct Classification of the Sugar Syrup.

Although neither Customs nor Defendant-Intervenor press the argument in their briefs, [***62] n24 Customs provided further justification for its classification under subheading 1702.90.10 HTSUS on the basis of the quota provisions in the TSUS. *See* Final Notice at 51-53. After examining various provisions of the TSUS, Customs concluded that the sugar syrup would have been classified in item 155.75 TSUS and subject to an absolute quota. n25 Customs is wrong for several reasons.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n24 Indeed, when asked by the Court at oral argument if Customs was abandoning its position counsel replied it was not, but noted that it was not a particularly strong position.

n25 Customs stated:

> 155.75, TSUS, provided for sugars, sirups, and molasses, described in this subpart, flavored: and sirups, flavored or unflavored, consisting of blends of any of the products described in the subpart. Under item 958.10, blended sirups in item 155.75, containing sugars derived from cane or beet and capable of being further processed or mixed with similar ingredients and not for the ultimate consumer, and under item 958.15, articles containing over 65 percent by dry weight of sugars derived from sugar cane or sugar beets, were subject to a 'none' absolute quota.

Final Notice at 52.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [***63]

First, it is apparent that the TSUS involves an entirely different law than the HTSUS provisions governing sugar products. The HTSUS breaks sugar products out into several subheadings: 1701 for cane or beet sugar and chemically pure sucrose in solid form; 1702 for other sugars, including sugar syrups; 1703 for [**1345] molasses resulting from the extraction or refining of sugar; and 1704 for sugar confectionery (including white chocolate), not containing cocoa. Customs itself recognized that when the TSUS was converted to the HTSUS, "Item 155.75, TSUS, in part, became subheadings 1702.30.40, 1702.40.00, and 1702.60, HTSUS." Final Notice at 52.

Second, under the TSUS the sugar syrup in question would more likely have been classified under TSUS 155.35. The superior heading provided for "Sugars, syrups, and molasses, derived from sugar cane or sugar beets" and TSUS heading 155.30 provided for "Not principally of crystalline structure and not in dry or amorphous form . . . [containing less than six percent soluble non-sugar solids]." However, since the sugar syrup in question contains greater than six percent soluble non-sugar solids it would have fallen within TSUS 155.35, an "Other" provision [***64] not subject to quota and covering those items enumerated in TSUS 155.30 but containing more than six percent soluble non-sugar solids.

Customs' determination that the sugar syrup would have fallen within TSUS 155.75 fails to account for *HN18* TSUS General Interpretive Rule 10(c), which provided that "an imported article which is described in [*777] two or more provisions of the schedules is classifiable in the provision which most specifically describes it . . . ." Since TSUS 155.35 was the more specific heading, the sugar syrup would have fallen within it, not subject to quota.

**V. CONCLUSION**

For the foregoing reasons, the Court concludes that the sugar syrup before it, as described in AR I(37-38), requesting a ruling, is correctly classified under subheading 1702.90.40 HTSUS. Customs' rationale for classifying the sugar syrup in a manner inconsistent with the plain meaning of the statute was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Judgment will enter accordingly.

Dated: October 19, 1999, New York, NY

Judith M. Barzilay

Judge

**JUDGMENT**

This case having been duly submitted for decision; and the Court, after due deliberation, [***65] having rendered a decision herein;

**Reply in Supp. Pl.'s Mot. In Limine, Ex. B**

Now therefore, in conformity with said decision, it is

ORDERED that Plaintiff's Motion for Judgment Upon an Agency Record is granted; and it is further

ORDERED that Customs Headquarters Ruling Letter 961273 revoking New York Ruling Letter 810328 is hereby declared unlawful; and it is further

ORDERED that the sugar syrup at issue in this case and as described in Administrative Record File I, Documents 37-38 is properly classified under subheading 1702.90.40 HTSUS.

Dated: October 19, 1999, New York, NY

Judith M. Barzilay

Judge

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.
Your use of this service is governed by Terms & Conditions . Please review them.