**PROTECTED INFORMATION:**
**To Be Disclosed Only in Accordance with**
**U.S. Court of Federal Claims Protective Order**

RESPONSE AND OPPOSITION TO MOTION TO DISMISS

In the

# United States Court of Federal Claims

No. 03-2485C (Braden, J.)

FOREST PRODUCTS NORTHWEST, INC.,

*Plaintiff,*

*v.*

UNITED STATES OF AMERICA,

*Defendant.*

Response in Opposition to the Motion to Dismiss
Under RCFC Rule 12(b) Filed January 28, 2004.

A. Woodson Stuart, Esq.
JONES & STUART, LLP
2300 M Street, NW
Suite 800
Washington, D.C. 20037
Tel: (202) 297-3196
Fax: (202) 338-0270

Date: February 9, 2004

*Attorney for the Plaintiff*

**I. SUMMARY** ......................................................................................................1

**II. QUESTIONS PRESENTED** ...........................................................................1

**III. STATEMENT OF FACTS**................................................................................3

**A. Administrative Proceedings** ...........................................................................3

**B. The Statutory Scheme** ....................................................................................9

1. *The Customs Entry and Liquidation Process* ..............................................9

2. *Antidumping and Countervailing Duty Proceedings* .................................11

**IV. ARGUMENT**.................................................................................................15

**A. Legal Standard for Dismissal Under Rule 12(b)**.............................................15

1. *Dismissal Under Rule 12(b)(1) for Lack of Jurisdiction* ..........................15

2. *Dismissal Under Rule 12(b)(6) for Failure to State a Claim* ...................16

**B. This Court Clearly Has Jurisdiction to Entertain this Action.**.......................16

**C. The Court of International Trade's Exclusive Jurisdiction Is not Implicated Here.** ..............................................................18

**D. The Government's Attempt to Distinguish *Trayco* Must Fail.** ......................20

**E. The Government's Attempt to Distinguish *High Star Toys* Must Fail.** .......22

**F. A Refund Action Is "Ripe" by Definition.** ......................................................23

**V. CONCLUSION** ..............................................................................................24

# TABLE OF AUTHORITIES

*Cases*

*Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967) ..............................................23

*American Air Parcel Forwarding v. United States*, 718 F.2d 1546 (Fed. Cir.1983),

*cert. denied*, 466 U.S. 937 (1984) ....................................................................11

*American Bayridge Corp. v. United States*, 35 F. Supp. 2d 922 (Ct. Int'l Trade 1998),

*vacated in part without pub. op.*, 1999 WL 997303 (Fed. Cir. Oct. 26, 1999) ....4, 11, 19

*High Star Toys, Inc. v. United States*, 32 Fed. Cl. 176 (1994) ..........................................*passim*

*K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176 (1988) ..............................................................18

*Magone v. Luckemeyer*, 139 U.S. 612 (1891) ...............................................................17

*Merritt v. Welsh*, 104 U. S. 694 (1881) .........................................................................17

*Miller & Co. v. United States*, 824 F.2d 961 (Fed. Cir.1987) ..................................................11

*National Corn Growers Ass'n v. Baker*, 840 F.2d 1547 (Fed. Cir. 1988) ................................11

*Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356 (Fed. Cir.1992) ............................11

*Seeberger v. Farwell*, 139 U.S. 608 (1891) ...........................................................17

*Trayco Inc. v. United States*, 994 F.2d 832 (Fed. Cir. 1993) ...........................................*passim*

*Worthington v. Robbins*, 139 U.S. 337 (1891) ...........................................................17

*cert. denied*, 484 U.S. 1041 (1988) ..................................................................11

*United States v. Uniroyal, Inc.*, 687 F.2d 467 (Ct. Cust. & Pat. App. 1982) ............................11

*Statutes*

Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202 note:

Chapter 44, Stat. Note 1 .................................................................................4

Heading 4407 .........................................................................................*passim*

Subheading 4407.10.0000 ....................3, 7

Heading 4421 ....................1, 4

Subheading 4421.90.9700 ....................3, 7, 12

19 U.S.C. § 1481(a) ....................10

19 U.S.C. § 1484(a) ....................10

19 U.S.C. § 1484(c) ....................10

19 U.S.C. § 1485....................10

19 U.S.C. § 1499(a) ....................10

19 U.S.C. § 1500....................10

19 U.S.C. § 1500(a) ....................10

19 U.S.C. § 1500(b) ....................10

19 U.S.C. § 1514(a) ....................10

19 U.S.C. § 1515....................11

19 U.S.C. § 1516a(a)....................13

19 U.S.C. § 1516a(a)(1)(D) ....................13

19 U.S.C. § 1516a(a)(2)(B)....................12

19 U.S.C. § 1516a(c)....................13

19 U.S.C. § 1516a(g)(5)....................13

19 U.S.C. § 1592....................*passim*

19 U.S.C. § 1592(a) ....................14

19 U.S.C. § 1592(a)(1)....................14

19 U.S.C. § 1592(c) ....................14

19 U.S.C. § 1592(c)(4)....................14

19 U.S.C. § 1625(c)(1) ....................4, 19

19 U.S.C. § 1671 *et seq.* ....................11

19 U.S.C. § 1671b(d)(2) ....................11

19 U.S.C. § 1673 *et seq.* ....................11

19 U.S.C. § 1671e(a)(2) ....................12

19 U.S.C. § 1673b(d)(2) ....................13

19 U.S.C. § 1673e(a)(2) ....................12

19 U.S.C. § 1675(c)(3) ....................13

19 U.S.C. § 1677 *et seq.* ....................11

28 U.S.C. § 1491(a) ....................2, 14

28 U.S.C. § 1491(c) ....................16

28 U.S.C. § 1581 ....................2, 21

28 U.S.C. § 1581(a) ....................10, 19

28 U.S.C. § 1581(c) ....................13, 18

28 U.S.C. § 1582 ....................21

28 U.S.C. § 1582(1) ....................21

28 U.S.C. § 1582(2) ....................21

28 U.S.C. § 1582(3) ....................21

28 U.S.C. § 2636(a)(1) ....................10

Continued Dumping and Subsidy Offset Act, 114 Stat. 1549A (Oct. 28 2000) ....................3

*Treaties*

North American Free Trade Agreement ....................3, 13

North American Free Trade Agreement, Art. 1904 ....................13

*Rules*

Rule 12(b), Rules of the U.S. Court of Federal Claims ........................................................ 15, 24

Rule 12(b)(1), Rules of the U.S. Court of Federal Claims ........................................................ 15

Rule 12(b)(6), Rules of the U.S. Court of Federal Claims ........................................................ 16

*Administrative Materials*

19 C.F.R. § 163.9. ........................................................................................................ 9

Customs Service Headquarters Ruling 087616 (Aug. 20, 1990)........................................................ 4

*Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15545

(Dep't Comm. Apr. 2, 2002)........................................................................................ 12

**PLAINTIFF'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS**

COMES NOW Plaintiff, Forest Products Northwest, Inc., doing business as Northwest Forest Products ("NWFP"), and hereby submits this Response in Opposition to the Motion to Dismiss filed by the government on January 28, 2004, and respectfully requests that said motion be DENIED, based on the points and authorities set forth in the following brief and appendix. A hearing is requested on the government's motion.

## I. SUMMARY

This is a customs classification case. NWFP made payments under protest to satisfy the demand of the U.S. Customs and Border Protection Service ("U.S. Customs"), for payment of cash deposits of estimated antidumping ("AD") and countervailing ("CV") duties on importations of edge-glued cedar lumber. **Edge-glued lumber is expressly excluded from such duties by statute and administrative order.** NWFP entered the subject merchandise, in accordance with these statutory and administrative directives, under Heading 4421 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Without awaiting liquidation, U.S. Customs reclassified the subject entries under Heading 4407, HTSUS, and commenced penalty proceedings against NWFP under 19 U.S.C. § 1592. In fact, the penalty proceedings were commenced **before** the entries were even reclassified, let alone liquidated, and before NWFP had an opportunity for judicial review of the reclassification decision upon which the investigation was based.

The government would have done well to remember the old adage that you should be careful what you ask for. By accepting NWFP's payment of almost $150,000.00 under protest, the government created an implied-in-fact contract with NWFP to submit to "judicial review" in "any appropriate form of action." Ex. 1. As the *Winstar* cases

established so dramatically, the government is not relieved of its contractual obligations merely because they prove to be inexpedient later. In this case, that means the government is not relieved of its contractual obligation to submit to judicial review in a court of competent jurisdiction and repay any monies adjudged to have been unlawfully exacted from NWFP. For the reasons stated below, this Court is clearly a court of competent jurisdiction given the size of NWFP's claim and the Court of International Trade's lack of jurisdiction over that claim. Accordingly, the government's Motion to Dismiss, presently before the Court, must be DENIED.

## II. QUESTIONS PRESENTED

A. Does this Court have subject matter jurisdiction, under the Tucker Act, 28 U.S.C. § 1491(a), over claims against the United States founded on an implied in fact contract to repay monies unlawfully exacted and paid under protest?

B. Does the Court of International Trade have exclusive jurisdiction over claims against the United States seeking a refund of monies unlawfully assessed by U.S. Customs, and paid under protest to the agency, when the assessment is based on an agency decision that is "not protestable" or otherwise subject to direct judicial review at the importer's instance under 28 U.S.C. § 1581?

C. Did NWFP fail to state a claim for money damages against the United States by alleging the unlawful exaction of money by U.S. Customs pursuant to an Act of Congress?

D. Is a final agency order "ripe" for judicial review where it was applied to the plaintiff in a demand for money and the money was paid under protest?

E. Is a final agency order "ripe" for judicial review where it formed the basis for collateral penalty proceedings commenced by U.S. Customs?

## III. STATEMENT OF FACTS

### A. Administrative Proceedings

This case has its origins in actions taken by a customs collector in Sumas, Washington, with respect to a shipment of edge-glued lumber that NWFP entered on September 11, 2003, under the dutiable provision for "Other Articles of Wood: Other; Other, Subheading 4421.90.9700, HTSUS/3.3% *ad valorem*. *See* Ex. 2. The collector took the position that the "more correct" classification of edge-glued lumber is the duty free provision[1] for "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm: Coniferous," Subheading 4407.10.0000, HTSUS/free. *See id.*

The collector thereby disregarded longstanding instructions from Customs Headquarters stating categorically that "[e]dge-glued lumber does not meet the definition

---

[1] One of the peculiar features of this case is that U.S. Customs is arguing for an expansive new interpretation of the ***duty free*** provision for lumber (i.e., sawn wood) vis-à-vis the ***dutiable*** provisions for manufactured "articles of wood." As this Court is particularly well aware, federal revenue collectors are not known for espousing legal interpretations that result in less revenue to the Treasury than competing interpretations, particularly when the competing interpretation is clearly correct. The only apparent reason why U.S. Customs is doing so in this case is that duty free "softwood lumber" imports from the largest exporting country, Canada, are subject to combined AD/CV duties of 27.5% *ad valorem* (and imports of "articles of wood" from Canada are now duty free because of NAFTA). However, AD/CV duties are paid to the U.S. lumber industry, not to the U.S. Treasury. *See* Continued Dumping and Subsidy Offset Act, 114 Stat. 1549A (Oct. 28 2000). Thus, the only revenue that would be enhanced if this Court approved U.S. Customs' interpretation in this case is revenue to certain U.S. lumber companies. The revenue to the Treasury, by contrast, would decrease as formerly-dutiable imports from every other lumber exporting country in the world start entering the United States duty free.

of lumber in . . . heading 4407." Customs Service Headquarters Ruling 087616 (Aug. 20, 1990).[2] The collector also disregarded the underlying statutory basis for the instructions. *See* Chapter 44, Stat. Note 1, HTSUS ("For the purposes of heading 4407, the term 'rough' . . . does not include wood that . . . has been edge-glued . . . .").

On or about September 19, 2003, two shipments of edge-glued lumber by NWFP were denied or effectively denied entry by U.S. Customs at Sumas because of supposed misclassification under Heading 4421. *See* Ex. 4.

On September 25, 2003, after several days of consultation, NWFP formally retained the undersigned counsel to prepare a request for a tariff classification ruling for submission to the National Import Specialist for lumber products, Mr. Paul Garretto, based on the numerous unrevoked Customs Service Rulings holding that edge-glued lumber is not classifiable under Heading 4407, HTSUS, and the absence of a single ruling classifying any form of edge-glued lumber under Heading 4407, HTSUS.

Meanwhile, on September 26, 2003, the collector simultaneously referred the matter to the local Import Specialist, Ms. Lorisa Hubsch, for a classification ruling, **and also to a fraud investigator**, Special Agent Randy Kivlighn, for an investigation into the circumstances of the supposed "misclassification" by NWFP and its broker. *See* Ex. 3 (Request for Information (CF-28) dated September 26, 2003, and received September 29, 2003, concerning a shipment of edge-glued lumber that NWFP entered on July 11, 2003). NWFP did not learn about this action until October 7, 2003. *See* Ex. 5(letter dated

---

[2] *See also American Bayridge Corp. v. United States*, 35 F. Supp. 2d 922 (Ct. Int'l Trade 1998) (under 19 U.S.C. § 1625(c)(1), even Headquarters must follow Customs Service Rulings unless and until they are revoked or modified *mutatis mutandis* in a notice and comment proceeding), *vacated in part as moot on other grounds*, 1999 WL 997303 (Fed. Cir. Oct. 26, 1999).

September 26, 2003, and received October 7, 2003, notifying NWFP of an investigation under 19 U.S.C. § 1592).

On the morning of September 29, 2003, before NWFP received notice of any inquiry by U.S. Customs, Special Agents Ed Suarez and Randy Kivlighn suddenly appeared at NWFP's facilities, without invitation or appointment, asking to speak to the owner. *See* Ex. 6(declaration of Terry Swanson). NWFP co-owner Terry Swanson was notified and came to the front. Initially, Mr. Suarez did all the talking. He said U.S. Customs was visiting businesses in Tacoma's port area to gather information to assist them in the War on Terrorism. *Id.* Neither agent displayed his identification card, disclosed that Mr. Kivlighn was a fraud investigator, or revealed that NWFP was being investigated under 19 U.S.C. § 1592 based on the supposed "misclassification" of its edge-glued lumber imports. *Id.*

Eventually, Mr. Kivlighn started talking and immediately asked Mr. Swanson about NWFP's edge-glued lumber imports. *Id.* These questions related to the actual use of the imported merchandise and, specifically, whether NWFP was resawing the lumber lengthwise on or near the glue line ("ripping"). *Id.* Mr. Swanson answered in the affirmative. *Id.* He then took Mr. Kivlighn on a tour of the facility, showed him exactly what NWFP was doing with the imported lumber, and even allowed him to take photographs. *Id.* At no time did Mr. Kivlighn disclose that he was investigating NWFP and intended to use the information he obtained in penalty proceedings against NWFP. *Id.*

Shortly after the agents left, Mr. Swanson finally received the September 26, 2003, CF-28 issued by Ms. Hubsch. *See* Ex. 3 The CF-28 asked three questions: "What,

if anything, is done to the panels at your Tacoma facility after it is [sic] received from Canada? Do you resell the panels to retail centers or directly to end-users? *See id.* What are these edge-glued cedar panels used for by the end user?" *Id.* The second page of the CF-28, advising NWFP that it had 30 days to respond to the request before U.S. Customs would take action to reclassify its entries, was missing from the copy sent to NWFP.

The next day, on September 30, 2003, the undersigned counsel finished NWFP's ruling request and sent it to Mr. Garretto by overnight mail. *See* Ex. 7. This submission, which stipulated to the facts that Mr. Kivlighn considered fraudulent ("ripping" the lumber after importation), was followed up with a telephone call to Mr. Garretto on October 1, 2003, during which Mr. Garretto asked for additional information. This information was provided by way of an amended ruling request express mailed to Mr. Garretto on or about October 5, 2003. *See* Ex. 8.

On September 30, 2003, the undersigned counsel also sent Ms. Hubsch a letter indicating that a ruling request had been submitted to Mr. Garretto. *See* Ex. 9.

On October 7, NWFP received the above-cited notice, dated September 26, 2003, accusing NWFP of violating 19 U.S.C. § 1592 and stating that the Bureau of Immigration and Customs Enforcement ("ICE") was investigating the "misclassification" of its edge-glued lumber entries. *See* Ex. 5.

On October 9, 2003, NWFP responded to Mr. Kivlighn's notice with a detailed letter explaining that the investigation was based on the incorrect legal premise that NWFP had misclassified its entries and that, in any event, the investigation of an alleged misclassification was premature (*i.e.*, not "ripe") until U.S. Customs liquidated the subject entries and the liquidation become final (*i.e.*, 90 days after liquidation if no

protest is filed, and otherwise after the protest and judicial review process has run its course). *See* Ex. 10.

On October 15, 2003, more than two weeks before NWFP's time for filing a response to the CF-28 expired, Ms. Hubsch issued a Notice of Action (CF-29) concerning 10 entries of edge-glued lumber going back to March 31, 2003. *See* Ex. 11. The CF-29 states that the subject entries are "in the liquidation process" and "are being re-classified under HTS#4407.10.00." *Id.*[3] **In truth, however, the liquidation of entries subject to the AD/CVD orders on Canadian softwood lumber is currently suspended, and "the liquidation process" will not begin for several years with respect to entries for which a judicial review of the final AD/CVD rate is sought**. The CF-29 also states that the decision was based on "a visit by a CBP agent to the importer's premises" and "discussions with the National Import Specialist." *Id.* Finally, the CF-29 purports to order NWFP to classify "[a]ll future shipments of this product" under Subheading 4407.10.00, HTSUS.

On October 15, 2003, based on the CF-29, U.S. Customs began assessing estimated AD/CV duties on all of NWFP's entries of edge-glued lumber, and NWFP began paying the assessments under protest. *See* Ex. 1; Compl. Ex. 2.

This action was commenced on October 23, 2003, by the filing of a complaint seeking a refund of the initial assessments that were paid under protest on two importations made on October 7, 2003, and October 8, 2003, respectively.[4] Courtesy

---

[3] NWFP promptly withdrew its ruling request as moot in view of the CF-29. *See* Ex. 8-B.

[4] The entered classification of the October 8, 2003, importation is Subheading 4421.90.9700, HTSUS. The entered classification of the remaining importations at issue in this action is Subheading 4407.10.0000, HTSUS. However, as indicated above, the change of the entered classification to Subheading 4407.10.0000, HTSUS, was made under protest after U.S. Customs ordered the change.

copies of the complaint were sent electronically to Mr. Garretto and Mr. Kivlighn. The undersigned counsel also telephoned Mr. Kivlighn, summarized the classification arguments presented to Mr. Garretto, and asked that all future inquiries to NWFP or its agents and employees concerning the subject entries be directed to counsel.

The next day, on October 24, 2003, before Ms. Burke had a chance to enter an appearance in this case, Mr. Kivlighn called NWFP's customs broker requesting an interview concerning NWFP's entries of edge-glued lumber. *See* Ex. 12. Counsel immediately responded to Mr. Kivlighn with a letter noting that the classification of the subject entries was *sub judice* in this Court and **again** asking that any future requests for records or information from NWFP's employees and agents be directed to counsel. *See id.* The letter also asked Mr. Kivlighn to inform counsel of any information requests directed to third party witnesses concerning the subject matter of this litigation. *See id.*

Despite the undersigned counsel's October 24, 2003, letter and prior telephone conversation with Mr. Kivlighn, on or about October 28, 2003, without informing counsel, Mr. Kivlighn crossed the border and paid an unannounced visit to the company that produced the subject merchandise for NWFP in Canada accompanied by a fraud investigator from Canada Customs, Mr. Brent Oslund. *See* Ex. 13. The owner showed Mr. Kivlighn around and answered all of his questions about the subject merchandise and how it was produced. *See id.* Mr. Kivlighn claimed to be satisfied and said the company would not be hearing from him again.

On December 8, 2003, Mr. Kivlighn called NWFP's broker asking again for an interview. *See* Ex. 14. The broker told Mr. Kivlighn that he wanted to confer with the undersigned counsel, and he did so immediately. *See id.* The undersigned counsel and

the broker teleconferenced and called Mr. Kivlighn offering to give an interview, but he was not there and did not return a voice mail message inviting him to a teleconference with the undersigned counsel and NWFP's broker. The undersigned counsel reported the incident to Ms. Burke by email. *See* Ex. 15. In a subsequent telephone conversation, Ms. Burke said she agreed that all inquiries to NWFP's broker are supposed to go through counsel and said her client had so instructed Mr. Kivlighn.

On January 13, 2004, Mr. Kivlighn got his immediate superior, Resident Special Agent-in-Charge Roy Hoffman, to send the undersigned counsel a letter stating that ICE "intend[ed] to serve a Customs Summons" on NWFP's broker requiring him "to appear and provide information, and produce records related to commercial entries made" for NWFP. Ex. 16. The letter also states that "Randy Kivlighn will serve the summons." *Id.*

The undersigned counsel sent another email and a copy of the letter to Ms. Burke to give her an opportunity to take corrective action before NWFP bothered this Court with protective order litigation. *See* Ex. 17. In a follow-up telephone call, Ms. Burke told the undersigned counsel that her client contacted Mr. Hoffman, "explained the situation to him and asked him to exercise some restraint."[5] As of the time this response was filed, no summons has been served on NWFP's broker, and Mr. Kivlighn has not otherwise reared his head again.

**B. <u>The Statutory Scheme</u>**

1. *The Customs Entry and Liquidation Process*

In order to enter merchandise into the customs territory of the United States, an importer must file a customs invoice and sworn declaration with U.S. Customs describing

[5] Fortunately, a Customs Summons cannot be enforced without the permission and assistance of the Department of Justice, so any further defiance of Ms. Burke's instructions will be futile, and the Court will not have to be burdened with a motion for a protective order. *See* 19 C.F.R. § 163.9.

the merchandise and stating its classification under the HTSUS. *See* 19 U.S.C. § 1481(a); *id.* § 1484(a); *id.* § 1485. Unless entry examination is required by law for the merchandise in question, *see id.* § 1499(a), entries are released immediately from U.S. Customs' custody and into the commerce of the United States based on the entry papers and without payment of any duties, fees, or other charges that may be owed on the importation, *see id.* § 1484(c), provided that the importer posts a bond, in an amount determined by U.S. Customs, to protect the United States against defaults. The settlement of accounts comes much later (314 days under current agency practice), in a process called "liquidation." *See id.* § 1500. It is in the liquidation process that U.S. Customs fixes the final classification of the merchandise and assesses any duties, fees, or other charges owed on the importation. *See id.*

The amount of duties owed on an importation is determined by the value (or quantity) and tariff classification of the merchandise and the rate of duty, if any, assigned to that classification. *See id.* § 1500(a) and (b). If an importer misclassifies merchandise at entry, U.S. Customs simply changes the classification at liquidation and assesses duties based on the correct classification. *See id.* § 1500(b) and (c). The importer then has 90 days to file an administrative protest of the classification at liquidation. *See* 19 U.S.C. § 1514(a); *id.* § 1515. If the protest is denied, the importer has 180 days to commence an action to contest the denial of the protest in the Court of International Trade. *See* 28 U.S.C. § 1581(a); *id.* § 2636(a)(1). The liquidation becomes final in 90 days if no protest is filed. *See* 19 U.S.C. § 1514(a). Otherwise, the liquidation is not final until all administrative and judicial reviews of the liquidation have been completed. *See id.* If the

importer prevails in an administrative or judicial review of the liquidation, the collector must reliquidate the entry in accordance with the review decision. *See id.* § 1515.

As the government concedes in its Motion to Dismiss, absent extraordinary circumstances not present here, the Court of International Trade has no jurisdiction to review classification decisions made by U.S. Customs concerning an entry of merchandise unless and until U.S. Customs liquidates the entry.[6] **This is true even if U.S. Customs unlawfully refuses to wait until liquidation to make an assessment based on its classification decision** (*e.g.*, an assessment of cash deposits of estimated antidumping and countervailing duties, described below).

2. *Antidumping and Countervailing Duty Proceedings*

To protect U.S. industry from "unfair trade," imports of products sold for "less than fair value" are subject to AD duties in an amount equal to the discount from fair value or "dumping margin," as determined by the U.S. Department of Commerce ("DOC"), if the International Trade Commission ("ITC") finds that the dumped imports are causing or threatening to cause "material injury" to domestic producers of the "like product." *See* 19 U.S.C. § 1673 *et seq.* Imports of merchandise produced by companies who receive foreign government subsidies are likewise subject to countervailing CV duties in an amount equal to the amount of the subsidy or "subsidy margin" if the ITC finds that the subsidized imports are causing material injury or threaten such industry on domestic producers of the like product. *See id.* § 1671 *et seq.*; *id.* § 1677 *et seq.*

---

[6] *See Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356, 359 (Fed. Cir.1992); *National Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1557 (Fed. Cir. 1988); *Miller & Co. v. United States*, 824 F.2d 961, 963 (Fed. Cir.1987), *cert. denied*, 484 U.S. 1041 (1988); *American Air Parcel Forwarding v. United States*, 718 F.2d 1546, 1550-51 (Fed. Cir.1983), *cert. denied*, 466 U.S. 937 (1984); *United States v. Uniroyal, Inc.*, 687 F.2d 467, 471 (Ct. Cust. & Pat. App. 1982); *see also American Bayridge Corp. v. United States*, 35 F. Supp. 2d 922 (Ct. Int'l Trade 1998) (noting that the plaintiffs voluntarily dismissed a prior action for declaratory and injunctive relief after the government raised jurisdictional objections), *vacated in part as moot*, 1999 WL 997303, at *1 n.1 (Fed. Cir. Oct. 26, 1999).

When DOC commences an AD/CVD investigation concerning imports from a particular country, it formulates a "scope definition" to identify what types of merchandise are within the class or kind of merchandise covered by the investigation. If an ambiguity in the scope definition becomes apparent, DOC can make a determination, on its own initiative or on the petition of any interested party, "as to whether a particular type of merchandise[7] is within the class or kind of merchandise described" in a notice of investigation or determination. 19 U.S.C. § 1516a(a)(2)(B); *see also id.* § 1671e(a)(2) (requiring scope definition in final ADD orders); § 1673e(a)(2) (requiring scope definition in final CVD orders). Interested parties who disagree with a final scope ruling by DOC have 30 days from publication of the next final determination on the merits of the proceeding to commence an action for judicial review thereof in the Court of International Trade. *See id.* **In other words, scope determinations are interlocutory and not immediately appealable.**

In the Canadian softwood lumber case, DOC's original scope definition was silent with respect to "edge-glued lumber." In response to petitions from interested parties, DOC added language explicitly excluding "edge-glued lumber, properly classified under HTSUS item 4421.90.[97].40." *See Certain Softwood Lumber Products from Canada,* 67 Fed. Reg. 15545, 15546 n.1 (Dep't Comm. Apr. 2, 2002) (final determination). NWFP is not aware of any petition for judicial review filed to challenge the correctness of DOC's scope determination regarding edge-glued lumber, and that determination is now *res judicata.* Moreover, even if DOC's scope determination were not conclusive of the scope issue in this case, **any scope determination DOC issued would not be reviewable until**

---

[7] As this statutory language indicates, DOC makes scope determinations with respect to general "types" of merchandise, not specific "entries."

**<u>the conclusion of the next round of annual "administrative reviews" in mid-2005</u>**. *See* 19 U.S.C. § 1516a(a)(1)(D); *id.* § 1675(c)(3).

Similarly, as indicated above, U.S. Customs' classification decision and assessment of cash deposits is not reviewable until liquidation. This will not occur until after the completion of the current round of administrative reviews and any judicial review of the annual AD/CV duty rate determined in that review, *see* 19 U.S.C. § 1516a(a)(1)(D) and 28 U.S.C. § 1581(c). This is because the liquidation of entries of merchandise subject to an AD/CVD order is suspended until a final AD/CVD rate for the entries is determined by DOC and that determination becomes final. *See* 19 U.S.C. § 1671b(d)(2) (requiring suspension of liquidation in ADD cases); *id.* § 1673b(d)(2) (requiring suspension of liquidation in CVD cases).

This process can take years, however, if the importer files a timely complaint for judicial review of the annual AD/CVD rate determination in the Court of International Trade under 28 U.S.C. § 1581(c) or in a binding arbitration under Article 1904 of the North American Free Trade Agreement ("NAFTA"). *See*19 U.S.C. § 1516a(c) (provision for continuing the suspension of liquidation in judicial reviews under 19 U.S.C. § 1516a(a) and 28 U.S.C. § 1581(c)); 19 U.S.C. § 1516a(g)(5) (provision for continuing the suspension of liquidation in panel reviews under Article 1904 of NAFTA).

Because of the potentially long delay in the liquidation of entries subject to an AD/CVD order, importers are required to make a cash deposit of estimated AD/CV duties if the entered classification of their merchandise is covered by a relevant AD/CVD order. Importers are not required to make such deposits, however, if the entered classification of their merchandise is not covered by a relevant AD/CVD order, even if

U.S. Customs believes the merchandise belongs in a classification covered by the order. What U.S. Customs can do in such circumstances is: (a) change the entered classification of the merchandise at liquidation and assess final AD/CV duties; and (b) assess penalties once the liquidation has become final and it is conclusively established that the importer misclassified its merchandise at entry. *See* 19 U.S.C. § 1592.[8]

As described in Section III.A. *supra,* U.S. Customs did not follow the correct procedure in this case. Instead, the agency ordered NWFP to pay cash deposits of estimated AD/CV duties on all entries of edge-glued lumber made as of October 7, 2003, and began a penalty investigation with respect to NWFP's prior entries even though U.S. Customs has not yet classified the entries in a final way. NWFP reluctantly commenced this action under the Tucker Act, 28 U.S.C. § 1491(a), because of the lack of any "protestable" decision by U.S. Customs and a desire to avoid a collection action, *see Trayco Inc. v. United States,* 994 F.2d 832, 837 (Fed. Cir. 1993) (rejecting the argument that an importer should have to wait until U.S. Customs brings an action to collect an assessment to obtain judicial review thereof).

[8] Section 1592(a)(1) authorizes U.S. Customs to assess penalties for negligence, gross negligence, or fraud by importers in classifying or describing merchandise in entry papers without regard to whether the United States was deprived of lawful duties as a result. Section 1592(c)(4) encourages importers who discover a possible Section 1592(a) violation to make a "prior disclosure" to U.S. Customs in exchange for the reduction or elimination of penalties that may be assessed. To be effective, the disclosure must be made before the disclosing party has received notice of an investigation by U.S. Customs. In addition, any duties owed must be tendered no later than 30 days after an assessment of duties owed by U.S. Customs. As indicated above, NWFP made a "prior disclosure" of the facts to Mr. Kivlighn before he informed NWFP of the investigation, and the undersigned counsel made a similar disclosure to Mr. Garretto before NWFP received the letter notifying the company of Mr. Kivlighn's investigation. Thus, any penalties that could be assessed against NWFP would be *de minimis* even assuming the company misclassified its merchandise (which it clearly did not).

## IV. ARGUMENT

### A. Legal Standard for Dismissal Under RCFC Rule 12(b)

Dismissal of a Tucker Act claim under RCFC Rule 12(b) "is drastic and should be used only when clearly appropriate." *High Star Toys, Inc. v. United States*, 32 Fed. Cl. 176, 179 (1994) (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

Factual inquiry on a motion to dismiss under RCFC 12(b) is limited. In passing on a motion to dismiss, whether on the ground of lack of subject matter jurisdiction or for failure to state a cause of action, the allegations in the complaint are to be considered favorably to the pleader. *Id.* The issue is not whether the plaintiff ultimately will prevail; it is whether the plaintiff is entitled to offer evidence to support facts alleged in the complaint. *Id.*

#### 1. *Dismissal Under Rule 12(b)(1) for Lack of Jurisdiction*

RCFC Rule 12(b)(1) authorizes dismissal when the Court lacks subject matter jurisdiction. "The procedure for rendering a final dismissal for want of jurisdiction should be used sparingly." *High Star Toys*, 32 Fed. Cl. at 179. Subject matter jurisdiction relates to the Court's general powers to adjudicate in specific areas of substantive law. *Id.* The subject matter of a dispute between the parties on the facts peculiar to a specific claim under the Tucker Act may implicate the doctrine of sovereign immunity, but such jurisdictional concepts do not limit the subject matter jurisdiction of the Court, just as prudential doctrines such as exhaustion of remedies and ripeness do not limit the Court's subject matter jurisdiction. *Id.*

2. *Dismissal Under Rule 12(b)(6) for Failure to State a Claim.*

With respect to Rule 12(b)(6), "a complaint should not be dismissed for failure to state a claim upon which relief can be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *High Star Toys,* 32 Fed. Cl. at 179 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The Court "must 'assume each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant.'" *Id.* (quoting *Chang v. United States,* 859 F.2d 893, 894 (Fed. Cir. 1988)).

**B. <u>This Court Clearly Has Jurisdiction to Entertain this Action.</u>**

NWFP's Tucker Act refund claim is based on alleged violations of the customs laws. "Historically, refunds for improper collections of customs duties, and the forfeiture provisions of the customs laws, have been considered to be within the scope of the Tucker Act." *High Star Toys,* 32 Fed. Cl. 179 (citing *Trayco*, 994 F.2d 832, *Doherty v. United States,* 205 Ct. Cl. 34 (1974), and *Simons v. United States,* 497 F.2d 1046, 1049 (9th Cir. 1974)).

For purposes of dismissal on the pleadings under RCFC 12(b)(1), the complaint states claims within the subject matter jurisdiction of this Court. *See id.* (citing *Mindes v. Seaman*, 453 F.2d 197, 198 (5th Cir. 1971); *Bray v. United States,* 785 F.2d 989, 992 (Fed. Cir. 1986); *Merck & Co. v. United States,* 24 Cl. Ct. 73, 77-79 (1991)). Accordingly, the government's motion to dismiss under RCFC 12(b)(1) must be denied.

The government's first argument under Rule 12(b)(1) is that NWFP "failed to cite any separate money-mandating constitutional provision, statute, or regulation, the violation of which would support a claim for damages against the United States." Def.'s

Mot. to Dismiss at 7. This argument does not go to the Court's subject matter jurisdiction, but to whether NWFP has stated a claim upon which relief can be granted. *See Trayco,* 994 F.2d at 837 ("[T]he Tucker Act . . . is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction . . . whenever [a] substantive right exists.") (citation and internal quotation marks omitted).

Moreover, the government is clearly wrong that NWFP failed to assert any substantive right to money damages enforceable against the United States. NWFP alleges that U.S. Customs unlawfully assessed cash deposits of estimated AD/CV duties from NWFP and that NWFP paid these assessments under protest with a reservation of all rights to judicial review. *See* Compl. ¶¶ 1, 9, 38-47. By accepting the payment, the government created an implied-in-fact contract with NWFP to refund any monies found to be unlawfully assessed by a court of competent jurisdiction. *See, e.g., Worthington v. Robbins,* 139 U.S. 337 (1891) (action "to recover an alleged excess of duties, paid under protest" brought under federal common law, before the advent of the administrative protest and judicial review procedure established in the Customs Administrative Act of 1890); *Seeberger v. Farwell,* 139 U.S. 608 (1891) (same); *Magone v. Luckemeyer,* 139 U.S. 612 (1891) (same); *Merritt v. Welsh,* 104 U. S. 694 (1881) (same).[9] Thus, NWFP clearly has asserted a substantive right to money damages enforceable against the United States, and this Court has jurisdiction to entertain NWFP's claim under the Tucker Act.

---

[9] *See also Trayco,* 994 F.2d 832 ("Trayco alleges that the Customs Service improperly assessed and exacted a penalty from Trayco . . . . The refund of a penalty improperly exacted pursuant to an Act of Congress is a substantive right for money damages.") (citing *Eastport Steamship Corp. v. United States,* 178 Ct. Cl. 599, 605 (1967) ("[T]he claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.")).

**C. The Court of International Trade's Exclusive <u>Jurisdiction Is not Implicated Here.</u>**

This Court's subject matter jurisdiction over refund actions arising from import transactions is limited by 28 U.S.C. 1491(c), which reads as follows:

> Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade.

It is well settled, however, that the Court of International Trade, like other specialized courts, operates within precise and narrow jurisdictional limits granted by Congress. *Trayco*, 994 F.2d at 836 (citation and quotation marks omitted). "Despite the fact that the Customs Courts Act of 1980 broadened the exclusive jurisdiction of the Court of International Trade, it cannot exercise jurisdiction over actions not addressed by a specific jurisdictional grant." *Id.; see, e.g., K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176 (1988).

The government argues that the Court of International Trade has exclusive subject matter jurisdiction, under 28 U.S.C. § 1581(c), to review scope determinations issued by DOC. Def.'s Mot. to Dismiss at 8-9. The complaint, however, does not ask the Court to review a scope determination issued by DOC. Rather, as the government acknowledges, the complaint asks the Court to review a classification decision made by U.S. Customs. Thus, the Court of International Trade's exclusive subject matter jurisdiction under 28 U.S.C. § 1581(c) is not implicated here.

Furthermore, requiring NWFP to pursue a scope ruling and judicial review thereof in the Court of International Trade would be inappropriate, because such a ruling already has been issued with respect to edge-glued lumber. NWFP is challenging the correctness of U.S. Customs' interpretation and application of that ruling. The carefully-calibrated

administrative mechanism Congress created for conducting AD/CVD proceedings on an expedited basis would come to a screeching halt if DOC had to conduct entry-by-entry scope determinations, as opposed to issuing general instructions to U.S. Customs as to what "types of merchandise" are covered by an AD/CVD order.[10] Moreover, even assuming NWFP obtained a DOC ruling that its specific type of edge-glued lumber is not covered by the AD/CVD orders, what is to prevent U.S. Customs from simply ignoring that more specific ruling?

Turning to the review of classification decisions by U.S. Customs, the government is correct that the Court of International Trade has exclusive subject matter jurisdiction, under 28 U.S.C. § 1581(a), to review the denial by U.S. Customs of an protest of the classification of merchandise **at liquidation**. A classification-based assessment made outside the context of a liquidation, however, is not "protestable" and thus cannot be reviewed in the Court of International Trade under 28 U.S.C. § 1581(a). *See* Memo in Supp. of Pl.'s Mot. for Expedited Consideration at 2 n.1 (noting that NWFP confirmed with the National Import Specialist that the classification decision embodied in the CF-29 issued to NWFP is "not protestable").[11]

---

[10] Indeed, there are so many lumber remanufacturers in Canada that DOC has refused to make individualized AD/CVD rate determinations for them given the expedited nature of AD/CVD proceedings and the limited staff resources available to the agency. Surely the government is not suggesting that DOC can and should be making individualized scope determinations for all these companies.

[11] The case law cited by the government on this point stands for nothing more than the unexceptionable proposition that the Court of International Trade has exclusive subject matter jurisdiction to review the classification of imported merchandise at liquidation. None of the cited decisions holds that final classification decisions *per se* are "protestable" or otherwise subject to judicial review in the Court of International Trade. Indeed, it should be noted that the United States moved to dismiss an action by Canadian importers and U.S. consumers in the Court of International Trade to review a final classification decision under 19 U.S.C. § 1625(c)(1) **precisely** on the ground that such decisions are protestable only when embodied in a liquidation. Eventually, the plaintiffs in that case agreed to dismiss the action voluntarily in exchange for an expedited entry, liquidation, and protest review process followed by expedited action for judicial review in the Court of International Trade. *See American Bayridge Corp. v. United States,* 35 F. Supp. 2d 922, 941-42 (Ct. Int'l Trade 1998), *vacated in part on other grounds without pub. op.*, 1999 WL 997303 (Fed. Cir. Oct. 26, 1999).

If the government did not want to be haled into this Court on a Tucker Act claim, "the government could have refused to accept [NWFP's] check." *Trayco*, 994 F.2d at 839. Alternatively, the government could have simply waited until liquidation to assess the duties and, if appropriate, pursue penalties under 19 U.S.C. § 1592 once the liquidation became final (assuming the final classification was under Heading 4407).

In sum, NWFP clearly satisfied the requirements for jurisdiction in this Court under the Tucker Act and alleged a substantive right against the United States for money damages. Accordingly, the Court has subject matter jurisdiction; NWFP has stated a substantive claim for relief that this Court can grant; and the government's Motion to Dismiss must be denied.

**D. The Government's Attempt to Distinguish *Trayco* Must Fail.**

The government labors long and hard to distinguish the two controlling jurisdictional precedents upon which NWFP based its complaint, *Trayco* and *High Star Toys*. The supposedly distinguishing facts, however, are irrelevant under the rule stated and applied in the decisions and therefore cannot change the outcome here.

The government attempts to distinguish *Trayco* from this refund case on the ground that *Trayco* was a "**penalty** refund case." The actual holding of *Trayco*, however, is that a gap exists in the Court of International Trade's jurisdiction in situations where U.S. Customs demands money from someone in a non-protestable way. The rationale for this holding is that importers should not have to endure the uncertainty and unpleasantness of not paying the assessment and waiting to be sued by the government in a collection action under 28 U.S.C. § 1582.[12]

[12] *See Trayco*, 994 F.2d at 837 ("The government takes the position that if Trayco desired judicial review, it need only have declined to pay the assessed penalty. Customs then would have commenced an enforcement

It is telling, in this regard, that Section 1582 is **not** limited to "penalty cases," but rather, has separate subsections for collection actions "to recover customs duties" and "to recover upon a bond" posted by the importer to cover any assessments. *See* 28 U.S.C. § 1582(2) and (3). Presumably, the government would have brought an action under one one or both of these provisions had NWFP refused to pay the assessments demanded by U.S. Customs. It makes no sense to read *Trayco* as requiring importers to "sit[ ] back and refus[e] to pay" a demand for payment by U.S. Customs simply because the agency's collection remedy is under subsections (2) and (3) of 28 U.S.C. § 1582 as opposed to subsection (1).

In short, the *Trayco* decision clearly holds that the existence of a potential **future** remedy, under 28 U.S.C. § 1581 or 28 U.S.C. § 1582, for an unlawful assessment by U.S. Customs on an entry, is not a bar to jurisdiction under the Tucker Act. As the Federal Circuit stated:

> Congress did not fully explain, and neither can we, why certain customs-related matters are excluded from the jurisdiction of the Court of International Trade. We refrain from interpreting **either section 1581 or section 1582** as granting exclusive jurisdiction to the Court of International Trade over importer-initiated suits for refund . . . where Congress has not explicitly done so.

994 F.2d at 837 (emphasis added; citations omitted). Thus, the government's attempt to distinguish *Trayco* must fail.[13]

---

action in the Court of International Trade pursuant to . . . 28 U.S.C. § 1582(1). However, there is no statutory bar to the course of action Trayco elected. Congress has not explicitly granted exclusive jurisdiction to the Court of International Trade over refund suits initiated by importers. A gap exists in the exclusive jurisdiction of the Court of International Trade. Therefore, Trayco had the option, and more importantly, the right to initiate suit [under the Tucker Act].").

[13] The government's argument that *Trayco* is distinguishable because it involved the jurisdiction of the district courts under the Little Tucker Act, as opposed to the jurisdiction of this Court under the Tucker Act, is frivolous and does not merit a response except to say that, again, the government's factual distinctions make no difference under the holding or reasoning of *Trayco.*

### E. **The Government's Attempt to Distinguish *High Star Toys* Must Fail.**

The government attempts to distinguish *High Star Toys* on the ground that the case involved a "forfeiture" and, thus, was really a "takings" case. *See* Def.'s Mot. to Dismiss at 14-15. This is not correct. *High Star Toys* was a *Trayco* action for money paid to U.S. Customs **in lieu of** a forfeiture. *See High Star Toys*, 32 Fed. Cl. at 178 ("Customs' decision on plaintiffs petitions for relief and requests to return the shipments to the country of origin was to remit forfeitures on the payment of an amount that was 52.2 percent of the forfeiture value, and to allow exportation on receipt of approval from [the Consumer Product Safety Commision]"). Thus, *High Star Toys* was not, strictly speaking, a forfeiture case and did not arise under the Court's "takings" jurisdiction. *Id.* at 179 ("Historically, refunds for improper collections of customs **duties**, **and** the forfeiture provisions of the customs laws, have been considered to be within the scope of the Tucker Act.") (citing *Trayco* and *Doherty v. United States*, 205 Ct. Cl. 34, 500 F.2d 540 (1974) (forfeiture under 19 U.S.C. § 1595a(a) alleged to be a "taking")) (emphasis added).

Nor did *High Star Toys* involve a claim for a refund of penalties improperly assessed and exacted under 19 U.S.C. § 1592, as in *Trayco*. Rather, Senior Judge Harkins was extending the core holding of *Trayco* to non-penalty cases in which U.S. Customs has made an allegedly illegal exaction of money that is not "protestable."

In short, if the government were right that *Trayco* is limited to "penalty refund actions," then Senior Judge Harkins would not have found jurisdiction in *High Star Toys*, because it was not a "penalty refund case" either.

**F. A Refund Action Is "Ripe" by Definition.**

The last ditch in the government's technical defenses is the prudential doctrine of ripeness and the Supreme Court's seminal decision in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-49 (1967). Def.'s Mot. at Dismiss at 15.[14] Unlike this case, *Abbott Labs,* involved an action for "pre-enforcement review" of a regulation. In other words, the agency interpretation of law that the plaintiff alleged to be invalid had not yet been applied to the plaintiff. Nevertheless, the Supreme Court held that Abbott's claim was ripe because of the penalties that could be assessed based on the interpretation once the regulation was actually applied to Abbott's merchandise.

In this case, by contrast, U.S. Customs applied its allegedly invalid interpretation of Heading 4407, HTSUS, to NWFP's merchandise when it assessed cash deposits of estimated AD/CV duties on the merchandise. *See* Ex. 1. NWFP felt the application of this agency interpretation in a very concrete way when it paid these assessments, *see* Compl. Ex. 2, which are now up to almost $150,000.00.

Moreover, as indicated above, the government has accused NWFP of fraud, gross negligence, or negligence for the supposed "misclassification" of its entries and has been harassing NWFP and its agents and vendors. *See* Exs. 10 through 17. U.S. Customs has ordered NWFP to change the entered classification of its future entries or face exclusion if not worse. *See* Ex. 3; Ex. 11. These concrete effects would bring this case within the principle of *Abbot Labs*, and make NWFP's claim ripe, even if U.S. Customs had not yet assessed the cash deposits of estimated AD/CV duties.

[14] There is no page number at the bottom of page 15 of the government's brief, and page 15 is actually page 16. The reference to page 15 here is to the actual page 15, not the page numbered "15."

It is easy for Ms. Burke to say that NWFP's claim of unlawful agency action is not "ripe." She is not the one who had to pay $150,000.00 to the government, or endure harassment by government agents, based on that action. We are in serious trouble if the time has come in this country when such unlawful agency action is not considered "ripe" for judicial review.

## V. CONCLUSION

The government is trying to have its cake and eat it too. NWFP must wait patiently until liquidation to obtain review of the reclassification of its entries under Heading 4407, HTSUS, but the government does not have to wait until liquidation to assess cash deposits based on the reclassification.

No one had a gun to the government's head when it accepted NWFP's payments under protest. As the *Winstar* cases established so dramatically, the government is not relieved of its contractual obligations merely because they prove to be inexpedient later. In this case, that means the government is not relieved of its contractual obligation to submit to judicial review in a court of competent jurisdiction and repay any monies adjudged to have been unlawfully exacted from NWFP. For the reasons stated above, this Court is clearly a court of competent jurisdiction given the size of NWFP's claim and the Court of International Trade's lack of jurisdiction over that claim.

Accordingly, the "drastic" action of dismissal under RCFC Rule 12(b) is not "clearly appropriate," and the government's motion to dismiss must be DENIED. *High Star Toys*, 32 Fed. Cl. at 179.

Respectfully submitted,

Date: February 9, 2004

________________________
A. Woodson Stuart
JONES & STUART, LLP
2300 M Street, NW, Suite 800
Washington, D.C. 20037
Tel: (202) 297-3196
Fax: (202) 338-0270

*Attorney for the Plaintiff*

**TABLE OF EXHIBITS**

| | |
|---|---|
| Ex. 1 | October 7, 2003, protest letter from Mike Jones to Port Director Peggy Fearon regarding payments of cash deposits of estimated AD/CV duties on the subject edge-glued lumber. |
| Ex. 2 | September 10, 2003, customs invoice reflecting notes of collector questioning the classification at entry of shipment of edge-glued lumber. |
| Ex. 3 | September 18, 2003, customs invoice for two shipments of edge-glued lumber denied or effectively denied entry by U.S. Customs at Sumas. |
| Ex. 4 | September 26, 2003, Request for Information (CF-28) to NWFP |
| Ex. 5 | September 26, 2003, letter from U.S. Customs to NWFP regarding investigation under 19 U.S.C. § 1592 |
| Ex. 6 | October 27, 2003, declaration of Terry Swanson |
| Ex. 7 | September 30, 2003, ruling request and memorandum from NWFP to Paul Garretto |
| Ex. 8 | October 5, 2003, revised ruling request from NWFP to Paul Garretto |
| Ex. 9 | September 30, 2003, letter from NWFP to Lorisa Hubsch regarding CF-28 and pending ruling request. |
| Ex. 10 | October 9, 2003, letter from NWFP to Randy Kivlighn regarding requests for information. |
| Ex. 11 | October 15, 2003, Notice of Action (CF-29) to NWFP |
| Ex. 12 | October 24, 2003, letter from NWFP to Randy Kivlighn regarding attempt to interview Mike Jones *ex parte*. |
| Ex. 13 | October 28, 2003, letter from NWFP to M. Jean Anderson, Esq., regarding harassment of NWFP's supplier. |
| Ex. 14 | December 8, 2003, email from Mike Jones to NWFP regarding further attempts by Randy Kivlighn to conduct *ex parte* interview. |
| Ex. 15 | December 9, 2003, email from Claudia Burke to NWFP regarding further attempts by Randy Kivlighn to conduct *ex parte* interview of Mike Jones. |
| Ex. 16 | January 13, 2004, letter from Roy Hoffman to NWFP regarding service of Customs Summons on Mike Jones. |

| | |
|---|---|
| Ex. 17 | January 22, 2004, email from NWFP to Claudia Burke regarding service of Customs Summons on Mike Jones. |
| Ex. 18 | Appendix of cited statutory and administrative materials. |