A. WOODSON STUART, ESQ.
2315 Wisconsin Avenue, NW, Second Floor
Washington, D.C. 20007-1866
Tel: (202) 297-3196 ✧ Fax: (202) 338-0270
Email: awstuart@att.net

September 30, 2003

Mr. Paul Garretto
National Import Specialist
U.S. Customs and Border Protection
One Penn Plaza
New York, New York 10119

**Re: Request for ruling regarding the classification of edge-glued cedar lumber.**

Dear Mr. Garretto:

I am writing on behalf of my client, Northwest Forest Products ("NWFP"), to request a ruling as to the correct classification at entry of certain edge-glued cedar lumber, which NWFP has been importing as "edge-glued lumber" since February under Subheading 4421.900000 of the Harmonized Tariff Schedules of the United States ("HTSUS"). It is my understanding that none of the merchandise entered thus far has liquidated.

Two weeks ago, a Supervisory Inspector at the Sumas, Washington, Port of Entry began making notations on the release documents that edge-glued lumber "is only lumber" and should be classified in Subheading 4407.100000. On September 26, 2003, the local Import Specialist, Lorisa Hubsch, issued a Request for Information ("RFI") regarding post-importation use. *See* Ex. A. On September 29, 2003, the RFI was personally served on NWFP's officers by Customs agents, including a fraud investigator. The agents elicited answers to the questions posed in the RFI without giving NWFP a chance to confer with counsel.

As the accompanying memorandum of law indicates, NWFP's classification at entry was dictated by a long and unbroken line of Customs Service Rulings involving "edge-glued lumber" with substantially identical physical characteristics based on its "condition as imported." I have advised my

client that its classification at entry was clearly correct under these rulings and that, indeed, any deviation from them could subject NWFP to penalties for violation of its duty of "reasonable care" in classifying its merchandise at entry.

If U.S. Customs wishes to revoke or modify its edge-glued lumber rulings, or the treatment accorded to substantially identical transactions involving third parties, it may do so ***only*** by conducting notice-and-comment proceedings under Section 625(c) of the Customs Modernization Act of 1993, 19 U.S.C. § 1625(c). As long as the rulings are on the books, however, both U.S. Customs and the importing community must follow their teachings in all substantially identical transactions. *See American Bayridge Corp. v. United States,* 35 F. Supp. 2d 922, 941-42 (Ct. Int'l Trade 1998) (Customs Service Rulings apply to all importers of substantially identical merchandise, and all importers of substantially identical merchandise are entitled to the same treatment as the importer that requested the ruling unless and until the ruling is revoked or modified under Section 625(c)), *vacated in part on other grounds without pub. op.,* 1999 WL 997303 (Fed. Cir. Oct. 26, 1999).

Accordingly, NWFP respectfully requests a ruling confirming that the edge-glued lumber described in the accompanying memorandum is properly classified in Subheading 4421.9000, HTSUS, and, in any event, cannot be classified in Subheading 4407.1000, HTSUS.

If I can be of any further assistance, please let me know.

Respectfully submitted,



A. Woodson Stuart

Enclosure

Cc: Tom Read
Mike Jones

# Memorandum

To: Paul Garretto

From: A. Woodson Stuart, Esq.

Date: September 29, 2003

Re: Customs classification of edge-glued lumber.

## I. INTRODUCTION

This memorandum addresses: (a) the customs classification of unfinished edge-glued cedar lumber; and (b) whether post-importation use of particular entries of such lumber is relevant to its classification at entry.

This memorandum concludes that such lumber is properly classified as "edge-glued lumber" in Heading 4421 of the Harmonized Tariff Schedule of the United States ("HTSUS"), and that post-importation use is irrelevant to the classification analysis because it does not relate to the condition of the merchandise on the date of importation.

## II. DESCRIPTION OF THE SUBJECT MERCHANDISE

The subject merchandise is made by gluing pieces of rough Western Red Cedar dimension lumber together edge to edge, using a product called Mira-Lok, to form larger pieces of various dimensions and lengths. *See* Ex. A. The resulting

product is suitable for a variety of uses in its condition as imported, such as siding and trim board. It requires only minor trimming and finishing operations necessary to ready the lumber for such uses. These operations include kiln drying and, depending on the application, also could include planing and treating the wood with a preservative (e.g., sealant, primer, or paint). Representative samples of the subject merchandise are being sent separately.

## III. "EDGE-GLUED LUMBER" IS NOT PROPERLY CLASSIFIED IN HEADING 4407, HTSUS, REGARDLESS OF ACTUAL USE.

U.S. Customs has held that edge-glued dimension lumber is properly classified as "other articles of wood" in Subheading 4421.90, HTSUS, a dutiable provision,[1] and not as "wood sawn lengthwise" in Subheading 4407.10, HTSUS, a duty free provision, even though such merchandise is "merely a rectangular board suitable for a number of different uses." Customs Service Ruling F88847 (July 19, 2000).

Indeed, there is a long and unbroken line of customs rulings involving (nonstructural) edge-glued boards and panels, dating back to shortly after the adoption of the Harmonized Tariff System in 1989, requiring their classification as dutiable "articles of wood," and not as duty-free "wood sawn lengthwise," on the ground that **edge-gluing is not allowed under Heading 4407.** *See* Customs

[1] Though imports from Canada are duty-free now, generally speaking, imports under Heading 4421, HTSUS, are dutiable, whereas imports under Heading 4407 are duty free. While there are AD/CV duties on Canadian imports of "softwood lumber," this does not include "edge-glued lumber" properly classified in Subheading 4421.90, HTSUS.

Service Ruling 087616 (Aug. 20, 1990) ("Edge-glued lumber does not meet the definition of lumber in . . . heading 4407."); *see also* Customs Service Ruling J82165 (Mar. 28, 2003); Customs Service Ruling I85263 (Sept. 12, 2002); Customs Service Ruling I81972 (June 6, 2002); Customs Service Ruling H84102 (Aug. 10, 2001); Customs Service Ruling G82627 (Oct. 10, 2000); Customs Service Ruling B80847 (Jan. 23, 1997); Customs Service Ruling A85552 (July 23, 1996); Customs Service Ruling 087616 (Aug. 20, 1990).

"[A]ll importers" are entitled to rely, and must follow, Customs rulings involving substantially identical merchandise unless and until those rulings are revoked or modified in a notice-and-comment proceeding under Section 625(c) of the Customs Modernization Act of 1993, 19 U.S.C. 1625(c). *See American Bayridge Corp. v. United States,* 35 F. Supp. 2d 922, 941 (Ct. Int'l Trade 1998), *vacated in part on other grounds without pub. op.*, 1999 WL 997303 (Fed. Cir. Oct. 26, 1999).

The above-cited Customs rulings expressly state that the classification of "edge-glued lumber" is based on the physical characteristics of the merchandise in its "condition as imported into the United States." Unlike the rulings on truss components and other use-related lumber classifications, there is no reference to a particular use as defining the essence of the article at importation. To the contrary, the rulings all make clear that edge-glued lumber is a general purpose

material that is not capable of being defined in terms of any particular post-importation use.

## IV. POST-IMPORTATION MODIFICATIONS CANNOT ALTER THE CLASSIFICATION OF EDGE-GLUED LUMBER AT IMPORTATION.

According to U.S. Customs' own rulings, an importer who enters edge-glued lumber is definitely ***not*** representing anything about any particular use after importation. So long as merchandise has the physical characteristics of a genuine article, in this case, "edge-glued lumber," it must be classified as such in entry papers even regardless of post-importation events.

This principle can be discerned by contrasting the facts of two lines of decisions. The first recognizes that importers have a "fundamental right" to import one product instead of another solely to avoid customs duties, even if it requires only minor further processing of the same basic merchandise.[2] The

[2] *Tropicana Prods., Inc. v. United States,* 789 F. Supp. 1154 (Ct. Int'l Trade 1992); *see also Merritt v. Welsh,* 104 U. S. 694 (1881) ("Suppose [it] is true [that the importer artificially darkened its sugar to avoid high duties on refined sugar]; has not a manufacturer a right to make his goods as he pleases? If they are less marketable, it is his loss. If they are more marketable, who has a right to complain. If duties are affected, there is a plain remedy. Congress can always [amend the tariff schedules]."); *Michaelian & Kohlberg, Inc. v. United States,* 22 C.C.P.A. 551, 557 (1935) ("the rule is well settled, having been often stated and approved by various courts, that an importer has the right to fashion his merchandise so that it shall be assessed with duty at the lowest rate"; "when the article imported is not the article described as dutiable at [the higher] rate, it does not become dutiable [simply] because it has been manufactured or prepared for the express purpose of being imported at a lower rate.") (citations omitted).

second holds, in qualification of the first, that importers cannot do this by importing a fictitious product or a mere facsimile of a real product.[3]

Thus, for example, an importer may:

- unstring pearls to avoid a duty on strung pearls (even if the importer intends the buyer to restring them);[4]
- disassemble guns and sell the parts separately to avoid a duty on guns (even if the importer intends the buyer to reassemble them);[5]
- add an imperceptible amount of cotton to avoid a duty on all-wool garments (even if the importer intends them to be indistinguishable from all-wool garments);[6]
- add artificial coloring to avoid a duty on refined sugar based strictly on color;[7]
- loosely sew a lace border to sheets of cloth to bring them within a favorable provision for articles made in part of lace (even if the importer intends the buyer to remove the lace after importation);[8]
- coat base metal watch cases with an extremely thin layer of gold to bring them within a favorable provision for watch cases made in part of gold;[9]

---

[3] *See, e.g., Notice of Proposed Revocation of Ruling Letter and Treatment Relating to Tariff Classification of Certain Sugar Syrup*, -- Cust. Bull. & Dec. ---- (June 1, 1999) (particular mixture of molasses and sugar was not a recognized commercial product) (collecting cases).

[4] *United States v. Citroen*, 223 U.S. 407, 414-15 (1912).

[5] *United States v. Schoverling*, 146 U.S. 76, 81 (1892).

[6] *Luckemeyer*, 139 U.S. 612; *Seeberger v. Farwell*, 139 U.S. 608 (1891).

[7] *Merritt v. Welsh*, 104 U. S. 694.

[8] *Mercantile Stores Co. v. United States*, 36 Cust. Ct. 354, 355 (1956).

[9] *Varsity Watch Co. v. United States*, 34 C.C.P.A. 155, 163 (1947).

- crudely embroider a dragon on rugs to bring them within a favorable provision for embroidered articles (even if the importer intends the buyer to remove the embroidery after importation);[10] or
- melt lead and cast it into busts to bring the merchandise within a favorable provision for busts of metal (even if the importer intends the buyer to remelt the busts after importation).[11]

By contrast, an importer may not:

- add water and formaldehyde,[12] corn syrup,[13] or molasses[14] to sugar syrup to avoid the duty on pure sugar when there is no evidence "that any such product[s] ever existed either in the United States or elsewhere;"[15] or
- add sulphuric acid to nitric acid to bring the merchandise within a favorable provision for mixtures of acids where the sulphuric acid was merely packing material to prevent the corrosion of tank cars during shipment and there was no recognized commercial use for the mixture.[16]

In sum, importers have a "fundamental right" to fashion their merchandise at importation in such a way as to obtain the most favorable customs classification, as long as they are importing a real product (e.g., strung pearls, lead busts, etc.). "Edge-glued lumber" clearly falls into this category, and

---

[10] *Michaelian & Kohlberg*, 22 C.C.P.A. at 557.

[11] *United States v. Levitt*, 26 Fed. Cas. 919 (D. Mass. 1842).

[12] *Savannah Sugar Ref'g Corp. v. United States*, 20 C.C.P.A. 272, 278 (1932).

[13] *Arbor Foods, Inc. v. United States*, 9 C.I.T. 119 (1985).

[14] *Notice of Proposed Revocation of Ruling Letter and Treatment Relating to Tariff Classification of Certain Sugar Syrup*, -- Cust. Bull. & Dec. ---- (June 1, 1999).

[15] *Savannah Sugar*, 20 C.C.P.A. at 278.

[16] *United States v. Aetna Explosives Co.*, 9 C.C.A. 298, 306 (1919), *aff'd*, 256 U.S. 402 (1920).

the subject merchandise is the genuine article and not a mere facsimile or imitation thereof. Thus, post-importation use is irrelevant to the classification of the subject merchandise.

## V. CONCLUSION AND REQUEST FOR RELIEF

U.S. Customs has correctly and consistently classified edge-glued dimension lumber in Heading 4421, HTSUS. Post-importation use is irrelevant and would be inadmissible in court.[17] If U.S. Customs wants to modify its rulings to make a statement about post-importation use, it may do so only by according all importers of substantially identical merchandise the benefit of the doubt regarding the relevancy of such considerations for customs classification purposes.

---

[17] *See Magone v. Luckemeyer,* 139 U.S. 612, 614 (1891) (affirming trial court's exclusion of evidence, as irrelevant to classification under tariff provision for all-wool garments, that the subject garments, to which the importer added an imperceptible amount of cotton solely to avoid duties, were in fact "bought and sold" as all-wool garments); *see also Hawaiian Motor Co. v. United States,* 473 F. Supp. 787, 788 (Cust. Ct. 1979) (evidence of actual use after modification of imported merchandise "is irrelevant on the issue of chief use, and cannot properly be considered by the court in connection with classification of the imported merchandise").

Customer Copy
Label 11-B September 2002

EXPRESS MAIL
UNITED STATES POSTAL SERVICE®

Post Office To Addressee

ER 298743589 US

**ORIGIN (POSTAL USE ONLY)**

| | | |
|---|---|---|
| PO ZIP Code: 20006 | Day of Delivery: Next / Second | Flat Rate Envelope |
| Date In: 9 30 03 (Mo. Day Year) | 12 Noon / 3 PM | Postage: $ 13 65 |
| Time In: 452 P (AM / PM) | Military: 2nd Day / 3rd Day | Return Receipt Fee |
| Weight: 5 lbs. ozs. | Int'l Alpha Country Code | COD Fee $ / Insurance Fee |
| No Delivery: Weekend / Holiday | Acceptance Clerk Initials: Tm | Total Postage & Fees: $ 13 65 |

**DELIVERY (POSTAL USE ONLY)**

| | | |
|---|---|---|
| Delivery Attempt (Mo. Day) | Time (AM / PM) | Employee Signature |
| Delivery Attempt (Mo. Day) | Time (AM / PM) | Employee Signature |
| Delivery Date (Mo. Day) | Time (AM / PM) | Employee Signature |

WASHINGTON DC CALVERT STATION SEP 30 2003 USPS

**CUSTOMER USE ONLY**

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or Postal Service Acct. No.

WAIVER OF SIGNATURE (Domestic Only)
**Additional merchandise insurance is void if waiver of signature is requested.**
I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and I authorize that delivery employee's signature constitutes valid proof of delivery.

Customer Signature

NO DELIVERY
Weekend Holiday

FROM: (PLEASE PRINT) PHONE 202 297 3196

Stuart
2315 Wisconsin Ave
Second Floor
Washington DC 20007

TO: (PLEASE PRINT) PHONE ( )

Paul Garretto
US Customs
One Penn Plaza
New York, New York
10119 + (ZIP + 4)

FOR PICKUP OR TRACKING CALL 1-800-222-1811
www.usps.com EMS
PRESS HARD. *You are making 3 copies.*

A. WOODSON STUART, ESQ.

2315 Wisconsin Avenue, NW, Second Floor
Washington, D.C. 20007-1866
Tel: (202) 297-3196 ✧ Fax: (202) 338-0270
Email: awstuart@att.net

October 5, 2003

Mr. Paul Garretto
National Import Specialist
U.S. Customs and Border Protection
One Penn Plaza
New York, New York 10119

Dear Mr. Garretto:

Enclosed please find a letter with the additional information you requested. I was interested to find that my own office was full of proof that edge-glued lumber in the dimensions and lengths imported by my client, Northwest Forest Products, is a real commercial product and not a mere artifice, like the syrup in *Heartland By-Products* case. I have attached two photos showing what I mean.

If you need any more information, please let me know.

Very truly yours,

A. Woodson Stuart

Cc: Tom Read
Terry Swanson
Mike Jones

**Pl.'s Resp. to Def.'s Mot. to Dismiss, Ex. 8**

A. WOODSON STUART, ESQ.
2315 Wisconsin Avenue, NW, Second Floor
Washington, D.C. 20007-1866
Tel: (202) 297-3196 ✧ Fax: (202) 338-0270
Email: awstuart@att.net

October 5, 2003

Mr. Paul Garretto
National Import Specialist
U.S. Customs and Border Protection
One Penn Plaza
New York, New York 10119

**Re: Response to request for further information to support the ruling request submitted by Northwest Forest Products.**

Dear Mr. Garretto:

I am writing on behalf of my client, Northwest Forest Products ("NWFP"), in response to your request for further information to support our ruling request, including information regarding the actual use of the imported merchandise. A set of samples, in one foot lengths, is being prepared and sent to you for delivery later this week.

**I. DETAILED DESCRIPTION OF THE SUBJECT MERCHANDISE**

The merchandise that NWFP has imported thus far, and would like to import in the future, is made by gluing pieces of rough dimension lumber together edge to edge, using special machinery and a super-adhesive product called Mira-Lok, to form larger pieces of various dimensions and lengths. *See* Ex. A. The specific products at issue here consist of rough edge-glued lumber, in lengths of from 8 to 20 feet, with the following nominal dimensions:

a. 1 ¼ inches by 8 inches.

b. 1 ¼ inches by 12 inches.

c. 1 ¼ inches by 16 inches.

d. 1 ¼ inches by 20 inches.



e. 1 ¼ inches by 24 inches.



---

f. 1 ¾ inches by 8 inches.

g. 1 ¾ inches by 12 inches.

h. 1 ¾ inches by 16 inches.

*i.* 1 ¾ inches by 20 inches.

j. 1 ¾ inches by 24 inches.

---



k. 2 inches by 8 inches.

*l.* 2 inches by 12 inches.

m. 2 inches by 16 inches.

n. 2 inches by 20 inches.

o. 2 inches by 24 inches.

---

p. 4 inches by 8 inches.

The resulting intermediate articles of wood are suited to a variety of uses in their condition as imported, with only minor processing operations being required to ready the material for assembly into ultimate articles (kiln drying, planning, and/or treating the wood for its preservation). *See* Bob Smith and Phil Arman, *Exploring Value Added Options,* Southern Lumberman (Ex. B) ("Typical uses for edge-glued panels (blanks) include table tops, drawer fronts, upholstered furniture frames, cabinet fronts, and shelving products. Another important market for blanks and edge-glued panels is the export market.").

"Edge-glued lumber" with identical physical characteristics and dimensions to the merchandise imported by NWF is clearly a genuine article of commerce that was not created solely for purposes of avoiding the AD/CV duties

on regular lumber. A few minutes of research on the Internet makes this clear beyond any peradventure of doubt.

For example, a leading manufacturer of edge-glued cedar lumber, Palco, boasts that edge-glued cedar lumber provides "wider widths" than solid lumber at the same price and that it "offers maximum dimensional stability with less warping and twisting than solid wood." *See* Ex. C. It "can be used for almost any interior or exterior application."

With respect to dimensions and length, Palco states that "[a] wide range of sizes are in stock and special orders are available," and that the "standard" length is 16 feet with "[o]ther lengths available on special order." Specifically, Palco states that it produces "Boards/Fascia" that are 1 ¼ and 2 inches thick (nominal) and 12 inches wide with "wider stock available" upon request. Palco also offers "panels" that are 1 inch thick (nominal) in widths "up to" 48 inches and various lengths depending on availability. Palco describes the glue it uses as "a high-quality exterior adhesive." Palco also notes that "a saw-textured side is recommended" for exterior applications.

Similar evidence of the availability of edge-glued lumber that is identical or equivalent to NWFP's imports can be found on the website of the Western Red Cedar Association ("WRCA"). The WRCA states the following about the characteristics and uses of Western Red Cedar:

> Western Red Cedar contains natural oils that act as preservatives to help the wood resist insect attack and decay. Cedar is also a dimensionally stable wood that lies flat and stays straight. Properly finished and maintained, Western Red Cedar ages gracefully and endures for many years. Cedar is the preferred material for all outdoor applications . . . : from siding and patio decking to fences, planters, screens, shelters and garden furniture. Indoors, cedar's dimensional stability makes it perfectly suited to a variety of uses in high moisture areas such as kitchens, bathrooms and saunas.

Ex. D; *see also* Ex. E (cedar sign blanks and products made from them).[1]

---

[1] The WCRA website also has a table of the physical characteristics and dimensions in which cedar "trim boards" are "available." These sizes include cedar lumber that in the same dimensions and lengths as NWFP products a, b, k and *l*, above.

It is abundantly clear, therefore, that every item that NWFP imports is identical or equivalent to the products described by the WRCA and Palco on their websites. Thus, every item that NWFP imports is ***unquestionably*** a real commercial product in which the glue performs a real function. Each of these items is suited to use in one or more applications with only minor finishing operations being necessary to ready them use. These facts readily distinguish NWFP's case from cases like *Heartland By-Products, Inc. v. United States*, 264 F.3d 1126 (Fed. Cir. 2001), where there was no recognized commercial use, or market, for the imported sugar syrup in its condition as imported. *See id.* at 1138 (distinguishing *United States v. Citroen,* 223 U.S. 407, 414-15 (1912) (rejecting the government's position that an importer could not string pearls solely to avoid high duty on unstrung pearls)).

## II. THE ACTUAL USE OF NWFP'S ENTRIES IS IRRELEVANT TO THEIR CUSTOMS CLASSIFICATION.

In AD/CVD cases, Congress has provided an ***exclusive remedy*** for domestic industries concerned about "circumvention" of AD/CVD orders. *See* 19 U.S.C. § 1677j. It is improper for U.S. Customs to address such issues under the guise of re-"interpreting" the tariff schedules. Indeed, in this case, U.S. Customs re-"interpretation" narrows the scope of a dutiable provision, Subheading 4421.90.9700, HTSUS, in favor of duty free provision, Subheading 4407.10.0000, HTSUS, and thus will result in a ***loss*** of revenue from customs duties to the United States Treasury (especially since AD/CV duties are now being paid to the domestic industry and cannot be considered "revenue" accruing to the United States).

The actual use of NWFP's entries does not relate to the condition of the merchandise as imported and, therefore, is not a proper subject for inquiry by U.S. Customs. The law could not be any clearer on this point. *See, e.g.*, *Citroen*, 223 U.S. at 414-15 ("the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported"). To paraphrase the Court in *Merritt v. Welsh,* 104 U.S. 694 (1881):

> Suppose [it] is true [that the importer altered his merchandise solely to alter its classification at entry]; has not a manufacturer a right to make his goods as he pleases? If they are less marketable,

> it is his loss. If they are more marketable, who has a right to complain. If duties are affected, there is a plain remedy. Congress can always [amend the tariff schedules].

The Supreme Court[2] and the lower courts[3] have reaffirmed this principle in numerous cases over the years. Indeed, the modern decisions have said that importers have a **"fundamental right"** to fashion their merchandise in such a way as to obtain the most favorable tariff classification at entry. *Tropicana Prods., Inc. v. United States,* 789 F. Supp. 1154 (Ct. Int'l Trade 1992).[4] This right has no practical significance if, as in this case, it cannot be exercised without risking a charge of customs fraud.[5] U.S. Customs is not at liberty to deviate from the clear and consistent commands of its reviewing courts,[6] or to sport away the "fundamental rights" of importers. That is what the agency is doing in this case.

---

[2] *See, e.g., Citroen,* 223 U.S. at 414-15; *United States v. Schoverling,* 146 U.S. 76, 81 (1892) (rejecting the government's position that an importer could not disassemble guns and import the parts separately to avoid a high duty on guns); *Magone v. Luckemeyer,* 139 U.S. 612 (1891) (rejecting the government's position that an importer could not add an imperceptible amount of cotton to garments, to avoid a high duty on "all wool" garments, even though the importer sold the goods as all wool garments); *Seeberger v. Farwell,* 139 U.S. 608 (1891) (same); *see also United States v. Levitt,* 26 Fed. Cas. 919 (D. Mass. 1842) (accepting Daniel Webster's argument that an importer could avoid high duty on lead, and obtain the benefit of more favorable tariff treatment for "busts," by casting the lead into busts prior to importation).

[3] *See, e.g., Varsity Watch Co. v. United States,* 34 C.C.P.A. 155, 163 (1947) (rejecting the government's position that an importer could not coat base metal watch cases with an ultra-thin layer of gold solely to bring them within a favorable provision for watch cases made in part of gold); *Mercantile Stores Co. v. United States,* 36 Cust. Ct. 354, 355 (1956) (rejecting the government's position that an importer could not loosely sew a lace border to sheets of cloth, to bring them within a favorable provision for articles made in part of lace, even though the importer removed the lace after importation).

[4] *Michaelian & Kohlberg, Inc. v. United States,* 22 C.C.P.A. 551, 557 (1935) ("the rule is well settled, having been often stated and approved by various courts, that an importer has the right to fashion his merchandise so that it shall be assessed with duty at the lowest rate") (citations omitted).

[5] It also violates constitutional due process to penalize importers for conduct that is not clearly proscribed and, indeed, is clearly permitted under current law. *See, e.g., United States v. Chrysler Corp.,* 158 F.3d 1350, 1354 (D.C. Cir. 1998) (under the "fair warning" doctrine, parties cannot be penalized consistently with due process based on novel interpretation or application of a statute or regulation); *GE v. EPA,* 53 F.3d 1324, 1328 (D.C. Cir. 1995) (same).

[6] *See Schott Optical Glass, Inc. v. United States,* 678 F. Supp. 882, 887-88 (Ct. Int'l Trade 1987) (U.S. Customs is bound, under the doctrine of *stare decisis,* to apply rules articulated in court decisions in subsequent adjudications involving different importers and merchandise), *aff'd,* 862 F.2d 866 (Fed. Cir. 1988).

## III. EVIDENCE OF POST-IMPORTATION USE WOULD NOT BE ADMISSIBLE IN JUDICIAL REVIEW OR ENFORCEMENT PROCEEDINGS.

The principle of substantive classification law articulated by the Supreme Court in cases like *Merritt* is reflected in a rule of evidence and procedure that facts related to post-importation use of particular entries are not admissible in court. *See, e.g., Magone,* 139 U.S. at 614. In this case, that means U.S. Customs would not be able to support the classification of NWFP's entries in Subheading 4407.10.0000, HTSUS, based on allegations about their post-importation use.

In *Magone*, the importer added an imperceptible amount of cotton to its wool garments in order to avoid a high duty on all wool garments. Customs classified the importer's entries as all wool garments, and the importer brought an action for judicial review. In court, the importer filed a motion *in limine* to exclude evidence relating to post-importation use and, specifically, Customs' allegation that the goods were in fact "bought and sold" as all wool garments and that the cotton was added solely to avoid the duty on all wool garments.

The trial court granted the motion, and the importer ultimately prevailed on the classification issue. On appeal, the United States argued that the trial court erred in excluding evidence of post-importation use. The Supreme Court rejected this argument, agreeing with the lower court that such evidence was irrelevant to the condition of the merchandise at importation and, thus, its customs classification.

Indeed, even when the essential character of a product at importation is defined in terms of a particular use or chief use (unlike the descriptive provision for "all wool" garments in *Magone* or the descriptive provisions for "edge-glued lumber" at issue here), evidence of the post-importation use of particular entries is irrelevant and inadmissible. Thus, in *Hawaiian Motor Co. v. United States,* 473 F. Supp. 787, 788 (Cust. Ct. 1979), the Customs Court excluded evidence of actual use of particular entries after the merchandise had been modified, saying it was "is irrelevant on the issue of chief use, and cannot properly be considered by the court in connection with classification of the imported merchandise."

For these reasons, NWFP can stipulate, for purposes of its pending ruling request and the Request for Information issued by the local Import Specialist,

that the actual use of the edge-glued lumber it imports may be a fugitive use, i.e., a use that does not utilize, or even nullifies, the gluing feature. NWFP respectfully submits that this is irrelevant and has no affect on classification of the merchandise, a topic addressed in the next two sections.

## IV. EDGE-GLUED LUMBER IS EXPLICITLY EXCLUDED FROM HEADING 4407, HTSUS, AND CANNOT BE CLASSIFIED THERE.

The classification of merchandise under the HTSUS is governed by the General Rules of Interpretation ("GRIs"). The GRIs are supposed to be applied in sequence until the issue of classification is resolved. GRI provides that classification "shall be determined according to the terms of the headings and any relative section or chapter notes." The HTSUS is so well crafted that the vast majority of products can be resolved by application of GRI 1.

The only Section or Chapter pertinent here ***explicitly states*** that edge-glued lumber cannot be classified in Heading 4407, HTSUS, even if it is "rough." *See* HTSUS, Chapter 44, Statistical Note ("For purposes of heading 4407, the term 'rough' . . . does not include wood that . . . has been edge-glued or end-glued.").[7]

Under GRI 1, the general classification principle stated in the Statistical Note to Chapter 44 is binding on both U.S. Customs and its reviewing courts. *See, e.g., Sharp Microelectronics Technology, Inc. v. United States*, 122 F.3d 1446, 1461 (Fed. Cir. 1997) (GRI 1 requires the clear and unambiguous terms of the HTSUS to be given effect). Accordingly, U.S. Customs recognized the principle in rulings issued contemporaneously with the adoption of the HTSUS.

Specifically, in Customs Service Ruling 087616 (Aug. 20, 1990), Headquarters stated that "Edge-glued lumber does not meet the definition of lumber in . . . heading 4407." Headquarters also stated that edge-glued lumber is properly classified in one of two provisions: (a) the *eo nomine* provision for "edge-glued lumber" in Subheading 4418.90.4000, HTSUS, if suitable for structural uses; or (b) the provision for "articles of wood" not otherwise

---

[7] This note was required to maintain revenue neutrality with respect to edge-glued lumber in the conversion from the former Tariff Schedules of the United States ("TSUS") to the HTSUS. Heading 4407, HTSUS, is a duty-free provision. Under the TSUS, edge-glued lumber was dutiable. *See* TSUS, Item 202.54 (1988); U.S. Int'l Trade Comm'n, Continuity of Import and Export Trade Statistics After Implementation of the Harmonized Commodity Description and Coding System, ITC Pub. 2051, at 32 (Jan. 1988).

provided for, namely, Subheading 4421.90.9700, HTSUS. *See id.* Finally, Headquarters defined edge-glued lumber broadly as any "lumber made of layers of wood that have been glued together" that also may be finger-jointed. *Id.*

In short, classification of NWFP's entries in Subheading 4407.10.0000, HTSUS, is precluded by GRI 1 and the unambiguous terms of the HTSUS relating to edge-glued lumber. Moreover, even if these terms ambiguous, the default rule of revenue neutrality would apply and also would preclude classification of edge-glued lumber in Subheading 4407.10.0000, HTSUS, because it is duty free and the express provision for "edge-glued lumber" in the TSUS, Item 202.54, was dutiable.

## V. SECTION 625(c) PRECLUDES U.S. CUSTOMS FROM CLASSIFYING NWFP'S PAST ENTRIES IN SUBHEADING 4407.10.0000, HTSUS.

In 1993, Congress amended Section 625 of the Tariff Act of 1930, 19 U.S.C. § 1625(c), by adding a new subsection (c) to preclude U.S. Customs' traditional discretion to revoke or modify rulings retroactively with respect to third party importers of substantially identical merchandise. *See American Bayridge Corp. v. United States,* 35 F. Supp. 2d 922, 941 (Ct. Int'l Trade 1998), *vacated in part on other grounds without pub. op.,* 1999 WL 997303 (Fed. Cir. Oct. 26, 1999); *accord Precision Specialty Metals, Inc. v. United States,* 182 F. Supp. 2d 1314, 1326 (Ct. Int'l Trade 2001). This was given to the importing community by U.S. Customs as a *quid pro quo* for enhanced penalty exposure for not following rulings addressing substantially identical merchandise, even if issued to a third party. *See American Bayridge,* 35 F. Supp. 2d 935. Thus, importers are entitled to rely upon, ***and can be penalized for not following,*** rulings issued by U.S. Customs involving "substantially identical" merchandise, even if they do not have their own rulings. *See id.*

In this case, U.S. Customs has applied the general principle embodied in the Statistical Note to Chapter 44, HTSUS, to merchandise that is identical to the lumber imported by NWFP except for finger-jointing. *See* Customs Service Ruling I85263 (Sept. 12, 2002); Customs Service Rulings B80847 (Jan. 23, 1997).[8] Unlike the rulings addressing the classification of truss components, the above-

---

[8] Finger jointing is explicitly provided for in Heading 4407, HTSUS. Thus, it is not a legitimate basis for regarding the articles imported by NWFP as less "advanced" in condition, or less of an assembled good, than the lumber described in Customs Service Ruling I85263.

cited rulings mention or contemplate a particular end use. To the contrary, they make clear that edge-glued lumber is merely a form of lumber and, thus, is suitable for a variety of uses in its imported condition. Other rulings involving edge-glued lumber, moreover, explicitly state that classification is determined by the characteristics of the goods "in their condition as imported." Customs Service Ruling H84102.

Thus, U.S. Customs has placed NWFP in an untenable, "Catch-22" situation: If the company enters its merchandise under Heading 4407, HTSUS, it could be assessed penalties for not following the above-cited rulings and court decisions; if NWFP enters its merchandise under Heading 4421, HTSUS, it could be assessed penalties for following these rulings and decisions. Obviously, such a Catch-22 violates fundamental notions of due process[9] quite apart from the lack of "fair warning" to the importer that its conduct was proscribed. *See supra* note 5.[10]

---

[9] *See, e.g., Philip Morris v. Harshbarger,* 159 F.3d 670, 678-79 (1st Cir. 1998) ("Here, . . . a state statute forces a party to make a Hobson's choice: either submit ingredient lists containing valuable trade secrets without adequate safeguards or cease doing business in an important market. This is the essence of legal compulsion."); *see also N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 664 (1995) (dictum) ("there might be a point at which an exorbitant tax leaving consumers with a Hobson's choice would be treated as imposing a substantive mandate").

[10] This would render "manifestly inadequate" the remedy available under Section 1581(a) of the Judicial Code, 28 U.S.C., for judicial review of the liquidation of the affected entries. That would allow NWFP to bring an action for appropriate relief under Section 1581(i)(4) (or Section 1581(h) if U.S. Customs issues a ruling). *See United States v. United States Shoe Corp.,* 523 U.S. 360, 365-66 (1998); *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281 (1988); *Pac Fung Feather Co. v. United States,* 111 F.3d 114, 116 (Fed. Cir. 1997) (regulation); *Yuri Fashions Co. v. United States,* 632 F. Supp. 41, 48-49 (Ct. Int'l Trade), *aff'd on basis of op. below,* 804 F.2d 1246 (Fed. Cir. 1986), *cert. denied,* 481 U.S. 1004 (1987); *Luggage & Leather Goods Mfrs. of Am. v. United States,* 588 F. Supp. 1413 (Ct. Int'l Trade 1984); *see also Abbott Laboratories v. Gardner,* 387 U.S. 136 (1967) (pre-enforcement review of FDA rule permissible when the plaintiff could be penalized for misbranding drugs for not complying with the rule); *National Juice Products Ass'n v. United States,* 628 F. Supp. 978, 986-87 (Ct. Int'l Trade 1986) (penalties for mismarking country of origin); *United States Cane Sugar Refiners' Ass'n v. Block,* 683 F.2d 399, 402 n.5 (Ct. Cust. & Pat. App. 1982) (same). Alternatively, U.S. Customs could agree to an expedited liquidation, protest, and protest review process to allow prompt action under Section 1581(a), as occurred in the *Bayridge* case after the original plaintiffs initially brought an action for emergency declaratory and injunctive relief under Section 1581(i)(4).

## VI. NWFP'S EDGE-GLUED LUMBER IS NON-STRUCTURAL AND THUS PROPERLY CLASSIFIED IN SUBHEADING 4421.90.9700, HTSUS.

Headquarters was clearly correct when it stated, in HQ 087616, that edge-glued lumber (i.e., "lumber made of layers of wood that have been glued together") is properly classified as "articles of wood" not specifically provided for, Subheading 4421.90.9700, HTSUS, if it is not suitable for structural uses, and otherwise, as "builders' joinery and carpentry of wood; . . . edge glued lumber" in Subheading 4418.90.4000, HTSUS. NWFP's edge-glued lumber is clearly non-structural, as it is too thin to be used for framing in its imported condition. Thus, NEFP's edge-glued lumber is properly classified in Subheading 4421.90.9700, HTSUS. *See, e.g.*, Customs Service Ruling I85263 (Sept. 12, 2002); Customs Service Rulings B80847 (Jan. 23, 1997).

## VII. CONCLUSION

The foregoing discussion clearly shows that NWFP had an objectively reasonable, good faith basis for classifying its merchandise in Subheading 4421.90.9700, HTSUS, regardless of its actual or intended use after importation. Thus, it is extremely unfair for U.S. Customs even to suggest that this classification was somehow fraudulent, even assuming U.S. Customs could persuade a court that the classification is incorrect in the first place. Under our constitutional system, a government "cannot do indirectly that which it cannot do and is forbidden to do directly." *Palmer v. Delaware, L.&W. R. Co.*, 222 F. 461, 465 (D.N.Y. 1915).[11] If U.S. Customs wishes to change the law by making actual use relevant to the classification of edge-glued lumber, it must do so directly, by modifying its previous rulings prospectively under Section 625(c). It may not do so indirectly, and retroactively, by the not-so-subtle *in terrorem* effect of investigating importers of edge-glued lumber for fraud because of what they do with the merchandise after importation even though it is legally irrelevant.

For these reasons, NWFP respectfully submits that its merchandise is properly classified in Subheading 4421.90.9700, HTSUS, and asks for a ruling to

---

[11] *Accord Speiser v. Randall,* 357 U.S. 513, 526-27 (1958) (a legal "prohibition" on governmental action "cannot be transgressed indirectly . . . any more than it can be violated by direct" action) (citation and internal quotation marks omitted); *Smith v. Turner,* 48 U.S. 283, 458 (1849) (a government "cannot do that indirectly which she is forbidden . . . to do directly").

that effect as soon as possible to clarify the situation and obviate an action for appropriate relief in the Court of International Trade.

If I can be of any further assistance, please let me know.

Respectfully submitted,



A. Woodson Stuart

Enclosure

Cc: Tom Read
Terry Swanson
Mike Jones

A. WOODSON STUART, ESQ.
2315 Wisconsin Avenue, NW, Second Floor
Washington, D.C. 20007-1866
Tel: (202) 297-3196 ✧ Fax: (202) 338-0270
Email: awstuart@att.net

September 30, 2003

Ms. Lorisa Hubsch
Import Specialist
U.S. Customs and Border Protection
9901 Pacific Coast Highway
Blaine, Washington 98230

**Re: Response to Request for Information from Northwest Forest Products.**

Dear Ms. Hubsch:

I am writing on behalf of my client, Northwest Forest Products ("NWFP"), in response to the Request for Information that you issued on September 26, 2003, regarding certain entries of edge-glued cedar lumber.

As you may be aware, NWFP has a ruling request pending with Paul Garretto in New York that involves the same issues raised in your Request for Information. Enclosed is my revised submission to Mr. Garretto, which addresses these issues.

If you need any more information or have any questions, please let me know.

Respectfully submitted,



A. Woodson Stuart

Enclosure

Cc: Tom Read
Terry Swanson
Mike Jones