**HQ 087616**
August 20, 1990
CLA-2 CO:R:C:G 087616 JMH
CATEGORY: Classification
TARIFF NO.: 4418.90.40, 4421.90.90, 9905.44.10, 9905.44.15
Mr. Dave Walser Arthur J. Humphreys, Inc.

P.O. Box 249 Sumas, Washington 98295
RE: United States-Canada Free Trade Agreement duty free status under Chapter 99 of the Harmonized Tariff Schedule of the United States Annotated for laminated wood and finger- jointed hemlock handrails, hemlock "turning squares", laminated and bullnosed hemlock stair treads, and laminated shoerails; builders' joinery and carpentry of wood, articles of wood, edge-glued lumber, pressure treated lumber, finger-jointed lumber
Dear Mr. Walser:

Your June 18, 1990 request for a classification ruling under the Harmonized Tariff Schedule of the United States Annotated ("HTSUSA") for certain wood products was referred to this office for a reply. Your classification request concerned the duty free status of the products in question under the United States-Canada Free Trade Agreement ("FTA").

FACTS:

The articles in question are wood products made of Canadian hemlock and imported from Canada. They are used to form complete staircase systems for residential and/or commercial buildings.

Three of the products were the subject of **New York Ruling Letter 847226** ("**NY 847226**"), dated December 12, 1989. The items in question are:

1. Hemlock handrails made of laminated wood sections, finger-jointed and worked to a pattern having the same profile in cross section throughout its length. These handrails, were classified by NY 847226 in subheading 4418.90.40, HTSUSA.

-2-

2. Hemlock stair treads made of laminated wood sections and bullnosed along the front edge. The stair treads were classified by **NY 847226** in subheading 4418.90.40, HTSUSA.

3. Hemlock "turning squares" made of various wood sections (which may be finger-jointed) laminated together to form a 10.7 cm square block with a 3.5 cm square hole in the center. The "turning squares" were classified by **NY 847226** in subheading 4421.90.90, HTSUSA.

4. Hemlock shoe rails made of clear (knot-free) lumber pieces, finger-jointed and worked to produce the same profile in cross section throughout its length. It is not stated whether these shoe rails are solid or laminated.

Laminated wood articles are made from edge-glued lumber.

Edge-glued lumber is lumber made of layers of wood that have been glued together. Articles which are finger-jointed are made from finger-jointed lumber. Finger-jointed lumber consists of shorter pieces of lumber that are connected to make longer pieces of lumber. Articles may be both laminated

and finger-jointed.

ISSUE:

Issue 1: What is the appropriate classification of the Canadian hemlock products under the HTSUSA?
Issue 2: Whether the Canadian hemlock products are entitled to duty free treatment under the FTA?
LAW AND ANALYSIS:

Issue 1: What is the appropriate classification of the Canadian hemlock products under the HTSUSA?
The classification of merchandise under the HTSUSA is governed by the General Rules of Interpretation (GRI's). GRI 1, HTSUSA, states in part that "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes..."
This office concurs with **NY 847228** in the classification of the handrails and stair treads in subheading 4418.90.40. The handrails and the bull-nosed stair treads are builders' carpentry and joinery. This subheading describes "Builders' joinery and carpentry of wood, including cellular woods panels and assembled
-3-
parquest panels; shingles and shakes...Other...Other..." There is a 4 percent ad valorem rate of duty applicable to goods of this classification that are of Canadian origin under the FTA.

This office also concurs with **NY 847228** in the classification of the "turning squares" in subheading 4421.90.90.

This subheading describes "Other articles of wood...Other...

Other..." **NY 847228** states that these articles "do not meet the description of products under heading 4418 since they are neither dedicated nor recognizable as woodwork used in the construction of any kind of building." Classification in subheading 4421.90.90 requires a 4 percent ad valorem rate of duty for goods of Canadian origin under the FTA.

The hemlock shoe rail has two possible classifications. If the shoe rail is a solid, unfinished molding, it is classified in subheading 4409.10.45, HTSUSA, as "Wood continuously shaped (...molded..) along any of its edges or faces, whether or not planed, sanded or finger-jointed...Wood moldings...Other..." All articles of this classification from Canada may enter the United States duty free. Since this classification provides for duty free entry regardless of the FTA, the question of the applicability of the FTA to a solid hemlock shoe rail does not arise.

If the hemlock shoe rail is laminated, then the proper classification is in subheading 4418.90.40 as "Builders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes...Other...Other..." As stated previously, articles of this classification of Canadian origin under the FTA are charged a 4 percent ad valorem rate of duty.

Issue 2: Whether the Canadian hemlock products, whose tariff is based upon whether they originate in Canada, are entitled to duty free treatment under the FTA?
General Note 3(c)(vii), HTSUSA, provides the FTA country of origin rules to be applied under the HTSUSA. These rules were taken from Articles 301 and 304 and Annex 301.2 of the FTA.

Chapter Three, Articles 301 and 304, Annex 301.2, FTA published in full at 19 U.S.C. 2112(E)(2),

2212(A), H.R. Doc. No. 216, 100th Cong., 2d Sess. (1988). General Note 3(c)(vii)(B)(1), HTSUSA, states that "goods originating in the territory of Canada" includes "goods wholly obtained or produced in the territory of Canada..."
"Goods wholly obtained or produced in the territory of Canada..." means "goods harvested in the territory of Canada..." General Note 3(c)(vii)(L)(2), HTSUSA. The hemlock which is grown in Canada is a good "wholly obtained or produced" in Canada.

-4-
Wood is considered an agricultural crop which is harvested. See United States v. Border Brokerage Co., 706 F.2d 1579 (1983), United States v. Norman G. Jensen, 550 F.2d 662 (CCPA 1977), **Headquarters Ruling Letter 082963**, dated July 25, 1990, **Headquarters Ruling Letter 078239**, dated March 23, 1987.

Therefore, the Canadian hemlock in question is a good "originating in the territory of Canada" within the meaning of the FTA. The wood is eligible for any provisions which apply to products covered by the FTA.

Chapter 99 of the HTSUSA contains two duty free provisions relevant to the wood articles of Canadian origin in question.

The two provisions, subheadings 9905.44.10 and 9905.44.15, HTSUSA, provide free rates of duty for "Goods originating in the territory of Canada under general note 3(c)(vii) of the tariff schedule." The subheadings state the following:

9905.44.10 Pressure treated lumber, finger-jointed builders' joinery, and edge-glued lumber (provided for in subheading 4418.90.40)...

[Subheading 4418.90.40 describes "Builder's joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes...

Other...Other..."]
9905.44.15 Laminated hemlock post blanks, finger- jointed lumber, and edge-glued lumber (provided for in subheading 4421.90.90)...

[Subheading 4421.90.90 describes "Other articles of wood...Other...

Other..."]
The laminated handrails and shoe rails and the bull-nosed stair treads are classified in subheading 4418.90.40. However, the language of subheading 9905.44.10 does not mimic the language of subheading 4418.90.40, to which it refers. Therefore, it must be determined exactly what articles classified in subheading 4418.90.40 are to receive duty free treatment under subheading 9905.44.10.

Heading 4418 covers "Builders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes..." Subheading 4418.90.40, is the "other" subheading for heading 4418. It covers articles that fall within heading 4418, but which do not fall in any of the -5-
specific subheadings. Specific subheadings exist for parquet panels, and shingles and shakes. Therefore, since these articles are not covered by subheading 4418.90.40, they are not included within subheading 9905.44.10. This exclusion of parquet panels, shingles and shakes leaves "Builders' joinery and carpentry of wood, including cellular wood panels..." to be possibly covered

by subheading 9905.44.10.

Subheading 9905.44.10 covers in part "Pressure treated lumber..." Pressure treated lumber is lumber that has been treated with a chemical under pressure. Lumber, within the HTSUSA, is unfinished wood of all types that has been sawn, chipped, sliced or peeled lengthwise and that does not exceed 6 mm in thickness. Lumber which meets this definition is classified in heading 4407, HTSUSA, not under heading 4418.

Heading 4407 provides a free rate of duty. Since pressure treated lumber is already duty free, it is unlikely that subheading 9905.44.10 refers to pressure treated lumber of these types.

Also covered by subheading 9905.44.10 is "edge-glued lumber". Edge-glued lumber does not meet the definition of lumber in order to be classified in heading 4407. This layered lumber is classified under various headings of the HTSUSA according to the product made from the lumber.

Since heading 4418 covers specific articles, builders' joinery and carpentry, the subheading 9905.44.10 reference to pressure treated lumber and edge-glued lumber alludes to articles made of these types of lumber. It is the opinion of this office that subheading 9905.44.10 refers to builders' joinery and carpentry made of pressure treated lumber, and builders' joinery and carpentry made of edge-glued lumber, whether or not they are finger-jointed. Cellular wood panels are not considered to be builders' joinery and carpentry. Thus, cellular wood panels are not included in subheading 9905.44.10.

The articles in question classified in subheading 4418.90.40, the laminated handrail and shoe rail and the stair treads, are covered by subheading 9905.44.10. Laminated wood articles are articles made of edge-glued lumber. Thus, under the above interpretation of subheading 9905.44.10, the laminated handrails, shoe rails and stair treads are eligible for duty free entry into the Customs territory of the United States.

The "turning squares" are classified in subheading 4421.90.90, the "basket" provision of heading 4421, HTSUSA, which describes "Other articles of wood..." The language of subheading 9905.44.15 is clear that laminated hemlock post blanks are included in this duty free provision. However, the remainder of the provision refers to types of lumber, finger-jointed lumber -6-
and edge-glued lumber. Since lumber is classified in heading 4407 or in the heading appropriate to the product made from the lumber, in the case of edge-glued lumber, the language of subheading 9905.44.15 cannot be referring to lumber. It is the opinion of this office that subheading 9905.44.15 is meant to cover laminated hemlock post blanks, articles made of finger- jointed lumber and articles made of edge-glued lumber, whether or not finger-jointed, that are classified in subheading 4421.90.90.

The "turning squares" are laminated, and therefore, edge- glued. Since the "turning squares" are articles of edge-glued lumber that are classified in subheading 4421.90.90. They are eligible for duty free entry under subheading 9905.44.15.

Subheadings 9905.44.10 and 9905.44.15 were announced on May 25, 1990 in Presidential Proclamation 6142. This proclamation was not pubished until May 30, 1990. 55 Fed. Reg. 21835 (May 30, 1990). The Chapter 99 subheadings were included in Section C of the proclamation. Section C states "Effective with respect to articles entered, or withdrawn from warehouse for consumption, on or after April 1, 1990, subchapter V of chapter 99 to the HTS is modified..." 55 Fed. Reg. at 21838. Therefore, the effective date of subheadings 9905.44.10 and 9905.44.15 is April 1,

1990.

HOLDING:

It is the opinion of this office that subheading 9905.44.10 is meant to be read as "builders joinery and carpentry made of pressure treated lumber, and builders joinery and carpentry made of edge-glued lumber classified in subheading 4418.90.40, whether or not finger-jointed."
The Canadian hemlock items classified in subheading 4418.90.40, the laminated handrails, shoe rails, and stair treads are builders' carpentry or joinery made of edge-glued lumber, are eligible for duty free entry under subheading 9905.44.10.

It is the opinion of this office that subheading 9905.44.15 is meant to be read as "laminated hemlock post blanks and other articles made of edge-glued lumber, whether or not finger- jointed, classified in subheading 4421.90.90."
The Canadian laminated hemlock shoe rails are articles made of edge-glued lumber that are also finger jointed. Since the shoe rails are classified in subheading 4421.90.90 and are articles made of edge-glued lumber, they are eligible for duty free treatment under subheading 9905.44.15.

-7-
The effective date of subheadings 9905.44.10 and 9905.44.15 for articles entered or withdrawn from a warehouse for consumption is April 1, 1990, in accordance with Presidential Proclamation 6142 of May 25, 1990.

Sincerely,
John Durant, Director Commercial Rulings Division

Results Analysis Memorandum, dated March 15, 2002.

**Amended Final Results of Review**

In accordance with 19 CFR 351.224(e), we are amending the final results of the 1999–2000 antidumping duty administrative review of stainless steel sheet and strip in coils from Mexico, as noted above. The revised weighted–average percentage margin for Mexinox is 2.28 percent.

This administrative review and notice is issued and published in accordance with sections 751(a)(1) and 777(i)(1) of the Tariff Act.

Dated: March 15, 2002

**Richard W. Moreland,**

*Acting Assistant Secretary for Import Administration.*

[FR Doc. 02–7955 Filed 4–1–02; 8:45 am]

BILLING CODE 3510–DS–S

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–601]**

### Notice of Court Decision: Tapered Roller Bearings and Parts Thereof from the People's Republic of China

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** On March 20, 2002, the United States Court of International Trade issued a final judgment with respect to the litigation in The Timken Company v. United States, Ct. No. 97–12–02156, Slip Op. 02–30. This case arises from the Department of Commerce's Final Results of Antidumping Administrative Review of Tapered Roller Bearings and Parts Thereof, from the People's Republic of China, 62 FR 61276 (November 17, 1997). The administrative review period was June 1, 1995, through May 31, 1996. The final judgment by the court in this case was not in harmony with the Department of Commerce's November, 1997 final results of review.

**EFFECTIVE DATE:** The effective date of this notice is April 1, 2002, which is 10 days from the date on which the court issued its judgment.

**FOR FURTHER INFORMATION CONTACT:** George Callen at (202) 482–0180 or Richard Rimlinger at (202) 482–4477, Import Administration, International Trade Administration, U.S. Department. of Commerce, 14th Street and Constitution Avenue, N.W., Washington, D.C. 20230.

**SUPPLEMENTARY INFORMATION:** The decision of the Court of International Trade (''CIT'') in Slip Op. 02–30 is that Court's final decision concerning the calculation of various elements of constructed value. More specifically, the CIT ordered the Department of Commerce to make the following changes to its original calculations: 1) determine direct labor costs without relying on labor hours; 2) exclude the ''purchases of traded goods'' from its calculation of the cost of manufacturing; and 3) adjust United States price by recalculating marine insurance pursuant to a value–based methodology.

In its decision in Timken Co. v. United States, 893 F.2d 337, 341 (Fed.Cir.1990) (''Timken''), the United States Court of Appeals for the Federal Circuit held that, pursuant to 19 USC 1516a(e), the Department must publish a notice of a court decision which is not ''in harmony'' with a Department determination and must suspend liquidation of entries pending a ''conclusive'' court decision. The CIT's decision in Slip Op.02–30 on March 20, 2002, constitutes a final decision of that court which is ''not in harmony'' with the Department's final results of administrative review. We are publishing this notice in fulfillment of the publication requirements of Timken.

Accordingly, the Department will continue the suspension of liquidation of the subject merchandise pending the expiration of the period of appeal or, if appealed, upon a ''conclusive'' court decision.

Dated: March 26, 2002

**Faryar Shirzad,**

*Assistant Secretary for Import Administration.*

[FR Doc. 02–7951 Filed 4–1–02; 8:45 am]

BILLING CODE 3510–DS–S

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[C–122–839]**

### Notice of Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Softwood Lumber Products From Canada

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**ACTION:** Notice of final affirmative countervailing duty determination and final negative critical circumstances determination.

---

**SUMMARY:** On August 17, 2001, the Department of Commerce (the Department) published in the **Federal Register** its preliminary affirmative determination in the countervailing duty investigation of softwood lumber products (subject merchandise) from Canada for the period April 1, 2000, through March 31, 2001 (66 FR 43186).

The net subsidy rate in the final determination differs from that of the preliminary determination. The revised final net subsidy rate is listed below in the ''Suspension of Liquidation'' section of this notice.

**EFFECTIVE DATE:** April 2, 2002.

**FOR FURTHER INFORMATION CONTACT:** Eric B. Greynolds at (202) 482–6071 or Stephanie Moore (202) 482–3692, Office of AD/CVD Enforcement VI, Import Administration, International Trade Administration, U.S. Department of Commerce, Room 4012, 14th Street and Constitution Avenue, NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

**Applicable Statute and Regulations**

Unless otherwise indicated, all citations to the statute are references to the provisions effective January 1, 1995, the effective date of the amendments made to the Tariff Act of 1930 (the Act) by the Uruguay Round Agreements Act (URAA). In addition, unless otherwise indicated, all citations to the Department's regulations are to the regulations codified at 19 CFR Part 351 (2000).

**Background**

On August 17, 2001, the Department published the preliminary determination of its investigation of softwood lumber products from Canada. *See Notice of Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination: Certain Softwood Lumber Products from Canada,* 66 FR 43186 (August 17, 2001) (*Preliminary Determination*). This investigation covers the period April 1, 2000, through March 31, 2001.

We invited interested parties to comment on the *Preliminary Determination.* We received both case briefs and rebuttal briefs from interested parties. Public hearings were held on March 6 and March 19, 2002. All issues raised in the case and rebuttal briefs by parties to this investigation are addressed in the ''Issues and Decision Memorandum'' (*Decision Memorandum*) dated March 21, 2002, which is hereby adopted by this notice.

**Scope of Investigation**

The products covered by this investigation are softwood lumber,

flooring and siding (softwood lumber products). Softwood lumber products include all products classified under headings 4407.1000, 4409.1010, 4409.1090, and 4409.1020, respectively, of the Harmonized Tariff Schedule of the United States (HTSUS), and any softwood lumber, flooring and siding described below. These softwood lumber products include:

(1) Coniferous wood, sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding six millimeters;

(2) Coniferous wood siding (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, V-jointed, beaded, molded, rounded or the like) along any of its edges or faces, whether or not planed, sanded or finger-jointed;

(3) Other coniferous wood (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, V-jointed, beaded, molded, rounded or the like) along any of its edges or faces (other than wood mouldings and wood dowel rods) whether or not planed, sanded or finger-jointed; and

(4) Coniferous wood flooring (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, V-jointed, beaded, molded, rounded or the like) along any of its edges or faces, whether or not planed, sanded or finger-jointed.

Although the HTSUS subheadings are provided for convenience and U.S. Customs purposes, the written description of the merchandise under investigation is dispositive. Preliminary scope exclusions and clarifications were published in three separate **Federal Register** notices.

**Final Scope Exclusions**

On February 11, 2002, we published an amendment to the preliminary antidumping (AD) determination which modified the list of products excluded from the scope of the AD and CVD softwood lumber investigations. See Notice of Amendment to Preliminary Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada; Amendment to Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Countervailing Duty Determination with Final Antidumping Determination: Certain Softwood Lumber Products from Canada, 67 FR 6230, 6231 (February 11, 2002) (Amended Preliminary). In our review of the comments received throughout the course of these proceedings, we found that the definitions for some of the excluded products required further clarification and/or elaboration. Based on our analysis of the comments received, we have modified the list of excluded products as follows: [1]

Softwood lumber products excluded from the scope only if they meet certain requirements:

1. *Stringers* (pallet components used for runners): if they have at least two notches on the side, positioned at equal distance from the center, to properly accommodate forklift blades, properly classified under HTSUS 4421.90.98.40.

2. *Box-spring frame kits:* if they contain the following wooden pieces—two side rails, two end (or top) rails and varying numbers of slats. The side rails and the end rails should be radius-cut at both ends. The kits should be individually packaged, they should contain the exact number of wooden components needed to make a particular box spring frame, with no further processing required. None of the components exceeds 1″ in actual thickness or 83″ in length.

3. *Radius-cut box-spring-frame components,* not exceeding 1″ in actual thickness or 83″ in length, ready for assembly without further processing. The radius cuts must be present on both ends of the boards and must be substantial cuts so as to completely round one corner.

4. *Fence pickets* requiring no further processing and properly classified under HTSUS 4421.90.70, 1″ or less in actual thickness, up to 8″ wide, 6′ or less in length, and have finials or decorative cuttings that clearly identify them as fence pickets. In the case of dog-eared fence pickets, the corners of the boards should be cut off so as to remove pieces of wood in the shape of isosceles right angle triangles with sides measuring ¾ inch or more.

5. *U.S. origin lumber* shipped to Canada for minor processing and imported into the United States, is excluded from the scope of the investigations if the following conditions are met: (a) the processing occurring in Canada is limited to kiln-drying, planing to create smooth-to-size board, and sanding, and (b) if the importer establishes to Customs' satisfaction that the lumber is of U. S. origin.

6. *Softwood lumber products contained in single family home packages or kits,* regardless of tariff classification, are excluded from the scope of the orders if the following criteria are met:

A. The imported home package or kit constitutes a full package of the number of wooden pieces specified in the plan, design or blueprint necessary to produce a home of at least 700 square feet produced to a specified plan, design or blueprint;

B. The package or kit must contain all necessary internal and external doors and windows, nails, screws, glue, subfloor, sheathing, beams, posts, connectors and if included in purchase contract decking, trim, drywall and roof shingles specified in the plan, design or blueprint;

C. Prior to importation, the package or kit must be sold to a retailer of complete home packages or kits pursuant to a valid purchase contract referencing the particular home design plan or blueprint, and signed by a customer not affiliated with the importer;

D. The whole package must be imported under a single consolidated entry when permitted by the U.S. Customs Service, whether or not on a single or multiple trucks, rail cars or other vehicles, which shall be on the same day except when the home is over 2,000 square feet;

E. the following documentation must be included with the entry documents:

1. A copy of the appropriate home design, plan, or blueprint matching the entry;

2. A purchase contract from a retailer of home kits or packages signed by a customer not affiliated with the importer;

3. A listing of inventory of all parts of the package or kit being entered that conforms to the home design package being entered;

4. In the case of multiple shipments on the same contract, all items listed in E(3) which are included in the present shipment shall be identified as well.

We have determined that the excluded products listed above are outside the scope of these investigations provided the specified conditions are

---

[1] A group of products that were excluded from the scope as classified was listed in the preliminary determinations as Group A. This list remains applicable as we determined, through our review of the petition and factual information submitted, and consultations with the parties, that the products were outside the scope of the investigations.

Group A. Softwood lumber products excluded from the scope:

1. Trusses and truss kits, properly classified under HTSUS 4418.90.

2. I-Joist beams.

3. Assembled box spring frames.

4. Pallets and pallet kits, properly classified under HTSUS 4415.20.

5. Garage doors.

6. Edge-glued wood, properly classified under HTSUS item 4421.90.98.40.

7. Properly classified complete door frames.

8. Properly classified complete window frames.

9. Properly classified furniture.

met. *See* Section C (Scope Issues) and Section D (Scope Exclusion Analysis) of the March 21, 2002, Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Softwood Lumber Products From Canada for further discussion. Lumber products that Customs may classify as stringers, radius cut box-spring-frame components, and fence pickets, not conforming to the above requirements, as well as truss components, pallet components, and door and window frame parts, are covered under the scope of this investigation and may be classified under HTSUS subheadings 4418.90.40.90, 4421.90.70.40, and 4421.90.98.40. On January 24, 2002, Customs informed the Department of certain changes in the 2002 HTSUS affecting these products. Specifically, subheading 4418.90.40.90 and 4421.90.98.40 were changed to 4418.90.45.90 and 4421.90.97.40, respectively. Therefore, we are adding these subheadings as well.

**Exclusion of Maritime Products**

On July 27, 2001, we amended our Initiation Notice, to exempt certain softwood lumber products from the Provinces of New Brunswick, Nova Scotia, Prince Edward Island, and Newfoundland (the Maritime Provinces) from this investigation. This exemption does not apply to softwood lumber products produced in the Maritime Provinces from Crown timber harvested in any other Province. See Amendment to the Notice of Initiation of Countervailing Duty Investigation: Certain Softwood Lumber Products from Canada, 66 FR 40228 (August 2, 2001).

**Company Exclusions**

Based upon our review of exclusion requests received prior to the Preliminary Determination, the Department preliminarily excluded Frontier Lumber from the investigation. Since the Preliminary Determination, the deadline was extended and we received exclusion requests directly from companies and through the Government of Canada (GOC). By memorandum of February 20, 2002, the Department announced that we found it practicable to consider only 30 of the more than 300 company-specific requests for exclusion. We sent supplemental questionnaires to the selected companies and conducted verification of each of the company responses received.

Based upon the verified information on the record, the following companies have been granted company exclusions: Armand Duhamel et fils Inc., Bardeaux et Cedres, Beaubois Coaticook Inc., Busque & Laflamme Inc., Carrier & Begin Inc., Clermond Hamel, J.D. Irving, Ltd., Les Produits. Forestiers. D.G., Ltee, Marcel Lauzon Inc., Mobilier Rustique, Paul Vallee Inc., Rene Bernard, Inc., Roland Boulanger & Cite., Ltee, Scierie Alexandre Lemay, Scierie La Patrie, Inc., Scierie Tech, Inc., Wilfrid Paquet et fils, Ltee, B. Luken Logging Ltd., Frontier Lumber, and Sault Forest Products Ltd.

For further discussion of this issue, *see* the *Decision Memorandum*.

**Period of Investigation**

The period of investigation (POI) for which we are measuring subsidies is April 1, 2000, through March 31, 2001, which is the most recently completed fiscal year of the GOC.

**Negative Critical Circumstances**

In the *Preliminary Determination*, the Department determined that critical circumstances exist with respect to imports of softwood lumber from Canada, pursuant to section 703(e) of the Act and section 351.206 of the regulations. Based on further investigation, the Department is not finding critical circumstances in this final determination. For further discussion on this issue, *see* the *Decision Memorandum*.

**Verification**

As provided in section 782(i) of the Act, we conducted verification of the government responses from January 13, 2002 through February 5, 2002. We also conducted verification of the responses of companies seeking exclusion from February 27 through March 6, 2002. We used standard verification procedures, including meeting with government and company officials and examining relevant accounting records and original source documents provided by the respondents. Our verification results are outlined in detail in the public versions of the verification reports, which are on file in the Central Records Unit of the Department of Commerce (Room B–099).

**Analysis of Comments Received**

A list of issues which parties have raised and to which we have responded, all of which are in the *Decision Memorandum,* is attached to this notice as Appendix I. Parties can find a complete discussion of all issues raised in this investigation and the corresponding recommendations in this public memorandum which is on file in room B–099 of the Main Commerce Building. In addition, a complete version of the *Decision Memorandum* can be accessed directly on the World Wide Web at http://ia.ita.doc.gov, under the heading ''**Federal Register** Notices.'' The paper copy and electronic version of the *Decision Memorandum* are identical in content.

**Suspension of Liquidation**

In accordance with sections 705(c)(1)(B)(i)(II) and 777A(e)(2)(B) of the Act, we have calculated a single country-wide subsidy rate to be applied to all producers and exporters of the subject merchandise from Canada. This rate is summarized below:

| Producer/exporter | Net subsidy rate |
|---|---|
| All Producers/Exporters . | 19.34 *Ad Valorem*. |

In accordance with the preliminary affirmative determination of critical circumstances, we instructed the U.S. Customs Service to suspend liquidation of all entries of the subject merchandise from Canada, which were entered or withdrawn from warehouse, on or after May 19, 2001, which is 90 days prior to August 17, 2001, the date of publication of the Preliminary Determination in the **Federal Register**. In accordance with section 703(d) of the Act, we instructed the U.S. Customs Service to discontinue the suspension of liquidation for merchandise entered, or withdrawn from warehouse, for consumption on or after December 15, 2001. Because we do not find critical circumstances in this final determination, we will instruct U.S. Customs to terminate suspension of liquidation, and release any cash deposits or bonds, on imports during the 90 day period prior to the date of publication of the *Preliminary Determination*.

We will reinstate suspension of liquidation under section 706(a) of the Act for all entries if the International Trade Commission (ITC) issues a final affirmative injury determination and will require a cash deposit of estimated countervailing duties for such entries of merchandise in the amounts indicated above. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or canceled.

As indicated above, the Department exempted certain softwood lumber products from the Maritime Provinces from this investigation. This exemption, however, does not apply to softwood lumber products produced in the Maritime Provinces from Crown timber harvested in any other province. Additionally, as explained above in the

''Exclusions'' section of the notice, we are excluding the following companies: Armand Duhamel et fils Inc., Bardeaux et Cedres, Beaubois Coaticook Inc., Busque & Laflamme Inc., Carrier & Begin Inc., Clermond Hamel, J.D. Irving, Ltd., Les Produits. Forestiers. D.G., Ltee, Marcel Lauzon Inc., Mobilier Rustique, Paul Vallee Inc., Rene Bernard, Inc., Roland Boulanger & Cite., Ltee, Scierie Alexandre Lemay, Scierie La Patrie, Inc., Scierie Tech, Inc., Wilfrid Paquet et fils, Ltee, B. Luken Logging Ltd., Frontier Lumber, and Sault Forest Products Ltd. Therefore, we are directing the U.S. Customs Service to exempt from the suspension of liquidation only entries of softwood lumber products from Canada which are accompanied by an original Certificate of Origin issued by the Maritime Lumber Bureau (MLB), and those of the excluded companies listed above. The MLB certificate will specifically state that the corresponding entries cover softwood lumber products produced in the Maritime Provinces from logs originating in Nova Scotia, New Brunswick, Prince Edward Island, Newfoundland and the state of Maine.

## ITC Notification

In accordance with section 705(d) of the Act, we will notify the ITC of our determination. In addition, we are making available to the ITC all non-privileged and non-proprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided that the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order (APO), without the written consent of the Assistant Secretary for Import Administration.

If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated. If however, the ITC determines that such injury does exist, we will issue a countervailing duty order.

## Return or Destruction of Proprietary Information

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to APO of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Failure to comply is a violation of the APO.

This determination is published pursuant to sections 705(d) and 777(i) of the Act.

Dated: March 21, 2002.

**Faryar Shirzad,**

*Assistant Secretary for Import Administration.*

## Appendix I—Issues and Decision Memorandum

### A. Summary

### B. Methodology and Background

I. Scope of Investigation
II. Company Exclusions
III. Period of Investigation
IV. Critical Circumstances
V. Subsidies Valuation Information
  A. Aggregation
  B. Allocation Period
  C. Benchmarks for Loans and Discount Rate
  D. Recurring and Non-recurring Benefits
  E. Subsidy Rate Calculation
  F. Upstream Subsidies
VI. Numerator Issues
VII. Denominator Issues

### C. Analysis of Programs

I. Provincial Stumpage Programs Determined to Confer Subsidies
  A. Financial Contribution
  B. Benefit
  C. Specificity
  D. Conversion Factor
  E. Description of Provincial Stumpage Programs
  1. Province of Quebec
  2. Province of British Columbia
  3. Province of Ontario
  4. Province of Alberta
  5. Province of Manitoba
  6. Province of Saskatchewan
  F. Country-Wide Rate for Stumpage
II. Other Programs Determined to Confer Subsidies
  A. Programs Administered by the Government of Canada
  1. Non-Payable Grants and Conditionally Repayable Contributions from the Department of Western Economic Diversification
  2. Federal Economic Development Initiative in Northern Ontario (FedNor)
  B. Programs Administered by the Province of British Columbia
  1. Forest Renewal B.C.
  2. Job Protection Commission
  C. Programs Administered by the Province of Quebec
  1. Private Forest Development Program
III. Programs Determined to be Not Countervailable
  A. Funds for Job Creation by the Province of Quebec
  B. Sales Tax Exemption for Seedlings by the Province of Ontario
  C. Forest Resources Improvement Program
IV. Programs Determined Not to Confer a Benefit
  A. Export Assistance Under the Societe de Developpement Industrial du Quebec (SDI)/Investissement Quebec
  B. Assistance under Article 7 of the SDI
  C. Assistance from the Societe de Recupertioon d-Exploitation et de Developpement Forestiers du Quebec (Rexfor)
V. Other Programs
  A. Tembec Redemption of Preferred Stock Held by SDI
  B. Subsidies to Skeena Cellulose Inc.
VI. Programs Determined Not to be Used
  A. Canadian Forest Service Industry, Trade and Economics Program
  B. Loan Guarantees to Attract New Mills from the Province of Alberta
VII. Program Which Has Been Terminated
  A. Export Support Loan Program from the Province of Ontario
VIII.Programs Which We Did Not Investigate
  A. Subsidies Provided by Canada's Export Development Corporation
  B. Timber Damage Compensation in Alberta

### D. Total Ad Valorem Rate

### E. Analysis of Comments

Comment 1: Adjust Provincial Stumpage Rates for U.S. Procurement Costs
Comment 2: Tenure Security Rights are Countervailable
Comment 3: Forest Renewal B.C. and Job Protection Commission Being Terminated
Comment 4: Clerical Errors in Forest Renewal B.C. Subsidy Calculation
Comment 5: The Private Forest Development Program is not Specific under the Act
Comment 6: Loan Guarantees from Investissement Quebec are Not Export Subsidies
Comment 7: Job Protection Commission is Not Countervailable
Comment 8: The Industry, Trade and Economics Program is Not Countervailable

[FR Doc. 02–7849 Filed 4–1–02; 8:45 am]

BILLING CODE 3510–DS–P

---

## DEPARTMENT OF COMMERCE

## National Institute of Standards and Technology

**[Docket No. 000929279–1219–02]**

**RIN 0693–ZA41**

## Announcing Approval of Federal Information Processing Standard (FIPS) 198, The Keyed-Hash Message Authentication Code (HMAC)

**AGENCY:** National Institute of Standards and Technology (NIST), Commerce.

**ACTION:** Notice.

**SUMMARY:** The Secretary of Commerce approves FIPS 198, The Keyed-Hash Message Authentication Code (HMAC), and makes it compulsory and binding on Federal agencies for the protection of sensitive, unclassified information. FIPS 198 is an essential component of a comprehensive group of cryptographic techniques that government agencies need to protect data, communications, and operations. The Key-Hashed Message Authentication Code specifies a cryptographic process for protecting

*U.S. Code as of: 01/22/02*

## Section 1481. Invoice; contents

Related Res

International T Guide

Export Controls

International La and Docur

Internationa Discuss

(a) In general

All invoices of merchandise to be imported into the United States and any electronic equivalent thereof considered acceptable by the Secretary in regulations prescribed under this section shall set forth, in written, electronic, or such other form as the Secretary shall prescribe, the following:

(1) The port of entry to which the merchandise is destined;

(2) The time when, the place where, and the person by whom and the person to whom the merchandise is sold or agreed to be sold, or if to be imported otherwise than in pursuance of a purchase, the place from which shipped, the time when and the person to whom and the person by whom it is shipped;

(3) A detailed description of the merchandise, including the commercial name by which each item is known, the grade or quality, and the marks, numbers, or symbols under which sold by the seller or manufacturer in the country of exportation, together with the marks and numbers of the packages in which the merchandise is packed;

(4) The quantities in the weights and measures of the country or place from which the merchandise is shipped, or in the weights and measures of the United States;

(5) The purchase price of each item in the currency of the purchase, if the merchandise is shipped in pursuance of a purchase or an agreement to purchase;

(6) If the merchandise is shipped otherwise than in pursuance of a purchase or an agreement to purchase, the value for each item, in the currency in which the transactions are usually made, or, in the absence of such value, the price in such currency that the manufacturer, seller, shipper, or owner would have received, or was willing to receive, for such merchandise if sold in the ordinary course of trade and in the usual wholesale quantities in the country of exportation;

(7) The kind of currency, whether gold, silver, or paper;

(8) All charges upon the merchandise, itemized by name and amount when known to the seller or shipper; or all charges by name (including commissions, insurance, freight, cases, containers, coverings, and cost of packing) included in the invoice prices when the amounts for such charges are unknown to the seller or shipper;

(9) All rebates, drawbacks, and bounties, separately itemized, allowed upon the exportation of the merchandise; and

(10) Any other fact that the Secretary may by regulation require as being necessary to a proper appraisement, examination and classification of the merchandise.

(b) Shipments not purchased and not shipped by manufacturer

If the merchandise is shipped to a person in the United States by a person other than the manufacturer, otherwise than by purchase, such person shall state on the invoice the time when, the place where, the person from whom such merchandise was purchased, and the price paid therefor in the currency of the purchase, stating whether gold, silver, or paper.

(c) Importer provision of information

Any information required to be set forth on an invoice may alternatively be provided by any of the parties qualifying as an ''importer of record'' under section 1484(a)(2)(B) of this title by such means, in such form or manner, and within such time as the Secretary shall by regulation prescribe.

(d) Exceptions by regulations

The Secretary of the Treasury may by regulations provide for such exceptions from the requirements of this section as he deems advisable and may allow for the submission or electronic transmission of partial invoices, electronic equivalents of invoices, bills, or other documents or parts thereof, required under this section.

Previous [Notes] Next

**Laws: Cases and Codes : U.S. Code : Title 19 : Section 1484**

Search Title 19

- United States Code
  - TITLE 19 - CUSTOMS DUTIES
    - CHAPTER 4 - TARIFF ACT OF 1930
      - SUBTITLE III - ADMINISTRATIVE PROVISIONS
        - PART III - ASCERTAINMENT, COLLECTION, AND RECOVERY OF

*U.S. Code as of: 01/22/02*

## Section 1484. Entry of merchandise

**Related Res**

International T Guide

Export Controls

International La and Docur

Internationa Discuss

(a) Requirement and time
(1) Except as provided in sections 1490, 1498, 1552, and 1553 of this title, one of the parties qualifying as ''importer of record'' under paragraph (2)(B), either in person or by an agent authorized by the party in writing, shall, using reasonable care -
(A) make entry therefor by filing with the Customs Service -
(i) such documentation or, pursuant to an electronic data interchange system, such information as is necessary to enable the Customs Service to determine whether the merchandise may be released from customs custody, and
(ii) notification whether an import activity summary statement will be filed; and
(B) complete the entry by filing with the Customs Service the declared value, classification and rate of duty applicable to the merchandise, and such other documentation or, pursuant to an electronic data interchange system, such other information as is necessary to enable the Customs Service to -
(i) properly assess duties on the merchandise,
(ii) collect accurate statistics with respect to the merchandise, and
(iii) determine whether any other applicable requirement of law (other than a requirement relating to release from customs custody) is met.
(2)(A) The documentation or information required under paragraph (1) with respect to any imported merchandise shall be filed or transmitted in such manner and within such time periods as the Secretary shall by regulation prescribe. Such regulations shall provide for the filing of import activity summary statements, covering entries or warehouse withdrawals made during a calendar month, within such time period as is prescribed in regulations but not to exceed the 20th day following such calendar month.
(B) When an entry of merchandise is made under this section, the required documentation or information shall be filed or electronically transmitted either by the owner or purchaser of the merchandise or, when appropriately designated by the owner, purchaser, or consignee of the merchandise, a person holding a valid license under section 1641 of this title. When a consignee declares on entry that he is the owner or purchaser of merchandise the Customs Service may, without liability, accept the declaration. For the purposes of this chapter, the importer of record must be one of the parties who is eligible to file the

documentation or information required by this section.

(C) The Secretary, in prescribing regulations to carry out this subsection, shall establish procedures which insure the accuracy and timeliness of import statistics, particularly statistics relevant to the classification and valuation of imports. Corrections of errors in such statistical data shall be transmitted immediately to the Director of the Bureau of the Census, who shall make corrections in the statistics maintained by the Bureau. The Secretary shall also provide, to the maximum extent practicable, for the protection of the revenue, the enforcement of laws governing the importation and exportation of merchandise, the facilitation of the commerce of the United States, and the equal treatment of all importers of record of imported merchandise.

(b) Reconciliation

(1) In general

A party may elect to file a reconciliation with regard to such entry elements as are identified by the party pursuant to regulations prescribed by the Secretary. If the party so elects, the party shall declare that a reconciliation will be filed. The declaration shall be made in such manner as the Secretary shall prescribe and at the time the documentation or information required by subsection (a)(1)(B) of this section or the import activity summary statement is filed with, or transmitted to, the Customs Service, or at such later time as the Customs Service may, in its discretion, permit. The reconciliation shall be filed by the importer of record at such time and in such manner as the Secretary prescribes but not later than 15 months after the date the importer declares his intent to file the reconciliation. In the case of reconciling issues relating to the assessment of antidumping and countervailing duties, the reconciliation shall be filed not later than 90 days after the date the Customs Service advises the importer that the period of review for antidumping or countervailing duty purposes has been completed. Before filing a reconciliation, an importer of record shall post bond or other security pursuant to such regulations as the Secretary may prescribe.

(2) Regulations regarding AD/CV duties

The Secretary shall prescribe, in consultation with the Secretary of Commerce, such regulations as are necessary to adapt the reconciliation process for use in the collection of antidumping and countervailing duties.

(c) Release of merchandise

The Customs Service may permit the entry and release of merchandise from customs custody in accordance with such regulations as the Secretary may prescribe. No officer of the Customs Service shall be liable to any person with respect to the delivery of merchandise released from customs custody in accordance with such regulations.

(d) Signing and contents

(1) Entries shall be signed by the importer of record, or his agent, unless filed pursuant to an electronic data interchange system. If electronically filed, each transmission of data shall be certified by an importer of record or his agent, one of whom shall be resident in the United States for purposes of receiving service of process, as being true and correct to the best of his knowledge and belief, and such transmission shall be binding in the same manner and to the same extent as a signed document. The entry shall set forth such facts in regard to the importation as the Secretary may require and shall be accompanied by such invoices, bills of lading, certificates, and documents, or their

electronically submitted equivalents, as are required by regulation.

(2) The Secretary, in prescribing regulations governing the content of entry documentation, shall require that entry documentation contain such information as may be necessary to determine whether the imported merchandise bears an infringing trademark in violation of section 1124 of title 15 or any other applicable law, including a trademark appearing on the goods or packaging.

(e) Production of invoice

The Secretary may provide by regulation for the production of an invoice, parts thereof, or the electronic equivalents thereof, in such manner and form, and under such terms and conditions, as the Secretary considers necessary.

(f) Statistical enumeration

The Secretary, the Secretary of Commerce, and the United States International Trade Commission shall establish from time to time for statistical purposes an enumeration of articles in such detail as in their judgment may be necessary, comprehending all merchandise imported into the United States and exported from the United States, and shall seek, in conjunction with statistical programs for domestic production and programs for achieving international harmonization of trade statistics, to establish the comparability thereof with such enumeration of articles. All import entries and export declarations shall include or have attached thereto an accurate statement specifying, in terms of such detailed enumeration, the kinds and quantities of all merchandise imported and exported and the value of the total quantity of each kind of article.

(g) Statement of cost of production

Under such regulations as the Secretary may prescribe, the Customs Service may require a verified statement from the manufacturer or producer showing the cost of producing the imported merchandise, if the Customs Service considers such verification necessary for the appraisement of such merchandise.

(h) Admissibility of data electronically transmitted

Any entry or other information transmitted by means of an authorized electronic data interchange system shall be admissible in any and all administrative and judicial proceedings as evidence of such entry or information.

(i) Special rule for foreign trade zone operations

(1) In general

Notwithstanding any other provision of law and except as provided in paragraph (3), all merchandise (including merchandise of different classes, types, and categories), withdrawn from a foreign trade zone during any 7-day period, shall, at the option of the operator or user of the zone, be the subject of a single estimated entry or release filed on or before the first day of the 7-day period in which the merchandise is to be withdrawn from the zone. The estimated entry or release shall be treated as a single entry and a single release of merchandise for purposes of section 58c(a)(9)(A) of this title and all fee exclusions and limitations of such section 58c of this title shall apply, including the maximum and minimum fee amounts provided for under subsection (b)(8)(A)(i) of such section. The entry summary for the estimated entry or release shall cover only the merchandise actually withdrawn from the foreign trade zone during the 7-day period.

(2) Other requirements

The Secretary of the Treasury may require that the operator or

user of the zone -
(A) use an electronic data interchange approved by the Customs Service -
(i) to file the entries described in paragraph (1); and
(ii) to pay the applicable duties, fees, and taxes with respect to the entries; and
(B) satisfy the Customs Service that accounting, transportation, and other controls over the merchandise are adequate to protect the revenue and meet the requirements of other Federal agencies.

(3) Exception

The provisions of paragraph (1) shall not apply to merchandise the entry of which is prohibited by law or merchandise for which the filing of an entry summary is required before the merchandise is released from customs custody.

(4) Foreign trade zone; zone

In this subsection, the terms ''foreign trade zone'' and ''zone'' mean a zone established pursuant to the Act of June 18, 1934, commonly known as the Foreign Trade Zones Act (19 U.S.C. 81a et seq.).

(j) Treatment of multiple entries of merchandise as single transaction

In the case of merchandise that is purchased and invoiced as a single entity but -
(1) is shipped in an unassembled or disassembled condition in separate shipments due to the size or nature of the merchandise, or
(2) is shipped in separate shipments due to the inability of the carrier to include all of the merchandise in a single shipment (at the instruction of the carrier),
the Customs Service may, upon application by an importer in advance, treat such separate shipments for entry purposes as a single transaction.

Previous [Notes] Next

*U.S. Code as of: 01/22/02*

## Section 1485. Declaration

Related Res

International T Guide

Export Controls

International La and Docur

Internationa Discuss

(a) Requirement; form and contents

Every importer of record making an entry under the provisions of section 1484 of this title shall make and file or transmit electronically therewith, in a form and manner to be prescribed by the Secretary of the Treasury, a declaration under oath, stating -

(1) Whether the merchandise is imported in pursuance of a purchase or an agreement to purchase, or whether it is imported otherwise than in pursuance of a purchase or agreement to purchase;

(2) That the prices set forth in the invoice are true, in the case of merchandise purchased or agreed to be purchased; or in the case of merchandise secured otherwise than by purchase or agreement to purchase, that the statements in such invoice as to value or price are true to the best of his knowledge and belief;

(3) That all other statements in the invoice or other documents filed with the entry, or in the entry itself, are true and correct; and

(4) That he will produce at once to the appropriate customs officer any invoice, paper, letter, document, or information received showing that any such prices or statements are not true or correct.

(b) Books and periodicals

The Secretary of the Treasury is authorized to prescribe regulations for one declaration in the case of books, magazines, newspapers, and periodicals published and imported in successive parts, numbers, or volumes, and entitled to free entry.

(c) Agents

In the event that an entry is made by an agent under the provisions of section 1484 of this title and such agent is not in possession of such declaration of the importer of record, such agent shall give a bond to produce such declaration.

(d) Liability of importer of record for increased duties

An importer of record shall not be liable for any additional or increased duties if (1) he declares at the time of entry that he is not the actual owner of the merchandise, (2) he furnishes the name and address of such owner, and (3) within ninety days from the date of entry he produces a declaration of such owner conditioned that he will pay all additional and increased duties, under such regulations as the Secretary of the Treasury may prescribe. Such owner shall possess all the rights of an importer of record.

(e) Separate forms for purchase and nonpurchase importations

The Secretary of the Treasury shall prescribe separate forms for the declaration in the case of merchandise which is imported in pursuance of a purchase or agreement to purchase and merchandise which is imported otherwise than in pursuance of a purchase or agreement to purchase.

(f) Deceased or insolvent persons; partnerships and corporations

Whenever such merchandise is consigned to a deceased person, or to an insolvent person who has assigned the same for the benefit of his creditors, the executor or administrator, or the assignee of such person or trustee in a case under title 11, shall be considered as the importer of record; when consigned to a partnership the declaration of one of the partners only shall be required, and when consigned to a corporation such declaration may be made by any officer of such corporation. Whether the importer of record is an individual, a partnership, or a corporation, the declaration may be made by any person who has knowledge of the facts and who is specifically authorized by such individual, a member of such partnership, or an officer of such corporation to make such declaration.

(g) Exported merchandise returned as undeliverable

With respect to any importation of merchandise to which General Headnote 4(e) of the Harmonized Tariff Schedule of the United States applies, any person who gained any benefit from, or met any obligation to, the United States as a result of the prior exportation of such merchandise shall, in accordance with regulations prescribed by the Secretary, within a reasonable time inform the Customs Service of the return of the merchandise.

Previous [Notes] Next

*U.S. Code as of: 01/22/02*

## Section 1499. Examination of merchandise

Related Res

International T
Guide

Export Controls

International La
and Docur

Internationa
Discuss

```
(a) Entry examination
  (1) In general
    Imported merchandise that is required by law or regulation to
  be inspected, examined, or appraised shall not be delivered from
  customs custody (except under such bond or other security as may
  be prescribed by the Secretary to assure compliance with all
  applicable laws, regulations, and instructions which the
  Secretary or the Customs Service is authorized to enforce) until
  the merchandise has been inspected, appraised, or examined and is
  reported by the Customs Service to have been truly and correctly
  invoiced and found to comply with the requirements of the laws of
  the United States.
  (2) Examination
    The Customs Service -
      (A) shall designate the packages or quantities of merchandise
    covered by any invoice or entry which are to be opened and
    examined for the purpose of appraisement or otherwise;
      (B) shall order such packages or quantities to be sent to
    such place as is designated by the Secretary by regulation for
    such purpose;
      (C) may require such additional packages or quantities as the
    Secretary considers necessary for such purpose; and
      (D) shall inspect a sufficient number of shipments, and shall
    examine a sufficient number of entries, to ensure compliance
    with the laws enforced by the Customs Service.
  (3) Unspecified articles
    If any package contains any article not specified in the
  invoice or entry and, in the opinion of the Customs Service, the
  article was omitted from the invoice or entry -
      (A) with fraudulent intent on the part of the seller,
    shipper, owner, agent, importer of record, or entry filer, the
    contents of the entire package in which such article is found
    shall be subject to seizure; or
      (B) without fraudulent intent, the value of the article shall
    be added to the entry and the duties, fees, and taxes thereon
    paid accordingly.
  (4) Deficiency
    If a deficiency is found in quantity, weight, or measure in the
  examination of any package, the person finding the deficiency
  shall make a report thereof to the Customs Service. The Customs
  Service shall make allowance for the deficiency in the
```

liquidation of duties.

(5) Information required for release

If an examination is conducted, any information required for release shall be provided, either electronically or in paper form, to the Customs Service at the port of examination. The absence of such information does not limit the authority of the Customs Service to conduct an examination.

(b) Testing laboratories

(1) Accreditation of private testing laboratories

The Customs Service shall establish and implement a procedure, under regulations promulgated by the Secretary, for accrediting private laboratories within the United States which may be used to perform tests (that would otherwise be performed by Customs Service laboratories) to establish the characteristics, quantities, or composition of imported merchandise. Such regulations -

(A) shall establish the conditions required for the laboratories to receive and maintain accreditation for purposes of this subsection;

(B) shall establish the conditions regarding the suspension and revocation of accreditation, which may include the imposition of a monetary penalty not to exceed $100,000 and such penalty is in addition to the recovery, from a gauger or laboratory accredited under paragraph (1), of any loss of revenue that may have occurred, but the Customs Service -

(i) may seek to recover lost revenue only in cases where the gauger or laboratory intentionally falsified the analysis or gauging report in collusion with the importer; and

(ii) shall neither assess penalties nor seek to recover lost revenue because of a good faith difference of professional opinion; and

(C) may provide for the imposition of a reasonable charge for accreditation and periodic reaccreditation.

The collection of any charge for accreditation and reaccreditation under this section is not prohibited by section 58c(e)(6) of this title.

(2) Appeal of adverse accreditation decisions

A laboratory applying for accreditation, or that is accredited, under this section may contest any decision or order of the Customs Service denying, suspending, or revoking accreditation, or imposing a monetary penalty, by commencing an action in accordance with chapter 169 of title 28 in the Court of International Trade within 60 days after issuance of the decision or order.

(3) Testing by accredited laboratories

When requested by an importer of record of merchandise, the Customs Service shall authorize the release to the importer of a representative sample of the merchandise for testing, at the expense of the importer, by a laboratory accredited under paragraph (1). The testing results from a laboratory accredited under paragraph (1) that are submitted by an importer of record with respect to merchandise in an entry shall, in the absence of testing results obtained from a Customs Service laboratory, be accepted by the Customs Service if the importer of record certifies that the sample tested was taken from the merchandise in the entry. Nothing in this subsection shall be construed to limit in any way or preclude the authority of the Customs Service to test or analyze any sample or merchandise independently.

(4) Availability of testing procedure, methodologies, and information

Testing procedures and methodologies used by the Customs Service, and information resulting from any testing conducted by the Customs Service, shall be made available as follows:

(A) Testing procedures and methodologies shall be made available upon request to any person unless the procedures or methodologies are -

(i) proprietary to the holder of a copyright or patent related to such procedures or methodologies, or

(ii) developed by the Customs Service for enforcement purposes.

(B) Information resulting from testing shall be made available upon request to the importer of record and any agent thereof unless the information reveals information which is -

(i) proprietary to the holder of a copyright or patent; or

(ii) developed by the Customs Service for enforcement purposes.

(5) Miscellaneous provisions

For purposes of this subsection -

(A) any reference to a private laboratory includes a reference to a private gauger; and

(B) accreditation of private laboratories extends only to the performance of functions by such laboratories that are within the scope of those responsibilities for determinations of the elements relating to admissibility, quantity, composition, or characteristics of imported merchandise that are vested in, or delegated to, the Customs Service.

(c) Detentions

Except in the case of merchandise with respect to which the determination of admissibility is vested in an agency other than the Customs Service, the following apply:

(1) In general

Within the 5-day period (excluding weekends and holidays) following the date on which merchandise is presented for customs examination, the Customs Service shall decide whether to release or detain the merchandise. Merchandise which is not released within such 5-day period shall be considered to be detained merchandise.

(2) Notice of detention

The Customs Service shall issue a notice to the importer or other party having an interest in detained merchandise no later than 5 days, excluding weekends and holidays, after the decision to detain the merchandise is made. The notice shall advise the importer or other interested party of -

(A) the initiation of the detention;

(B) the specific reason for the detention;

(C) the anticipated length of the detention;

(D) the nature of the tests or inquiries to be conducted; and

(E) the nature of any information which, if supplied to the Customs Service, may accelerate the disposition of the detention.

(3) Testing results

Upon request by the importer or other party having an interest in detained merchandise, the Customs Service shall provide the party with copies of the results of any testing conducted by the Customs Service on the merchandise and a description of the testing procedures and methodologies (unless such procedures or methodologies are proprietary to the holder of a copyright or patent or were developed by the Customs Service for enforcement purposes). The results and test description shall be in sufficient detail to permit the duplication and analysis of the

testing and the results.

(4) Seizure and forfeiture

If otherwise provided by law, detained merchandise may be seized and forfeited.

(5) Effect of failure to make determination

(A) The failure by the Customs Service to make a final determination with respect to the admissibility of detained merchandise within 30 days after the merchandise has been presented for customs examination, or such longer period if specifically authorized by law, shall be treated as a decision of the Customs Service to exclude the merchandise for purposes of section 1514(a)(4) of this title.

(B) For purposes of section 1581 of title 28, a protest against the decision to exclude the merchandise which has not been allowed or denied in whole or in part before the 30th day after the day on which the protest was filed shall be treated as having been denied on such 30th day.

(C) Notwithstanding section 2639 of title 28, once an action respecting a detention is commenced, unless the Customs Service establishes by a preponderance of the evidence that an admissibility decision has not been reached for good cause, the court shall grant the appropriate relief which may include, but is not limited to, an order to cancel the detention and release the merchandise.

**Previous** **[Notes]** **Next**

Search Title 19



*U.S. Code as of: 01/22/02*

## Section 1500. Appraisement, classification, and liquidation procedure

```
   The Customs Service shall, under rules and regulations prescribed
 by the Secretary -
     (a) fix the final appraisement of merchandise by ascertaining
   or estimating the value thereof, under section 1401a of this
   title, by all reasonable ways and means in his power, any
   statement of cost or costs of production in any invoice,
   affidavit, declaration, other document to the contrary
   notwithstanding;
     (b) fix the final classification and rate of duty applicable to
   such merchandise;
     (c) fix the final amount of duty to be paid on such merchandise
   and determine any increased or additional duties, taxes, and fees
   due or any excess of duties, taxes, and fees deposited;
     (d) liquidate the entry and reconciliation, if any, of such
   merchandise; and
     (e) give or transmit, pursuant to an electronic data
   interchange system, notice of such liquidation to the importer,
   his consignee, or agent in such form and manner as the Secretary
   shall by regulation prescribe.
```

Related Res

International T
Guide

Export Controls

International La
and Docur

Internationa
Discuss

**Previous** **[Notes]** **Next**

*U.S. Code as of: 01/22/02*

## Section 1514. Protest against decisions of Customs Service

Related Res

International T Guide

Export Controls

International La and Docur

Internationa Discuss

(a) Finality of decisions; return of papers

Except as provided in subsection (b) of this section, section 1501 of this title (relating to voluntary reliquidations), section 1516 of this title (relating to petitions by domestic interested parties), and section 1520 of this title (relating to refunds and errors), decisions of the Customs Service, including the legality of all orders and findings entering into the same, as to -

(1) the appraised value of merchandise;

(2) the classification and rate and amount of duties chargeable;

(3) all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury;

(4) the exclusion of merchandise from entry or delivery or a demand for redelivery to customs custody under any provision of the customs laws, except a determination appealable under section 1337 of this title;

(5) the liquidation or reliquidation of an entry, or reconciliation as to the issues contained therein, or any modification thereof;

(6) the refusal to pay a claim for drawback; or

(7) the refusal to reliquidate an entry under subsection (c) or (d) of section 1520 of this title;

shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest, in whole or in part, is commenced in the United States Court of International Trade in accordance with chapter 169 of title 28 within the time prescribed by section 2636 of that title. When a judgment or order of the United States Court of International Trade has become final, the papers transmitted shall be returned, together with a copy of the judgment or order to the Customs Service, which shall take action accordingly.

(b) Finality of determinations

With respect to determinations made under section 1303 (FOOTNOTE 1) of this title or subtitle IV of this chapter which are reviewable under section 1516a of this title, determinations of the Customs Service are final and conclusive upon all persons (including the United States and any officer thereof) unless a civil action contesting a determination listed in section 1516a of this title is commenced in the United States Court of International Trade, or review by a binational panel of a determination to which

section 1516a(g)(2) of this title applies is commenced pursuant to section 1516a(g) of this title and article 1904 of the North American Free Trade Agreement or the United States-Canada Free-Trade Agreement.

(FOOTNOTE 1) See References in Text note below.

(c) Form, number, and amendment of protest; filing of protest

(1) A protest of a decision made under subsection (a) of this section shall be filed in writing, or transmitted electronically pursuant to an electronic data interchange system, in accordance with regulations prescribed by the Secretary. A protest must set forth distinctly and specifically -

(A) each decision described in subsection (a) of this section as to which protest is made;

(B) each category of merchandise affected by each decision set forth under paragraph (1);

(C) the nature of each objection and the reasons therefor; and

(D) any other matter required by the Secretary by regulation.

Only one protest may be filed for each entry of merchandise, except that where the entry covers merchandise of different categories, a separate protest may be filed for each category. In addition, separate protests filed by different authorized persons with respect to any one category of merchandise, or with respect to a determination of origin under section 3332 of this title, that is the subject of a protest are deemed to be part of a single protest. A protest may be amended, under regulations prescribed by the Secretary, to set forth objections as to a decision or decisions described in subsection (a) of this section which were not the subject of the original protest, in the form and manner prescribed for a protest, any time prior to the expiration of the time in which such protest could have been filed under this section. New grounds in support of objections raised by a valid protest or amendment thereto may be presented for consideration in connection with the review of such protest pursuant to section 1515 of this title at any time prior to the disposition of the protest in accordance with that section.

(2) Except as provided in sections 1485(d) and 1557(b) of this title, protests may be filed with respect to merchandise which is the subject of a decision specified in subsection (a) of this section by -

(A) the importers or consignees shown on the entry papers, or their sureties;

(B) any person paying any charge or exaction;

(C) any person seeking entry or delivery;

(D) any person filing a claim for drawback;

(E) with respect to a determination of origin under section 3332 of this title, any exporter or producer of the merchandise subject to that determination, if the exporter or producer completed and signed a NAFTA Certificate of Origin covering the merchandise; or

(F) any authorized agent of any of the persons described in clauses (A) through (E).

(3) A protest of a decision, order, or finding described in subsection (a) of this section shall be filed with the Customs Service within ninety days after but not before -

(A) notice of liquidation or reliquidation, or

(B) in circumstances where subparagraph (A) is inapplicable, the date of the decision as to which protest is made.

A protest by a surety which has an unsatisfied legal claim under its bond may be filed within 90 days from the date of mailing of notice of demand for payment against its bond. If another party

has not filed a timely protest, the surety's protest shall certify that it is not being filed collusively to extend another authorized person's time to protest as specified in this subsection.

(d) Limitation on protest of reliquidation

The reliquidation of an entry shall not open such entry so that a protest may be filed against the decision of the Customs Service upon any question not involved in such reliquidation.

(e) Advance notice of certain determinations

Except as provided in subsection (f) of this section, an exporter or producer referred to in subsection (c)(2)(E) of this section shall be provided notice in advance of an adverse determination of origin under section 3332 of this title. The Secretary may, by regulations, prescribe the time period in which such advance notice shall be issued and authorize the Customs Service to provide in the notice the entry number and any other entry information considered necessary to allow the exporter or producer to exercise the rights provided by this section.

(f) Denial of preferential treatment

If the Customs Service finds indications of a pattern of conduct by an exporter or producer of false or unsupported representations that goods qualify under the rules of origin set out in section 3332 of this title -

(1) the Customs Service, in accordance with regulations issued by the Secretary, may deny preferential tariff treatment to entries of identical goods exported or produced by that person; and

(2) the advance notice requirement in subsection (e) of this section shall not apply to that person;

until the person establishes to the satisfaction of the Customs Service that its representations are in conformity with section 3332 of this title.

Previous [Notes] Next

*U.S. Code as of: 01/22/02*

## Section 1515. Review of protests

(a) Administrative review and modification of decisions

Unless a request for an accelerated disposition of a protest is filed in accordance with subsection (b) of this section the appropriate customs officer, within two years from the date a protest was filed in accordance with section 1514 of this title, shall review the protest and shall allow or deny such protest in whole or in part. Thereafter, any duties, charge, or exaction found to have been assessed or collected in excess shall be remitted or refunded and any drawback found due shall be paid. Upon the request of the protesting party, filed within the time allowed for the filing of a protest under section 1514 of this title, a protest may be subject to further review by another appropriate customs officer, under the circumstances and in the form and manner that may be prescribed by the Secretary in regulations, but subject to the two-year limitation prescribed in the first sentence of this subsection. Within 30 days from the date an application for further review is filed, the appropriate customs officer shall allow or deny the application and, if allowed, the protest shall be forwarded to the customs officer who will be conducting the further review. Notice of the denial of any protest shall be mailed in the form and manner prescribed by the Secretary. Such notice shall include a statement of the reasons for the denial, as well as a statement informing the protesting party of his right to file a civil action contesting the denial of a protest under section 1514 of this title.

(b) Request for accelerated disposition of protest

A request for accelerated disposition of a protest filed in accordance with section 1514 of this title may be mailed by certified or registered mail to the appropriate customs officer any time after ninety days following the filing of such protest. For purposes of section 1581 of title 28, a protest which has not been allowed or denied in whole or in part within thirty days following the date of mailing by certified or registered mail of a request for accelerated disposition shall be deemed denied on the thirtieth day following mailing of such request.

(c) Request for set aside of denial of further review

If a protesting party believes that an application for further review was erroneously or improperly denied or was denied without authority for such action, it may file with the Commissioner of Customs a written request that the denial of the application for further review be set aside. Such request must be filed within 60

Related Res

International T Guide

Export Controls

International La and Docur

Internationa Discussi

days after the date of the notice of the denial. The Commissioner of Customs may review such request and, based solely on the information before the Customs Service at the time the application for further review was denied, may set aside the denial of the application for further review and void the denial of protest, if appropriate. If the Commissioner of Customs fails to act within 60 days after the date of the request, the request shall be considered denied. All denials of protests are effective from the date of original denial for purposes of section 2636 of title 28. If an action is commenced in the Court of International Trade that arises out of a protest or an application for further review, all administrative action pertaining to such protest or application shall terminate and any administrative action taken subsequent to the commencement of the action is null and void.

(d) Voiding denial of protest

If a protest is timely and properly filed, but is denied contrary to proper instructions, the Customs Service may on its own initiative, or pursuant to a written request by the protesting party filed with the appropriate port director within 90 days after the date of the protest denial, void the denial of the protest.

Previous [Notes] Next

*U.S. Code as of: 01/22/02*

## Section 1516a. Judicial review in countervailing duty and antidumping duty proceedings

Related Res

International T Guide

Export Controls

International La and Docur

Internationa Discussi

```
    (a) Review of determination
      (1) Review of certain determinations
        Within 30 days after the date of publication in the Federal
      Register of -
          (A) a determination by the administering authority, under
        1671a(c) (FOOTNOTE 1) or 1673a(c) of this title, not to
        initiate an investigation,
       (FOOTNOTE 1) So in original.  Probably should be preceded by
    ''section''.
          (B) a determination by the Commission, under section 1675(b)
        of this title, not to review a determination based upon changed
        circumstances,
          (C) a negative determination by the Commission, under section
        1671b(a) or 1673b(a) of this title, as to whether there is
        reasonable indication of material injury, threat of material
        injury, or material retardation, or
          (D) a final determination by the administering authority or
        the Commission under section 1675(c)(3) of this title,
      an interested party who is a party to the proceeding in
      connection with which the matter arises may commence an action in
      the United States Court of International Trade by filing
      concurrently a summons and complaint, each with the content and
      in the form, manner, and style prescribed by the rules of that
      court, contesting any factual findings or legal conclusions upon
      which the determination is based.
      (2) Review of determinations on record
        (A) In general
          Within thirty days after -
            (i) the date of publication in the Federal Register of -
              (I) notice of any determination described in clause (ii),
            (iii), (iv), (v), or (viii) of subparagraph (B),
              (II) an antidumping or countervailing duty order based
            upon any determination described in clause (i) of
            subparagraph (B), or
              (III) notice of the implementation of any determination
            described in clause (vii) of subparagraph (B), or
            (ii) the date of mailing of a determination described in
          clause (vi) of subparagraph (B),
        an interested party who is a party to the proceeding in
        connection with which the matter arises may commence an action
```

in the United States Court of International Trade by filing a summons, and within thirty days thereafter a complaint, each with the content and in the form, manner, and style prescribed by the rules of that court, contesting any factual findings or legal conclusions upon which the determination is based.

(B) Reviewable determinations

The determinations which may be contested under subparagraph (A) are as follows:

(i) Final affirmative determinations by the administering authority and by the Commission under section 1671d or 1673d of this title, including any negative part of such a determination (other than a part referred to in clause (ii)).

(ii) A final negative determination by the administering authority or the Commission under section 1671d or 1673d of this title, including, at the option of the appellant, any part of a final affirmative determination which specifically excludes any company or product.

(iii) A final determination, other than a determination reviewable under paragraph (1), by the administering authority or the Commission under section 1675 of this title.

(iv) A determination by the administering authority, under section 1671c or 1673c of this title, to suspend an antidumping duty or a countervailing duty investigation, including any final determination resulting from a continued investigation which changes the size of the dumping margin or net countervailable subsidy calculated, or the reasoning underlying such calculations, at the time the suspension agreement was concluded.

(v) An injurious effect determination by the Commission under section 1671c(h) or 1673c(h) of this title.

(vi) A determination by the administering authority as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order.

(vii) A determination by the administering authority or the Commission under section 3538 of this title concerning a determination under subtitle IV of this chapter.

(viii) A determination by the Commission under section 1675b(a)(1) of this title.

(3) Exception

Notwithstanding the limitation imposed by paragraph (2)(A)(i)(II) of this subsection, a final affirmative determination by the administering authority under section 1671d or 1673d of this title may be contested by commencing an action, in accordance with the provisions of paragraph (2)(A), within thirty days after the date of publication in the Federal Register of a final negative determination by the Commission under section 1671d or 1673d of this title.

(4) Procedures and fees

The procedures and fees set forth in chapter 169 of title 28 apply to an action under this section.

(5) Time limits in cases involving merchandise from free trade area countries

Notwithstanding any other provision of this subsection, in the case of a determination to which the provisions of subsection (g) of this section apply, an action under this subsection may not be commenced, and the time limits for commencing an action under this subsection shall not begin to run, until the day specified in whichever of the following subparagraphs applies:

(A) For a determination described in paragraph (1)(B) or

clause (i), (ii) or (iii) of paragraph (2)(B), the 31st day after the date on which notice of the determination is published in the Federal Register.

(B) For a determination described in clause (vi) of paragraph (2)(B), the 31st day after the date on which the government of the relevant FTA country receives notice of the determination.

(C) For a determination with respect to which binational panel review has commenced in accordance with subsection (g)(8) of this section, the day after the date as of which -

(i) the binational panel has dismissed binational panel review of the determination for lack of jurisdiction, and

(ii) any interested party seeking review of the determination under paragraph (1), (2), or (3) of this subsection has provided timely notice under subsection (g)(3)(B) of this section.

If such an interested party files a summons and complaint under this subsection after dismissal by the binational panel, and if a request for an extraordinary challenge committee is made with respect to the decision by the binational panel to dismiss -

(I) judicial review under this subsection shall be stayed during consideration by the committee of the request, and

(II) the United States Court of International Trade shall dismiss the action if the committee vacates or remands the binational panel decision to dismiss.

(D) For a determination for which review by the United States Court of International Trade is provided for -

(i) under subsection (g)(12)(B) of this section, the day after the date of publication in the Federal Register of notice that article 1904 of the NAFTA has been suspended, or

(ii) under subsection (g)(12)(D) of this section, the day after the date that notice of settlement is published in the Federal Register.

(E) For a determination described in clause (vii) of paragraph (2)(B), the 31st day after the date on which notice of the implementation of the determination is published in the Federal Register.

(b) Standards of review

(1) Remedy

The court shall hold unlawful any determination, finding, or conclusion found -

(A) in an action brought under subparagraph (A), (B), or (C) of subsection (a)(1) of this section, to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or

(B)(i) in an action brought under paragraph (2) of subsection (a) of this section, to be unsupported by substantial evidence on the record, or otherwise not in accordance with law, or

(ii) in an action brought under paragraph (1)(D) of subsection (a) of this section, to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

(2) Record for review

(A) In general

For the purposes of this subsection, the record, unless otherwise stipulated by the parties, shall consist of -

(i) a copy of all information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 1677f(a)(3) of this title; and

(ii) a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register.

(B) Confidential or privileged material

The confidential or privileged status accorded to any documents, comments, or information shall be preserved in any action under this section. Notwithstanding the preceding sentence, the court may examine, in camera, the confidential or privileged material, and may disclose such material under such terms and conditions as it may order.

(3) Effect of decisions by NAFTA or United States-Canada binational panels

In making a decision in any action brought under subsection (a) of this section, a court of the United States is not bound by, but may take into consideration, a final decision of a binational panel or extraordinary challenge committee convened pursuant to article 1904 of the NAFTA or of the Agreement.

(c) Liquidation of entries

(1) Liquidation in accordance with determination

Unless such liquidation is enjoined by the court under paragraph (2) of this subsection, entries of merchandise of the character covered by a determination of the Secretary, the administering authority, or the Commission contested under subsection (a) of this section shall be liquidated in accordance with the determination of the Secretary, the administering authority, or the Commission, if they are entered, or withdrawn from warehouse, for consumption on or before the date of publication in the Federal Register by the Secretary or the administering authority of a notice of a decision of the United States Court of International Trade, or of the United States Court of Appeals for the Federal Circuit, not in harmony with that determination. Such notice of a decision shall be published within ten days from the date of the issuance of the court decision.

(2) Injunctive relief

In the case of a determination described in paragraph (2) of subsection (a) of this section by the Secretary, the administering authority, or the Commission, the United States Court of International Trade may enjoin the liquidation of some or all entries of merchandise covered by a determination of the Secretary, the administering authority, or the Commission, upon a request by an interested party for such relief and a proper showing that the requested relief should be granted under the circumstances.

(3) Remand for final disposition

If the final disposition of an action brought under this section is not in harmony with the published determination of the Secretary, the administering authority, or the Commission, the matter shall be remanded to the Secretary, the administering authority, or the Commission, as appropriate, for disposition consistent with the final disposition of the court.

(d) Standing

Any interested party who was a party to the proceeding under section 1303 (FOOTNOTE 2) of this title or subtitle IV of this chapter shall have the right to appear and be heard as a party in interest before the United States Court of International Trade. The party filing the action shall notify all such interested parties of the filing of an action under this section, in the form, manner, style, and within the time prescribed by rules of the court.

(FOOTNOTE 2) See References in Text note below.

(e) Liquidation in accordance with final decision

If the cause of action is sustained in whole or in part by a decision of the United States Court of International Trade or of the United States Court of Appeals for the Federal Circuit -

(1) entries of merchandise of the character covered by the published determination of the Secretary, the administering authority, or the Commission, which is entered, or withdrawn from warehouse, for consumption after the date of publication in the Federal Register by the Secretary or the administering authority of a notice of the court decision, and

(2) entries, the liquidation of which was enjoined under subsection (c)(2) of this section,

shall be liquidated in accordance with the final court decision in the action. Such notice of the court decision shall be published within ten days from the date of the issuance of the court decision.

(f) Definitions

For purposes of this section -

(1) Administering authority

The term ''administering authority'' means the administering authority described in section 1677(1) of this title.

(2) Commission

The term ''Commission'' means the United States International Trade Commission.

(3) Interested party

The term ''interested party'' means any person described in section 1677(9) of this title.

(4) Secretary

The term ''Secretary'' means the Secretary of the Treasury.

(5) Agreement

The term ''Agreement'' means the United States-Canada Free-Trade Agreement.

(6) United States Secretary

The term ''United States Secretary'' means -

(A) the secretary for the United States Section referred to in article 1908 of the NAFTA, and

(B) the secretary of the United States Section provided for in article 1909 of the Agreement.

(7) Relevant FTA Secretary

The term ''relevant FTA Secretary'' means the Secretary -

(A) referred to in article 1908 of the NAFTA, or

(B) provided for in paragraph 5 of article 1909 of the Agreement,

of the relevant FTA country.

(8) NAFTA

The term ''NAFTA'' means the North American Free Trade Agreement.

(9) Relevant FTA country

The term ''relevant FTA country'' means the free trade area country to which an antidumping or countervailing duty proceeding pertains.

(10) Free trade area country

The term ''free trade area country'' means the following:

(A) Canada for such time as the NAFTA is in force with respect to, and the United States applies the NAFTA to, Canada.

(B) Mexico for such time as the NAFTA is in force with respect to, and the United States applies the NAFTA to, Mexico.

(C) Canada for such time as -

(i) it is not a free trade area country under subparagraph (A); and

(ii) the Agreement is in force with respect to, and the United States applies the Agreement to, Canada.

(g) Review of countervailing duty and antidumping duty determinations involving free trade area country merchandise

(1) ''Determination'' defined

For purposes of this subsection, the term ''determination'' means a determination described in -

(A) paragraph (1)(B) of subsection (a) of this section, or

(B) clause (i), (ii), (iii), or (vi) of paragraph (2)(B) of subsection (a) of this section,

if made in connection with a proceeding regarding a class or kind of free trade area country merchandise, as determined by the administering authority.

(2) Exclusive review of determination by binational panels

If binational panel review of a determination is requested pursuant to article 1904 of the NAFTA or of the Agreement, then, except as provided in paragraphs (3) and (4) -

(A) the determination is not reviewable under subsection (a) of this section, and

(B) no court of the United States has power or jurisdiction to review the determination on any question of law or fact by an action in the nature of mandamus or otherwise.

(3) Exception to exclusive binational panel review

(A) In general

A determination is reviewable under subsection (a) of this section if the determination sought to be reviewed is -

(i) a determination as to which neither the United States nor the relevant FTA country requested review by a binational panel pursuant to article 1904 of the NAFTA or of the Agreement,

(ii) a revised determination issued as a direct result of judicial review, commenced pursuant to subsection (a) of this section, if neither the United States nor the relevant FTA country requested review of the original determination,

(iii) a determination issued as a direct result of judicial review that was commenced pursuant to subsection (a) of this section prior to the entry into force of the NAFTA or of the Agreement,

(iv) a determination which a binational panel has determined is not reviewable by the binational panel,

(v) a determination as to which binational panel review has terminated pursuant to paragraph 12 of article 1905 of the NAFTA, or

(vi) a determination as to which extraordinary challenge committee review has terminated pursuant to paragraph 12 of article 1905 of the NAFTA.

(B) Special rule

A determination described in subparagraph (A)(i) or (iv) is reviewable under subsection (a) of this section only if the party seeking to commence review has provided timely notice of its intent to commence such review to -

(i) the United States Secretary and the relevant FTA Secretary;

(ii) all interested parties who were parties to the proceeding in connection with which the matter arises; and

(iii) the administering authority or the Commission, as appropriate.

Such notice is timely provided if the notice is delivered no later than the date that is 20 days after the date described in subparagraph (A) or (B) of subsection (a)(5) of this section

that is applicable to such determination, except that, if the time for requesting binational panel review is suspended under paragraph (8)(A)(ii) of this subsection, any unexpired time for providing notice of intent to commence judicial review shall, during the pendency of any such suspension, also be suspended. Such notice shall contain such information, and be in such form, manner, and style, as the administering authority, in consultation with the Commission, shall prescribe by regulations.

(4) Exception to exclusive binational panel review for constitutional issues

(A) Constitutionality of binational panel review system

An action for declaratory judgment or injunctive relief, or both, regarding a determination on the grounds that any provision of, or amendment made by, the North American Free Trade Agreement Implementation Act implementing the binational dispute settlement system under chapter 19 of the NAFTA, or the United States-Canada Free-Trade Agreement Implementation Act of 1988 implementing the binational panel dispute settlement system under chapter 19 of the Agreement, violates the Constitution may be brought only in the United States Court of Appeals for the District of Columbia Circuit, which shall have jurisdiction of such action.

(B) Other constitutional review

Review is available under subsection (a) of this section with respect to a determination solely concerning a constitutional issue (other than an issue to which subparagraph (A) applies) arising under any law of the United States as enacted or applied. An action for review under this subparagraph shall be assigned to a 3-judge panel of the United States Court of International Trade.

(C) Commencement of review

Notwithstanding the time limits in subsection (a) of this section, within 30 days after the date of publication in the Federal Register of notice that binational panel review has been completed, an interested party who is a party to the proceeding in connection with which the matter arises may commence an action under subparagraph (A) or (B) by filing an action in accordance with the rules of the court.

(D) Transfer of actions to appropriate court

Whenever an action is filed in a court under subparagraph (A) or (B) and that court finds that the action should have been filed in the other court, the court in which the action was filed shall transfer the action to the other court and the action shall proceed as if it had been filed in the court to which it is transferred on the date upon which it was actually filed in the court from which it is transferred.

(E) Frivolous claims

Frivolous claims brought under subparagraph (A) or (B) are subject to dismissal and sanctions as provided under section 1927 of title 28 and the Federal Rules of Civil Procedure.

(F) Security

(i) Subparagraph (A) actions

The security requirements of rule 65(c) of the Federal Rules of Civil Procedure apply with respect to actions commenced under subparagraph (A).

(ii) Subparagraph (B) actions

No claim shall be heard, and no temporary restraining order or temporary or permanent injunction shall be issued, under an action commenced under subparagraph (B), unless the party

seeking review first files an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense parties affected for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction. If a court upholds the constitutionality of the determination in question in such action, the court shall award to a prevailing party fees and expenses, in addition to any costs incurred by that party, unless the court finds that the position of the other party was substantially justified or that special circumstances make an award unjust.

(G) Panel record

The record of proceedings before the binational panel shall not be considered part of the record for review pursuant to subparagraph (A) or (B).

(H) Appeal to Supreme Court of court orders issued in subparagraph (A) actions

Notwithstanding any other provision of law, any final judgment of the United States Court of Appeals for the District of Columbia Circuit which is issued pursuant to an action brought under subparagraph (A) shall be reviewable by appeal directly to the Supreme Court of the United States. Any such appeal shall be taken by a notice of appeal filed within 10 days after such order is entered; and the jurisdictional statement shall be filed within 30 days after such order is entered. No stay of an order issued pursuant to an action brought under subparagraph (A) may be issued by a single Justice of the Supreme Court.

(5) Liquidation of entries

(A) Application

In the case of a determination for which binational panel review is requested pursuant to article 1904 of the NAFTA or of the Agreement, the rules provided in this paragraph shall apply, notwithstanding the provisions of subsection (c) of this section.

(B) General rule

In the case of a determination for which binational panel review is requested pursuant to article 1904 of the NAFTA or of the Agreement, entries of merchandise covered by such determination shall be liquidated in accordance with the determination of the administering authority or the Commission, if they are entered, or withdrawn from warehouse, for consumption on or before the date of publication in the Federal Register by the administering authority of notice of a final decision of a binational panel, or of an extraordinary challenge committee, not in harmony with that determination. Such notice of a decision shall be published within 10 days of the date of the issuance of the panel or committee decision.

(C) Suspension of liquidation

(i) In general

Notwithstanding the provisions of subparagraph (B), in the case of a determination described in clause (iii) or (vi) of subsection (a)(2)(B) of this section for which binational panel review is requested pursuant to article 1904 of the NAFTA or of the Agreement, the administering authority, upon request of an interested party who was a party to the proceeding in connection with which the matter arises and who is a participant in the binational panel review, shall order the continued suspension of liquidation of those entries of merchandise covered by the determination that are involved in the review pending the final disposition of the review.

(ii) Notice

At the same time as the interested party makes its request to the administering authority under clause (i), that party shall serve a copy of its request on the United States Secretary, the relevant FTA Secretary, and all interested parties who were parties to the proceeding in connection with which the matter arises.

(iii) Application of suspension

If the interested party requesting continued suspension of liquidation under clause (i) is a foreign manufacturer, producer, or exporter, or a United States importer, the continued suspension of liquidation shall apply only to entries of merchandise manufactured, produced, exported, or imported by that particular manufacturer, producer, exporter, or importer. If the interested party requesting the continued suspension of liquidation under clause (i) is an interested party described in subparagraph (C), (D), (E), or (F) of section 1677(9) of this title, the continued suspension of liquidation shall apply only to entries which could be affected by a decision of the binational panel convened under chapter 19 of the NAFTA or of the Agreement.

(iv) Judicial review

Any action taken by the administering authority or the United States Customs Service under this subparagraph shall not be subject to judicial review, and no court of the United States shall have power or jurisdiction to review such action on any question of law or fact by an action in the nature of mandamus or otherwise.

(6) Injunctive relief

Except for cases under paragraph (4)(B), in the case of a determination for which binational panel review is requested pursuant to article 1904 of the NAFTA or of the Agreement, the provisions of subsection (c)(2) of this section shall not apply.

(7) Implementation of international obligations under article 1904 of the NAFTA or the Agreement

(A) Action upon remand

If a determination is referred to a binational panel or extraordinary challenge committee under the NAFTA or the Agreement and the panel or committee makes a decision remanding the determination to the administering authority or the Commission, the administering authority or the Commission shall, within the period specified by the panel or committee, take action not inconsistent with the decision of the panel or committee. Any action taken by the administering authority or the Commission under this paragraph shall not be subject to judicial review, and no court of the United States shall have power or jurisdiction to review such action on any question of law or fact by an action in the nature of mandamus or otherwise.

(B) Application if subparagraph (A) held unconstitutional

In the event that the provisions of subparagraph (A) are held unconstitutional under the provisions of subparagraphs (A) and (H) of paragraph (4), the provisions of this subparagraph shall take effect. In such event, the President is authorized on behalf of the United States to accept, as a whole, the decision of a binational panel or extraordinary challenge committee remanding the determination to the administering authority or the Commission within the period specified by the panel or committee. Upon acceptance by the President of such a decision, the administering authority or the Commission shall,

within the period specified by the panel or committee, take action not inconsistent with such decision. Any action taken by the President, the administering authority, or the Commission under this subparagraph shall not be subject to judicial review, and no court of the United States shall have power or jurisdiction to review such action on any question of law or fact by an action in the nature of mandamus or otherwise.

(8) Requests for binational panel review

(A) Interested party requests for binational panel review

(i) General rule

An interested party who was a party to the proceeding in which a determination is made may request binational panel review of such determination by filing a request with the United States Secretary by no later than the date that is 30 days after the date described in subparagraph (A), (B), or (E) of subsection (a)(5) of this section that is applicable to such determination. Receipt of such request by the United States Secretary shall be deemed to be a request for binational panel review within the meaning of article 1904(4) of the NAFTA or of the Agreement. Such request shall contain such information and be in such form, manner, and style as the administering authority, in consultation with the Commission, shall prescribe by regulations.

(ii) Suspension of time to request binational panel review under the NAFTA

Notwithstanding clause (i), the time for requesting binational panel review shall be suspended during the pendency of any stay of binational panel review that is issued pursuant to paragraph 11(a) of article 1905 of the NAFTA.

(B) Service of request for binational panel review

(i) Service by interested party

If a request for binational panel review of a determination is filed under subparagraph (A), the party making the request shall serve a copy, by mail or personal service, on any other interested party who was a party to the proceeding in connection with which the matter arises, and on the administering authority or the Commission, as appropriate.

(ii) Service by United States Secretary

If an interested party to the proceeding requests binational panel review of a determination by filing a request with the relevant FTA Secretary, the United States Secretary shall serve a copy of the request by mail on any other interested party who was a party to the proceeding in connection with which the matter arises, and on the administering authority or the Commission, as appropriate.

(C) Limitation on request for binational panel review

Absent a request by an interested party under subparagraph (A), the United States may not request binational panel review of a determination under article 1904 of the NAFTA or the Agreement.

(9) Representation in panel proceedings

In the case of binational panel proceedings convened under chapter 19 of the NAFTA or of the Agreement, the administering authority and the Commission shall be represented by attorneys who are employees of the administering authority or the Commission, respectively. Interested parties who were parties to the proceeding in connection with which the matter arises shall have the right to appear and be represented by counsel before the

binational panel.

(10) Notification of class or kind rulings

In the case of a determination which is described in paragraph (2)(B)(vi) of subsection (a) of this section and which is subject to the provisions of paragraph (2), the administering authority, upon request, shall inform any interested person of the date on which the Government of the relevant FTA country received notice of the determination under paragraph 4 of article 1904 of the NAFTA or the Agreement.

(11) Suspension and termination of suspension of article 1904 of the NAFTA

(A) Suspension of article 1904

If a special committee established under article 1905 of the NAFTA issues an affirmative finding, the Trade Representative may, in accordance with paragraph 8(a) or 9, as appropriate, of article 1905 of the NAFTA, suspend the operation of article 1904 of the NAFTA.

(B) Termination of suspension of article 1904

If a special committee is reconvened and makes an affirmative determination described in paragraph 10(b) of article 1905 of the NAFTA, any suspension of the operation of article 1904 of the NAFTA shall terminate.

(12) Judicial review upon termination of binational panel or committee review under the NAFTA

(A) Notice of suspension or termination of suspension of article 1904

(i) Upon notification by the Trade Representative or the Government of a country described in subsection (f)(10)(A) or (B) of this section that the operation of article 1904 of the NAFTA has been suspended in accordance with paragraph 8(a) or 9 of article 1905 of the NAFTA, the United States Secretary shall publish in the Federal Register a notice of suspension of article 1904 of the NAFTA.

(ii) Upon notification by the Trade Representative or the Government of a country described in subsection (f)(10)(A) or (B) of this section that the suspension of the operation of article 1904 of the NAFTA is terminated in accordance with paragraph 10 of article 1905 of the NAFTA, the United States Secretary shall publish in the Federal Register a notice of termination of suspension of article 1904 of the NAFTA.

(B) Transfer of final determinations for judicial review upon suspension of article 1904

If the operation of article 1904 of the NAFTA is suspended in accordance with paragraph 8(a) or 9 of article 1905 of the NAFTA -

(i) upon the request of an authorized person described in subparagraph (C), any final determination that is the subject of a binational panel review or an extraordinary challenge committee review shall be transferred to the United States Court of International Trade (in accordance with rules issued by the Court) for review under subsection (a) of this section; or

(ii) in a case in which -

(I) a binational panel review was completed fewer than 30 days before the suspension, and

(II) extraordinary challenge committee review has not been requested,

upon the request of an authorized person described in subparagraph (C) which is made within 60 days after the completion of the binational panel review, the final

determination that was the subject of the binational panel review shall be transferred to the United States Court of International Trade (in accordance with rules issued by the Court) for review under subsection (a) of this section.

(C) Persons authorized to request transfer of final determinations for judicial review

A request that a final determination be transferred to the Court of International Trade under subparagraph (B) may be made by -

(i) if the United States made an allegation under paragraph 1 of article 1905 of the NAFTA and the operation of article 1904 of the NAFTA was suspended pursuant to paragraph 8(a) of article 1905 of the NAFTA -

(I) the government of the relevant country described in subsection (f)(10)(A) or (B) of this section,

(II) an interested party that was a party to the panel or committee review, or

(III) an interested party that was a party to the proceeding in connection with which panel review was requested, but only if the time period for filing notices of appearance in the panel review has not expired, or

(ii) if a country described in subsection (f)(10)(A) or (B) of this section made an allegation under paragraph 1 of article 1905 of the NAFTA and the operation of article 1904 of the NAFTA was suspended pursuant to paragraph 9 of article 1905 of the NAFTA -

(I) the government of that country,

(II) an interested party that is a person of that country and that was a party to the panel or committee review, or

(III) an interested party that is a person of that country and that was a party to the proceeding in connection with which panel review was requested, but only if the time period for filing notices of appearance in the panel review has not expired.

(D) Transfer for judicial review upon settlement

(i) If the Trade Representative achieves a settlement with the government of a country described in subsection (f)(10)(A) or (B) of this section pursuant to paragraph 7 of article 1905 of the NAFTA, and referral for judicial review is among the terms of such settlement, any final determination that is the subject of a binational panel review or an extraordinary challenge committee review shall, upon a request described in clause (ii), be transferred to the United States Court of International Trade (in accordance with rules issued by the Court) for review under subsection (a) of this section.

(ii) A request referred to in clause (i) is a request made by -

(I) the country referred to in clause (i),

(II) an interested party that was a party to the panel or committee review, or

(III) an interested party that was a party to the proceeding in connection with which panel review was requested, but only if the time for filing notices of appearance in the panel review has not expired.

*U.S. Code as of: 01/22/02*

## Section 1592. Penalties for fraud, gross negligence, and negligence

Related Res

International T Guide

Export Controls

International La and Docur

Internationa Discuss

```
(a) Prohibition
  (1) General rule
    Without regard to whether the United States is or may be
  deprived of all or a portion of any lawful duty, tax, or fee
  thereby, no person, by fraud, gross negligence, or negligence -
      (A) may enter, introduce, or attempt to enter or introduce
    any merchandise into the commerce of the United States by means
    of -
        (i) any document or electronically transmitted data or
      information, written or oral statement, or act which is
      material and false, or
        (ii) any omission which is material, or
      (B) may aid or abet any other person to violate subparagraph
    (A).
  (2) Exception
    Clerical errors or mistakes of fact are not violations of
  paragraph (1) unless they are part of a pattern of negligent
  conduct.  The mere nonintentional repetition by an electronic
  system of an initial clerical error does not constitute a pattern
  of negligent conduct.
(b) Procedures
  (1) Pre-penalty notice
    (A) In general
      If the Customs Service has reasonable cause to believe that
    there has been a violation of subsection (a) of this section
    and determines that further proceedings are warranted, it shall
    issue to the person concerned a written notice of its intention
    to issue a claim for a monetary penalty.  Such notice shall -
        (i) describe the merchandise;
        (ii) set forth the details of the entry or introduction,
      the attempted entry or introduction, or the aiding or
      procuring of the entry or introduction;
        (iii) specify all laws and regulations allegedly violated;
        (iv) disclose all the material facts which establish the
      alleged violation;
        (v) state whether the alleged violation occurred as a
      result of fraud, gross negligence, or negligence;
        (vi) state the estimated loss of lawful duties, taxes, and
      fees, if any, and, taking into account all circumstances, the
      amount of the proposed monetary penalty; and
        (vii) inform such person that he shall have a reasonable
```

opportunity to make representations, both oral and written, as to why a claim for a monetary penalty should not be issued in the amount stated.

(B) Exceptions

The preceding subparagraph shall not apply if -

(i) the importation with respect to which the violation of subsection (a) of this section occurs is noncommercial in nature, or

(ii) the amount of the penalty in the penalty claim issued under paragraph (2) is $1,000 or less.

(2) Penalty claim

After considering representations, if any, made by the person concerned pursuant to the notice issued under paragraph (1), the Customs Service shall determine whether any violation of subsection (a) of this section, as alleged in the notice, has occurred. If the Customs Service determines that there was no violation, it shall promptly issue a written statement of the determination to the person to whom the notice was sent. If the Customs Service determines that there was a violation, it shall issue a written penalty claim to such person. The written penalty claim shall specify all changes in the information provided under clauses (i) through (vi) of paragraph (1)(A). Such person shall have a reasonable opportunity under section 1618 of this title to make representations, both oral and written, seeking remission or mitigation of the monetary penalty. At the conclusion of any proceeding under such section 1618, the Customs Service shall provide to the person concerned a written statement which sets forth the final determination and the findings of fact and conclusions of law on which such determination is based.

(c) Maximum penalties

(1) Fraud

A fraudulent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed the domestic value of the merchandise.

(2) Gross negligence

A grossly negligent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed -

(A) the lesser of -

(i) the domestic value of the merchandise, or

(ii) four times the lawful duties, taxes, and fees of which the United States is or may be deprived, or

(B) if the violation did not affect the assessment of duties, 40 percent of the dutiable value of the merchandise.

(3) Negligence

A negligent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed -

(A) the lesser of -

(i) the domestic value of the merchandise, or

(ii) two times the lawful duties, taxes, and fees of which the United States is or may be deprived, or

(B) if the violation did not affect the assessment of duties, 20 percent of the dutiable value of the merchandise.

(4) Prior disclosure

If the person concerned discloses the circumstances of a violation of subsection (a) of this section before, or without knowledge of, the commencement of a formal investigation of such violation, with respect to such violation, merchandise shall not be seized and any monetary penalty to be assessed under subsection (c) of this section shall not exceed -

(A) if the violation resulted from fraud -

(i) an amount equal to 100 percent of the lawful duties, taxes, and fees of which the United States is or may be deprived, so long as such person tenders the unpaid amount of the lawful duties, taxes, and fees at the time of disclosure, or within 30 days (or such longer period as the Customs Service may provide) after notice by the Customs Service of its calculation of such unpaid amount, or

(ii) if such violation did not affect the assessment of duties, 10 percent of the dutiable value; or

(B) if such violation resulted from negligence or gross negligence, the interest (computed from the date of liquidation at the prevailing rate of interest applied under section 6621 of title 26) on the amount of lawful duties, taxes, and fees of which the United States is or may be deprived so long as such person tenders the unpaid amount of the lawful duties, taxes, and fees at the time of disclosure, or within 30 days (or such longer period as the Customs Service may provide) after notice by the Customs Service of its calculation of such unpaid amount.

The person asserting lack of knowledge of the commencement of a formal investigation has the burden of proof in establishing such lack of knowledge. For purposes of this section, a formal investigation of a violation is considered to be commenced with regard to the disclosing party and the disclosed information on the date recorded in writing by the Customs Service as the date on which facts and circumstances were discovered or information was received which caused the Customs Service to believe that a possibility of a violation of subsection (a) of this section existed.

(5) Prior disclosure regarding NAFTA claims

An importer shall not be subject to penalties under subsection (a) of this section for making an incorrect claim for preferential tariff treatment under section 3332 of this title if the importer -

(A) has reason to believe that the NAFTA Certificate of Origin (as defined in section 1508(b)(1) of this title) on which the claim was based contains incorrect information; and

(B) in accordance with regulations issued by the Secretary, voluntarily and promptly makes a corrected declaration and pays any duties owing.

(6) Seizure

If the Secretary has reasonable cause to believe that a person has violated the provisions of subsection (a) of this section and that such person is insolvent or beyond the jurisdiction of the United States or that seizure is otherwise essential to protect the revenue of the United States or to prevent the introduction of prohibited or restricted merchandise into the customs territory of the United States, then such merchandise may be seized and, upon assessment of a monetary penalty, forfeited unless the monetary penalty is paid within the time specified by law. Within a reasonable time after any such seizure is made, the Secretary shall issue to the person concerned a written statement containing the reasons for the seizure. After seizure of merchandise under this subsection, the Secretary may, in the case of restricted merchandise, and shall, in the case of any other merchandise (other than prohibited merchandise), return such merchandise upon the deposit of security not to exceed the maximum monetary penalty which may be assessed under subsection (c) of this section.

(d) Deprivation of lawful duties, taxes, or fees

Notwithstanding section 1514 of this title, if the United States has been deprived of lawful duties, taxes, or fees as a result of a violation of subsection (a) of this section, the Customs Service shall require that such lawful duties, taxes, and fees be restored, whether or not a monetary penalty is assessed.

(e) Court of International Trade proceedings

Notwithstanding any other provision of law, in any proceeding commenced by the United States in the Court of International Trade for the recovery of any monetary penalty claimed under this section -

(1) all issues, including the amount of the penalty, shall be tried de novo;

(2) if the monetary penalty is based on fraud, the United States shall have the burden of proof to establish the alleged violation by clear and convincing evidence;

(3) if the monetary penalty is based on gross negligence, the United States shall have the burden of proof to establish all the elements of the alleged violation; and

(4) if the monetary penalty is based on negligence, the United States shall have the burden of proof to establish the act or omission constituting the violation, and the alleged violator shall have the burden of proof that the act or omission did not occur as a result of negligence.

(f) False certifications regarding exports to NAFTA countries

(1) In general

Subject to paragraph (3), it is unlawful for any person to certify falsely, by fraud, gross negligence, or negligence, in a NAFTA Certificate of Origin (as defined in section 1508(b)(1) of this title) that a good to be exported to a NAFTA country (as defined in section 3301(4) of this title) qualifies under the rules of origin set out in section 3332 of this title.

(2) Applicable provisions

The procedures and penalties of this section that apply to a violation of subsection (a) of this section also apply to a violation of paragraph (1), except that -

(A) subsection (d) of this section does not apply, and

(B) subsection (c)(5) of this section applies only if the person voluntarily and promptly provides, to all persons to whom the person provided the NAFTA Certificate of Origin, written notice of the falsity of the Certificate.

(3) Exception

A person may not be considered to have violated paragraph (1) if -

(A) the information was correct at the time it was provided in a NAFTA Certificate of Origin but was later rendered incorrect due to a change in circumstances; and

(B) the person voluntarily and promptly provides written notice of the change to all persons to whom the person provided the Certificate of Origin.

*U.S. Code as of: 01/22/02*

## Section 1671. Countervailing duties imposed

Related Res

International T Guide

Export Controls

International La and Docur

Internationa Discuss

```
(a) General rule
  If -
    (1) the administering authority determines that the government
  of a country or any public entity within the territory of a
  country is providing, directly or indirectly, a countervailable
  subsidy with respect to the manufacture, production, or export of
  a class or kind of merchandise imported, or sold (or likely to be
  sold) for importation, into the United States, and
    (2) in the case of merchandise imported from a Subsidies
  Agreement country, the Commission determines that -
      (A) an industry in the United States -
        (i) is materially injured, or
        (ii) is threatened with material injury, or
      (B) the establishment of an industry in the United States is
    materially retarded,
  by reason of imports of that merchandise or by reason of sales
  (or the likelihood of sales) of that merchandise for importation,
then there shall be imposed upon such merchandise a countervailing
duty, in addition to any other duty imposed, equal to the amount of
the net countervailable subsidy.  For purposes of this subsection
and section 1671d(b)(1) of this title, a reference to the sale of
merchandise includes the entering into of any leasing arrangement
regarding the merchandise that is equivalent to the sale of the
merchandise.
(b) Subsidies Agreement country
  For purposes of this subtitle, the term ''Subsidies Agreement
country'' means -
    (1) a WTO member country,
    (2) a country which the President has determined has assumed
  obligations with respect to the United States which are
  substantially equivalent to the obligations under the Subsidies
  Agreement, or
    (3) a country with respect to which the President determines
  that -
      (A) there is an agreement in effect between the United States
    and that country which -
        (i) was in force on December 8, 1994, and
        (ii) requires unconditional most-favored-nation treatment
      with respect to articles imported into the United States, and
      (B) the agreement described in subparagraph (A) does not
    expressly permit -
```

(i) actions required or permitted by the GATT 1947 or GATT 1994, as defined in section 3501(1) of this title, or required by the Congress, or

(ii) nondiscriminatory prohibitions or restrictions on importation which are designed to prevent deceptive or unfair practices.

(c) Countervailing duty investigations involving imports not entitled to a material injury determination

In the case of any article or merchandise imported from a country which is not a Subsidies Agreement country -

(1) no determination by the Commission under section 1671b(a), 1671c, or 1671d(b) of this title shall be required,

(2) an investigation may not be suspended under section 1671c(c) or 1671c(l) of this title,

(3) no determination as to the presence of critical circumstances shall be made under section 1671b(e) or 1671d(a)(2) of this title,

(4) section 1671e(c) of this title shall not apply,

(5) any reference to a determination described in paragraph (1) or (3), or to the suspension of an investigation under section 1671c(c) or 1671c(l) of this title, shall be disregarded, and

(6) section 1675(c) of this title shall not apply.

(d) Treatment of international consortia

For purposes of this part, if the members (or other participating entities) of an international consortium that is engaged in the production of subject merchandise receive countervailable subsidies from their respective home countries to assist, permit, or otherwise enable their participation in that consortium through production or manufacturing operations in their respective home countries, then the administering authority shall cumulate all such countervailable subsidies, as well as countervailable subsidies provided directly to the international consortium, in determining any countervailing duty upon such merchandise.

(e) Upstream subsidies

Whenever the administering authority has reasonable grounds to believe or suspect that an upstream subsidy, as defined in section 1677-1(a)(1) (FOOTNOTE 1) of this title, is being paid or bestowed, the administering authority shall investigate whether an upstream subsidy has in fact been paid or bestowed, and if so, shall include the amount of the upstream subsidy as provided in section 1677-1(a)(3) (FOOTNOTE 2) of this title.

(FOOTNOTE 1) So in original. Probably should be section ''1677-1(a)''.

(FOOTNOTE 2) So in original. Probably should be section ''1677-1(c)''.

*U.S. Code as of: 01/22/02*

## Section 1671b. Preliminary determinations

Related Res
International T Guide
Export Controls
International La and Docur
Internationa Discuss

(a) Determination by Commission of reasonable indication of injury
  (1) General rule
    Except in the case of a petition dismissed by the administering authority under section 1671a(c)(3) of this title, the Commission, within the time specified in paragraph (2), shall determine, based on the information available to it at the time of the determination, whether there is a reasonable indication that -
      (A) an industry in the United States -
        (i) is materially injured, or
        (ii) is threatened with material injury, or
      (B) the establishment of an industry in the United States is materially retarded,
    by reason of imports of the subject merchandise and that imports of the subject merchandise are not negligible. If the Commission finds that imports of the subject merchandise are negligible or otherwise makes a negative determination under this paragraph, the investigation shall be terminated.
  (2) Time for Commission determination
    The Commission shall make the determination described in paragraph (1) -
      (A) in the case of a petition filed under section 1671a(b) of this title -
        (i) within 45 days after the date on which the petition is filed, or
        (ii) if the time has been extended pursuant to section 1671a(c)(1)(B) of this title, within 25 days after the date on which the Commission receives notice from the administering authority of initiation of the investigation, and
      (B) in the case of an investigation initiated under section 1671a(a) of this title, within 45 days after the date on which the Commission receives notice from the administering authority that an investigation has been initiated under such section.
(b) Preliminary determination by administering authority; expedited determinations; waiver of verification
  (1) Within 65 days after the date on which the administering authority initiates an investigation under section 1671a(c) of this title, or an investigation is initiated under section 1671a(a) of this title, but not before an affirmative determination by the Commission under subsection (a) of this section, the administering

authority shall make a determination, based upon the information available to it at the time of the determination, of whether there is a reasonable basis to believe or suspect that a countervailable subsidy is being provided with respect to the subject merchandise.

(2) Notwithstanding paragraph (1), when the petition is one subject to section 1671a(b)(3) of this title, the Administering Authority shall, taking into account the nature of the countervailable subsidy concerned, make the determination required by paragraph (1) on an expedited basis and within 65 days after the date on which the administering authority initiates an investigation under section 1671a(c) of this title unless the provisions of subsection (c) of this section apply.

(3) Within 55 days after the initiation of an investigation the administering authority shall cause an official designated for such purpose to review the information concerning the case received during the first 50 days of the investigation, and, if there appears to be sufficient information available upon which the determination can reasonably be based, to disclose to the petitioner and any interested party, then a party to the proceedings that requests such disclosure, all available nonconfidential information and all other information which is disclosed pursuant to section 1677f of this title. Within 3 days (not counting Saturdays, Sundays, or legal public holidays) after such disclosure, the petitioner and each party which is an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title to whom such disclosure was made may furnish to the administering authority an irrevocable written waiver of verification of the information received by the authority, and an agreement that it is willing to have a determination made on the basis of the record then available to the authority. If a timely waiver and agreement have been received from the petitioner and each party which is an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title to whom the disclosure was made, and the authority finds that sufficient information is then available upon which the preliminary determination can reasonably be based, a preliminary determination shall be made on an expedited basis on the basis of the record established during the first 50 days after the investigation was initiated.

(4) De minimis countervailable subsidy. -

(A) General rule. - In making a determination under this subsection, the administering authority shall disregard any de minimis countervailable subsidy. For purposes of the preceding sentence, a countervailable subsidy is de minimis if the administering authority determines that the aggregate of the net countervailable subsidies is less than 1 percent ad valorem or the equivalent specific rate for the subject merchandise.

(B) Exception for developing countries. - In the case of subject merchandise imported from a Subsidies Agreement country (other than a country to which subparagraph (C) applies) designated by the Trade Representative as a developing country in accordance with section 1677(36) of this title, a countervailable subsidy is de minimis if the administering authority determines that the aggregate of the net countervailable subsidies does not exceed 2 percent ad valorem or the equivalent specific rate for the subject merchandise.

(C) Certain other developing countries. - In the case of subject merchandise imported from a Subsidies Agreement country that is -

(i) a least developed country, as determined by the Trade

Representative in accordance with section 1677(36) of this title, or

(ii) a developing country with respect to which the Trade Representative has notified the administering authority that the country has eliminated its export subsidies on an expedited basis within the meaning of Article 27.11 of the Subsidies Agreement,

subparagraph (B) shall be applied by substituting ''3 percent'' for ''2 percent''.

(D) Limitations on application of subparagraph (C). -

(i) In general. - In the case of a country described in subparagraph (C)(i), the provisions of subparagraph (C) shall not apply after the date that is 8 years after the date the WTO Agreement enters into force.

(ii) Special rule for subparagraph (C)(ii) countries. - In the case of a country described in subparagraph (C)(ii), the provisions of subparagraph (C) shall not apply after the earlier of -

(I) the date that is 8 years after the date the WTO Agreement enters into force, or

(II) the date on which the Trade Representative notifies the administering authority that such country is providing an export subsidy.

(5) Notification of article 8 violation. - If the only subsidy under investigation is a subsidy with respect to which the administering authority received notice from the Trade Representative of a violation of Article 8 of the Subsidies Agreement, paragraph (1) shall be applied by substituting ''60 days'' for ''65 days''.

(c) Extension of period in extraordinarily complicated cases

(1) In general

If -

(A) the petitioner makes a timely request for an extension of the period within which the determination must be made under subsection (b) of this section, or

(B) the administering authority concludes that the parties concerned are cooperating and determines that -

(i) the case is extraordinarily complicated by reason of -

(I) the number and complexity of the alleged countervailable subsidy practices;

(II) the novelty of the issues presented;

(III) the need to determine the extent to which particular countervailable subsidies are used by individual manufacturers, producers, and exporters; or

(IV) the number of firms whose activities must be investigated; and

(ii) additional time is necessary to make the preliminary determination,

then the administering authority may postpone making the preliminary determination under subsection (b) of this section until not later than the 130th day after the date on which the administering authority initiates an investigation under section 1671a(c) of this title, or an investigation is initiated under section 1671a(a) of this title.

(2) Notice of postponement

The administering authority shall notify the parties to the investigation, not later than 20 days before the date on which the preliminary determination would otherwise be required under subsection (b) of this section, if it intends to postpone making the preliminary determination under paragraph (1). The

notification shall include an explanation of the reasons for the postponement. Notice of the postponement shall be published in the Federal Register.

(d) Effect of determination by the administering authority

If the preliminary determination of the administering authority under subsection (b) of this section is affirmative, the administering authority -

(1)(A) shall -

(i) determine an estimated individual countervailable subsidy rate for each exporter and producer individually investigated, and, in accordance with section 1671d(c)(5) of this title, an estimated all-others rate for all exporters and producers not individually investigated and for new exporters and producers within the meaning of section 1675(a)(2)(B) of this title, or

(ii) if section 1677f-1(e)(2)(B) of this title applies, determine a single estimated country-wide subsidy rate, applicable to all exporters and producers, and

(B) shall order the posting of a cash deposit, bond, or other security, as the administering authority deems appropriate, for each entry of the subject merchandise in an amount based on the estimated individual countervailable subsidy rate, the estimated all-others rate, or the estimated country-wide subsidy rate, whichever is applicable,

(2) shall order the suspension of liquidation of all entries of merchandise subject to the determination which are entered, or withdrawn from warehouse, for consumption on or after the later of -

(A) the date on which notice of the determination is published in the Federal Register, or

(B) the date that is 60 days after the date on which notice of the determination to initiate the investigation is published in the Federal Register, and

(3) shall make available to the Commission all information upon which its determination was based and which the Commission considers relevant to its injury determination, under such procedures as the administering authority and the Commission may establish to prevent disclosure, other than with the consent of the party providing it or under protective order, of any information to which confidential treatment has been given by the administering authority.

The instructions of the administering authority under paragraphs (1) and (2) may not remain in effect for more than 4 months.

(e) Critical circumstances determinations

(1) In general

If a petitioner alleges critical circumstances in its original petition, or by amendment at any time more than 20 days before the date of a final determination by the administering authority, then the administering authority shall promptly (at any time after the initiation of the investigation under this part) determine, on the basis of the information available to it at that time, whether there is a reasonable basis to believe or suspect that -

(A) the alleged countervailable subsidy is inconsistent with the Subsidies Agreement, and

(B) there have been massive imports of the subject merchandise over a relatively short period.

(2) Suspension of liquidation

If the determination of the administering authority under paragraph (1) is affirmative, then any suspension of liquidation ordered under subsection (d)(2) of this section shall apply, or,

if notice of such suspension of liquidation is already published, be amended to apply, to unliquidated entries of merchandise entered, or withdrawn from warehouse, for consumption on or after the later of -

(A) the date which is 90 days before the date on which the suspension of liquidation was first ordered, or

(B) the date on which notice of the determination to initiate the investigation is published in the Federal Register.

(f) Notice of determination

Whenever the Commission or the administering authority makes a determination under this section, the Commission or the administering authority, as the case may be, shall notify the petitioner, and other parties to the investigation, and the Commission or the administering authority (whichever is appropriate) of its determination. The administering authority shall include with such notification the facts and conclusions on which its determination is based. Not later than 5 days after the date on which the determination is required to be made under subsection (a)(2) of this section, the Commission shall transmit to the administering authority the facts and conclusions on which its determination is based.

(g) Time period where upstream subsidization is involved

(1) In general

Whenever the administering authority concludes prior to a preliminary determination under subsection (b) of this section, that there is a reasonable basis to believe or suspect that an upstream subsidy is being bestowed, the time period within which a preliminary determination must be made shall be extended to 250 days after the filing of a petition under section 1671a(b) of this title or initiation of an investigation under section 1671a(a) of this title (310 days in cases declared extraordinarily complicated under subsection (c) of this section), if the administering authority concludes that such additional time is necessary to make the required determination concerning upstream subsidization.

(2) Exceptions

Whenever the administering authority concludes, after a preliminary determination under subsection (b) of this section, that there is a reasonable basis to believe or suspect that an upstream subsidy is being bestowed -

(A) in cases in which the preliminary determination was negative, the time period within which a final determination must be made shall be extended to 165 or 225 days, as appropriate, under section 1671d(a)(1) of this title; or

(B) in cases in which the preliminary determination is affirmative, the determination concerning upstream subsidization -

(i) need not be made until the conclusion of the first annual review under section 1675 of this title of any eventual Countervailing Duty Order, or, at the option of the petitioner, or

(ii) will be made in the investigation and the time period within which a final determination must be made shall be extended to 165 or 225 days, as appropriate, under section 1671d(a)(1) of this title, as appropriate, (FOOTNOTE 1) except that the suspension of liquidation ordered in the preliminary determination shall terminate at the end of 120 days from the date of publication of that determination and not be resumed unless and until the publication of a Countervailing Duty Order under section 1671e(a) of this

title.

(FOOTNOTE 1) So in original. The words ''as appropriate,'' probably should not appear.

There may be an extension of time for the making of a final determination under this subsection only if the administering authority determines that such additional time is necessary to make the required determination concerning upstream subsidization.

Previous [Notes] Next

*U.S. Code as of: 01/22/02*

## Section 1673. Imposition of antidumping duties

Related Res

International T
Guide

Export Controls

International La
and Docur

Internationa
Discuss

```
    If -
      (1) the administering authority determines that a class or kind
    of foreign merchandise is being, or is likely to be, sold in the
    United States at less than its fair value, and
      (2) the Commission determines that -
        (A) an industry in the United States -
          (i) is materially injured, or
          (ii) is threatened with material injury, or
        (B) the establishment of an industry in the United States is
      materially retarded,
    by reason of imports of that merchandise or by reason of sales
    (or the likelihood of sales) of that merchandise for importation,
  then there shall be imposed upon such merchandise an antidumping
  duty, in addition to any other duty imposed, in an amount equal to
  the amount by which the normal value exceeds the export price (or
  the constructed export price) for the merchandise.  For purposes of
  this section and section 1673d(b)(1) of this title, a reference to
  the sale of foreign merchandise includes the entering into of any
  leasing arrangement regarding the merchandise that is equivalent to
  the sale of the merchandise.
```

**Previous** **[Notes]** **Next**

*U.S. Code as of: 01/22/02*

## Section 1677. Definitions; special rules

Related Res

International T Guide

Export Controls

International La and Docur

Internationa Discuss

```
For purposes of this subtitle -
(1) Administering authority
  The term ''administering authority'' means the Secretary of
Commerce, or any other officer of the United States to whom the
responsibility for carrying out the duties of the administering
authority under this subtitle are transferred by law.
(2) Commission
  The term ''Commission'' means the United States International
Trade Commission.
(3) Country
  The term ''country'' means a foreign country, a political
subdivision, dependent territory, or possession of a foreign
country, and, except for the purpose of antidumping proceedings,
may include an association of 2 or more foreign countries,
political subdivisions, dependent territories, or possessions of
countries into a customs union outside the United States.
(4) Industry
  (A) In general
    The term ''industry'' means the producers as a whole of a
  domestic like product, or those producers whose collective
  output of a domestic like product constitutes a major
  proportion of the total domestic production of the product.
  (B) Related parties
    (i) If a producer of a domestic like product and an exporter
  or importer of the subject merchandise are related parties, or
  if a producer of the domestic like product is also an importer
  of the subject merchandise, the producer may, in appropriate
  circumstances, be excluded from the industry.
    (ii) For purposes of clause (i), a producer and an exporter
  or importer shall be considered to be related parties, if -
      (I) the producer directly or indirectly controls the
    exporter or importer,
      (II) the exporter or importer directly or indirectly
    controls the producer,
      (III) a third party directly or indirectly controls the
    producer and the exporter or importer, or
      (IV) the producer and the exporter or importer directly or
    indirectly control a third party and there is reason to
    believe that the relationship causes the producer to act
    differently than a nonrelated producer.
  For purposes of this subparagraph, a party shall be considered
```

to directly or indirectly control another party if the party is legally or operationally in a position to exercise restraint or direction over the other party.

(C) Regional industries

In appropriate circumstances, the United States, for a particular product market, may be divided into 2 or more markets and the producers within each market may be treated as if they were a separate industry if -

(i) the producers within such market sell all or almost all of their production of the domestic like product in question in that market, and

(ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

In such appropriate circumstances, material injury, the threat of material injury, or material retardation of the establishment of an industry may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of that product, is not injured, if there is a concentration of dumped imports or imports of merchandise benefiting from a countervailable subsidy into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured or threatened by material injury, or if the establishment of an industry is being materially retarded, by reason of the dumped imports or imports of merchandise benefiting from a countervailable subsidy. The term ''regional industry'' means the domestic producers within a region who are treated as a separate industry under this subparagraph.

(D) Product lines

The effect of dumped imports or imports of merchandise benefiting from a countervailable subsidy shall be assessed in relation to the United States production of a domestic like product if available data permit the separate identification of production in terms of such criteria as the production process or the producer's profits. If the domestic production of the domestic like product has no separate identity in terms of such criteria, then the effect of the dumped imports or imports of merchandise benefiting from a countervailable subsidy shall be assessed by the examination of the production of the narrowest group or range of products, which includes a domestic like product, for which the necessary information can be provided.

(E) Industry producing processed agricultural products

(i) In general

Subject to clause (v), in an investigation involving a processed agricultural product produced from any raw agricultural product, the producers or growers of the raw agricultural product may be considered part of the industry producing the processed product if -

(I) the processed agricultural product is produced from the raw agricultural product through a single continuous line of production; and

(II) there is a substantial coincidence of economic interest between the producers or growers of the raw agricultural product and the processors of the processed agricultural product based upon relevant economic factors, which may, in the discretion of the Commission, include price, added market value, or other economic

interrelationships (regardless of whether such coincidence of economic interest is based upon any legal relationship).

(ii) Processing

For purposes of this subparagraph, the processed agricultural product shall be considered to be processed from a raw agricultural product through a single continuous line of production if -

(I) the raw agricultural product is substantially or completely devoted to the production of the processed agricultural product; and

(II) the processed agricultural product is produced substantially or completely from the raw product.

(iii) Relevant economic factors

For purposes of clause (i)(II), in addition to such other factors it considers relevant to the question of coincidence of economic interest, the Commission shall -

(I) if price is taken into account, consider the degree of correlation between the price of the raw agricultural product and the price of the processed agricultural product; and

(II) if added market value is taken into account, consider whether the value of the raw agricultural product constitutes a significant percentage of the value of the processed agricultural product.

(iv) Raw agricultural product

For purposes of this subparagraph, the term ''raw agricultural product'' means any farm or fishery product.

(v) Termination of this subparagraph

This subparagraph shall cease to have effect if the United States Trade Representative notifies the administering authority and the Commission that the application of this subparagraph is inconsistent with the international obligations of the United States.

(5) Countervailable subsidy

(A) In general

Except as provided in paragraph (5B), a countervailable subsidy is a subsidy described in this paragraph which is specific as described in paragraph (5A).

(B) Subsidy described

A subsidy is described in this paragraph in the case in which an authority -

(i) provides a financial contribution,

(ii) provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or

(iii) makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments,

to a person and a benefit is thereby conferred. For purposes of this paragraph and paragraphs (5A) and (5B), the term ''authority'' means a government of a country or any public entity within the territory of the country.

(C) Other factors

The determination of whether a subsidy exists shall be made without regard to whether the recipient of the subsidy is publicly or privately owned and without regard to whether the subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise. The administering

authority is not required to consider the effect of the subsidy in determining whether a subsidy exists under this paragraph.

(D) Financial contribution

The term ''financial contribution'' means -

(i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

(ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

(iii) providing goods or services, other than general infrastructure, or

(iv) purchasing goods.

(E) Benefit conferred

A benefit shall normally be treated as conferred where there is a benefit to the recipient, including -

(i) in the case of an equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made,

(ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market,

(iii) in the case of a loan guarantee, if there is a difference, after adjusting for any difference in guarantee fees, between the amount the recipient of the guarantee pays on the guaranteed loan and the amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, and

(iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

(F) Change in ownership

A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by the administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change in ownership is accomplished through an arm's length transaction.

(5A) Specificity

(A) In general

A subsidy is specific if it is an export subsidy described in subparagraph (B) or an import substitution subsidy described in subparagraph (C), or if it is determined to be specific pursuant to subparagraph (D).

(B) Export subsidy

An export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more

conditions.

(C) Import substitution subsidy

An import substitution subsidy is a subsidy that is contingent upon the use of domestic goods over imported goods, alone or as 1 of 2 or more conditions.

(D) Domestic subsidy

In determining whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy, the following guidelines shall apply:

(i) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law.

(ii) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if -

(I) eligibility is automatic,

(II) the criteria or conditions for eligibility are strictly followed, and

(III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.

For purposes of this clause, the term ''objective criteria or conditions'' means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.

(iii) Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist:

(I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.

(II) An enterprise or industry is a predominant user of the subsidy.

(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation.

(iv) Where a subsidy is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy, the subsidy is specific.

For purposes of this paragraph and paragraph (5B), any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries.

(5B) Categories of noncountervailable subsidies

(A) In general

Notwithstanding the provisions of paragraphs (5) and (5A), in the case of merchandise imported from a Subsidies Agreement country, a subsidy shall be treated as noncountervailable if the administering authority determines in an investigation under part I of this subtitle or a review under part III of this subtitle that the subsidy meets all of the criteria described in subparagraph (B), (C), or (D), as the case may be, or the provisions of subparagraph (E)(i) apply.

(B) Research subsidy

(i) In general

Except for a subsidy provided on the manufacture, production, or export of civil aircraft, a subsidy for research activities conducted by a person, or by a higher education or research establishment on a contract basis with a person, shall be treated as noncountervailable, if the subsidy covers not more than 75 percent of the costs of industrial research or not more than 50 percent of the costs of precompetitive development activity, and such subsidy is limited exclusively to -

(I) the costs of researchers, technicians, and other supporting staff employed exclusively in the research activity,

(II) the costs of instruments, equipment, land, or buildings that are used exclusively and permanently (except when disposed of on a commercial basis) for the research activity,

(III) the costs of consultancy and equivalent services used exclusively for the research activity, including costs for bought-in research, technical knowledge, and patents,

(IV) additional overhead costs incurred directly as a result of the research activity, and

(V) other operating costs (such as materials and supplies) incurred directly as a result of the research activity.

(ii) Definitions

For purposes of this subparagraph -

(I) Industrial research

The term ''industrial research'' means planned search or critical investigation aimed at the discovery of new knowledge, with the objective that such knowledge may be useful in developing new products, processes, or services, or in bringing about a significant improvement to existing products, processes, or services.

(II) Precompetitive development activity

The term ''precompetitive development activity'' means the translation of industrial research findings into a plan, blueprint, or design for new, modified, or improved products, processes, or services, whether intended for sale or use, including the creation of a first prototype that would not be capable of commercial use. The term also may include the conceptual formulation and design of products, processes, or services alternatives and initial demonstration or pilot projects, if these same projects cannot be converted or used for industrial application or commercial exploitation. The term does not include routine or periodic alterations to existing products, production lines, manufacturing processes, services, or other ongoing operations even if those alterations may represent improvements.

(iii) Calculation rules

(I) In general

In the case of a research activity that spans both industrial research and precompetitive development activity, the allowable level of the noncountervailable subsidy shall not exceed 62.5 percent of the costs set forth in subclauses (I), (II), (III), (IV), and (V) of clause (i).

(II) Total eligible costs

The allowable level of a noncountervailable subsidy described in clause (i) shall be based on the total eligible costs incurred over the duration of a particular project.

(C) Subsidy to disadvantaged regions

(i) In general

A subsidy provided, pursuant to a general framework of regional development, to a person located in a disadvantaged region within a country shall be treated as noncountervailable, if it is not specific (within the meaning of paragraph (5A)) within eligible regions and if the following conditions are met:

(I) Each region identified as disadvantaged within the territory of a country is a clearly designated, contiguous geographical area with a definable economic and administrative identity.

(II) Each region is considered a disadvantaged region on the basis of neutral and objective criteria indicating that the region is disadvantaged because of more than temporary circumstances, and such criteria are clearly stated in the relevant statute, regulation, or other official document so as to be capable of verification.

(III) The criteria described in subclause (II) include a measurement of economic development.

(IV) Programs provided within a general framework of regional development include ceilings on the amount of assistance that can be granted to a subsidized project. Such ceilings are differentiated according to the different levels of development of assisted regions, and are expressed in terms of investment costs or costs of job creation. Within such ceilings, the distribution of assistance is sufficiently broad and even to avoid the predominant use of a subsidy by, or the provision of disproportionately large amounts of a subsidy to, an enterprise or industry as described in paragraph (5A)(D).

(ii) Measurement of economic development

For purposes of clause (i), the measurement of economic development shall be based on one or more of the following factors:

(I) Per capita income, household per capita income, or per capita gross domestic product that does not exceed 85 percent of the average for the country subject to investigation or review.

(II) An unemployment rate that is at least 110 percent of the average unemployment rate for the country subject to investigation or review.

The measurement of economic development shall cover a 3-year period, but may be a composite measurement and may include factors other than those set forth in this clause.

(iii) Definitions

For purposes of this subparagraph -

(I) General framework of regional development

The term ''general framework of regional development'' means that the regional subsidy programs are part of an internally consistent and generally applicable regional development policy, and that regional development subsidies are not granted in isolated geographical points having no, or virtually no, influence on the development of a region.

(II) Neutral and objective criteria

The term ''neutral and objective criteria'' means criteria that do not favor certain regions beyond what is appropriate for the elimination or reduction of regional disparities within the framework of the regional development policy.

(D) Subsidy for adaptation of existing facilities to new environmental requirements

(i) In general

A subsidy that is provided to promote the adaptation of existing facilities to new environmental requirements that are imposed by statute or by regulation, and that result in greater constraints and financial burdens on the recipient of the subsidy, shall be treated as noncountervailable, if the subsidy -

(I) is a one-time nonrecurring measure,

(II) is limited to 20 percent of the cost of adaptation,

(III) does not cover the cost of replacing and operating the subsidized investment, a cost that must be fully borne by the recipient,

(IV) is directly linked and proportionate to the recipient's planned reduction of nuisances and pollution, and does not cover any manufacturing cost savings that may be achieved, and

(V) is available to all persons that can adopt the new equipment or production processes.

(ii) Existing facilities

For purposes of this subparagraph, the term ''existing facilities'' means facilities that have been in operation for at least 2 years before the date on which the new environmental requirements are imposed.

(E) Notified subsidy program

(i) General rule

If a subsidy is provided pursuant to a program that has been notified in accordance with Article 8.3 of the Subsidies Agreement, the subsidy shall be treated as noncountervailable and shall not be subject to investigation or review under this subtitle.

(ii) Exception

Notwithstanding clause (i), a subsidy shall be treated as countervailable if -

(I) the Trade Representative notifies the administering authority that a determination has been made pursuant to Article 8.4 or 8.5 of the Subsidies Agreement that the subsidy, or the program pursuant to which the subsidy was provided, does not satisfy the conditions and criteria of Article 8.2 of the Subsidies Agreement; and

(II) the subsidy is specific within the meaning of paragraph (5A).

(F) Certain subsidies on agricultural products

Domestic support measures that are provided with respect to products listed in Annex 1 to the Agreement on Agriculture, and that the administering authority determines conform fully to the provisions of Annex 2 to that Agreement, shall be treated

as noncountervailable. Upon request by the administering authority, the Trade Representative shall provide advice regarding the interpretation and application of Annex 2.

(G) Provisional application

(i) Subparagraphs (B), (C), (D), and (E) shall not apply on or after the first day of the month that is 66 months after the WTO Agreement enters into force, unless the provisions of such subparagraphs are extended pursuant to section 3572(c) of this title.

(ii) Subparagraph (F) shall not apply to imports from a WTO member country at the end of the 9-year period beginning on January 1, 1995. The Trade Representative shall determine the precise termination date for each WTO member country in accordance with paragraph (i) of Article 1 of the Agreement on Agriculture and such date shall be notified to the administering authority.

(6) Net countervailable subsidy

For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of -

(A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,

(B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and

(C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

(7) Material injury

(A) In general

The term ''material injury'' means harm which is not inconsequential, immaterial, or unimportant.

(B) Volume and consequent impact

In making determinations under sections 1671b(a), 1671d(b), 1673b(a), and 1673d(b) of this title, the Commission, in each case -

(i) shall consider -

(I) the volume of imports of the subject merchandise,

(II) the effect of imports of that merchandise on prices in the United States for domestic like products, and

(III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States; and

(ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

In the notification required under section 1671d(d) or 1673d(d) of this title, as the case may be, the Commission shall explain its analysis of each factor considered under clause (i), and identify each factor considered under clause (ii) and explain in full its relevance to the determination.

(C) Evaluation of relevant factors

For purposes of subparagraph (B) -

(i) Volume

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in

the United States, is significant.

(ii) Price

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether -

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

(iii) Impact on affected domestic industry

In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to -

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

(iv) Captive production

If domestic producers internally transfer significant production of the domestic like product for the production of a downstream article and sell significant production of the domestic like product in the merchant market, and the Commission finds that -

(I) the domestic like product produced that is internally transferred for processing into that downstream article does not enter the merchant market for the domestic like product,

(II) the domestic like product is the predominant material input in the production of that downstream article, and

(III) the production of the domestic like product sold in the merchant market is not generally used in the production of that downstream article,

then the Commission, in determining market share and the factors affecting financial performance set forth in clause (iii), shall focus primarily on the merchant market for the domestic like product.

(D) Special rules for agricultural products

(i) The Commission shall not determine that there is no material injury or threat of material injury to United States producers of an agricultural commodity merely because the prevailing market price is at or above the minimum support price.

(ii) In the case of agricultural products, the Commission shall consider any increased burden on government income or price support programs.

(E) Special rules

For purposes of this paragraph -

(i) Nature of countervailable subsidy

In determining whether there is a threat of material injury, the Commission shall consider information provided to it by the administering authority regarding the nature of the countervailable subsidy granted by a foreign country (particularly whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement) and the effects likely to be caused by the countervailable subsidy.

(ii) Standard for determination

The presence or absence of any factor which the Commission is required to evaluate under subparagraph (C) or (D) shall not necessarily give decisive guidance with respect to the determination by the Commission of material injury.

(F) Threat of material injury

(i) In general

In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise, the Commission shall consider, among other relevant economic factors -

(I) if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement), and whether imports of the subject merchandise are likely to increase,

(II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

(VII) in any investigation under this subtitle which involves imports of both a raw agricultural product (within the meaning of paragraph (4)(E)(iv)) and any product processed from such raw agricultural product, the likelihood that there will be increased imports, by reason of product shifting, if there is an affirmative determination by the Commission under section 1671d(b)(1)

or 1673d(b)(1) of this title with respect to either the raw agricultural product or the processed agricultural product (but not both),

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

(ii) Basis for determination

The Commission shall consider the factors set forth in clause (i) as a whole in making a determination of whether further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted under this subtitle. The presence or absence of any factor which the Commission is required to consider under clause (i) shall not necessarily give decisive guidance with respect to the determination. Such a determination may not be made on the basis of mere conjecture or supposition.

(iii) Effect of dumping in third-country markets

(I) In general

In investigations under part II of this subtitle, the Commission shall consider whether dumping in the markets of foreign countries (as evidenced by dumping findings or antidumping remedies in other WTO member markets against the same class or kind of merchandise manufactured or exported by the same party as under investigation) suggests a threat of material injury to the domestic industry. In the course of its investigation, the Commission shall request information from the foreign manufacturer, exporter, or United States importer concerning this issue.

(II) WTO member market

For purposes of this clause, the term ''WTO member market'' means the market of any country which is a WTO member.

(III) European Communities

For purposes of this clause, the European Communities shall be treated as a foreign country.

(G) Cumulation for determining material injury

(i) In general

For purposes of clauses (i) and (ii) of subparagraph (C), and subject to clause (ii), the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which -

(I) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,

(II) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or

(III) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,

if such imports compete with each other and with domestic like products in the United States market.

(ii) Exceptions

The Commission shall not cumulatively assess the volume and

effect of imports under clause (i) -

(I) with respect to which the administering authority has made a preliminary negative determination, unless the administering authority subsequently made a final affirmative determination with respect to those imports before the Commission's final determination is made;

(II) from any country with respect to which the investigation has been terminated;

(III) from any country designated as a beneficiary country under the Caribbean Basin Economic Recovery Act (19 U.S.C. 2701 et seq.) for purposes of making a determination with respect to that country, except that the volume and effect of imports of the subject merchandise from such country may be cumulatively assessed with imports of the subject merchandise from any other country designated as such a beneficiary country to the extent permitted by clause (i); or

(IV) from any country that is a party to an agreement with the United States establishing a free trade area, which entered into force and effect before January 1, 1987, unless the Commission determines that a domestic industry is materially injured or threatened with material injury by reason of imports from that country.

(iii) Records in final investigations

In each final determination in which it cumulatively assesses the volume and effect of imports under clause (i), the Commission shall make its determinations based on the record compiled in the first investigation in which it makes a final determination, except that when the administering authority issues its final determination in a subsequently completed investigation, the Commission shall permit the parties in the subsequent investigation to submit comments concerning the significance of the administering authority's final determination, and shall include such comments and the administering authority's final determination in the record for the subsequent investigation.

(iv) Regional industry determinations

In an investigation which involves a regional industry, and in which the Commission decides that the volume and effect of imports should be cumulatively assessed under this subparagraph, such assessment shall be based upon the volume and effect of imports into the region or regions determined by the Commission. The provisions of clause (iii) shall apply to such investigations.

(H) Cumulation for determining threat of material injury

To the extent practicable and subject to subparagraph (G)(ii), for purposes of clause (i)(III) and (IV) of subparagraph (F), the Commission may cumulatively assess the volume and price effects of imports of the subject merchandise from all countries with respect to which -

(i) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,

(ii) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or

(iii) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,

if such imports compete with each other and with domestic like products in the United States market.

(I) Consideration of post-petition information

The Commission shall consider whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation under part I or II of this subtitle is related to the pendency of the investigation and, if so, the Commission may reduce the weight accorded to the data for the period after the filing of the petition in making its determination of material injury, threat of material injury, or material retardation of the establishment of an industry in the United States.

(8) Subsidies Agreement; Agreement on Agriculture

(A) Subsidies Agreement

The term ''Subsidies Agreement'' means the Agreement on Subsidies and Countervailing Measures referred to in section 3511(d)(12) of this title.

(B) Agreement on Agriculture

The term ''Agreement on Agriculture'' means the Agreement on Agriculture referred to in section 3511(d)(2) of this title.

(9) Interested party

The term ''interested party'' means -

(A) a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise,

(B) the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported,

(C) a manufacturer, producer, or wholesaler in the United States of a domestic like product,

(D) a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product,

(E) a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States,

(F) an association, a majority of whose members is composed of interested parties described in subparagraph (C), (D), or (E) with respect to a domestic like product, and

(G) in any investigation under this subtitle involving an industry engaged in producing a processed agricultural product, as defined in paragraph (4)(E), a coalition or trade association which is representative of either -

(i) processors,

(ii) processors and producers, or

(iii) processors and growers,

but this subparagraph shall cease to have effect if the United States Trade Representative notifies the administering authority and the Commission that the application of this subparagraph is inconsistent with the international obligations of the United States.

(10) Domestic like product

The term ''domestic like product'' means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle.

(11) Affirmative determinations by divided Commission

If the Commissioners voting on a determination by the Commission, including a determination under section 1675 of this

title, are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination. For the purpose of applying this paragraph when the issue before the Commission is to determine whether there is -

(A) material injury to an industry in the United States,

(B) threat of material injury to such an industry, or

(C) material retardation of the establishment of an industry in the United States,

by reason of imports of the merchandise, an affirmative vote on any of the issues shall be treated as a vote that the determination should be affirmative.

(12) Attribution of merchandise to country of manufacture or production

For purposes of part I of this subtitle, merchandise shall be treated as the product of the country in which it was manufactured or produced without regard to whether it is imported directly from that country and without regard to whether it is imported in the same condition as when exported from that country or in a changed condition by reason of remanufacture or otherwise.

(13) Repealed. Pub. L. 103-465, title II, Sec. 222(i)(2), Dec. 8, 1994, 108 Stat. 4876

(14) Sold or, in the absence of sales, offered for sale

The term ''sold or, in the absence of sales, offered for sale'' means sold or, in the absence of sales, offered -

(A) to all purchasers in commercial quantities, or

(B) in the ordinary course of trade to one or more selected purchasers in commercial quantities at a price which fairly reflects the market value of the merchandise,

without regard to restrictions as to the disposition or use of the merchandise by the purchaser except that, where such restrictions are found to affect the market value of the merchandise, adjustment shall be made therefor in calculating the price at which the merchandise is sold or offered for sale.

(15) Ordinary course of trade

The term ''ordinary course of trade'' means the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:

(A) Sales disregarded under section 1677b(b)(1) of this title.

(B) Transactions disregarded under section 1677b(f)(2) of this title.

(16) Foreign like product

The term ''foreign like product'' means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise -

(i) produced in the same country and by the same person as the subject merchandise,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.
(C) Merchandise -
(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
(ii) like that merchandise in the purposes for which used, and
(iii) which the administering authority determines may reasonably be compared with that merchandise.
(17) Usual commercial quantities
The term ''usual commercial quantities'', in any case in which the subject merchandise is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.
(18) Nonmarket economy country
(A) In general
The term ''nonmarket economy country'' means any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise.
(B) Factors to be considered
In making determinations under subparagraph (A) the administering authority shall take into account -
(i) the extent to which the currency of the foreign country is convertible into the currency of other countries; (FOOTNOTE 1)
(FOOTNOTE 1) So in original. The semicolon probably should be a comma.
(ii) the extent to which wage rates in the foreign country are determined by free bargaining between labor and management,
(iii) the extent to which joint ventures or other investments by firms of other foreign countries are permitted in the foreign country,
(iv) the extent of government ownership or control of the means of production,
(v) the extent of government control over the allocation of resources and over the price and output decisions of enterprises, and
(vi) such other factors as the administering authority considers appropriate.
(C) Determination in effect
(i) Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority.
(ii) The administering authority may make a determination under subparagraph (A) with respect to any foreign country at any time.
(D) Determinations not in issue
Notwithstanding any other provision of law, any determination made by the administering authority under subparagraph (A) shall not be subject to judicial review in any investigation conducted under part II of this subtitle.
(E) Collection of information
Upon request by the administering authority, the Commissioner of Customs shall provide the administering authority a copy of

all public and proprietary information submitted to, or obtained by, the Commissioner of Customs that the administering authority considers relevant to proceedings involving merchandise from nonmarket economy countries. The administering authority shall protect proprietary information obtained under this section from public disclosure in accordance with section 1677f of this title.

(19) Equivalency of leases to sales

In determining whether a lease is equivalent to a sale for purposes of this subtitle, the administering authority shall consider -

(A) the terms of the lease,

(B) commercial practice within the industry,

(C) the circumstances of the transaction,

(D) whether the product subject to the lease is integrated into the operations of the lessee or importer,

(E) whether in practice there is a likelihood that the lease will be continued or renewed for a significant period of time, and

(F) other relevant factors, including whether the lease transaction would permit avoidance of antidumping or countervailing duties.

(20) Application to governmental importations

(A) In general

Except as otherwise provided by this paragraph, merchandise imported by, or for the use of, a department or agency of the United States Government (including merchandise provided for under chapter 98 of the Harmonized Tariff Schedule of the United States) is subject to the imposition of countervailing duties or antidumping duties under this subtitle or section 1303 of this title.

(B) Exceptions

Merchandise imported by, or for the use of, the Department of Defense shall not be subject to the imposition of countervailing or antidumping duties under this subtitle if -

(i) the merchandise is acquired by, or for use of, such Department -

(I) from a country with which such Department had a Memorandum of Understanding which was in effect on January 1, 1988, and has continued to have a comparable agreement (including renewals) or superceding agreements, and

(II) in accordance with terms of the Memorandum of Understanding in effect at the time of importation, or

(ii) the merchandise has no substantial nonmilitary use.

(21) United States-Canada Agreement

The term ''United States-Canada Agreement'' means the United States-Canada Free-Trade Agreement.

(22) NAFTA

The term ''NAFTA'' means the North American Free Trade Agreement.

(23) Entry

The term ''entry'' includes, in appropriate circumstances as determined by the administering authority, a reconciliation entry created under a reconciliation process, defined in section 1401(s) of this title, that is initiated by an importer. The liability of an importer under an antidumping or countervailing duty proceeding for entries of merchandise subject to the proceeding will attach to the corresponding reconciliation entry or entries. Suspension of liquidation of the reconciliation entry or entries, for the purpose of enforcing this subtitle, is

equivalent to the suspension of liquidation of the corresponding individual entries; but the suspension of liquidation of the reconciliation entry or entries for such purpose does not preclude liquidation for any other purpose.

(24) Negligible imports

(A) In general

(i) Less than 3 percent

Except as provided in clauses (ii) and (iv), imports from a country of merchandise corresponding to a domestic like product identified by the Commission are ''negligible'' if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available that precedes -

(I) the filing of the petition under section 1671a(b) or 1673a(b) of this title, or

(II) the initiation of the investigation, if the investigation was initiated under section 1671a(a) or 1673a(a) of this title.

(ii) Exception

Imports that would otherwise be negligible under clause (i) shall not be negligible if the aggregate volume of imports of the merchandise from all countries described in clause (i) with respect to which investigations were initiated on the same day exceeds 7 percent of the volume of all such merchandise imported into the United States during the applicable 12-month period.

(iii) Determination of aggregate volume

In determining aggregate volume under clause (ii) or (iv), the Commission shall not consider imports from any country specified in paragraph (7)(G)(ii).

(iv) Negligibility in threat analysis

Notwithstanding clauses (i) and (ii), the Commission shall not treat imports as negligible if it determines that there is a potential that imports from a country described in clause (i) will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States, or that the aggregate volumes of imports from all countries described in clause (ii) will imminently exceed 7 percent of the volume of all such merchandise imported into the United States. The Commission shall consider such imports only for purposes of determining threat of material injury.

(B) Negligibility for certain countries in countervailing duty investigations

In the case of an investigation under section 1671 of this title, subparagraph (A) shall be applied to imports of subject merchandise from developing countries by substituting ''4 percent'' for ''3 percent'' in subparagraph (A)(i) and by substituting ''9 percent'' for ''7 percent'' in subparagraph (A)(ii).

(C) Computation of import volumes

In computing import volumes for purposes of subparagraphs (A) and (B), the Commission may make reasonable estimates on the basis of available statistics.

(D) Regional industries

In an investigation in which the Commission makes a regional industry determination under paragraph (4)(C), the Commission's examination under subparagraphs (A) and (B) shall be based upon the volume of subject merchandise exported for sale in the regional market in lieu of the volume of all subject

merchandise imported into the United States.

(25) Subject merchandise

The term ''subject merchandise'' means the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921.

(26) Section 1303

The terms ''section 1303'' and ''1303'' mean section 1303 of this title as in effect on the day before the effective date of title II of the Uruguay Round Agreements Act.

(27) Suspension agreement

The term ''suspension agreement'' means an agreement described in section 1671c(b), 1671c(c), 1673c(b), 1673c(c), or 1673c(l) of this title.

(28) Exporter or producer

The term ''exporter or producer'' means the exporter of the subject merchandise, the producer of the subject merchandise, or both where appropriate. For purposes of section 1677b of this title, the term ''exporter or producer'' includes both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise.

(29) WTO Agreement

The term ''WTO Agreement'' means the Agreement defined in section 3501(9) of this title.

(30) WTO member and WTO member country

The terms ''WTO member'' and ''WTO member country'' mean a state, or separate customs territory (within the meaning of Article XII of the WTO Agreement), with respect to which the United States applies the WTO Agreement.

(31) GATT 1994

The term ''GATT 1994'' means the General Agreement on Tariffs and Trade annexed to the WTO Agreement.

(32) Trade representative

The term ''Trade Representative'' means the United States Trade Representative.

(33) Affiliated persons

The following persons shall be considered to be ''affiliated'' or ''affiliated persons'':

(A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.

(B) Any officer or director of an organization and such organization.

(C) Partners.

(D) Employer and employee.

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

(G) Any person who controls any other person and such other person.

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other

person.

(34) Dumped; dumping

The terms ''dumped'' and ''dumping'' refer to the sale or likely sale of goods at less than fair value.

(35) Dumping margin; weighted average dumping margin

(A) Dumping margin

The term ''dumping margin'' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise.

(B) Weighted average dumping margin

The term ''weighted average dumping margin'' is the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer.

(C) Magnitude of the margin of dumping

The magnitude of the margin of dumping used by the Commission shall be -

(i) in making a preliminary determination under section 1673b(a) of this title in an investigation (including any investigation in which the Commission cumulatively assesses the volume and effect of imports under paragraph (7)(G)(i)), the dumping margin or margins published by the administering authority in its notice of initiation of the investigation;

(ii) in making a final determination under section 1673d(b) of this title, the dumping margin or margins most recently published by the administering authority prior to the closing of the Commission's administrative record;

(iii) in a review under section 1675(b)(2) of this title, the most recent dumping margin or margins determined by the administering authority under section 1675a(c)(3) of this title, if any, or under section 1673b(b) or 1673d(a) of this title; and

(iv) in a review under section 1675(c) of this title, the dumping margin or margins determined by the administering authority under section 1675a(c)(3) of this title.

(36) Developing and least developed country

(A) Developing country

The term ''developing country'' means a country designated as a developing country by the Trade Representative.

(B) Least developed country

The term ''least developed country'' means a country which the Trade Representative determines is -

(i) a country referred to as a least developed country within the meaning of paragraph (a) of Annex VII to the Subsidies Agreement, or

(ii) any other country listed in Annex VII to the Subsidies Agreement, but only if the country has a per capita gross national product of less than $1,000 per annum as measured by the most recent data available from the World Bank.

(C) Publication of list

The Trade Representative shall publish in the Federal Register, and update as necessary, a list of -

(i) developing countries that have eliminated their export subsidies on an expedited basis within the meaning of Article 27.11 of the Subsidies Agreement, and

(ii) countries determined by the Trade Representative to be least developed or developing countries.

(D) Factors to consider

In determining whether a country is a developing country

under subparagraph (A), the Trade Representative shall consider such economic, trade, and other factors which the Trade Representative considers appropriate, including the level of economic development of such country (the assessment of which shall include a review of the country's per capita gross national product) and the country's share of world trade.

(E) Limitation on designation

A determination that a country is a developing or least developed country pursuant to this paragraph shall be for purposes of this subtitle only and shall not affect the determination of a country's status as a developing or least developed country with respect to any other law.

Previous [Notes] Next

Search Title 28



*U.S. Code as of: 01/22/02*

**Section 1491. Claims against United States generally; actions involving Tennessee Valley Authority**

Related Res

Judiciary Leg

Litigation Leg

U.S. Legal S
Summa

Judiciary Dis

(a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

(b)(1) Both the Unites (FOOTNOTE 1) States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(FOOTNOTE 1) So in original. Probably should be ''United''.

(2) To afford relief in such an action, the courts may award any

relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

(c) Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade, or of any action against, or founded on conduct of, the Tennessee Valley Authority, or to amend or modify the provisions of the Tennessee Valley Authority Act of 1933 with respect to actions by or against the Authority.

[Notes] Next

*U.S. Code as of: 01/22/02*

**Section 1581. Civil actions against the United States and agencies and officers thereof**

Related Res

Judiciary Leg

Litigation Leg

U.S. Legal S
Summa

Judiciary Dis

(a) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.

(b) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516 of the Tariff Act of 1930.

(c) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930.

(d) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review -

(1) any final determination of the Secretary of Labor under section 223 of the Trade Act of 1974 with respect to the eligibility of workers for adjustment assistance under such Act;

(2) any final determination of the Secretary of Commerce under section 251 of the Trade Act of 1974 with respect to the eligibility of a firm for adjustment assistance under such Act; and

(3) any final determination of the Secretary of Commerce under section 271 of the Trade Act of 1974 with respect to the eligibility of a community for adjustment assistance under such Act.

(e) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review any final determination of the Secretary of the Treasury under section 305(b)(1) of the Trade Agreements Act of 1979.

(f) The Court of International Trade shall have exclusive jurisdiction of any civil action involving an application for an order directing the administering authority or the International Trade Commission to make confidential information available under section 777(c)(2) of the Tariff Act of 1930.

(g) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review -

(1) any decision of the Secretary of the Treasury to deny a customs broker's license under section 641(b)(2) or (3) of the Tariff Act of 1930, or to deny a customs broker's permit under section 641(c)(1) of such Act, or to revoke a license or permit under section 641(b)(5) or (c)(2) of such Act;

(2) any decision of the Secretary of the Treasury to revoke or suspend a customs broker's license or permit, or impose a

monetary penalty in lieu thereof, under section 641(d)(2)(B) of the Tariff Act of 1930; and

(3) any decision or order of the Customs Service to deny, suspend, or revoke accreditation of a private laboratory under section 499(b) of the Tariff Act of 1930.

(h) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

(i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for -

(1) revenue from imports or tonnage;

(2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

(3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section.

This subsection shall not confer jurisdiction over an antidumping or countervailing duty determination which is reviewable either by the Court of International Trade under section 516A(a) of the Tariff Act of 1930 or by a binational panel under article 1904 of the North American Free Trade Agreement or the United States-Canada Free-Trade Agreement and section 516A(g) of the Tariff Act of 1930.

(j) The Court of International Trade shall not have jurisdiction of any civil action arising under section 305 of the Tariff Act of 1930.

[Notes] Next

*U.S. Code as of: 01/22/02*

## Section 1582. Civil actions commenced by the United States

The Court of International Trade shall have exclusive jurisdiction of any civil action which arises out of an import transaction and which is commenced by the United States -

(1) to recover a civil penalty under section 592, 593A, 641(b)(6), 641(d)(2)(A), 704(i)(2), or 734(i)(2) of the Tariff Act of 1930;

(2) to recover upon a bond relating to the importation of merchandise required by the laws of the United States or by the Secretary of the Treasury; or

(3) to recover customs duties.

Related Resou

Judiciary Legal

Litigation Legal

U.S. Legal Sys
Summary

Judiciary Discu

Previous [Notes] Next

**Laws: Cases and Codes : U.S. Code : Title 28 : Section 2636**

Search Title 28

- United States Code
  - TITLE 28 - JUDICIARY AND JUDICIAL PROCEDURE
    - PART VI - PARTICULAR PROCEEDINGS
      - CHAPTER 169 - COURT OF INTERNATIONAL TRADE PROCEDURE

*U.S. Code as of: 01/22/02*

## Section 2636. Time for commencement of action

Related Res

Judiciary Leg

Litigation Leg

U.S. Legal S Summa

Judiciary Dis

(a) A civil action contesting the denial, in whole or in part, of a protest under section 515 of the Tariff Act of 1930 is barred unless commenced in accordance with the rules of the Court of International Trade -

(1) within one hundred and eighty days after the date of mailing of notice of denial of a protest under section 515(a) of such Act; or

(2) within one hundred and eighty days after the date of denial of a protest by operation of law under the provisions of section 515(b) of such Act.

(b) A civil action contesting the denial of a petition under section 516 of the Tariff Act of 1930 is barred unless commenced in accordance with the rules of the Court of International Trade within thirty days after the date of mailing of a notice pursuant to section 516(c) of such Act.

(c) A civil action contesting a reviewable determination listed in section 516A of the Tariff Act of 1930 is barred unless commenced in accordance with the rules of the Court of International Trade within the time specified in such section.

(d) A civil action contesting a final determination of the Secretary of Labor under section 223 of the Trade Act of 1974 or a final determination of the Secretary of Commerce under section 251 or section 271 of such Act is barred unless commenced in accordance with the rules of the Court of International Trade within sixty days after the date of notice of such determination.

(e) A civil action contesting a final determination made under section 305(b)(1) of the Trade Agreements Act of 1979 is barred unless commenced in accordance with the rules of the Court of International Trade within thirty days after the date of the publication of such determination in the Federal Register.

(f) A civil action involving an application for the issuance of an order making confidential information available under section 777(c)(2) of the Tariff Act of 1930 is barred unless commenced in accordance with the rules of the Court of International Trade within ten days after the date of the denial of the request for such confidential information.

(g) A civil action contesting the denial or revocation by the Secretary of the Treasury of a customs broker's license or permit under subsection (b) or (c) of section 641 of the Tariff Act of 1930, or the revocation or suspension of such license or permit or the imposition of a monetary penalty in lieu thereof by such Secretary under section 641(d) of such Act, is barred unless

commenced in accordance with the rules of the Court of International Trade within sixty days after the date of the entry of the decision or order of such Secretary.

(h) A civil action contesting the denial, suspension, or revocation by the Customs Service of a private laboratory's accreditation under section 499(b) of the Tariff Act of 1930 is barred unless commenced in accordance with the rules of the Court of International Trade within 60 days after the date of the decision or order of the Customs Service.

(i) A civil action of which the Court of International Trade has jurisdiction under section 1581 of this title, other than an action specified in subsections (a)-(h) of this section, is barred unless commenced in accordance with the rules of the court within two years after the cause of action first accrues.

Previous [Notes] Next

# SECTION IX

## WOOD AND ARTICLES OF WOOD; WOOD CHARCOAL; CORK AND ARTICLES OF CORK; MANUFACTURES OF STRAW, OF ESPARTO OR OF OTHER PLAITING MATERIALS; BASKETWARE AND WICKERWORK

# CHAPTER 44

## WOOD AND ARTICLES OF WOOD; WOOD CHARCOAL



Notes

1. This chapter does not cover:

(a) Wood, in chips, in shavings, crushed, ground or powdered, of a kind used primarily in perfumery, in pharmacy, or for insecticidal, fungicidal or similar purposes (heading 1211);

(b) Bamboo or other materials of a woody nature of a kind used primarily for plaiting, in the rough, whether or not split, sawn lengthwise or cut to length (heading 1401);

(c) Wood, in chips, in shavings, ground or powdered, of a kind used primarily in dyeing or in tanning (heading 1404);

(d) Activated charcoal (heading 3802);

(e) Articles of heading 4202;

(f) Goods of chapter 46;

(g) Footwear or parts thereof of chapter 64;

(h) Goods of chapter 66 (for example, umbrellas and walking-sticks and parts thereof);

(ij) Goods of heading 6808;

(k) Imitation jewelry of heading 7117;

(l) Goods of section XVI or section XVII (for example, machine parts, cases, covers, cabinets for machines and apparatus and wheelwrights' wares);

(m) Goods of section XVIII (for example, clock cases and musical instruments and parts thereof);

(n) Parts of firearms (heading 9305);

(o) Articles of chapter 94 (for example, furniture, lamps and lighting fittings, prefabricated buildings);

(p) Articles of chapter 95 (for example, toys, games, sports equipment);

(q) Articles of chapter 96 (for example, smoking pipes and parts thereof, buttons, pencils) excluding bodies and handles, of wood, for articles of heading 9603; or

(r) Articles of chapter 97 (for example, works of art).

2. In this chapter, the expression "densified wood" means wood which has been subjected to chemical or physical treatment (being, in the case of layers bonded together, treatment in excess of that needed to insure a good bond), and which has thereby acquired increased density or hardness together with improved mechanical strength or resistance to chemical or electrical agencies.

3. Headings 4414 to 4421 apply to articles of the respective descriptions of particle board or similar board, fiberboard, laminated wood or densified wood as they apply to such articles of wood.

4. Products of heading 4410, 4411 or 4412 may be worked to form the shapes provided for in respect of the articles of heading 4409, curved, corrugated, perforated, cut or formed to shapes other than square or rectangular or submitted to any other operation provided it does not give them the character of articles of other headings.

5. Heading 4417 does not apply to tools in which the blade, working edge, working surface or other working part is formed by any of the materials specified in note 1 to chapter 82.

6. Subject to note 1 above and except where the context otherwise requires, any reference to "wood" in a heading of this chapter applies also to bamboo and other materials of a woody nature.

IX
44-2

Subheading Note

1. For the purposes of subheadings 4403.41 to 4403.49, 4407.24 to 4407.29, 4408.31 to 4408.39 and 4412.13 to 4412.99, the expression “tropical wood” means one of the following types of wood :
Abura, Acajou d'Afrique, Afrormosia, Ako, Alan, Andiroba, Aningré, Avodiré, Azobé, Balau, Balsa, Bossé clair, Bossé foncé, Cativo, Cedro, Dabema, Dark Red Meranti, Dibétou, Doussié, Framiré, Freijo, Fromager, Fuma, Geronggang, Ilomba, Imbuia, Ipé, Iroko, Jaboty, Jelutong, Jequitiba, Jongkong, Kapur, Kempas, Keruing, Kosipo, Kotibé, Koto, Light Red Meranti, Limba, Louro, Maçaranduba, Mahogany, Makoré, Mandioqueira, Mansonia, Mengkulang, Meranti Bakau, Merawan, Merbau, Merpauh, Mersawa, Moabi, Niangon, Nyatoh, Obeche, Okoumé, Onzabili, Orey, Ovengkol, Ozigo, Padauk, Paldao, Palissandre de Guatemala, Palissandre de Para, Palissandre de Rio, Palissandre de Rose, Pau Amarelo, Pau Marfim, Pulai, Punah, Quaruba, Ramin, Sapelli, Saqui-Saqui, Sepetir, Sipo, Sucupira, Suren, Teak, Tauari, Tiama, Tola, Virola, White Lauan, White Meranti, White Seraya, Yellow Meranti.

Additional U.S. Notes

1. In this chapter:

   (a) The term "wood waste" means residual material other than firewood resulting from the processing of wood, including scraps, shavings, sawdust, veneer clippings, chipper rejects and similar small wood residues, as well as larger or coarser solid types of residual wood such as slabs, edgings, cull pieces and veneer log cores;

   (b) The term "standard wood moldings" means wood moldings worked to a pattern and having the same profile in cross section throughout their length; and

   (c) The term "surface covered," as applied to the articles of headings 4411 and 4412, means that one or more exterior surfaces of a product have been treated with creosote or other wood preservatives, or with fillers, sealers, waxes, oils, stains, varnishes, paints or enamels, or have been overlaid with paper, fabric, plastics, base metal, or other material.

2. The effectiveness of the proviso to section 304(a)(3)(J) of the Tariff Act of 1930 (19 U.S.C. 1304(a)(3)(J)), to the extent permitted by that section and as provided for in schedule XX to the General Agreement on Tariffs and Trade, is suspended, with the result that sawed lumber and sawed timbers however provided for, telephone, trolley, electric light and telegraph poles of wood and bundles of shingles, other than red cedar shingles, shall not be required to be marked to indicate the country of origin.

3. Heading 4409 includes articles having a repeating design worked along any edge or face.

Statistical Note

1. For the purposes of heading 4407, the term "rough" includes wood that has been edged, resawn, crosscut or trimmed to smaller sizes but it does not include wood that has been dressed or surfaced by planing on one or more edges or faces or has been edge-glued or end-glued.

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4401 | | Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms; wood in chips or particles; sawdust and wood waste and scrap, whether or not agglomerated in logs, briquettes, pellets or similar forms: | | | | |
| 4401.10.00 | 00 | Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms | X | Free | | 20% |
| | | Wood in chips or particles: | | | | |
| 4401.21.00 | 00 | Coniferous | t dwb | Free | | Free |
| 4401.22.00 | 00 | Nonconiferous | t dwb | Free | | Free |
| 4401.30 | | Sawdust and wood waste and scrap, whether or not agglomerated in logs, briquettes, pellets or similar forms: | | | | |
| 4401.30.20 | 00 | Artificial fire logs, composed of wax and sawdust, with or without added materials | kg | 0.2% | Free (A,CA,E,IL,J, MX) | 20% |
| 4401.30.40 | | Other | | Free | | Free |
| | 10 | Sawdust not agglomerated | kg | | | |
| | 20 | Shavings | kg | | | |
| | 90 | Other | kg | | | |
| 4402.00.00 | 00 | Wood charcoal (including shell or nut charcoal), whether or not agglomerated | t | Free | | Free |
| 4403 | | Wood in the rough, whether or not stripped of bark or sap- wood, or roughly squared: | | | | |
| 4403.10.00 | | Treated with paint, stain, creosote or other pre- servatives | | Free | | Free |
| | | Poles, piles and posts: | | | | |
| | 20 | Telephone, telegraph and electrical power poles | m | | | |
| | 40 | Fence posts | m | | | |
| | 50 | Other | m | | | |
| | 60 | Other | $m^3$ | | | |

# Harmonized Tariff Schedule of the United States (2003) – Supplement 1

Annotated for Statistical Reporting Purposes



| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4403 (con.) | | Wood in the rough, whether or not stripped of bark or sapwood, or roughly squared (con.): | | | | |
| 4403.20.00 | | Other, coniferous | | Free | | Free |
| | | Pulpwood: | | | | |
| | 04 | Balsam, fir or spruce | $m^3$ | | | |
| | 08 | Other | $m^3$ | | | |
| | | Poles, piles and posts: | | | | |
| | 12 | Telephone, telegraph and electrical power poles | m | | | |
| | 15 | Fence posts | m | | | |
| | 16 | Other | m | | | |
| | | Logs and timber: | | | | |
| | | Pine (Pinus spp.): | | | | |
| | 20 | Southern yellow pine (Loblolly pine (Pinus taeda)), long leaf pine (Pinus palustris), pitch pine (Pinus rigida), short leaf pine (Pinus echinada), slash pine (Pinus elliottii) and Virginia pine (Pinus virginiana) | $m^3$ | | | |
| | 25 | Ponderosa pine (Pinus ponderosa) | $m^3$ | | | |
| | 30 | Other | $m^3$ | | | |
| | 35 | Spruce (Picea spp.) | $m^3$ | | | |
| | 40 | Douglas-fir (Pseudotsuga menziesii) | $m^3$ | | | |
| | 42 | Other fir; balsam | $m^3$ | | | |
| | 45 | Port Orford cedar (Chamaecyparis lawsoniana) | $m^3$ | | | |
| | 50 | Western hemlock (Tsugo meterophylla) | $m^3$ | | | |
| | 52 | Other hemlock | $m^3$ | | | |
| | 55 | Western red cedar (Thuja plicata) | $m^3$ | | | |
| | 57 | Other cedar | $m^3$ | | | |
| | 63 | Other | $m^3$ | | | |
| | 65 | Other | $m^3$ | | | |
| | | Other, of tropical wood specified in subheading note 1 to this chapter: | | | | |
| 4403.41.00 | 00 | Dark Red Meranti, Light Red Meranti and Meranti Bakau | $m^3$ | Free | | Free |
| 4403.49.00 | 00 | Other | $m^3$ | Free | | Free |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4403 (con.) | | Wood in the rough, whether or not stripped of bark or sap-wood, or roughly squared (con.): | | | | |
| | | Other: | | | | |
| 4403.91.00 | | Of oak (Quercus spp.) | | Free | | Free |
| | 20 | Of red oak | $m^3$ | | | |
| | 40 | Other | $m^3$ | | | |
| 4403.92.00 | 00 | Of beech (Fagus spp.) | $m^3$ | Free | | Free |
| 4403.99.00 | | Other | | Free | | Free |
| | | Pulpwood: | | | | |
| | 22 | Of poplar, aspen or cottonwood | $m^3$ | | | |
| | 24 | Other | $m^3$ | | | |
| | | Poles, piles and posts: | | | | |
| | 26 | Of poplar, aspen or cottonwood | $m^3$ | | | |
| | 27 | Of birch | $m^3$ | | | |
| | 29 | Other | $m^3$ | | | |
| | | Other | | | | |
| | 30 | Of birch (Betula spp.) | $m^3$ | | | |
| | 40 | Of ash (Fraxinus spp.) | $m^3$ | | | |
| | 50 | Of western red alder (Alnus rubra) | $m^3$ | | | |
| | 55 | Of cherry (Prunus spp.) | $m^3$ | | | |
| | 60 | Of maple (Acer spp.) | $m^3$ | | | |
| | 65 | Of yellow poplar (Liriodendron tulipifera) | $m^3$ | | | |
| | 67 | Of other poplar; of aspen or cottonwood | $m^3$ | | | |
| | 70 | Of walnut (Juglans spp.) | $m^3$ | | | |
| | 75 | Of paulownia (Paulownia spp.) | $m^3$ | | | |
| | 91 | Other | $m^3$ | | | |
| 4404 | | Hoopwood; split poles; piles, pickets and stakes of wood, pointed but not sawn lengthwise; wooden sticks, roughly trimmed but not turned, bent or otherwise worked, suitable for the manufacture of walking-sticks, umbrellas, tool handles or the like; chipwood and the like: | | | | |
| 4404.10.00 | | Coniferous | | Free | | Free |
| | 40 | Fence pickets, palings and rails | X | | | |
| | 80 | Poles, piles and posts | X | | | |
| | 90 | Other | X | | | |
| 4404.20.00 | | Nonconiferous | | Free | | Free |
| | 40 | Fence pickets, palings and rails | X | | | |
| | 80 | Poles, piles and posts | X | | | |
| | 90 | Other | X | | | |
| 4405.00.00 | 00 | Wood wool (excelsior); wood flour | kg | 3.2% | Free (A+,CA,D,E, IL,J,JO,MX) | 33 1/3% |
| 4406 | | Railway or tramway sleepers (cross-ties) of wood: | | | | |
| 4406.10.00 | 00 | Not impregnated | $m^3$ No. | Free | | Free |
| 4406.90.00 | 00 | Other | $m^3$ No. | Free | | Free |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4407 | | Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm: | | | | |
| 4407.10.00 | | Coniferous | | Free | | $1.70/m^3$ |
| | 01 | Finger-jointed | $m^3$ | | | |
| | | Other: | | | | |
| | 02 | Treated with paint, stain, creosote, or other preservative | $m^3$ | | | |
| | | Not treated: | | | | |
| | 15 | Mixtures of spruce, pine, and fir ("S-P-F") | $m^3$ | | | |
| | 16 | Mixtures of western hemlock and amabilis fir ("hem-fir") | $m^3$ | | | |
| | | Other: | | | | |
| | | Sitka spruce (Picea sitchensis): | | | | |
| | 17 | Rough | $m^3$ | | | |
| | 18 | Other | $m^3$ | | | |
| | | Other spruce: | | | | |
| | 19 | Rough | $m^3$ | | | |
| | 20 | Other | $m^3$ | | | |
| | | Eastern white pine (Pinus Strobus) and red pine (Pinus resinosa): | | | | |
| | 42 | Rough | $m^3$ | | | |
| | 43 | Other | $m^3$ | | | |
| | | Lodgepole pine (Pinus contorta): | | | | |
| | 44 | Rough | $m^3$ | | | |
| | 45 | Other | $m^3$ | | | |
| | | Southern yellow pine (Loblolly pine (Pinus taeda)), long leaf pine (Pinus palustris), pitch pine (Pinus rigida), short leaf pine (Pinus echinada), slash pine (Pinus elliottii) and Virginia pine (Pinus virginiana): | | | | |
| | 46 | Rough | $m^3$ | | | |
| | 47 | Other | $m^3$ | | | |
| | | Ponderosa pine (Pinus ponderosa): | | | | |
| | 48 | Rough | $m^3$ | | | |
| | 49 | Other | $m^3$ | | | |
| | | Other pine: | | | | |
| | 52 | Rough | $m^3$ | | | |
| | 53 | Other | $m^3$ | | | |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4407 (con.) | | Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm (con.): | | | | |
| 4407.10.00 (con.) | | Coniferous (con.) | | | | |
| | | Other (con): | | | | |
| | | Not treated (con.): | | | | |
| | | Other (con.): | | | | |
| | | Douglas-fir (Pseudotsuga menziesii): | | | | |
| | | Rough: | | | | |
| | 54 | Having a minimum dimension less than 5.1 cm . . . . . . . . . . . . | $m^3$ | | | |
| | 55 | Having a minimum dimension 5.1 cm or more but less than 12.7 cm . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | 56 | Having a minimum dimension 12.7 cm or more . . . . . . . . . . . . | $m^3$ | | | |
| | 57 | Other . . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | | Fir (Abies spp.): | | | | |
| | 58 | Rough . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | 59 | Other . . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | | Hemlock (Tsuga spp.): | | | | |
| | 64 | Rough . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | 65 | Other . . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | | Larch (Larix spp.) | | | | |
| | 66 | Rough . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | 67 | Other . . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | | Western red cedar: | | | | |
| | 68 | Rough . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | 69 | Other . . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | | Yellow cedar (Chamaecyparis nootkanensis): | | | | |
| | 74 | Rough . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | 75 | Other . . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | | Other cedar (Thuja spp., Juniperus spp., Chamaecyparis spp., Cupressus spp. and Libocedrus spp.): | | | | |
| | 76 | Rough . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | 77 | Other . . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | | Redwood (Sequoia sempervirens): | | | | |
| | 82 | Rough . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | 83 | Other . . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | | Other: | | | | |
| | 92 | Rough . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |
| | 93 | Other . . . . . . . . . . . . . . . . . . . . . . . | $m^3$ | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4407 (con.) | | Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm (con.): | | | | |
| | | Of tropical wood specified in subheading note 1 to this chapter: | | | | |
| 4407.24.00 | | Virola, Mahogany (Swietenia spp.), Imbuia and Balsa | | Free | | $1.27/m^3$ |
| | | Balsa (Ochroma lagopus): | | | | |
| | 05 | Rough | $m^3$ | | | |
| | 10 | Other | $m^3$ | | | |
| | | Mahogany (Swetenia spp.): | | | | |
| | 25 | Rough | $m^3$ | | | |
| | 30 | Other | $m^3$ | | | |
| | | Other: | | | | |
| | 90 | Rough | $m^3$ | | | |
| | 95 | Other | $m^3$ | | | |
| 4407.25.00 | 00 | Dark Red Meranti, Light Red Meranti and Meranti Bakau | $m^3$ | Free | | $1.27/m^3$ |
| 4407.26.00 | 00 | White Lauan, White Meranti, White Seraya, Yellow Meranti and Alan | $m^3$ | Free | | $1.27/m^3$ |
| 4407.29.00 | | Other | | Free | | $1.27/m^3$ |
| | | Teak (Tectona grandis): | | | | |
| | 05 | Rough | $m^3$ | | | |
| | 10 | Other | $m^3$ | | | |
| | | Keruing (Dipterocarpus spp.): | | | | |
| | 25 | Rough | $m^3$ | | | |
| | 30 | Other | $m^3$ | | | |
| | | Other: | | | | |
| | 90 | Rough | $m^3$ | | | |
| | 95 | Other | $m^3$ | | | |
| | | Other: | | | | |
| 4407.91.00 | | Of oak (Quercus spp.) | | Free | | $1.27/m^3$ |
| | | Red oak: | | | | |
| | 20 | Rough | $m^3$ | | | |
| | 21 | Other | $m^3$ | | | |
| | | Other: | | | | |
| | 60 | Rough | $m^3$ | | | |
| | 61 | Other | $m^3$ | | | |
| 4407.92.00 | | Of beech (Fagus spp.) | | Free | | $1.27/m^3$ |
| | 20 | Rough | $m^3$ | | | |
| | 40 | Other | $m^3$ | | | |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4408 | | Sheets for veneering (including those obtained by slicing laminated wood), for plywood or for other similar laminated wood and other wood, sawn lengthwise, sliced or peeled, whether or not planed, sanded, spliced or end-jointed, of a thickness not exceeding 6 mm: | | | | |
| 4408.10.01 | | Coniferous | | Free | | 20% |
| | | Reinforced or backed: | | | | |
| | 10 | Douglas fir | $m^2$ | | | |
| | 30 | Other | $m^2$ | | | |
| | | Not reinforced or backed: | | | | |
| | 50 | Douglas fir | $m^2$ | | | |
| | 70 | Other | $m^2$ | | | |
| | | Of tropical wood specified in subheading note 1 to this chapter: | | | | |
| 4408.31.01 | 00 | Dark Red Meranti, Light Red Meranti and Meranti Bakau | $m^2$ | Free | | 20% |
| 4408.39.01 | 00 | Other | $m^2$ | Free | | 20% |
| 4408.90.01 | | Other | | Free | | 20% |
| | | Not reinforced or backed: | | | | |
| | 20 | Birch (Betula spp.) | $m^2$ | | | |
| | 30 | Cherry (Prunus spp.) | $m^2$ | | | |
| | 40 | Maple (Acer spp.) | $m^2$ | | | |
| | | Oak (Quercus spp.): | | | | |
| | 50 | Red | $m^2$ | | | |
| | 60 | Other | $m^2$ | | | |
| | 65 | Ash (Fraxinus spp.) | $m^2$ | | | |
| | 70 | Walnut (Juglans spp.) | $m^2$ | | | |
| | 80 | Other | $m^2$ | | | |
| | | Reinforced or backed: | | | | |
| | 82 | Birch (Betula spp.) | $m^2$ | | | |
| | 84 | Cherry (Prunus spp.) | $m^2$ | | | |
| | 86 | Maple (Acer spp.) | $m^2$ | | | |
| | | Oak (Quercus spp.): | | | | |
| | 88 | Red | $m^2$ | | | |
| | 92 | Other | $m^2$ | | | |
| | 94 | Ash (Fraxinus spp.) | $m^2$ | | | |
| | 96 | Walnut (Juglans spp.) | $m^2$ | | | |
| | 98 | Other | $m^2$ | | | |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4409 | | Wood (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like) along any of its edges, ends or faces, whether or not planed, sanded or end-jointed: | | | | |
| 4409.10 | | Coniferous: | | | | |
| 4409.10.05 | 00 | Wood continuously shaped along any of its ends, whether or not also continuously shaped along any of its edges or faces, all the foregoing whether or not planed, sanded or end-jointed | $m^3$ | 3.2% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| | | Other: | | | | |
| 4409.10.10 | | Wood siding | | Free | | 2.2¢/$m^2$ |
| | | Resawn bevel siding: | | | | |
| | 20 | Western red cedar | $m^2$ $m^3$ | | | |
| | 40 | Other | $m^2$ $m^3$ | | | |
| | | Other: | | | | |
| | 60 | Western red cedar | $m^2$ $m^3$ | | | |
| | 80 | Other | $m^2$ $m^3$ | | | |
| 4409.10.20 | 00 | Wood flooring | $m^2$ $m^3$ | Free | | 33 1/3% |
| | | Wood moldings: | | | | |
| | | Standard wood molding: | | | | |
| 4409.10.40 | 00 | Pine (Pinus spp.) | m | Free | | 5% |
| 4409.10.45 | 00 | Other | m | Free | | 5% |
| 4409.10.50 | 00 | Other | m | Free | | 40% |
| | | Wood dowel rods: | | | | |
| 4409.10.60 | 00 | Plain | m $m^3$ | Free | | 5% |
| 4409.10.65 | 00 | Sanded, grooved, or otherwise advanced in condition | m $m^3$ | 4.9% | Free (A+,CA,D,E, IL,J,JO,MX) | 33 1/3% |
| 4409.10.90 | | Other | | Free | | \$1.70/$m^3$ |
| | 20 | Western red cedar | $m^2$ $m^3$ | | | |
| | 40 | Other | $m^2$ $m^3$ | | | |
| 4409.20 | | Nonconiferous: | | | | |
| 4409.20.05 | 00 | Wood continuously shaped along any of its ends, whether or not also continuously shaped along any of its edges or faces, all the foregoing whether or not planed, sanded or end-jointed | $m^3$ | 3.2% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| | | Other: | | | | |
| 4409.20.10 | 00 | Wood siding | $m^2$ | Free | | 4.3¢/$m^2$ |
| 4409.20.25 | | Wood flooring | | Free | | 8% |
| | 30 | Maple (Acer spp.) | $m^2$ $m^3$ | | | |
| | 50 | Birch (Betula spp.) and beech (Fagus spp.) | $m^2$ $m^3$ | | | |
| | 60 | Other | $m^2$ $m^3$ | | | |
| | | Wood moldings: | | | | |
| 4409.20.40 | 00 | Standard wood moldings | m | Free | | 5% |
| 4409.20.50 | 00 | Other | m | Free | | 40% |
| | | Wood dowel rods: | | | | |
| 4409.20.60 | 00 | Plain | m | Free | | 5% |
| 4409.20.65 | 00 | Sanded, grooved or otherwise advanced in condition | m | 4.9% | Free (A+,CA,D,E, IL,J,JO,MX) | 33 1/3% |
| 4409.20.90 | 00 | Other | $m^3$ | Free | | \$1.70/$m^3$ |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4410 | | Particle board and similar board (for example, oriented strand board and waferboard) of wood or other ligneous materials, whether or not agglomerated with resins or other organic binding substances: | | | | |
| | | Oriented strand board and waferboard, of wood: | | | | |
| 4410.21.00 | 00 | Unworked or not further worked than sanded | $m^3$<br>kg | Free | | 40% |
| 4410.29.00 | 00 | Other | $m^3$<br>kg | Free | | 40% |
| | | Other, of wood: | | | | |
| 4410.31.00 | | Unworked or not further worked than sanded | | Free | | 40% |
| | 20 | Particle board | $m^3$<br>kg | | | |
| | 60 | Other | $m^3$<br>kg | | | |
| 4410.32.00 | | Surface-covered with melamine-impregnated paper | | Free | | 40% |
| | 20 | Particle board | $m^3$<br>kg | | | |
| | 60 | Other | $m^3$<br>kg | | | |
| 4410.33.00 | | Surface-covered with decorative laminates of plastic | | Free | | 40% |
| | 20 | Particle board | $m^3$<br>kg | | | |
| | 60 | Other | $m^3$<br>kg | | | |
| 4410.39.00 | | Other | | Free | | 40% |
| | 20 | Particle board | $m^3$<br>kg | | | |
| | 60 | Other | $m^3$<br>kg | | | |
| 4410.90.00 | 00 | Other | $m^3$<br>kg | Free | | 20% |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | 1 Special | 2 |
|---|---|---|---|---|---|---|
| 4411 | | Fiberboard of wood or other ligneous materials, whether or not bonded with resins or other organic substances: | | | | |
| | | Fiberboard of a density exceeding 0.8 g/cm$^3$: | | | | |
| 4411.11.00 | | Not mechanically worked or surface covered | | Free | | 30% |
| | 05 | Medium density fiberboard | m$^3$ | | | |
| | 95 | Other | m$^3$ | | | |
| 4411.19 | | Other: | | | | |
| 4411.19.20 | | Not surface covered (except for oil treatment) | | Free | | 30% |
| | 05 | Medium density fiberboard | m$^3$ | | | |
| | 95 | Other | m$^3$ | | | |
| | | Other: | | | | |
| 4411.19.30 | 00 | Tileboard which has been continuously worked along any of its edges and is dedicated for use in the construction of walls, ceilings or other parts of buildings | m$^3$ | Free | | 20% |
| 4411.19.40 | 00 | Other | m$^3$ | 6% | Free (A,CA,E,IL,J, MX)<br>1.5% (JO) | 45% |
| | | Fiberboard of a density exceeding 0.5 g/cm$^3$ but not exceeding 0.8 g/cm$^3$: | | | | |
| 4411.21.00 | | Not mechanically worked or surface covered | | Free | | 30% |
| | 05 | Medium density fiberboard | m$^3$ | | | |
| | 95 | Other | m$^3$ | | | |
| 4411.29 | | Other: | | | | |
| | | Tongued, grooved or rabbetted continuously along any of its edges and dedicated for use in the construction of walls, ceilings or other parts of buildings: | | | | |
| 4411.29.20 | 00 | Laminated boards bonded in whole or in part, or impregnated, with synthetic resins | kg<br>m$^3$ | 1.9¢/kg + 1.5% | Free (A,CA,E,IL,J, JO,MX) | 33¢/kg + 25% |
| 4411.29.30 | 00 | Other | m$^3$ | Free | | 20% |
| | | Other: | | | | |
| 4411.29.60 | | Not surface covered (except for oil treatment) | | Free | | 30% |
| | 05 | Medium density fiberboard | m$^3$ | | | |
| | 95 | Other | m$^3$ | | | |
| 4411.29.90 | 00 | Other | m$^3$ | 3.9% | Free (A,CA,E,IL, J,JO,MX) | 45% |
| | | Fiberboard of a density exceeding 0.35 g/cm$^3$ but not exceeding 0.5 g/cm$^3$: | | | | |
| 4411.31.00 | | Not mechanically worked or surface covered | | Free | | 20% |
| | 10 | Impregnated with bitumen | m$^3$ | | | |
| | 90 | Other | m$^3$ | | | |
| 4411.39.00 | | Other | | Free | | 20% |
| | 10 | Impregnated with bitumen | m$^3$ | | | |
| | 90 | Other | m$^3$ | | | |
| | | Other: | | | | |
| 4411.91.00 | | Not mechanically worked or surface covered | | Free | | 20% |
| | 10 | Impregnated with bitumen | m$^3$ | | | |
| | 90 | Other | m$^3$ | | | |
| 4411.99.00 | | Other | | Free | | 20% |
| | 10 | Impregnated with bitumen | m$^3$ | | | |
| | 90 | Other | m$^3$ | | | |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4412 | | Plywood, veneered panels and similar laminated wood: | | | | |
| | | Plywood consisting solely of sheets of wood, each ply not exceeding 6 mm in thickness: | | | | |
| 4412.13 | | With at least one outer ply of tropical wood specified in subheading note 1 to this chapter: | | | | |
| | | Not surface covered, or surface covered with a clear or transparent material which does not obscure the grain, texture or markings of the face ply: | | | | |
| 4412.13.05 | | With a face ply of birch (<u>Betula</u> spp.) | | Free | | 50% |
| | 20 | Panels not exceeding in any dimension 3.6 mm in thickness, 1.2 m in width and 2.2 m in length | $m^3$ | | | |
| | | Other: | | | | |
| | 40 | Not surface covered | $m^3$ | | | |
| | 60 | Other | $m^3$ | | | |
| 4412.13.25 | | With a face ply of Spanish cedar (<u>Cedrela</u> spp.) or walnut (<u>Juglans</u> spp.) | | 8% | Free (A*,CA,E,IL,J,MX)<br>2% (JO) | 40% |
| | 10 | With a face ply of Spanish cedar (<u>Cedrela</u> spp.) | $m^3$ | | | |
| | 20 | With a face ply of walnut (<u>Juglans</u> spp.) | $m^3$ | | | |
| | | Other: | | | | |
| 4412.13.40 | | With at least one outer ply of the following tropical woods: Dark Red Meranti, Light Red Meranti, White Lauan, Sipo, Limba, Okoumé, Obeche, Acajou d'Afrique, Sapelli, Virola, Mahogany, Palissandre de Para, Palissandre de Rio or Palissandre de Rose | | 8% | Free (A*,CA,E,IL,J,MX)<br>2% (JO) | 40% |
| | 40 | With a face ply of mahogany (<u>Swietenia</u> spp. or <u>Khaya</u> spp.) | $m^3$ | | | |
| | | Other: | | | | |
| | 50 | Panels not exceeding in any dimension 3.6 mm in thickness, 1.2 m in width and 2.2 m in length | $m^3$ | | | |
| | | Other: | | | | |
| | 60 | Not surface covered | $m^3$ | | | |
| | 70 | Other | $m^3$ | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4412 (con.) | | Plywood, veneered panels and similar laminated wood (con.): | | | | |
| | | Other (con.): | | | | |
| 4412.92 (con.) | | With at least one ply of tropical wood specified in subheading note 1 to this chapter (con.): | | | | |
| | | Other: | | | | |
| | | Plywood: | | | | |
| | | Not surface covered, or surface covered with a clear or transparent material which does not obscure the grain, texture or markings of the face ply: | | | | |
| 4412.92.10 | 00 | With a face ply of Parana pine (Araucaria angustifolia) | $m^3$ | Free | | 40% |
| 4412.92.30 | 00 | With a face ply of European red pine (Pinus silvestris) | $m^3$ | 3.4% | Free (A,CA,E,IL,J, JO,MX) | 40% |
| 4412.92.41 | 00 | Other | $m^3$ | 8% | Free (A*,CA,E,IL,J, MX)<br>2% (JO) | 40% |
| 4412.92.51 | 00 | Other | $m^3$ | 5.1% | Free (A*,CA,E,IL, J,MX)<br>1.2% (JO) | 40% |
| 4412.92.91 | | Other | | Free | | 40% |
| | 20 | With an outer ply of Douglas fir (Pseudotsuga menziesii) | $m^3$ | | | |
| | 40 | With a face ply of Southern yellow pine (Loblolly pine (Pinus taeda)), long leaf pine (Pinus palustris), pitch pine (Pinus rigida), short leaf pine (Pinus echinada), slash pine (Pinus elliottii) and Virginia pine (Pinus virginiana) | $m^3$ | | | |
| | 90 | Other | $m^3$ | | | |
| 4412.93.01 | 00 | Other, containing at least one layer of particle board | $m^3$ | Free | | 40% |
| 4412.99 | | Other: | | | | |
| | | Plywood: | | | | |
| | | Not surface covered, or surface covered with a clear or transparent material which does not obscure the grain, texture or markings of the face ply: | | | | |
| 4412.99.15 | 00 | With a face ply of Parana pine (Araucaria angustifolia) | $m^3$ | Free | | 40% |
| 4412.99.35 | 00 | With a face ply of European red pine (Pinus silvestris) | $m^3$ | 3.4% | Free (A,CA,E,IL,J, JO,MX) | 40% |
| 4412.99.46 | 00 | Other | $m^3$ | 8% | Free (A,CA,E,IL,J, MX)<br>2% (JO) | 40% |
| 4412.99.56 | 00 | Other | $m^3$ | 5.1% | Free (A*,CA,E,IL, J,MX)<br>1.2% (JO) | 40% |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | 2 |
|---|---|---|---|---|---|---|
| 4412 (con.) | | Plywood, veneered panels and similar laminated wood (con.): | | | | |
| | | Other (con.): | | | | |
| 4412.99 (con.) | | Other (con.): | | | | |
| 4412.99.96 | | Other | | Free | | 40% |
| | 20 | With an outer ply of Douglas fir (Pseudotsuga menziesii) | $m^3$ | | | |
| | 40 | With a face ply of Southern yellow pine (Loblolly pine (Pinus taeda)), long leaf pine (Pinus palustris), pitch pine (Pinus rigida), short leaf pine (Pinus echinada), slash pine (Pinus elliottii) and Virginia pine (Pinus virginiana) | $m^3$ | | | |
| | 90 | Other | $m^3$ | | | |
| 4413.00.00 | 00 | Densified wood, in blocks, plates, strips or profile shapes | kg | 3.7% | Free (A,CA,E,IL,J, JO,MX) | 50% |
| 4414.00.00 | 00 | Wooden frames for paintings, photographs, mirrors or similar objects | No. | 3.9% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| 4415 | | Packing cases, boxes, crates, drums and similar packings, of wood; cable-drums, of wood; pallets, box-pallets and other load boards, of wood; pallet collars of wood: | | | | |
| 4415.10 | | Cases, boxes, crates, drums and similar packings; cable-drums: | | | | |
| 4415.10.30 | 00 | Packing boxes and cases with solid sides, lids and bottoms | No. | Free | | 15% |
| 4415.10.60 | 00 | Containers designed for use in the harvesting of fruits and vegetables | No. | Free | | Free |
| 4415.10.90 | 00 | Other | No. | 10.7% | Free (A,CA,E,IL,J, MX)<br>4.2% (JO) | 33 1/3% |
| 4415.20 | | Pallets, box-pallets and other load boards; pallet collars: | | | | |
| 4415.20.40 | 00 | Containers designed for use in the harvesting of fruits and vegetables | No. | Free | | Free |
| 4415.20.80 | 00 | Other | No. | 10.7% | Free (A,CA,E,IL,J, MX)<br>4.2% (JO) | 33 1/3% |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4416.00 | | Casks, barrels, vats, tubs and other coopers' products and parts thereof, of wood, including staves: | | | | |
| 4416.00.30 | | Casks, barrels and hogsheads | | Free | | 15% |
| | 10 | New | No. | | | |
| | | Used: | | | | |
| | 20 | Assembled (set up) | No. | | | |
| | 30 | Unassembled (knocked down) | No. | | | |
| 4416.00.60 | | Staves and hoops; tight barrelheads of softwood | | Free | | Free |
| | | New: | | | | |
| | 10 | Staves | No. | | | |
| | 20 | Hoops | No. | | | |
| | 30 | Tight barrelheads | No. | | | |
| | | Used: | | | | |
| | 40 | Staves | No. | | | |
| | 50 | Other | No. | | | |
| 4416.00.90 | | Other | | 3.2% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| | 20 | New | X | | | |
| | 40 | Used | X | | | |
| 4417.00 | | Tools, tool bodies, tool handles, broom or brush bodies and handles, of wood; boot or shoe lasts and trees, of wood: | | | | |
| 4417.00.20 | 00 | Broom and mop handles, 1.9 cm or more in diameter and 97 cm or more in length | No. | Free | | 33 1/3% |
| 4417.00.40 | 00 | Paint brush and paint roller handles | X | Free | | 33 1/3% |
| 4417.00.60 | 00 | Brush backs | No. | Free | | 33 1/3% |
| 4417.00.80 | | Other | | 5.1% | Free (A,CA,E,IL,J, MX)<br>1.2% (JO) | 33 1/3% |
| | 10 | Tool handles | X | | | |
| | 90 | Other | X | | | |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4418 | | Builders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes: | | | | |
| 4418.10.00 | 00 | Windows, French-windows and their frames | No. | 3.2% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| 4418.20 | | Doors and their frames and thresholds: | | | | |
| 4418.20.40 | 00 | French doors | No. | 4.8% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| 4418.20.80 | | Other | | 4.8% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| | 30 | Flush doors | No. | | | |
| | 60 | Other | No. | | | |
| 4418.30.00 | 00 | Parquet panels | $m^2$ | Free | | 33 1/3% |
| 4418.40.00 | 00 | Formwork (shuttering) for concrete constructional work | X | 3.2% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| 4418.50.00 | | Shingles and shakes | | Free | | Free |
| | | Shingles: | | | | |
| | 10 | Of western red cedar | square kg | | | |
| | 30 | Other | square kg | | | |
| | 50 | Other | square kg | | | |
| 4418.90 | | Other: | | | | |
| 4418.90.20 | 00 | Edge-glued lumber | $m^3$ | Free | | 10% |
| 4418.90.45 | | Other | | 3.2% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| | 10 | Beams and arches, laminated | X | | | |
| | 20 | Roof trusses | X | | | |
| | 40 | Other fabricated structural wood members | X | | | |
| | 50 | Prefabricated partitions and panels for buildings | X | | | |
| | 90 | Other | X | | | |
| 4419.00 | | Tableware and kitchenware, of wood: | | | | |
| 4419.00.40 | 00 | Forks and spoons | X | 5.3% | Free (A,CA,E,IL,J, MX) 1.3% (JO) | 33 1/3% |
| 4419.00.80 | 00 | Other | X | 3.2% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | 1 Special | 2 |
|---|---|---|---|---|---|---|
| 4420 | | Wood marquetry and inlaid wood; caskets and cases for jewelry or cutlery and similar articles, of wood; statuettes and other ornaments, of wood; wooden articles of furniture not falling within chapter 94: | | | | |
| 4420.10.00 | 00 | Statuettes and other ornaments, of wood | X | 3.2% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| 4420.90 | | Other: | | | | |
| | | Jewelry boxes, silverware chests, cigar and cigarette boxes, microscope cases, tool or utensil cases and similar boxes, cases and chests, all the foregoing of wood: | | | | |
| 4420.90.20 | 00 | Cigar and cigarette boxes | No. | Free | | 60% |
| | | Other: | | | | |
| 4420.90.45 | 00 | Not lined with textile fabrics | No. | 4.3% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| 4420.90.65 | 00 | Lined with textile fabrics | kg No. | Free | | 11¢/kg + 20% |
| 4420.90.80 | 00 | Other | X | 3.2% | Free (A,CA,E,IL,J, JO,MX) | 33 1/3% |
| 4421 | | Other articles of wood: | | | | |
| 4421.10.00 | 00 | Clothes hangers | X | 3.2% | Free (A+,CA,D,E, IL,J,JO,MX) | 33 1/3% |
| 4421.90 | | Other: | | | | |
| | | Wood dowel pins: | | | | |
| | | Plain: | | | | |
| 4421.90.10 | 00 | Coniferous | m | Free | | 5% |
| 4421.90.15 | 00 | Other | m | Free | | 5% |
| 4421.90.20 | 00 | Sanded, grooved or otherwise advanced in condition | m | 4.9% | Free (A+,CA,D,E, IL,J,JO,MX) | 33 1/3% |
| | | Wood blinds, shutters, screens and shades, all the foregoing with or without their hardware: | | | | |
| 4421.90.30 | 00 | Consisting of wooden frames in the center of which are fixed louver boards or slats, with or without their hardware | X | 10.7% | Free (A,CA,E,IL,J, MX)<br>4.2% (JO) | 33 1/3% |
| 4421.90.40 | 00 | Other | X | 5.1% | Free (A+,CA,D,E, IL,J,MX) 1/<br>1.2% (JO) | 50% |
| | | Toothpicks, skewers, candy sticks, ice cream sticks, tongue depressors, drink mixers and similar small wares: | | | | |
| 4421.90.50 | 00 | Toothpicks | X | Free | | 25% |
| 4421.90.60 | 00 | Other | X | 5.1% | Free (A*,CA,E,IL, J,MX)<br>1.2% (JO) | 33 1/3% |

1/ See subheading 9906.44.21.

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 4421 (con.) | | Other articles of wood (con.): | | | | |
| 4421.90 (con.) | | Other (con.): | | | | |
| 4421.90.70 | | Pickets, palings, posts and rails, the foregoing which are sawn; assembled fence sections | | Free | | Free |
| | 20 | Assembled fence sections | X | | | |
| | 40 | Other | X | | | |
| | | Clothespins: | | | | |
| 4421.90.80 | | Spring-type | | 6.5¢/gross | Free (A+,CA,D,E, IL,J,MX) 1.6¢/gross (JO) | 20¢/gross |
| | 24 | Valued not over 80¢/gross | Gross | | | |
| | 27 | Valued over 80¢ but not over $1.35/gross | Gross | | | |
| | 30 | Valued over $1.35 but not over $1.70/gross | Gross | | | |
| | 33 | Valued over $1.70/gross | Gross | | | |
| 4421.90.85 | 00 | Other | Gross | 4.8% | Free (A+,CA,D,E, IL,J,JO,MX) | 35% |
| 4421.90.88 | 00 | Canoe paddles | No. | Free | | 35% |
| | | Other: | | | | |
| 4421.90.93 | 00 | Theatrical, ballet, and operatic scenery and properties, including sets | kg | Free | | 33 1/3% |
| 4421.90.97 | | Other | | 3.3% | Free (A,B,CA,E,IL, J,JO,MX) | 33 1/3% |
| | 20 | Pencil slats | Gross | | | |
| | 40 | Other | X | | | |