PREHEARING MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

In the

# United States Court of Federal Claims

No. 03-2485C (Block, J.)

FOREST PRODUCTS NORTHWEST, INC.,

*Plaintiff,*

*v.*

UNITED STATES OF AMERICA,

*Defendant.*

Plaintiff's Prehearing Memorandum in Opposition to Defendant's January 28, 2004, Motion to Dismiss Under RCFC Rule 12(b).

A. Woodson Stuart
JONES & STUART, LLP
2300 M Street, NW, Suite 800
Washington, D.C. 20037
Tel: (202) 297-3196
Fax: (202) 338-0270

Date: May 7, 2004

*Attorney for the Plaintiff*

**I. SUMMARY** .......... 1

**II. STATEMENT OF THE CASE** .......... 1

**III. STATEMENT OF ISSUES** .......... 4

**IV. STATEMENT OF FACTS** .......... 4

**A. Statutory Background** .......... 4

1. *The Mod Act* .......... 4

2. *The Harmonized Tariff Schedule of the United States* .......... 10

3. *The Customs Entry and Liquidation Process* .......... 13

**B. NWFP's Entries and Their Treatment by U.S. Customs** .......... 14

**V. ARGUMENT** .......... 19

**A. Legal Standard for Dismissal Under RCFC Rule 12(b)** .......... 19

1. *Dismissal Under Rule 12(b)(1) for Lack of Jurisdiction* .......... 20

2. *Dismissal Under Rule 12(b)(6) for Failure to State a Claim* .......... 20

**B. This Court Clearly Has Jurisdiction Over Refund Actions Based on Non-Protestable Exactions by U.S. Customs.** .......... 21

**C. The CIT's Exclusive Jurisdiction Is not Implicated Here.** .......... 22

**D. The Reasoning of *Trayco* Clearly Applies to All Non-"Protestable" Exactions by U.S. Customs.** .......... 24

**E. *High Star Toys* Rejected the Notion that *Trayco* is Limited to its Facts and Does not Apply to All Non-"Protestable" Exactions.** .......... 28

**F. The Government's Ripeness Argument Must Be Rejected.** .......... 30

**VI. CONCLUSION** .......... 31

# TABLE OF AUTHORITIES

*Cases*

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ......................................................19, 30

*American Bayridge Corp. v. United States*, 35 F. Supp. 2d 922 (Ct. Int'l Trade 1998),
*vacated in part without pub. op.*, 1999 WL 997303 (Fed. Cir. Oct. 26, 1999) .......*passim*

*Boen Hardwood Flooring, Inc., v. United States*, 254 F. Supp. 2d 1349
(Ct. Int'l Trade 2002)..............................................................................*passim*

*High Star Toys, Inc. v. United States*, 32 Fed. Cl. 176 (1994) ..........................................*passim*

*K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176 (1988) ...............................................................22

*Magone v. Luckemeyer*, 139 U.S. 612 (1891) ...........................................................................3, 5

*Merritt v. Welsh*, 104 U. S. 694 (1881) ..................................................................3, 5, 28

*Michaelian & Kohlberg, Inc. v. United States*, 22 C.C.P.A. 551 (1935)....................................3

*Mita Copystar America v. United States*, 21 F.3d 1079 (Fed. Cir. 1994)...................................3

*Precision Specialty Metals, Inc. v. United States*, 182 F. Supp. 2d 1314
(Ct. Int'l Trade 2001)..............................................................................5, 28

*Seeberger v. Farwell*, 139 U.S. 608 (1891) ...........................................................................3, 5

*Trayco Inc. v. United States*, 994 F.2d 832 (Fed. Cir. 1993) ............................................*passim*

*Tropicana Prods., Inc. v. United States*, 789 F. Supp. 1154 (Ct. Int'l Trade 1992).....................3

*Worthington v. Robbins*, 139 U.S. 337 (1891) ..........................................................................3, 5

*United States v. Levitt*, 26 Fed. Cas. 919 (D. Mass. 1842) .....................................................3, 5

*United States v. Schoverling*, 146 U.S. 76 (1892) ...................................................................3, 5

*Statutes*

Customs Modernization and Informed Compliance Act, Pub. L. 103-182, § 623,

107 Stat. 2186 (1993) (codified at 19 U.S.C. § 1625) .......................................... *passim*

Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202 note:

Chapter 44 .......................................................................................... 11

Chapter 44, Stat. Note 1 .......................................................................... *passim*

Heading 4407 .......................................................................................... *passim*

Item 4407.10.00.68 .................................................................................. 2, 11

Heading 4421 .......................................................................................... *passim*

Item 4421.90.97.40 .................................................................................. *passim*

19 U.S.C. § 1304(a) ...................................................................................... 24

19 U.S.C. § 1500(a) ...................................................................................... 10

19 U.S.C. § 1500(b) ...................................................................................... 10

19 U.S.C. § 1514(a) ...................................................................................... *passim*

19 U.S.C. § 1514(a)(4) .................................................................................. 17

19 U.S.C. § 1515(b) ...................................................................................... 17

19 U.S.C. § 1592(a) ...................................................................................... *passim*

19 U.S.C. § 1595(a) ...................................................................................... 28, 29

19 U.S.C. § 1618 ........................................................................................... 24, 27

28 U.S.C. § 1346(a) ...................................................................................... 25

28 U.S.C. § 1491(c) ...................................................................................... 2, 23

28 U.S.C. § 1581(a) ...................................................................................... *passim*

28 U.S.C. § 1581(c) ...................................................................................... 22

28 U.S.C. § 1582 ........ *passim*

28 U.S.C. § 1582(1) ........ 17

28 U.S.C. § 1582(2) ........ 27

28 U.S.C. § 1582(3) ........ 27

28 U.S.C. § 1582(2) ........ 27

*Rules*

Rule 12(b), Rules of the U.S. Court of Federal Claims ........ 21, 29

Rule 12(b)(1), Rules of the U.S. Court of Federal Claims ........ 21, 22

Rule 12(b)(6), Rules of the U.S. Court of Federal Claims ........ 22

*Administrative Materials*

19 C.F.R. § 141.0a. ........ 13

19 C.F.R. § 141.64. ........ 13, 18

19 C.F.R. § 141.68(c) ........ 13, 17

19 C.F.R. § 141.101. ........ 13

19 C.F.R. § 141.101(a) ........ 13, 17

19 C.F.R. § 141.113(c) ........ 13

19 C.F.R. § 142.12(b). ........ 13

19 C.F.R. § 142.22. ........ 13

19 C.F.R. § 142.23. ........ 13

19 C.F.R. § 152.2. ........ 13

19 C.F.R. § 159.1. ........ 4

Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) ........ *passim*

Customs Service Headquarters Ruling I85263 (Sept. 12, 2002) ........ *passim*

Customs Service Headquarters Ruling B80847 (Jan. 23, 1997)......................................... *passim*

*Notice of Amended Final Determination of Sales at Less than Fair Value and Antidumping Duty Order: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 36068 (May 22, 2002)....................................................................... 3

*Notice of Amended Final Affirmative Countervailing Duty Determination and Notice of Countervailing Duty Order: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 36070 (May 22, 2002)…………………………………..3

U.S. Customs Service, Getting Informed About Informed Compliance, *reprinted in* 4 Global Trade Talk No. 1 (Jan.-Feb. 1994)..........................................................10

*Legislative Materials*

H.R. 2512, 102nd Cong. (1991) ..................................................................................7

H.R. 2589, 102nd Cong. (1991) ..................................................................................7

*Report of the Conference Committee on the Revenue Act of 1992*, H.R. Conf. Rep. No. 102-1034 (1992) ........................................................................8

*Statement of Administrative Action, NAFTA Implementation Act*, H.R. Doc. No. 103-159 (1993) ..................................................................................9

*Opening Market Proposals, Auto Trade, and Customs Modernization: Hearings on H.R. 5100 Before the Senate Comm. on Finance*, S. Rep. No. 102-1065 (1992) ........................9

*Customs Modernization and Informed Compliance: Hearings on H.R. 3935 Before the Subcomm. on Trade of the House Comm. On Ways and Means*, H.R. Rep., 102nd Cong. (1992) ..................................................................................10

**PLAINTIFF'S PREHEARING MEMORANDUM IN**
**<u>OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

COMES NOW Plaintiff, Forest Products Northwest, Inc., doing business as Northwest Forest Products ("NWFP"), and hereby submits this Prehearing Memorandum in Opposition to the Motion to Dismiss filed by the United States on January 28, 2004, and respectfully requests that said motion be DENIED.

## I. SUMMARY

In *Trayco Inc. v. United States*, 994 F.2d 832 (Fed. Cir. 1993), the Federal Circuit held that the Court of International Trade ("CIT") has no jurisdiction under 28 U.S.C. § 1581(a) to review an exaction by the U.S. Customs and Border Protection Service ("U.S. Customs") that is not "protestable" under 19 U.S.C. § 1514(a), and that an importer therefore may bring a refund action under the Little Tucker Act, 28 U.S.C. § 1346(a). The logic of *Trayco* is that importers should not be forced to endure the uncertainty and unpleasantness of refusing to pay an assessment and waiting for the government to bring a collection action under 28 U.S.C. § 1582 to obtain judicial review. *See id.* Thus, *Trayco* is merely an application of the quintessentially American principle, first articulated by Abraham Lincoln, and now engraved on the wall of this Court's lobby, that "[i]t is as much the duty of government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private individuals."

In sum, this Court clearly has jurisdiction over this case under *Trayco*, and the government's motion to dismiss must be DENIED.

## II. STATEMENT OF THE CASE

This case arises from a non-"protestable" assessment of estimated antidumping and countervailing duties ("AD/CVDs") by U.S. Customs. This assessment was based on

the October 2003 reclassification of NWFP's entries of edge-glued wood from Item 4421.90.97.40, Harmonized Tariff Schedule of the United States ("HTSUS") (3.3% *ad valorem*) to Item 4407.10.00.68, HTSUS (free). NWFP had been entering edge-glued wood under Item 4421.90.97.40, HTSUS, and U.S. Customs had been accepting the entries, since March 2003. *See* Compl. Ex. 1.

Specifically, the Complaint alleges that the reclassification and exaction of estimated AD/CVDs by U.S. Customs violated the following laws:

(1) Section 625(c) of the Customs Modernization and Informed Compliance Act ("the Mod Act"), Pub. L. 103-182, § 623, 107 Stat. 2186 (1993) (codified at 19 U.S.C. § 1625(c)),

(2) General Rule of Interpretation 1 of the HTSUS; and

(3) the scope order issued by the U.S. Department of Commerce ("DOC") excluding "[e]dge-glued wood, properly classified under HTSUS Item 4421.90.[97].40," from the AD/CVD cases on certain softwood lumber products from Canada.[1]

*See* Compl. ¶¶ 26-47.

The reclassification of NWFP's edge-glued lumber under Heading 4407, HTSUS, was contrary to the clear instructions in Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) that "[e]dge-glued lumber does not meet the definition of lumber in . . . heading 4407."[2] The reclassification also was contrary to the clearly instructions in

[1] *Notice of Amended Final Determination of Sales at Less than Fair Value and Antidumping Duty Order: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 36068 (May 22, 2002); *Notice of Amended Final Affirmative Countervailing Duty Determination and Notice of Countervailing Duty Order: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 36070 (May 22, 2002). In 2003, the Subheading 4421.90.97, HTSUS, was amended, and former Item 4421.90.98.40 was redesignated as Item 4421.90.97.40.

[2] *See also* Customs Service Ruling I85263 (Sept. 12, 2002) (classifying merchandise similar to the subject merchandise under Subheading 4421.90, HTSUS); Customs Service Rulings B80847 (Jan. 23, 1997) (same); *accord Boen Hardwood Flooring, Inc., v. United States*, 254 F. Supp. 2d 1349, 1359-60 (Ct. Int'l Trade 2002) (edge-glued wood is more than mere lumber, because edge-gluing is not among the manufacturing processes enumerated in Headings 4407 and 4409, HTSUS).

Statistical Note 1 to Chapter 44, HTSUS, that Heading 4407, HTSUS "does not include wood that . . . has been edge-glued."

U.S. Customs based its reclassification on what NWFP did with its merchandise after importation. *See* Compl. Ex. 1 (Request for Information ("CF-28") about the actual use of the merchandise). The Federal Circuit and the Supreme Court have admonished repeatedly that "actual use" is irrelevant to classification absent a clear statement to the contrary in the applicable tariff provision.[3]

## III. STATEMENT OF ISSUES

A. Is the CIT's exclusive jurisdiction to review scope rulings issued by DOC implicated when DOC has issued a scope ruling on the product in question and the Plaintiff agrees with that ruling? (Yes)

[3] *See, e.g.*, *Mita Copystar America v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) ("It is well settled law that merchandise is classified according to its condition when imported. If the rule were otherwise, not only could the same product be subject to different duty rates depending on its intended end use, but Customs would be flooded with affidavits or other evidence of differing intended uses. Moreover, Customs would have no way of determining whether the merchandise was actually used for its alleged intended purpose after importation. . . . [There is nothing] in the instant tariff provision that suggests that it is proper to refer to [events] after importation for purposes of classifying merchandise.") (citing *United States v. Citroen*, 223 U.S. 407, 414 (1912)); *see also Merritt v. Welsh*, 104 U.S. 694, 704 (1881) ("Great stress [was] laid on the charge that sugars are manufactured in dark colors on purpose to evade our duties. Suppose this is true; has not a manufacturer a right to make his goods as he pleases? If they are less marketable, it is his loss; if they are not less marketable, who has a right to complain? If the duties are affected, there is a plain remedy. Congress can always [change the law]. . . . . So long as . . . the goods are truly invoiced and freely and honestly exposed to the officers of customs for their examination, . . . no penalty is incurred."); *accord United States v. Schoverling*, 146 U.S. 76, 81 (1892); *Seeberger v. Farwell*, 139 U.S. 608, 611 (1891); *Magone v. Luckemeyer*, 139 U.S. 612, 614 (1891); *Worthington v. Robbins*, 139 U.S. 337, 341 (1891); *United States v. Levitt*, 26 Fed. Cas. 919 (D. Mass. 1842); *see also Michaelian & Kohlberg, Inc. v. United States*, 22 C.C.P.A. 551, 557 (1935) ("the rule is well settled, having been often stated and approved by various courts, that an importer has the right to fashion his merchandise so that it shall be assessed with duty at the lowest rate"); *see also Tropicana Prods., Inc. v. United States*, 789 F. Supp. 1154 (Ct. Int'l Trade 1992) (same; using the term "fundamental right").

B. Is a reclassification decision "protestable" under 19 U.S.C. § 1514(a) and subject to judicial review in the CIT under 28 U.S.C. § 1581(a) prior to liquidation?[4] (No)

C. May an Import Specialist issue a reclassification decision more than 20 days before liquidation without the prior approval of the Port Director? (No)

D. Is a pre-liquidation assessment of duties based on a reclassification decision "protestable" under 19 U.S.C. § 1514(a) and subject to judicial review in the CIT under 28 U.S.C. § 1581(a)? (No)

E. Would NWFP have risked serious penalties under 19 U.S.C. § 1592(a) the company made additional entries under Heading 4421, HTSUS, after being told by U.S. Customs to change the classification of its merchandise to Heading 4407, HTSUS? (Yes)

## IV. STATEMENT OF FACTS

### A. <u>Statutory Background</u>

#### 1. *The Mod Act*

The Mod Act "was meant to alter fundamentally the entire statutory scheme" governing customs administration.[5] The fundamental purpose of the Mod Act was to

---

[4] Liquidation is defined as "the final computation or ascertainment of the duties . . . accruing on an entry." 19 C.F.R. § 159.1.

[5] *American Bayridge Corp. v. United States*, 35 F. Supp. 2d 922, 938 (Ct. Int'l Trade 1998) (citing, *inter alia*, testimony to Congress that the legislation would effect the broadest reforms of U.S. Customs law since 1789 and U.S. Customs' acknowledgment that over 50 percent of the Customs Regulations would have to be revised to implement the Mod Act), *vacated in part as moot on other grounds*, 1999 WL 997303 (Fed. Cir. Oct. 26, 1999).

impart a certainty and predictability[6] that had been sorely lacking in the customs area because of U.S. Customs' power to make retroactive changes to its interpretive rulings, decisions, and treatment of substantially identical transactions. To this end, Section 625(c) of the Mod Act, Pub. L. 103-182, § 623, 107 Stat. 2186 (codified at19 U.S.C. § 1625(c)), abolished this arbitrary power and gave importers a right to rely on Customs Service Rulings, and the treatment previously accorded by U.S. Customs to substantially identical transactions, in making import decisions.

The Mod Act is relevant in this case because NWFP has asserted that U.S. Customs violated, and is continuing to violate on a daily basis, the letter and spirit of Section 625(c) by effectively modifying Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) ("[e]dge-glued lumber does not meet the definition of lumber in . . . heading 4407")[7] and revoking the classification and entry treatment previously accorded to substantially identical merchandise, without giving the importing community the required notice and opportunity for comment, followed by a 60 day grace period to continue importing under the old rule.[8]

---

[6] The Supreme Court recognized long ago that there is a strong public policy in favor of certainty and predictability under the customs laws. *Merritt,* 104 U.S. at 704 ("Uncertainty and ambiguity are the bane of commerce. Discretion in the custom-house officer should be limited as strictly as possible. It has been said with much truth, 'Where law ends, tyranny begins.'"). At the time the Supreme Court decided *Merritt*, entries were liquidated within days of entry, and importers could initiate common law refund actions to challenge the classification at liquidation immediately after payment under protest. *See id.; see also Schoverling*, 146 U.S. 76; *Seeberger,* 139 U.S. 608; *Magone,* 139 U.S. 612; *Worthington,* 139 U.S. 337; *Levitt*, 26 Fed. Cas. 919.

[7] *See also* Customs Service Ruling I85263 (Sept. 12, 2002) (classifying merchandise similar to the subject merchandise under Heading 4421, HTSUS); Customs Service Rulings B80847 (Jan. 23, 1997) (same).

[8] *See Bayridge,* 35 F. Supp. 2d at 941 ("Customs acted contrary to 19 U.S.C. § 1625(c) when it stated that . . . third parties were not entitled to rely on the North Star Ruling" in entering their merchandise); *see also Precision Specialty Metals, Inc. v. United States*, 182 F. Supp. 2d 1314, 1326 (Ct. Int'l Trade 2001) (rejecting the government's argument that to establish a "previous treatment" under Section 625(c)(2), importers had to satisfy establish a "uniform and established practice" across many ports over many years involving many importers, as defined in its pre-Mod Act regulations).

Section 623 of the Mod Act substantially amended Section 625 of the Tariff Act of 1930, 19 U.S.C. § 1625 (2000), which had been added to the Act in 1978 by Public Law No. 95-410. Though revolutionary at the time, the original Section 625 merely required U.S. Customs to make all of its rulings and decisions publicly available — not simply the binding Customs Service Decisions that the agency decided to publish in the *Customs Bulletin.* The original Section 625 provided as follows:

> Within 120 days after issuing any precedential decision (including any ruling letter, internal advice memorandum, or protest review decision) under this chapter with respect to any customs transaction, the Secretary shall have such decision published in the *Customs Bulletin* or shall otherwise make such decision available for public inspection.

19 U.S.C. § 1625 (1988).

Under the original Section 625, then, U.S. Customs had to make public its "unpublished" Customs Service Rulings. However, only Customs Service Decisions were "binding" on U.S. Customs under the existing statutory scheme. The agency could revoke or modify Customs Service Rulings retroactively and without prior notice to affected importers. *See American Bayridge Corp. v. United States,* 35 F. Supp. 2d 922, 936-37 (Ct. Int'l Trade 1998), *vacated in part as moot on other grounds,* 1999 WL 997303 (Fed. Cir. Oct. 26, 1999). Thus, while importers could access Customs Service Rulings as a result of Section 625, they still could not rely on them, because they could be revoked or modified at any time without prior notice. *See id.* The inability of importers to rely on Customs Service Rulings was greatly exacerbated by the agency's practice of rarely issuing Customs Service Decisions outside certain limited contexts (*e.g.,* marking).

The amendments to Section 625 completed the revolution begun in 1978 by precluding U.S. Customs from revoking or modifying Customs Service Rulings

retroactively and without prior notice to importers of substantially identical merchandise. The amended Section 625 reads in relevant part as follows:

> (a) Within 90 days after the date of issuance of any interpretive ruling (including any ruling letter, or internal advice memorandum) or protest review decision under this chapter with respect to any customs transaction, the Secretary shall have such ruling or decision published in the *Customs Bulletin* or shall otherwise make such ruling or decision available for public inspection.
>
> * * *
>
> (c) Modification and revocation
>
> A proposed interpretive ruling or decision which would--
>
> (1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
>
> (2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;
>
> shall be published in the *Customs Bulletin.* The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.
>
> . . .

19 U.S.C. § 1625 (2000).

Though enacted as part of NAFTA, the Mod Act had been proposed three years earlier in two different forms: A bill drafted by the Joint Industry Group ("JIG"), H.R. 2512, 102nd Cong. (1991); and a bill drafted by U.S. Customs, H.R. 2589, 102nd Cong. (1991). *Bayridge,* 35 F. Supp. 2d at 938. The agency's bill proposed no amendments to Section 625 of the Tariff Act. The JIG's version, however, proposed amendments to Section 625 to implement its concept of "informed compliance" and abolish the historic (if arbitrary) power U.S. Customs had to revoke or modify the classification and

treatment of particular merchandise retroactively (*i.e.*, with respect to merchandise entered but not liquidated before the revocation or modification). *See Bayridge*, 35 F. Supp. 2d at 936-38. After months of negotiations to reconcile some 75 differences, the two bills were consolidated and the consolidated bill, including JIG's proposed amendments to Section 625, was eventually enacted as Title VI of NAFTA in 1993. *Id.*

In defining the basic policy of this historic reform legislation, the Conference Committee adopted the term "informed compliance," which it defined as follows:

> "Informed compliance" is premised on the belief that **importers have a right** to be informed about Customs rules and regulations, as well as interpretive rulings and other directives, and **to expect certainty that Customs will not unilaterally change the rules without providing importers with proper notice and an opportunity to respond**.

H.R. Conf. Rep. No. 102-1034, at 1208 (1992) (emphasis added).

The Conference Committee based its definition of "informed compliance" on the combined testimony by JIG and U.S. Customs offered in support of the legislation. For example, Assistant Commissioner Samuel H. Banks acknowledged that the key evil to be remedied by the new Section 625(c) was the inability of importers to rely on rulings, even ones specifically addressed to them:

SEN. MOYNIHAN: What is informed compliance?

MR. BANKS: Informed compliance is really an effort. And it was almost a demand from the industry. **We [must] do a better job of telling them what the trade rules are.** There are so many different trade agreements out there today, **it is very confusing for certain people to comply.**

SEN. MOYNIHAN: Yes

MR. BANKS: **I mean, if they want to completely, honestly comply, it is still very difficult.** And so they have asked us can we provide better information for those companies on what are the trade rules? What are the appropriate tariff classifications and duty regulations and admissibility

> requirements for their goods? . . . So this is really a shared responsibility. **It is a requirement that they live by the rules, but it is a requirement that we better explain the rules to them so that they can operate efficiently.**

*Opening Market Proposals, Auto Trade, and Customs Modernization: Hearings on H.R. 5100 Before the Senate Comm. on Finance,* S. Rep. No. 102-1065, at 66 (1992) (emphasis added).

The prepared remarks Mr. Banks submitted for the record described "informed compliance" this way:

> Informed compliance is a term that was first used by the trade community. Under informed compliance, the trade community needs to know and be able to obtain advice about Customs rules and procedures; and **the trade community needs certainty that those rules and procedures will not be changed suddenly.**

*Id.* at 84 (emphasis added). Responding to a question from Senator Moynihan asking if the proposed legislation signaled a move away from an adversarial relationship, JIG Chairman Aaron Cross said yes, stating that the "legislation implies that the historic adversarial relationship between industry and the Customs Service is not going to serve our interests, the United States' interests, as we go into the 21st century." *Id.* at 67. Cross also called Section 625(c) "informed compliance in its finest manifestation." *Id.* at 99.

To implement the Mod Act reforms, U.S. Customs promised Congress to overhaul the Customs Regulations, acknowledging "that 'over 50 percent" would have to be "revised," including the regulations "with respect to . . . rulings procedures." Statement of Administrative Action, NAFTA Implementation Act, H.R. Doc. No. 103-159, at 680E (1993); *see also Customs Modernization and Informed Compliance: Hearings on H.R. 3935 Before the Subcommittee on Trade of the House Committee on*

*Ways and Means*, H.R. Rep., 102[nd] Cong. 97 (1992) (Statement of Commissioner of Customs Carol Hallett) (acknowledging that the "modernization" and "informed compliance" would require regulatory "changes and new procedures relating to . . . [the] modification and revocation of prior interpretive rulings"); *see also* U.S. Customs Service, Getting Informed about Informed Compliance, *reprinted in* 4 Global Trade Talk No. 1 (Jan.-Feb. 1994) ("Customs recognizes that importers and exporters . . . need certainty").

2. *The Harmonized Tariff Schedule of the United States*

The amount of duties owed on an importation is determined by the value (or quantity) and tariff classification of the merchandise and the rate of duty, if any, assigned to that classification. *See* 19 U.S.C. § 1500(a) & (b).

The classification of merchandise under the HTSUS is to be determined by application of the General Rules of Interpretation ("GRIs") and the U.S. Additional Rules of Interpretation ("USARIs"). These rules are meant to be applied in sequence until the correct classification of the merchandise is clear. Because the HTSUS is so well crafted, the vast majority of classification questions can be determined by application of GRI 1.

GRI 1 provides that classification "shall be determined according to the terms of the [relevant] headings and any relative section or chapter notes." This has been interpreted to mean that merchandise is classifiable in a heading only if "the terms of the heading and any relative section or chapter notes" provide a "complete and accurate description" of the merchandise. *Boen Hardwood Flooring, Inc., v. United States,* 254 F. Supp. 2d 1349, 1359-60 (Ct. Int'l Trade 2002) (edge-glued wood is more than mere lumber, because edge-gluing is not among the manufacturing processes enumerated in

Headings 4407 and 4409, HTSUS). Thus, under GRI 1, merchandise that is more than what is described in a tariff provision cannot be classified in that provision. *See id.*

USARI 1 reads in relevant part as follows:

> (a) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use.

USARI 1 codifies longstanding Supreme Court case law holding that, with few exceptions not relevant here, the "actual use" to which a particular entry is applied after importation is irrelevant to its classification. *See supra* note 3 (collecting cases).

This case concerns the classification of merchandise in Chapter 44, HTSUS. The first part of Chapter 44, HTSUS (Headings 4401 to 4413) provides for "wood" in various raw and semi-processed forms, including what is commonly referred to as "timber" and "lumber." The rest of Chapter 44 specifies various further manufactured wood products or "Articles of wood" (Headings 4414 to 4420), and then has a catch-all provision for unspecified "Other articles of wood" (Heading 4421).

The two competing tariff provisions here are Item 4421.90.9740, HTSUS, where NWFP originally classified its merchandise, and Item 4407.10.00.68, HTSUS, where U.S. Customs reclassified the merchandise.

Heading 4407, HTSUS, reads in relevant part as follows:

| | | | |
|---|---|---|---|
| 4407 | | Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm: | |
| 4407.10.00 | 00 | Coniferous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Free |
| | 01 | Finger jointed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | | Other: | |
| | 02 | Treated with paint, stain, creosote, or other preservative . . . . | |
| | | Not treated: | |
| | 15 | Mixtures of spruce, pine, and fir ("S-P-F") . . . . . . . . . . . . . | |
| | 16 | Mixtures of western hemlock and amabilis fir ("hem-fir") . . | |
| | | Other: | |
| | * * * | * * * | |
| | | Western red cedar: | |
| | 68 | Rough . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | 69 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

Heading 4421, HTSUS, reads in relevant part as follows:

| | | | |
|---|---|---|---|
| 4421 | | Other articles of wood: | |
| 4421.10.00 | 00 | Clothes hangars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.2% |
| 4421.90 | | Other: | |
| * * * | * * * | * * * | |
| 4421.90.97 | | Other: | 3.3% |
| | 20 | Pencil slats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | 40 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

The only section or chapter note that addresses the classification of edge-glued lumber is Statistical Note 1 to Chapter 44. This chapter note states that Heading 4407, HTSUS "**<u>does not include wood that</u>** has been dressed or surfaced by planing on one or more edges or faces or **<u>has been edge-glued</u>**." Emphasis added. As indicated above, both U.S. Customs and the CIT have adopted this interpretation of Heading 4407, HTSUS. *See*, *e.g.*, Customs Service Headquarters Ruling 087616 (Aug. 20, 1990); *Boen*, 254 F. Supp. 2d at 1359-60.

3. *The Customs Entry and Liquidation Process*

To enter merchandise into the customs territory of the United States, an importer must file an "entry" that classifies the merchandise under the HTSUS and provides certain other information. *Id.* § 141.0a & 142.3. U.S. Customs examines the entry and, with a few exceptions not relevant here, conditionally releases the merchandise for immediate delivery to its destination in the United States. *Id.* § 142.3 & 142.22.

Within 10 days, the importer must file an "entry summary." *Id.* §§ 142.12(b) & 142.23. The entry summary classifies the subject merchandise and must have a check for any estimated AD/CVDs attached if the entered classification of the merchandise is covered by a relevant AD/CVD order. *Id.* § 141.101. U.S. Customs examines the entry summary and, if an entry requirement is not met, may deny entry and order "redelivery" of the merchandise to U.S. Customs. *See id.* §§ 141.64, 141.68(c), 141.101(a) & 141.113(c).[9] Alternatively, U.S. Customs can allow entry and assess liquidated damages, *see* § 113.62, and in some cases penalties under 19 U.S.C. § 1592(a) for non-compliance with the entry requirement.

If an entry is misclassified by the importer, U.S. Customs may reclassify the entry at liquidation and assess liquidated damages and penalties if appropriate. U.S. Customs is not authorized, however, to reclassify an entry while liquidation is suspended. *See* 19 C.F.R. § 152.2 (CF-29 cannot be issued more than 20 days before liquidation unless the Port Director makes a finding that there are "compelling reasons" to do so).[10]

---

[9] The denial of entry is a "protestable" action for which judicial review may be had in the CIT under 28 U.S.C. § 1581(a) within 120 days (immediately if U.S. Customs cooperates).

[10] To the best of NWFP's knowledge, the Port Director was not involved in any way in the decision to issue the CF-29 to NWFP years before liquidation.

Under current agency practice, liquidation normally occurs 314 days after entry. However, the liquidation of entries classified (or reclassified) in a tariff provision covered by a relevant AD/CVD order is suspended until the exhaustion of any administrative and judicial reviews of the AD/CVD order. Such reviews typically take about five years from entry. *See* Ex. A (chronologies of various hypothetical import scenarios).

Administrative review requests under the AD/CVD orders on softwood lumber from Canada for the year in which the subject entries were made (May 22, 2003, through May 21, 2004) may be filed anytime in May 2004. A final determination of the requests will be issued no later than May 22, 2005, and interested parties will have 30 days thereafter to file an action for review by the CIT (or a NAFTA panel).

### B. NWFP's Entries and Their Treatment by U.S. Customs

On March 31 2003, NWFP made its first entry of edge-glued wood (Entry No. WQO-12865573). *See* Compl. Ex. 1 (CF-29). NWFP classified its merchandise under Item 4421.90.97.40, HTSUS. *See id.*[11] U.S. Customs approved the entry and released the merchandise for immediate delivery to NWFP. *See id.* Within 10 days, NWFP filed its entry summary, which did not have any estimated AD/CVDs attached. U.S. Customs approved the entry summary and allowed the entry. *See id.*

---

[11] In classifying its merchandise at entry, NWFP relied upon Statistical Note 1 to Chapter 44, Harmonized Tariff Schedule of the United States ("HTSUS"), which states that Heading 4407, HTSUS "does not include wood that . . . has been edge-glued" and was adopted by U.S. Customs upon the enactment of the HTSUS in Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) ("[e]dge-glued lumber does not meet the definition of lumber in . . . heading 4407"). *See also* Customs Service Ruling I85263 (Sept. 12, 2002) (classifying merchandise similar to the subject merchandise under Heading 4421, HTSUS); Customs Service Rulings B80847 (Jan. 23, 1997) (same). NWFP could have been penalized under 19 U.S.C. § 1592(a) had it classified its edge-glued lumber under Heading 4407, HTSUS, at entry. *See* U.S. Customs Service, What Every Member of The Trade Community Should Know About "Reasonable Care": A Checklist for Compliance (January 1998) ("Have you consulted the tariff schedules, Customs' Informed Compliance publications, court cases and/or Customs rulings to assist you in describing and classifying [your] merchandise?"); *see also* S. Rep. No. 103-361, at 71 (1993) ("reasonable care" requires importers to follow all relevant rulings).

In reliance on the above-cited legal authorities, and the treatment of its initial entry, NWFP made a number of additional entries over the next 5 months. *See id.* U.S. Customs gave NWFP's subsequent entries the same treatment it had accorded to NWFP's initial entry and allowed entry without payment of estimated AD/CVDs. *See id.*

On September 11, 2003, NWFP made an entry that the examining official at U.S. Customs accepted after making a drawing of the merchandise and a notation on the entry documentation that the "more correct" classification of the merchandise was the tariff provision for "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm: Coniferous," Subheading 4407.10.0000, HTSUS/free. *See* Pl.'s Opp. to Def.'s Mot. to Dismiss Ex. 2.

On September 26, 2003, the local Import Specialist, Lorisa Hubsch, issued a CF-28 inquiring about the actual use of the merchandise after importation. *See id.* Ex. 4. The CF-28 asked the following questions:

> What, if anything, is done to the panels at your Tacoma facility after [they] are received from Canada? Do you resell these panels to retail centers or directly to end-users? What are the edge-glued cedar panels used for by the end user?

Compl. Ex. 1.

On September 30, 2003, NWFP sent a request for a tariff classification ruling to the National Import Specialist for lumber products, Paul Garretto, with a carbon copy to Ms. Hubsch. Pl.'s Opp. to Def.'s Mot. to Dismiss Ex. 7. This submission was supplemented at Mr. Garretto's request on October 5, 2003, in a further submission that addressed the actual use issues raised in the CF-28. *See id.* Ex. 8. NWFP's submissions set forth the long and unbroken line of Supreme Court decisions clearly holding that

actual use is irrelevant to the classification of merchandise as imported[12] and that there was no other apparent basis for distinguishing the many rulings holding that "[e]dge-glued lumber does not meet the definition of lumber in . . . heading 4407." Customs Service Headquarters Ruling 087616 (Aug. 20, 1990); *see also* Customs Service Ruling I85263 (Sept. 12, 2002) (classifying merchandise similar to the subject merchandise under Heading 4421, HTSUS); Customs Service Rulings B80847 (Jan. 23, 1997) (same); *accord Boen*, 254 F. Supp. 2d at 1359-60.[13]

On or about October 1, 2003, counsel for NWFP called Mr. Garretto to ask whether NWFP would be penalized for making additional entries under Heading 4421, HTSUS, and Mr. Garretto answered in the affirmative and said that NWFP had better make any additional entries under Heading 4407, HTSUS, and paying estimated AD/CVDs.[14]

In accordance with Mr. Garretto's instructions, NWFP made the two entries upon which this action originally was based on October 2, 2003, and October 6, 2003, respectively. *See* Compl. Ex. 1. In accordance with Mr. Garretto's instructions, and to avoid additional penalty exposure, NWFP's broker paid estimated AD/CVDs on the entries. However, he did so under protest and sent letters to this effect to the Port Director. These letters read as follows:

---

[12] The tariff classification of imported merchandise is not affected by what the importer does with it after importation. *See supra* note 3 (colleting cases).

[13] NWFP was unable to find a single ruling or judicial decision classifying any form of edge-glued wood as lumber, yet there are dozens of rulings classifying various forms of edge-glued lumber in Heading 4421, HTSUS.

[14] NWFP asked Mr. Garretto for instructions because NWFP's broker had refused to enter the merchandise under Heading 4407, HTSUS, because of an understandable concern that he could be penalized for not following Customs Service Headquarters Ruling 087616 (Aug. 20, 1990).

> Enclosed, please find our respective check(s) for payment of the assessment made by Customs and Border Protection under 19 U.S.C. Sections 1671(e) & 1673(g) on importation of the edge-glued merchandise covered by the following entry numbers:
>
> WQO-1289757-6 10/6/03
> Ref. # WFP-102
>
> This assessment was based on the conclusion of Customs and Border Protection – that the subject merchandise is not properly classified in subheading 4421.90.9740 of the Harmonized Tariff Schedule of the United States (HTSUS), or if ultimately allowed entry under this heading, that the material, although specifically exempted by Commerce's Scope Memorandum, is to be entered subject to such assessments. We believe that CBP's conclusion is legally incorrect and that the subject merchandise is properly classified under HTSUS subheading 4421.90.9740, and is specifically exempted from the scope of the present CVD/ADD (C-122-839-000 and A-122-838-000) investigation case.
>
> Accordingly, this payment is being made under protest. ***Northwest Forest Products*** reserves its right to obtain judicial review of said decision **by any appropriate form of action**.

Pl.'s Opp. to Def.'s Mot. to Dismiss Ex. 1 (emphasis added).

U.S. Customs chose not to exercise its power to reject the entry summary, order redelivery of the merchandise to U.S. Customs, and deny entry[15] — a protestable action that would have allowed CIT review under 28 U.S.C. § 1581(a) within 120 days (at once if U.S. Customs cooperated). *See* 19 U.S.C. §§ 1514(a)(4) & 1515(b). Instead, U.S. Customs accepted the entry summary and cashed NWFP's check.[16]

[15] Attaching estimated AD/CVDs to the entry summary is an entry requirement, 19 C.F.R. § 141.101(a), and non-compliance with entry requirements allows U.S. Customs to reject the entry and order redelivery of the merchandise to U.S. Customs' custody if it already has been released into the commerce of the United States. *See id.* §§ 141.64 & 141.113(c).

[16] By accepting NWFP's payments under protest, U.S. Customs precluded the indirect remedy that NWFP had of refusing to pay the estimated AD/CVDs and raising the invalidity of the subject reclassification decision and order as a defense to a collection action under 28 U.S.C. § 1582(1). *See Trayco*, 994 F.2d at 837 ("Trayco could have obtained judicial review in the Court of International Trade by refusing to pay the [assessment] and waiting for the government to commence an enforcement action. However, there is no statutory bar to the course of action Trayco elected.").

On October 15, 2003, in consultation with Mr. Garretto, Ms. Hubsch issued a CF 29 reclassifying NWFP's prior entries.[17] The CF-29 also formalized the instructions NWFP had been given verbally by Mr. Garretto two weeks before.[18] Specifically, the CF-29 reads in relevant part as follows:

> The following action which will result in an increase of duties . . . has been taken. The entry is in the liquidation process and is not available for review in this office.
>
> Type of Action: Rate Advance.
>
> Explanation: The entry listed above plus the entries listed on the attached continuation sheet are being re-classified under HTS#4407.10.00. This reclassification is based on discussions with the National Import Specialist and a visit by a CBP agent to the importer's premises. These entries will be subject to AD/CVD[s] under cases A 122-838 and C122-839. . . . All future shipments of this product **must** be classified according to this Notice of Action.

Compl. Ex. 1 (emphasis added).[19] As the use of mandatory language in the CF-29 clearly indicates, immediate compliance with the agency's order was expected, and NWFP would have risked serious penalties under 19 U.S.C. § 1592(a)[20] if the company made additional entries under Heading 4421, HTSUS. *See* Pl.'s Opp. to Def.'s Mot. to Dismiss at 4-8, 23.

---

[17] CF-29s are not "protestable," and NWFP therefore had no ability to pursue a judicial review of the order or the underlying classification decision in the CIT. *See* 19 C.F.R. § 141.68(c).

[18] This order confirmed oral instructions that Mr. Garretto gave counsel when asked in a telephone conference on or about October 6, 2003, whether NWFP could continue entering its merchandise under Heading 4421, HTSUS.

[19] NWFP subsequently withdrew its ruling request as moot.

[20] This provision reads in relevant part as follows:

> Without regard to whether the United States is or may be deprived of . . . any lawful duty, tax, or fee thereby, no person, by fraud, gross negligence, or negligence —
>
> (A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of —
>
> (i) any document . . . or information . . . which is material and false, or
>
> (ii) any omission which is material, . . .

19 U.S.C. § 1592(a)(1).

While the CF-29 stated that the subject entries were in the liquidation process, in fact, liquidation of entries subject to the AD/CVD orders is suspended and may not occur for years. *See* Ex. A.[21]

On October 23, 2003, NWFP commenced this action by filing a complaint seeking a refund of the monies paid under protest to U.S. Customs. NWFP continued to make entries and pay estimated AD/CVDs under protest, and filed four supplements to its complaint to cover these additional entries, bringing the total amount in controversy to approximately $150,000.00 (US).

Presently before the Court is the government's motion to dismiss for lack of jurisdiction or, alternatively, for failure to state a claim that is "ripe" for judicial review within the meaning of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). Def.'s Mot. to Dismiss at 15.

## V. ARGUMENT

This is a Tucker Act refund action "founded on alleged violations of the U.S. customs laws." *High Star Toys v. United States*, 32 Fed. Cl. 176, 178 (1994). "Historically, refunds for improper collections of customs duties . . . have been considered to be within the scope of the Tucker Act," and not within the jurisdiction of the CIT, when the exaction is not "protestable" under 19 U.S.C. § 1514(a). *Id.* (citing, *e.g.*, *Trayco*, 994 F.2d 832).

### A. <u>Legal Standard for Dismissal Under RCFC Rule 12(b)</u>

"Dismissal of a claim under the Tucker Act on the basis of the pleadings precludes consideration of supporting evidence on substantive merits." *High Star Toys*,

[21] While there has been talk of a settlement of the lumber cases, it is impossible to predict with any degree of certainty if such a settlement will occur, and, in any event, it is extremely doubtful that a settlement would result in a full refund of estimated duties paid on subject merchandise.

32 Fed. Cl. at 179. "The procedure is drastic and should be used only when clearly appropriate." *Id.* "The procedure for rendering a final dismissal for want of jurisdiction should be used sparingly." *Id.* (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

Factual inquiry on a motion to dismiss under RCFC 12(b) is limited. *Id.* In passing on a motion to dismiss, whether on the ground of lack of subject matter jurisdiction or for failure to state a cause of action, the allegations in the complaint are to be considered favorably to the pleader. *Id.* The issue is not whether the plaintiff ultimately will prevail; it is whether the plaintiff is entitled to offer evidence to support facts alleged in the complaint. *Id.*

1. *Dismissal Under Rule 12(b)(1) for Lack of Jurisdiction*

RCFC Rule 12(b)(1) authorizes dismissal when the Court lacks subject matter jurisdiction. "The procedure for rendering a final dismissal for want of jurisdiction should be used sparingly." *High Star Toys*, 32 Fed. Cl. at 179. Subject matter jurisdiction relates to the Court's general powers to adjudicate in specific areas of substantive law. *Id.* The subject matter of a dispute between the parties on the facts peculiar to a specific claim under the Tucker Act may implicate the doctrine of sovereign immunity, but such jurisdictional concepts do not limit the subject matter jurisdiction of the Court, just as prudential doctrines such as exhaustion of remedies and ripeness do not limit the Court's subject matter jurisdiction. *Id.*

2. *Dismissal Under Rule 12(b)(6) for Failure to State a Claim.*

With respect to Rule 12(b)(6), "a complaint should not be dismissed for failure to state a claim upon which relief can be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief.'" *High Star Toys,* 32 Fed. Cl. at 179 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The Court "must 'assume each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant.'" *Id.* (quoting *Chang v. United States,* 859 F.2d 893, 894 (Fed. Cir. 1988)).

### B. This Court Clearly Has Jurisdiction Over Refund Actions Based on Non-"Protestable" Exactions by U.S. Customs.

The government's first argument under Rule 12(b)(1) is that NWFP "failed to cite any separate money-mandating constitutional provision, statute, or regulation, the violation of which would support a claim for damages against the United States." Def.'s Mot. to Dismiss at 7. This argument does not go to the Court's subject matter jurisdiction, but to whether NWFP has stated a claim upon which relief can be granted. *See Trayco,* 994 F.2d at 837 ("[T]he Tucker Act . . . is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction . . . whenever [a] substantive right exists.") (citation and internal quotation marks omitted).

Moreover, the government is clearly wrong that NWFP failed to assert any substantive right to money damages enforceable against the United States. NWFP alleges that U.S. Customs unlawfully exacted. *See* Compl. ¶¶ 1, 9, 38-47; *see also Trayco,* 994 F.2d 832 ("Trayco alleges that the Customs Service improperly assessed and exacted a penalty from Trayco . . . . The refund of a penalty improperly exacted pursuant to an Act of Congress is a substantive right for money damages.") (citing *Eastport Steamship Corp. v. United States,* 178 Ct. Cl. 599, 605 (1967)). Thus, NWFP clearly has asserted a substantive right to money damages enforceable against the United States, and this Court has jurisdiction to entertain NWFP's claim under the Tucker Act.

**C. <u>The CIT's Exclusive Jurisdiction Is not Implicated Here.</u>**

This Court's subject matter jurisdiction over refund actions arising from import transactions is limited by 28 U.S.C. 1491(c), which reads as follows:

> Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade.

"It is well settled, however, that the Court of International Trade, like other specialized courts, operates within precise and narrow jurisdictional limits granted by Congress." *Trayco*, 994 F.2d at 836 (citation omitted). "Despite the fact that the Customs Courts Act of 1980 broadened the exclusive jurisdiction of the Court of International Trade, it cannot exercise jurisdiction over actions not addressed by a specific jurisdictional grant." *Id.; see, e.g., K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176 (1988).

The government argues that the CIT has exclusive subject matter jurisdiction, under 28 U.S.C. § 1581(c), to review scope determinations issued by DOC. Def.'s Mot. to Dismiss at 8-9. The complaint, however, does not ask the Court to review a scope determination issued by DOC. Rather, as the government acknowledges, the complaint asks the Court to review a classification decision made by U.S. Customs. Thus, the CIT's exclusive subject matter jurisdiction under 28 U.S.C. § 1581(c) is not implicated here.

Furthermore, requiring NWFP to pursue a scope ruling and judicial review thereof in the CIT would be inappropriate, because such a ruling already has been issued with respect to edge-glued lumber. NWFP is challenging the correctness of U.S. Customs' interpretation and application of that ruling. The carefully-calibrated administrative mechanism Congress created for conducting AD/CVD proceedings on an expedited basis

would come to a screeching halt if DOC had to conduct entry-by-entry scope determinations, as opposed to issuing general instructions to U.S. Customs as to what "types of merchandise" are covered by an AD/CVD order.[22] Moreover, even assuming NWFP obtained a DOC ruling that its specific form of edge-glued wood is not covered by the AD/CVD orders, what is to prevent U.S. Customs from simply ignoring that more specific ruling?

Turning to the review of classification decisions by U.S. Customs, the government is correct that the CIT has exclusive subject matter jurisdiction, under 28 U.S.C. § 1581(a), to review the denial by U.S. Customs of a protest of the classification of merchandise **at liquidation**. A classification-based exaction made outside the context of a liquidation, however, is not "protestable" and thus cannot be reviewed in the CIT under 28 U.S.C. § 1581(a). *See* Memo in Supp. of Pl.'s Mot. for Expedited Consideration at 2 n.1 (noting that NWFP confirmed with the National Import Specialist that the classification decision embodied in the CF-29 issued to NWFP is "not protestable").[23]

If the government did not want to be haled into this Court on a Tucker Act claim, "the government could have refused to accept [NWFP's] check." *Trayco*, 994 F.2d at 839. Alternatively, the government could have waited until liquidation to assess final

[22] Indeed, there are so many lumber remanufacturers in Canada that DOC has refused to make individualized AD/CVD rate determinations for them given the expedited nature of AD/CVD proceedings and the limited staff resources available to the agency. *See* Prehearing Memo. in Supp. of Pl.'s Mot. for Prot. Order Ex. B. Surely the government is not suggesting that all of these companies should be applying to DOC for individualized scope rulings, no matter how clear DOC's scope definition is.

[23] The case law cited by the government on this point stands for nothing more than the unexceptionable proposition that the CIT has exclusive subject matter jurisdiction to review the classification of imported merchandise at liquidation. None of the cited decisions holds that classification decisions *per se* are "protestable" or otherwise subject to judicial review in the CIT.

AD/CVDs and, if appropriate, the government then could assess penalties under 19 U.S.C. § 1592(a).

In sum, NWFP clearly satisfied the requirements for jurisdiction in this Court under the Tucker Act and alleged a substantive right against the United States for money damages. Accordingly, the Court has subject matter jurisdiction; NWFP has stated a substantive claim for relief that this Court can grant; and the government's Motion to Dismiss must be denied.

### D. **The Reasoning of *Trayco* Clearly Applies to All Non-"Protestable" Exactions by U.S. Customs.**

In *Trayco*, the importer entered shower heads that did not have the country of origin markings required by 19 U.S.C. § 1304(a). *See Trayco*, 994 F.2d at 834. U.S. Customs rejected the entry[24] and instructed the importer to place the required markings on the merchandise. *See id.* The importer did so and certified that fact to U.S. Customs. *See id.* An inspector then visited the importer's business to verify the certification. *See id.* However, the inspector was mistakenly directed to another shipment, which had not been marked. *See id.* & n.8.

U.S. Customs assessed penalties under 19 U.S.C. § 1592(a) based on the allegedly false certification. *See id.* at 835. The importer filed a petition for mitigation of the penalty with U.S. Customs under 19 U.S.C. § 1618. *See id.* The petition was denied, and the importer paid the penalties under protest with a reservation of all rights to judicial review. *See id.*

[24] Under 19 U.S.C. § 1304(h) & (i), U.S. Customs has discretion to reject an entry that is not properly marked or assess liquidated damages of 10% *ad valorem*.

The importer then commenced a refund action in the district court under the Little Tucker Act, 28 U.S.C. § 1346(a)(2). *See id.* The district court held that it had jurisdiction and proceeded to trial on the merits. *See id.* at 834. At the conclusion of the trial, the court found for the importer and ordered a refund. *See id.* The government appealed.

On appeal, the government argued that the Customs Courts Act of 1980, which created the CIT, established a "comprehensive statutory scheme" intended to vest exclusive jurisdiction in the CIT for all actions arising under the customs laws, such as actions challenging the exaction of penalties under 19 U.S.C. § 1592(a). *See id.* at 835-36. The Federal Circuit rejected this argument, stating as follows:

> [I]t is . . . well settled that the Court of International Trade, like other specialized courts, "operates within precise and narrow jurisdictional limits" granted by Congress. Despite the fact that the Customs Courts Act of 1980 broadened the exclusive jurisdiction of the Court of International Trade, it cannot exercise jurisdiction over actions not addressed by a specific jurisdictional grant.
>
> Section 1581 of Title 28 grants exclusive jurisdiction to the Court of International Trade for certain civil actions brought against the United States. The government concedes that section 1581 does not explicitly grant exclusive jurisdiction to the Court of International Trade for a refund suit initiated by an importer against the United States. The Government, however, would have us construe 28 U.S.C. § 1581 expansively to include such an action.
>
> . . .
>
> In subsections (a)-(i) of section 1581, Congress specifically enumerated the types of actions against the United States over which the Court of International Trade has exclusive jurisdiction. The government is asking us to look beyond the plain language of the statute to the legislative history and conclude that this importer-initiated suit for refund of a penalty is within the exclusive jurisdiction of the Court of International Trade. **We reject the government's argument and conclude that if Congress had intended all import-related matters to come within the exclusive jurisdiction of the Court of International Trade it would have specifically said so.**

> Section 1582 of Title 28 grants exclusive jurisdiction to the Court of International Trade over civil actions arising out of import transactions commenced by the United States. Trayco's action against the government meets two of the three jurisdictional requirements of section 1582: (1) it is a civil action; (2) arising out of an import transaction. The United States, however, did not commence this lawsuit . . . . **We reject the government's argument that no jurisdictional gap exists because Congress failed in section 1582 to explicitly grant the Court of International Trade jurisdiction of [refund] actions . . . commenced by an importer.**
>
> . . . Congress did not fully explain, and neither can we, why certain customs-related matters are excluded from the jurisdiction of the Court of International Trade. **We refrain from interpreting either section 1581 or section 1582 as granting exclusive jurisdiction to the Court of International Trade over importer- initiated suits . . . where Congress has not explicitly done so.**
>
> . . .
>
> Trayco could have obtained judicial review in the Court of International Trade by refusing to pay the penalty and waiting for the government to commence an enforcement action. However, there is no statutory bar to the course of action Trayco elected. **Congress has not explicitly granted exclusive jurisdiction to the Court of International Trade over refund suits initiated by importers. A gap exists in the exclusive jurisdiction of the Court of International Trade.** Therefore, Trayco had the option, and more importantly, the right to initiate suit in the district court . . . .

*Trayco*, 994 F.2d at 836-37 (citations omitted; emphasis added).

The government attempts to distinguish *Trayco* from this refund case on the ground that *Trayco* was a penalty refund case. The holding of *Trayco*, however, is that a gap exists in the CIT's jurisdiction in situations whenever U.S. Customs makes a non-"protestable" demand for money. The rationale for this holding is that importers should not have to endure the uncertainty and unpleasantness of not paying the assessment and waiting to be sued by the government in a collection action under 28 U.S.C. § 1582. *See Trayco*, 994 F.2d at 837.

It is telling, in this regard, that Section 1582 is **not** limited to the collection of penalty assessments. Section 1582 also authorizes collection actions "to recover customs duties" and "to recover upon a bond" posted by the importer to cover any assessments. *See* 28 U.S.C. § 1582(2) & (3). In this case, had NWFP refused to pay the assessment of estimated duties, it could have obtained judicial review of the assessment indirectly, as a defense to a collection action under either 28 U.S.C. § 1582(2) or 28 U.S.C. § 1582(3). It makes no sense to read *Trayco* as requiring importers to sit back and refuse to pay a demand for payment by U.S. Customs simply because the agency's collection remedy is under subsections (2) and (3) of 28 U.S.C. § 1582 as opposed to subsection (1).

As the Federal Circuit noted, neither the assessment of penalties, nor the denial of a petition under 19 U.S.C. § 1618, are "protestable" or otherwise subject to direct judicial review in the CIT. Similarly, neither the reclassification of merchandise, nor the requirement of estimated AD/CVDs at entry based on a reclassification, are "protestable" or otherwise subject to direct judicial review in the CIT.

While NWFP could obtain review of the reclassification of its merchandise at liquidation, liquidation is suspended indefinitely and may not occur for years. *See* Ex. A. In the meantime, NWFP is being deprived, on a daily basis, of its clear statutory right to rely on, and be treated in accordance with, Customs Service Headquarters Ruling 087616 (Aug. 20, 1990) ("Edge-glued lumber does not meet the definition of lumber in . . . heading 4407.")[25] and the treatment previously accorded by U.S. Customs to NWFP's merchandise at entry. *See Bayridge,* 35 F. Supp. 2d at 941 ("Customs acted contrary to 19 U.S.C. § 1625(c) when it stated that . . . third parties were not entitled to rely on the

[25] *See also* Customs Service Ruling I85263 (Sept. 12, 2002) (classifying merchandise similar to the subject merchandise under Subheading 4421.90, HTSUS); Customs Service Rulings B80847 (Jan. 23, 1997) (same).

North Star Ruling" in entering their merchandise); *see also Precision Specialty Metals, Inc. v. United States*, 182 F. Supp. 2d 1314, 1326 (Ct. Int'l Trade 2001) (rejecting the government's argument that to establish a "previous treatment" under Section 625(c)(2), importers had to satisfy establish a "uniform and established practice" across many ports over many years involving many importers, as defined in its pre-Mod Act regulations); *Merritt v. Welsh*, 104 U.S. 694, 704 (1881) ("Uncertainty and ambiguity are the bane of commerce. Discretion in the custom-house officer should be limited as strictly as possible. It has been said with much truth, 'Where law ends, tyranny begins.'").

In sum, the Federal Circuit held in *Trayco* that the availability of an indirect judicial review in the future in an action under 28 U.S.C. § 1582 did not bring the Trayco's claim "within the exclusive jurisdiction of the Court of International Trade," 28 U.S.C. § 1491(c). Similarly, in this case, the availability of an indirect judicial review in the future in an action under 28 U.S.C. § 1581 does not bring NWFP's claim "within the exclusive jurisdiction of the Court of International Trade," 28 U.S.C. § 1491(c).

### E. *High Star Toys* Rejected the Notion that *Trayco* is Limited to its Facts and Does not Apply to All Non-"Protestable" Exactions.

In *High Star Toys*, the importer entered certain toys that did not comply with applicable consumer product safety laws. *High Star Toys*, 32 Fed. Cl. at 178. U.S. Customs rejected the entry and seized the merchandise under 19 U.S.C. § 1595(a). *See id.; see also* 19 U.S.C. § 1595(a)(2)(A) (merchandise "may be seized or forfeited if its importation or entry is subject to any restriction or prohibition . . . relating to health, safety, or conservation and is not in compliance with the applicable rule or requirement"). The importer filed a petition for relief with U.S. Customs under 19 U.S.C. § 1618. *High Star Toys*, 32 Fed. Cl. at 178. The agency's decision on the petition was "to remit the

forfeiture on payment of an amount that was 52.2 percent of the forfeiture value." *See id.* The importer paid the money under protest and sought judicial review in this Court.

The government moved to dismiss for lack of jurisdiction. The Court denied the motion, rejecting the government's attempt to limit *Trayco* to its facts and holding that the Federal Circuit's reasoning applied equally to an exaction under 19 U.S.C. § 1592(a) and an exaction under 19 U.S.C. §§ 1595(a) & 1618. *High Star Toys,* 32 Fed. Cl. at 179 ("For purposes of dismissal on the pleadings under RCFC 12(b)(1), the complaint states claims within the subject matter jurisdiction of this Court.") (citing *Mindes v. Seaman,* 453 F.2d 197, 198 (5th Cir. 1971); *Bray v. United States,* 785 F.2d 989, 992 (Fed. Cir. 1986); *Merck & Co. v. United States,* 24 Cl. Ct. 73, 77-79 (1991)).

The government attempts to distinguish *High Star Toys* on the ground that the case involved a "forfeiture" and, thus, was really a "takings" case. *See* Def.'s Mot. to Dismiss at 14-15. This is not correct. *High Star Toys* was a *Trayco* action for money paid to U.S. Customs **<u>in lieu of</u>** a forfeiture. *See High Star Toys,* 32 Fed. Cl. at 178. Thus, *High Star Toys* was not, strictly speaking, a forfeiture case and did not arise under the Court's "takings" jurisdiction. *Id.* at 179. Nor did *High Star Toys* involve a claim for a refund of penalties improperly assessed and exacted under 19 U.S.C. § 1592, as in *Trayco*. Rather, Senior Judge Harkins extended *Trayco* to a non-penalty cases in which U.S. Customs had made an allegedly unlawful exaction that was not "protestable." In this case, there is likewise no principled basis for distinguishing assessments in lieu of forfeiture from assessments of estimated AD/CVDs. As Shakespeare wrote, "What's in a name? A rose by any other name smells as sweet."

In short, if the government were right that *Trayco* is limited to "penalty refund actions," then Senior Judge Harkins would not have found jurisdiction in *High Star Toys*, because it was not a "penalty refund case" either.

**F. <u>The Government's Ripeness Argument Must Be Rejected.</u>**

The last ditch in the government's technical defenses is the prudential doctrine of ripeness and the Supreme Court's seminal decision in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). Def.'s Mot. to Dismiss at 15.[26] Unlike this case, *Abbott Labs*, involved an action for "pre-enforcement review" of a regulation.[27] In other words, the agency interpretation of law that the plaintiff alleged to be invalid had not yet been applied to the plaintiff. Nevertheless, the Supreme Court held that Abbott's claim was ripe because of the penalties that could be assessed based on the interpretation once the regulation was actually applied to Abbott's merchandise.

In this case, by contrast, U.S. Customs applied its allegedly invalid interpretation of Heading 4407, HTSUS, to NWFP's merchandise when it assessed cash deposits of estimated AD/CV duties on the merchandise. *See* Compl. Ex. 1 (CF-29). NWFP felt the application of this agency interpretation in a very concrete way when it paid these assessments, *see* Compl. Ex. 2, which are now up to almost $150,000.00.

Moreover, NWFP would have risked serious penalties under 19 U.S.C. § 1592(a) if the company made additional entries under Heading 4421, HTSUS, after being told by

---

[26] There is no page number at the bottom of page 15 of the government's brief, and page 15 is actually page 16. The reference to page 15 here is to the actual page 15, not the page numbered "15."

[27] In its April 22, 2004, denial of NWFP's motion for a protective order, the Court ruled that the ripeness test articulated in *Abbott Labs* has no application in a Tucker Act case. This ruling is binding on the Court under the law of the case doctrine, and the ripeness argument in the government's motion to dismiss should be rejected on that basis. In case the Court changes its mind, NWFP will repeat its explanation of why this case passes the *Abbott Labs* test with flying colors.

U.S. Customs to change the classification to Heading 4407, HTSUS. *See* Pl.'s Opp. to Def.'s Mot. to Dismiss at 4-8, 23.

In sum, NWFP's claim passes the ripeness test set forth in *Abbott Labs* with flying colors.

## VI. CONCLUSION

For the foregoing reasons, the "drastic" action of dismissal under RCFC Rule 12(b) is not "clearly appropriate." *High Star Toys*, 32 Fed. Cl. at 179. Accordingly, the government's motion to dismiss must be DENIED.

Respectfully submitted,

Date: May 7, 2004

s/*A. Woodson Stuart*

A. Woodson Stuart
JONES & STUART, LLP
2300 M Street, NW, Suite 800
Washington, D.C. 20037
Tel: (202) 297-3196
Fax: (202) 338-0270

*Attorney for the Plaintiff*