# In The United States Court of Federal Claims

**No: 03-2485 C**
September 14, 2004

---

**FOREST PRODUCTS NORTHWEST, INC.,**

***Plaintiff*,**

**v.**

**THE UNITED STATES OF AMERICA,**

***Defendant*.**

---

RCFC 26 Protective Order; Motion to Dismiss; Jurisdiction of Court of Federal Claims and U.S. Court of International Trade; Antidumping and Countervailing Duties; Exhaustion of Remedies

*A. Woodson Stuart*, A. Woodson Stuart, Esq., Washington, D.C., attorney of record for the plaintiff.

*Claudia Burke*, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the defendant.

## OPINION AND ORDER

**Block, *Judge.***

## I. Introduction

This case is about jurisdiction. Specifically, it involves the respective jurisdiction of two courts, this court, the U.S. Court of Federal Claims, and the court primarily created to adjudicate trade and tariff disputes, the U.S. Court of International Trade ("CIT"). Forest Products Northwest ("Forest Products") imported certain lumber products in various shipments into the United States from Canada. The United States Customs and Border Protection, Department of Homeland Security ("Customs") determined that Forest Products' imported lumber fell under a particular classification and therefore was subject to antidumping and countervailing duties ("AD/CVD" or simply "countervailing duties"). Forest Products informed Customs that their classification decision was legally incorrect, but paid the assessed amount "under protest."

Instead of exhausting the administrative remedies available to challenge Customs' classification and thereafter seek review of the determination in the CIT (this statutory scheme is discussed below), Forest Products filed a complaint in this court on October 23, 2004, seeking refund of all payments made under protest to Customs. On January 28, 2004, the government filed a motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC").

Forest Products proffers various convoluted arguments in support of its position, but which in essence can be boiled down to a single proposition – since Forest Products cannot *immediately* seek relief in the CIT because it must first exhaust time-consuming and burdensome administrative procedures, there is a defect, a "gap," in the CIT's jurisdiction. Therefore, according to Forest Products, the levied countervailing duties are illegal exactions that can be challenged in this court under the Tucker Act. But this contention clearly stands the statutory scheme on its head. Because the Federal Circuit has made manifestly clear that available administrative remedies in the CIT must first be exhausted as a statutory condition precedent to judicial review of any challenges of Customs' classifications that impose antidumping and countervailing duties, this court must grant the government's motion and dismiss Forest Products' complaint. Furthermore, Forest Products' complaint would require the Court of Federal Claims to adjudicate the validity of Customs' classification and, collaterally, the appropriateness of the imposed antidumping and countervailing duties. These responsibilities the Congress has unequivocally assigned to the Court of International Trade.

## II. Background

The facts of this case derive from the parties' moving papers. Forest Products is a lumber remanufacturer whose principal place of business is in Tacoma, Washington. Pl.'s Compl. at ¶¶ 3-4. During the first week of October 2003, Forest Products imported from Canada two shipments of "rough edge-glued cedar lumber." *Id*. at ¶ 5. Customs entered the first shipment, Entry No. WQO-1289736-0, under Subheading 4407.10.00 of the Harmonized Tariff Schedule of the United States ("HTSUS").[1] *Id*. at ¶ 5; Ex. 1 to Pl.'s Compl. This subheading corresponds to the rate of duty for "[w]ood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding 6 mm: Coniferous." Ex. 1 to Pl.'s Compl. Customs entered the second shipment, Entry No. WQO-1289757-6, under Subheading 4421.90.9740. This provision sets the rate of duty for "other articles of wood . . ." *Id*. Customs subjected each of these shipments to countervailing duties orders at the time of their importation in the amount of $11,212.73 and $9,145.11, respectively. *Id*. Forest Products paid the total amount "under protest," and characterized the Customs' classifications and assessments as "legally incorrect."[2] *Id*.

---

[1] Congress codified the HTSUS at 19 U.S.C. § 1202, although it is not published in the Code. The HTSUS can, however, be found in its entirety on the website of the U.S. International Trade Commission ("USITC"), http://hotdocs.usitc.gov/tariff_chapters_current/toc.html. The HTSUS contains all provisions enacted by Congress or proclaimed by the President regarding importing/exporting goods and products into/out of the United States.

SECTION IX, WOOD AND ARTICLES OF WOOD; WOOD CHARCOAL; CORK AND ARTICLES OF CORK; MANUFACTURERS OF STRAW, OF ESPARTO OR OF OTHER PLAITING MATERIALS; BASKETWARE AND WICKERWORK, comprises HTSUS Chapters 44-46. Chapter 44, Wood and Articles of Wood; Wood Charcoal identifies specific items of wood (or its derivative products) and its corresponding rate of duty.

[2] In a letter to Customs, Forest Products wrote:

Because Commerce had issued so-called "scope" rulings concerning imported Canadian lumber entries, the "liquidation" by Customs of all entries of these lumber products had been suspended. Pl.'s Compl. at 2 n.2 and Tab 7. Liquidation is the final assessment of the countervailing duty of entries by Customs.[3]

On October 23, 2003, Forest Products filed its complaint,[4] alleging that Subheading 4421.90.9700 is the proper classification of the imported wood and, therefore, the wood is not subject to AD/CVD. Forest Products made three specific contentions:

(1) Subheading 4421.90.9700 provides a more complete and accurate description of the imported wood than Subheading 4407.10.00. Customs, therefore, misclassified the imports and erred in applying the AD/CVD orders. Pl.'s Compl. at ¶¶ 26-38.

(2) Customs misclassified the imports under the "Mod Act." *Id.* at ¶¶ 39-43. Customs did not issue a ruling, contrary to Customs Service Ruling 087616 (Aug. 20, 1990) (Forest Products' imports do not meet the definition offered under Subheading 4407.10.00), or the "rulings classifying merchandise similar to the subject merchandise under Heading 4421, HTSUS." *Id.* at ¶ 25. In the absence of an accompanying modification, Forest Products alleges Customs did not adhere to its own ruling and misclassified Forest Products' first shipment. *Id.* at ¶ 43.

(3) Customs improperly assessed AD/CVD orders on Forest Products' imports pursuant to their erroneous classification under Subheading 4407.10.00. *Id.* at ¶¶ 44-47.

On January 28, 2004, the government filed a motion to dismiss pursuant to RCFC 12(b)(1), or in the alternative, RCFC12(b)(6). Thereafter the court was buried with an avalanche of motions and papers. On February 10, 2004, Forest Products simultaneously filed with its response to the government's motion to dismiss a so-called "Motion for *In Limine* Protective Order." In its motion, Forest Products declared that it would serve a "Proposed Redacted Copy for the public record" once the court granted the protective order. The parties submitted responsive briefs concerning the

---

> This assessment [regarding Forest Products' two shipments] was based on the conclusion of Customs and Border Protection – that the subject merchandise is not properly classified in subheading 4421.90.9740 of the Harmonized Tariff Schedule of the United States (HTSUS), or if ultimately allowed entry under this heading, that the material, although specifically exempted by Commerce's Scope memorandum, is to be entered subject to such assessments. We believe that CBP's conclusion is legally incorrect and that the subject merchandise is properly classified under HTSUS subheading 4421.90.9740, and is specifically exempted from the scope of the present [AD/CVD] (C-122-839-000 and A-122-838-000) investigation case.

Exh. 1 to Pl.'s Complaint.

[3] For a further explanation, see Part III.A of this opinion below.

[4] Originally assigned to another judge of this court, the matter was reassigned on March 24, 2004.

protective order. Forest Products thereafter filed its own dispositive motion, a motion for summary judgement pursuant to RCFC 56, on February 20, 2004. All these voluminous papers were filed under seal by the Clerk of the Court until the motion for a protective order was decided. The government never filed a response to this motion apparently because it wanted the court to first resolve its January 28, 2004 Rule 12 motion.

On March 24, 2004, the Clerk of the Court reassigned this case to the present judge. This court convened a scheduling conference on March 31, 2004, to see if the parties could resolve the problems associated with the myriad filings, unresolved dispositive motions, and forests of paper filed in this case. During the March 31 telephone conference, the court ordered Forest Products to serve its response to the government's motion to dismiss and informed the parties that if they could not resolve the procedural issues in the case, the court would schedule another telephone conference on April 8, 2004. During the April 8 telephone conference, the court determined that the best way to proceed was for it to first resolve the merits of Forest Products' motion for a protective order at an oral argument scheduled for April 22, 2004.

At that oral argument, Forest Products argued that a protective order was necessary given an alleged ongoing Customs investigation under 19 U.S.C. § 1592,[5] based on Forest Products' purportedly fraudulent misclassifications of its October 2003 imports. The court was informed by plaintiff's counsel that this penalty investigation concerns confidential information "of the most sensitive nature to [Forest Products'] clients, competitors, and partners." Pl.'s Memo. in Supp. of Mot. for *In Liminie* Protective Order at 9. Forest Products claimed it cannot effectively refute the government's ripeness argument without mentioning the ongoing § 1592 investigation.[6] In its February 10, 2004 Motion for *In Limine* Protective Order Forest Products asserted that its response to the government's motion to dismiss contained "information that is legally privileged and confidential, the disclosure of which would harm Forest Products' business and its competitive position." Pl.'s Mot .for *In Liminie* Protective Order at 1.

---

[5] 19 U.S.C. § 1592, "Penalties for fraud, gross negligence, and negligence," outlines Customs' authority to investigate allegations of fraud and assess penalties against any person who "by fraud, gross negligence, or negligence . . . enter[s], introduce[s], or attempt[s] to enter or introduce any merchandise into the commerce of the United States" by means of a false and material written or oral statement, electronically transmitted data, act, or omission. 19 U.S.C. § 1592(a)(1)(A)(I) and (ii).

[6] It appears to the court that the genesis of the protective order motion and the avalanche of filings arose from Forest Products' counsel's confusing the government's "ripeness" argument (initially made in its January 2004 motion to dismiss) that the case must be dismissed for failure to exhaust administrative remedies in any challenge to a Customs classification order, with a "ripeness" argument, never really made by the government, based on possible penalties imposed in the alleged investigation. This abject confusion led Forest Products' counsel to conflate these two issues, as will be discussed below. This misapprehension further led plaintiff's counsel to strike preemptively by seeking a protective order, which led, ironically, to the public revelation of the existence of the possible investigation, once the court denied the motion. It is a prime example of misapprehension leading to a self-inflicted wound.

Forest Products argued the information relating to the § 1592 investigation fell within the purview of the "governmental secrets" privilege (what it also termed "executive privilege"), which it claimed is now codified in the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522(b), and the Privacy Act, 5 U.S.C. § 552a(b). *Id.* Citing 5 U.S.C. § 552(b)(7)(c), Forest Product contended that an "investigative files" privilege protects individual privacy and prevents "casting of unnecessary suspicion upon persons ultimately exonerated by the investigatory process." *Id*. at 7-8 (*citing* 5 U.S.C. § 552(b)(7)(c); McCORMICK ON EVIDENCE §§ 106-113 (3d ed. 1984)). Forest Products' counsel strenuously maintained that because his FOIA request for information regarding Customs' investigation of his client was denied on the "investigative privilege exemption" grounds, Forest Products' motion for a protective order should be granted because the existence of the privilege was thus admitted to by the government. Tr. April 22 Oral Argument, Pl. Motion Protective Order, at 44. Finally, along with various other contentions,[7] Forest Products argued that the Privacy Act furthers the policy of this "investigative files" privilege by prohibiting federal agencies from disclosing information from such files "without the consent of the individuals to whom the information pertains." *Id*. (*citing* 5 U.S.C. § 552a(b); *Tripp v. Dep't of Def.*, 219 F. Supp 2d. 85, 89-93 (D.D.C. 2003)).

The court rejected all of the above assertions as specious. As to the plaintiff's FOIA argument, clearly, the statutory exceptions to FOIA disclosure are privileges that may only be asserted by the government. FOIA mandates public disclosures of governmental records unless that information is specifically exempted by the statute. "Each agency shall make available to the public information as follows . . . ." 5 U.S.C. § 552(a). The statutory text lists nine different exemptions from FOIA's general mandate; these are the so-called "governmental" or "executive" privileges. 5 U.S.C. § 552(b)(1)-(9). In other words, FOIA requires a government agency to publicly disclose records unless the agency can show the information falls within one of the nine exceptions, which courts must narrowly construe. *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 630 (1982). But this showing is to be made by the government and thus the privilege from exemption from disclosure belongs to the government.

For instance, the so-called "investigative privilege exemption" Forest Products' counsel raised is contained in § 552(b)(7), and covers records or information compiled for law enforcement purposes.[8] To qualify for this privilege from disclosure the information must satisfy two conditions:

---

[7] For example, Forest Products' counsel relied upon as precedent various cited cases standing for the proposition that a court could close grand jury proceedings to the public. Pl.'s Mot. for *In Limine* Protective Order at 8.

**[8]** This provision contains six exceptions. Information sought under FOIA may be protected form disclosure if it:

> (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution

its source must be a government agency, and the agency must demonstrate how a disclosure would cause one of the harms specified in § 552 (b)(7). *Abramson*, 456 U.S. at 622; *see also Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

By its own terms then, the FOIA exceptions are for the government to invoke, not for a party seeking to prevent disclosure of a government investigation. Furthermore, this above exception Forest Products would rely upon prevents disclosure of the fruits, techniques, and procedures of an investigation rather than the mere existence of an investigation. This exemption is certainly not designed as a tool for private litigants to use to gain some litigation advantage. *See Cetron Elec. Corp. v. United States*, 207 Ct. Cl. 985, 987 (1975) ("[T]he doctrine of executive privilege . . . can be personally invoked only by the head of a department or agency.").

More to the point, at this stage of the proceedings – the parties here are still at pre-trial – the proper authority addressing this court's power to grant a protective order is not FOIA or the Privacy Act, but RCFC 26(c). Rule 26(c) grants this court the authority "[u]pon motion by a party . . . from whom discovery is sought, accompanied by a certification that the movant . . . for good cause shown . . . [to] make an order which justice requires to protect a party from "annoyance, embarrassment, oppression, or undue burden or expense . . . " RCFC 26(c). Pursuant to this rule, the party seeking the protective order bears the burden of demonstrating good cause. *Capital Properties, Inc. v. United States*, 49 Fed. Cl. 607, 611 (2001). A party establishes good cause by specifically demonstrating that "disclosure will cause a clearly defined and serious injury." *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995). "Broad allegations of harm, unsubstantiated by specific examples, however, will not suffice." *Id*.[9]

---

> which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual . . . .

5 U.S.C. § 552(b)(7).

[9] A court may consider the following factors in its determination of whether to issue a protective order:

> (1) whether disclosure will violate any privacy interests;
> (2) whether the information is being sought for a legitimate purpose or for an improper purpose;
> (3) whether disclosure of the information will cause a party embarrassment;
> (4) whether confidentiality is being sought over information important to the public health and safety;
> (5) whether the sharing of information among litigants will promote fairness and

In this case, all Forest Products had proffered in support for its motion for a protective order was its counsel's conclusory self-serving statement that Forest Products' "business and its competitive position" would suffer if information about Customs investigation became public. Pl.'s Mot. for *In Limine* Protective Order at 1. Forest Product did not detail how the purported Customs investigation currently affects it's business operations, its public persona, or the privacy of its principals. Furthermore, the court fails to see how the alleged investigation of Forest Products relates, in any way, to its complaint filed in the case before this court.

Courts of the United States are rightly loathe to close judicial proceedings to the public and veil what should be public documents behind a cloak of secrecy. Indeed, the United States Supreme Court has recognized a presumptive right of public access to civil proceedings and documents. *See Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 386, n. 15 (1979). And such a right derives from our common law heritage of resistence to arbitrary power. *See Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1067-70 (3d Cir. 1984).

Forest Products' reason for its petition for a protective order fell far short of the needed specific demonstration of a clear and serious injury necessary for a protective order. *See Cipollone v. Liggett Group, Inc.*,785 F.2d 1108, 1121 (3d Cir. 1986) (reversing the granting of protective order because no "substantial evidence" was proffered clearly showing that disclosure would result in embarrassment to movant). To be sure, its general statement of harm amounted to nothing more than a mere *ipse dixit* claim that public knowledge of Customs' investigation would be an embarrassment and bad for Forest Products' bottom line. Accordingly, at the oral argument, the court denied Forest Products' request for the protective order and ordered the Clerk of the Court to unseal the record in this case. *See* "ORDER MEMORIALIZING ORAL ARGUMENT," April 22, 2004.

Also at the oral argument, the court inquired *sua sponte* as to its jurisdiction to consider the case. The court rejected Forest Products' contention, first made in its memorandum for the protective order, Pl.'s Mot. for *In Limine* Protective Order at 2. n. 1, that because Forest Products paid the disputed duty to Customs, an implied-in-fact contract came into existence and that this was the Tucker Act predicate for this court's jurisdiction.[10] The court asked the parties to file

---

efficiency;
(6) whether a party benefitting from the order of confidentiality is a public entity or official; and
(7) whether the case involves issue important to the public.

*Glenmede Trust Co.*, 56 F.3d at 483.

[10] The court opined that jurisdiction under the Tucker Act cannot be premised on the payment of the countervailing duties, which were required by law and regulation, simply by characterizing the applicable statute or regulation as creating an implied contract. Tr. Oral Argument April 22, Pl. Motion Protective Order at 6-10. *Macrotel International Corp. v. United States*, 34 Fed. Cl. 98, 99 (1995) (holding that plaintiff cannot escape the conclusion that the Court of International Trade has exclusive jurisdiction over a protestable liquidation dispute by couching it as a breach of contract); *see also Franklin Savings Corp. v. United States*, 56 Fed. Cl. 720, 746 (2003); *Lion Raisins, Inc.*

supplemental briefing on the jurisdiction issue, and scheduled for August 3, 2004 a second oral argument to formally consider the government's pending motion to dismiss for lack of jurisdiction.

## III. Discussion

### A. Statutory and regulatory scheme facing importers.

To place the parties' arguments and use of statutory terms of art in some sort of context, it is helpful at this juncture to explain the regulatory scheme facing importers and the availability of judicial review when disputes arise. There is no question that Congress has plenary power under the Commerce Clause to regulate commerce with foreign nations and the importation of goods. U.S. Const. art. I, § 8, cl. 3; *see Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 447 (1979).[11] Congress also has extraordinarily broad power to levy duties upon imports. U.S. Const. art. I, § 10; *see Williams v. United States*, 289 U.S. 553 (1933). Indeed, it was in part the inability of the Articles Congress to retaliate against discriminatory British trade barriers because it lacked the power to tax and regulate imports that initially led to the convening of the Philadelphia Constitutional Convention of 1787 and the subsequent ratification of the U.S. Constitution. *See* John Ferling, *A Leap in the Dark* (2003) at 247-80; *see generally*, Gordon O. Wood, *The Creation of the American Republic, 1776-1787* (1969).

Pursuant to its Article I power, Congress has throughout the years established an elaborate scheme to regulate the importation of goods entering into the stream of commerce of the United States. For instance, Congress has promulgated countervailing duty laws to impose additional duties on imported goods which are subsidized by the country of export or manufacture. *See* 19 U.S.C. §§ 1303, 1671 (1982); *Wolfe Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998) . These so-called "countervailing" duties are levied on subsidized imports to offset the unfair competitive advantages created by foreign subsidies. *Id.*; *see also United States Steel Group v. United States,* 96 F.3d 1352, 1356 n. 1 (Fed. Cir.1996).

---

*v. United States,* 54 Fed. Cl. 427, 432 (2002). Furthermore, the court noted that Forest Products failed to demonstrate the requisite elements necessary to establish an implied-in-fact contract: (1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and (4) actual authority of the government representative whose conduct is relied upon to bind the government in contract. *See Trauma Serv Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997); *Macrotel International Corp.*, 34 Fed. Cl. at 99; *Franklin Savings Corp.*, 56 Fed. Cl. at 742. Forest Products apparently saw the light, for it dropped this argument in its latest round of briefing for the instant motion.

[11] The very fact that the Constitution prohibits state governments from imposing duties on exports and imports without the consent of the federal government, U.S. Const. art. I, § 10, cl. 2, while assuring that Congress would not tax exports thereby giving preferences to certain ports in foreign trade, U.S. Const. art. I. § 9, further demonstrates the delegation of plenary authority to Congress regulate foreign commerce. *See Japan Line, Ltd.*, 441 U.S. 434 (holding state tax on instrumentalities unconstitutional where tax may subject foreign commerce to the risk of multiple burdens and therefore impair federal commerce power).

Congress has delegated to two principal executive branch entities the authority to enforce its laws regulating foreign imports into the United States: Customs and the Department of Commerce. Customs is charged with the "ministerial function of fixing 'the amount of duty to be paid'" on imported goods. *Xerox Corp. v. United States*, 289 F.3d 792, 794 (Fed. Cir. 2002) (quoting 19 U.S.C. § 1500(c) (1994)). When these goods may be subject to an antidumping duty order, Customs makes factual findings to ascertain what the goods are, and whether it is described in an order. *Id.* (citing *Marcel Watch Co. v. United States*, 11 F.3d 1054, 1056 (Fed. Cir. 1993) (stating that Customs makes similar factual determinations to classify imported goods under tariff headings)). If applicable, Customs then assesses the appropriate antidumping duty. 19 U.S.C. § 1673e(a)(1) (1994); 19 C.F.R. § 351.211(b)(1) (2001). (This is what Forest Products paid "under protest.") "Such findings of Customs as to 'the classification and rate and amount of duties chargeable' are protestable to Customs under 19 U.S.C. § 1514(a)(2)." *Xerox Corp.*, 289 F. 3d at 794 (quoting 19 U.S.C. § 1514(a)(2)).

The port director will allow or deny a protest within two years of filing. 19 C.F.R. §§ 174.21, 29. The importer may file for an accelerated disposition of the protest 90 days after filing, and, if the port director does not allow or deny the protest within 30 days, the protest is deemed denied. 19 C.F.R. § 174.22. If customs denies a protest, then the party may appeal to the CIT within 180 days of the denial. 19 U.S.C. § 1514(a); 19 C.F.R. § 174.31. The review of denials of protests is in the exclusive domain of the CIT. 28 U.S.C. § 1581(a) (1994) (exclusive jurisdiction lies for actions "commenced to contest the denial of a protest . . . under § 515 of the Tariff Act of 1930").

It is important to note that a protest may not be lodged until "liquidation" occurs. 19 U.S.C. § 1514(c)(3). Liquidation is "the final computation or ascertainment [by Customs] of the duties or drawback accruing on an entry." 19 C.F.R. § 159.1 (1997). Liquidation of an entry is "final and conclusive upon all persons (including the United States and any officer thereof)." 19 U.S.C. § 1514(a). An importer makes an "entry" by filing documentation with Customs, which enables Customs, among other things, to "assess properly the duties [due] on the merchandise." 19 U.S.C. § 1484. The importer must also deposit estimated duties with Customs. *See* 19 U.S.C. § 1505(a). After documentation is filed and estimated duties paid, the imported goods are permitted to enter into the commerce of the United States. *See* 19 U.S.C. § 1490. Subsequently, during liquidation, Customs will collect any increased duties due or refund any excess of the estimated duties deposited on entry. *See* 19 U.S.C. § 1505(b).

Because Forest Products contends that liquidation is here suspended "indefinitely," and, thus, that it is unable to lodge a protest and seek review by the CIT – a contention which is at the heart of this case – it is crucial to reveal that by statute Customs must complete liquidation of an entry within certain time limits. *See* 19 U.S.C. § 1504. If Customs fails in this endeavor, the entry is "deemed liquidated" (*i.e.*, liquidated by operation of law). *Id.* Pursuant to 19 U.S.C. § 1504(a), imported goods which are not liquidated within one year of its entry are "deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer." 19 U.S.C. § 1504(a); *see Wolfe Shoe Co*, 141 F.3d at 1118. The statute includes several exceptions which permit Customs to extend liquidation beyond the one year anniversary of entry. *See* 19 U.S.C. § 1504(b). The statute permits an extension when (1) "information needed for the proper appraisement or classification of the merchandise" is unavailable; (2) "liquidation is suspended as required by statute or court order;" or (3) the importer "requests such extension and shows good cause therefor." *Id.* Nevertheless, and this is obviously crucial to our case, an entry of imported merchandise which is not liquidated within

*four years* after the date of entry is liquidated by operation of law at the "rate of duty, value, quantity, and amount of duty asserted at the time of entry by the importer . . . unless liquidation continues to be suspended by statute or court order." 19 U.S.C. § 1504(d)(emphasis added).[12]

In 1993, Congress amended § 1504(d). "The amendment was designed in part to address an anomaly in the prior version of the statute, which made deemed liquidation available if suspension of liquidation were removed before the expiration of the maximum four-year period for liquidating entries, but not if suspension of liquidation [was] removed after the expiration of the four-year period." *Int'l Trading Co.*, 281 F.3d at1272 (citing *Dal-Tile*, 829 F.Supp. at 399-400). The amendment increased the period of time in which Customs could liquidate entries after removal of suspension of liquidation from ninety days to six months. Significantly, however, the amendment made clear that the result of Customs' failure to liquidate within the six-month period was "deemed liquidation" by operation of law. *Id.* at 1273; *see* H.R. Rep. No. 103-361 part I, at 139 (1993).

The other governmental entity whose authority affects this case is the Commerce Department. Pursuant to statutory law, Commerce must impose countervailing duties on subsidized imports if it determines that the subject imports are in fact being subsidized, and the International Trade Commission determined that an industry in the United States is materially injured, or threatened with material injury, because of the subsidized imports. *See* 19 U.S.C. § 1671. After the initial determination, Commerce must perform annual reviews of outstanding countervailing duty orders, termed "scope" determinations. *See* 19 U.S.C. § 1675(a). After Commerce performs its annual review under § 1675(a), the statute permits an interested party to seek judicial review in the CIT of Commerce's factual findings and legal conclusions of the "scope" determination. *See* 19 U.S.C. § 1516a(a)(2).[13]

---

[12] Before the enactment of § 1504, there was "no statutory restriction on the length of time Customs could take to liquidate an entry." *Int'l Trading Co. v. United States*, 281 F.3d 1268, 1272 (Fed. Cir. 2002)(citing *St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763, 767 (Fed. Cir.1993)). In 1978, Congress enacted § 1504 to impose a four-year time limit for liquidation. *Id.* The primary purpose of § 1504 was to "increase certainty in the customs process for importers, surety companies, and other third parties with a potential liability relating to a customs transaction." *Dal-Tile Corp. v. United States*, 829 F.Supp. 394, 399 (Ct. Int'l Trade 1993) (internal quotations and citation omitted).

[13] More specifically, an interested party may file a challenge with Commerce to determine "whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi). Within 45 days of receiving an application for a "scope ruling," Commerce will issue a final scope ruling or initiate a scope inquiry. 19 C.F.R. § 351.225(c). If Commerce can determine whether the product is within the scope of countervailing duty order based solely on the party's application, then Commerce will publish a final ruling based on the application. 19 C.F.R. § 351.225(d). If Commerce cannot make a decision based on the application, then Commerce will begin a scope investigation. 19 C.F.R. § 351.225(e). Commerce, moreover, must provide notice of the investigation, including a preliminary scope ruling which, based on the information available at the time, states whether there is a reasonable basis to believe the item falls within the scope of the countervailing duty order. *Id*. During the notice period, Commerce accepts comments for twenty

During the annual review by Commerce, the liquidation of all imported goods subject to an outstanding countervailing duty order is suspended. 19 U.S.C. § 1504(a); *see Ambassador Div. of Florsheim Shoe v. United States*, 748 F.2d 1560, 1565 (Fed. Cir. 1984). It is apparent that unless liquidation of imported goods falling under the scope of Commerce's order is suspended, the annual review contemplated by 19 U.S.C. § 1675(a) "*would be frustrated unless* the final results of the review applied to the entries covered by the review." *Wolfe Shoe Co.*, 141 F.3d at 1118 (original emphasis) (citing *Florsheim Shoe*, 748 F.2d at 1565).

When Commerce conducts a scope inquiry, Customs automatically suspends liquidation of the products listed in the preliminary scope ruling. 19 C.F.R. § 351.225(l). Customs collects a cash deposit equal to the estimated duties when unliquidated products are entered into the country. *Id.* If Commerce issues a final scope ruling that the product in question is not within the scope of the countervailing duty order, Customs then liquidates the product and refunds any cash deposits. The suspension continues, however, if the product falls within the scope of the order. 19 C.F.R. § 351.225(l)(3). Entries are liquidated when the CIT or the Federal Circuit issues a decision regarding a party's appeal of a scope ruling. 19 U.S.C. § 1516a(e); *see also* 19 U.S.C. § 1504(d); *Hosiden Corp. v. Advanced Display Mfrs. Of America*, 85 F.3d 589, 591 (Fed. Cir. 1996) (CIT decisions appealed to the Federal Circuit are not final, and the CIT does not have discretion to order liquidation before a final decision by the Federal Circuit).

But, what if no appeal is taken? In that situation, the Federal Circuit concluded that publication of Commerce's findings after an administrative review effectively lifted the suspension on liquidation even though Commerce did not order an end to the suspension until much later. *Int'l Trading Co.*, 281 F.3d at 1272-73. The court noted that liquidation is suspended for entries when Commerce publishes a preliminary or final scope determination covering those entries because "it is not possible, at that point, to determine what duties will be assessed against those entries." *Id.* at 1273. The court concluded that allowing Commerce to suspend liquidation indefinitely would frustrate the purpose of 19 U.S.C. § 1504 and the "deemed liquidated" provision explained above. *Id.* at 1273. When Commerce or a court lifts the suspension, Customs must liquidate the entries covered by the suspension within six months. 19 U.S.C. § 1504(d).

Consequently, it would appear that Forest Products has two routes available to challenge the countervailing duty levied on its imported lumber: (1) wait until liquidation by Customs and thereafter seek review in the CIT, or (2) administratively challenge Commerce's scope determination and then seek review in the CIT. But Forest Products chose to do neither.

**B. Forest Products' contentions and the government's response.**

Forest Products admits that the importation of lumber products is normally a "classification" decision made by Customs, which is generally a "protestable" action falling under the CIT's exclusive

---

days and has ten days for rebuttal. *Id.* Generally, Commerce must issue a final scope ruling within 120 days or 300 days, depending on the type of inquiry. *Id.* Scope rulings are then listed in the Federal Register on a quarterly basis. 19 C.F.R.§ 351.225(o). A party may appeal a scope ruling to the CIT, which triggers the CIT's exclusive jurisdiction. 28 U.S.C. § 1581(c).

jurisdiction. Pl.'s Opp. at 22. Nevertheless, Forest Products claims "[a] classification-based exaction made outside the context of liquidation . . . is not 'protestable' and thus cannot be reviewed in the CIT under 28 U.S.C. § 1581(a)." *Id.* at 23. The levied countervailing duties are apparently "exactions" because, as Forest Products maintains, "liquidation is [here] suspended indefinitely and may not occur for years." Pl.'s Mem. at 27. In support, Forest Products cites no authority but concocts various hypothetical examples appended to its motion. *Id.* Forest Products argues that liquidation normally takes 314 days, but provides no support for this assertion, either. Pl.'s Opp. at 14; *see also* Compl. at 2-3 n.3. Consequently for Forest Products, since liquidation can take years, the Tucker Act is the only way Forest Products can obtain "timely judicial review." *Id.*

In support of its novel theory, Forest Products contends that this case falls outside the CIT's exclusive jurisdiction and into the "jurisdictional gap" described in *Trayco, Inc. v. United States*, 994 F.2d 832 (Fed. Cir. 1993), and alluded to in *High Star Toys, Inc. v. United States*, 32 Fed. Cl. 176, 178 (Fed. Cir. 1994).[14] Forest Products argues that the Federal Circuit holding in *Trayco* confers jurisdiction on this court to cover the gap in the CIT's exclusive jurisdiction when Customs assesses a penalty against a party in a "non-protestable way." Pl.'s Opp. at 28. Forest Products maintains that *High Star Toys* supports its use of *Trayco*. "*High Star Toys* rejected the notion that *Trayco* is limited to its facts and does not apply to all non-'protestable' exactions." *Id.*

Responding to Forest Products, the government asserts that Forest Products' application of *Trayco* and *High Star Toys* is inapposite because, unlike the plaintiffs in those cases, Forest Products neither exhausted its administrative remedies nor suffered a penalty prior to filing its complaint in this court. Def.'s Mot. to Dismiss at 10-14.[15] Furthermore, the government strongly disagrees with Forest Products' contention that Customs' action is outside the scope of liquidation because the "suspension of liquidation [here] is only temporary" and notes that "Forest Products has only made cash deposits of estimated antidumping and countervailing duties."[16] Def.'s Resp. at 18. Accordingly, to the government, "[a] gap in jurisdiction is not created merely because the congressional scheme of administrative remedies takes time." Def.'s Resp. at 17. The government concludes that "[e]ven if the Court were to determine that it possessed jurisdiction to entertain Forest Products' claims, it

---

[14] "This is an action for a refund of $20,357.84 paid under protest to the U.S. Customs and Border Protection Service . . . . This Court has jurisdiction over such actions under the Tucker Act." Pl.'s Compl. at ¶¶ 1-2 (citing 28 U.S.C. § 1491(a)(1); *Trayco v. United States*, 994 F.2d 832 (Fed. Cir. 1993); *High Star Toys v. United States*, 32 Fed. Cl. 176 (1994)).

[15] The government originally characterized these arguments as going to Forest Products' failure to state a claim upon which relief can be granted, but now it incorporates them into its jurisdictional response. *See* Def.'s Mot. to Dismiss at 10-15; Def.'s Resp. at 16-20.

[16] In a related point, the government characterizes Customs' re-classification and pre-liquidation assessment of the countervailing duties as neither a violation of the Mod Act nor an exaction. Def.'s Resp. at 19 n.4 (this is not an exaction because "it is for the Court of International Trade to determine whether Customs has assessed duties properly [and] Customs will do so at liquidation"); *id.* at 20 ("There is no interpretive ruling here. Customs has not changed the its [sic] interpretation of the tariff provision").

would necessarily have to find that it could not exercise jurisdiction over unripe claims . . . [because] neither Commerce nor Customs has had the opportunity to decide this dispute." Def.'s Mot. to Dismiss at 15.

Forest Products counters the government's ripeness argument with a three-pronged attack: (1) Customs' actions violated the Mod Act; (2) the exhaustion doctrine is inapplicable to this case; and (3) Commerce can not provide Forest Products an adequate remedy.

1. Customs' Treatment of Plaintiff Violates the Mod Act.

Each day that liquidation is suspended, Forest Products argues, it "is being deprived, on a daily basis, of its clear right to rely on . . . Customs Service Headquarters ruling 087616[17]. . . and the treatment previously accorded by U.S. Customs to [Forest Products'] merchandise at entry." Pl.'s Reply at 27. Forest Products portrays this treatment as particularly grave, claiming that Customs created the current situation by violating the letter and spirit of the Mod Act in reversing prior ruling letters and re-classifying Forest Products' merchandise under a tariff heading subject to an AD/CVD order. *Id*. at 19; Pl.'s Opp. at 14-15. Furthermore, Forest Products describes Customs' actions as forcing Forest Products to choose between paying the estimated countervailing duties or facing statutory penalty exposure by entering its products under the previous tariff heading. Pl.'s Opp. at 16, 23-24, 26-28, 30; *see also* Pl.'s Reply at 23 ("[i]f the government did not want to be haled into the Court on a Tucker Act claim, the government could have refused to accept [Forest Products'] check")(citation omitted).

2. Exhaustion of Remedies Is Inapplicable.

In response to the government's exhaustion argument, Forest Products argues exhaustion of administrative remedies does not apply in this case for three reasons. First, "[t]he balance of institutional versus private interests favors [Forest Products], and requiring the company to pursue a scope ruling therefore would be inappropriate." Pl.'s Reply at 6. Second, "[i]t is impracticable for [Commerce] to administer scope rulings on an entry-by-entry basis," and "[Commerce] has repeatedly 'clarified' the alleged ambiguity." *Id.* at 4-5. Third, Forest Products would not be able to obtain a complete remedy "by pursuing a scope ruling" because this is a classification case, and Forest Products' "statutory right to rely on rulings and prior treatments of its merchandise by U.S. Customs is being denied . . . causing mounting non-compensable loss on the company." *Id.* at 5. Forest Products also takes issue with the government's assertion of an exhaustion problem even though "the government studiously avoids mentioning the two alternative remedies foreclosed by its own actions" — Customs could have refused Forest Products' check paid under protest allowing timely review in the Court of International Trade or commenced a collection action under 28 U.S.C. § 1582(2) or (3). *Id.* at 6-7. Finally, although Forest Products' counsel contends that it was the government which first raised the case (Tr. Oral Argument Aug. 3., Def. Motion to Dismiss at 35), the truth of the matter is that throughout its many submissions and during at least two telephone conferences, Forest Products relied on *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) for the general proposition that

[17] Customs Service Headquarters Ruling 087616, dated August 20, 1990, states, "Edge-glued lumber does not meet the definition of lumber in . . . heading 4407."

because it faces a penalty, its case is ripe and exhaustion is not required. *See, e.g.*, Pl.'s Mot. for *In Limine* Protective Order at 4; Pl.'s Reply. at 23; Pl. Opp. at 19, 30; Transcript Oral Argument April 22, Pl. Motion Protective Order at 17-19. at 35; Tr. Oral Argument Aug. 3, Def. Motion to Dismiss at 35-38.

3. Commerce Cannot Provide an Adequate Remedy.

As its last salvo, Forest Products argues that the "primary jurisdiction doctrine" is not applicable to this case because a scope ruling would "further stretch [Commerce]'s resources" and "be pointless," as Commerce has already issued a scope ruling. Pl.'s Reply at 10. Further, seeking a scope determination "would take a lot of time, and the delay would cause harm to [Forest Products]'s business." *Id.* at 10. Forest Products also argues that Commerce has no expertise in tariff classification and no jurisdiction to decide the classification issue. Forest Products states, "Only a judicial decision on the classification issue will provide complete relief to [Forest Products] because of its potential liability for penalties under 19 U.S.C. § 1592(a)." *Id.* at 10.

**C. Standard of review and jurisdiction.**

It is important to initially point out that in considering a Rule 12(b)(1) motion, the burden of establishing this court's subject matter jurisdiction rests with Forest Products as the moving party. *See, e.g.*, *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). "Since they are not mere pleading requirements but rather an indispensable part of plaintiff's case, [jurisdiction] must be supported in the same manner as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

When this court hears such a jurisdictional challenge, "its task is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id*. The court must accept as true the facts alleged in the complaint, and must construe such facts in the light most favorable to the pleader. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988); *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (holding courts obligated "to draw all reasonable inferences in plaintiff's favor"). Nevertheless, unlike a Rule 12 (b)(6) motion for failure to state a claim, the court may consider *all* relevant evidence, including evidentiary matters outside the pleadings, when resolving a jurisdictional challenge. *See, e.g., Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985); *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 526-27 (2002).

The resolution of the instant motion revolves around this court's primary jurisdictional statute, the Tucker Act,[18] which operates as a waiver of sovereign immunity for non-tort suits against the

---

[18] "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

United States premised on the Constitution, a statute or regulation, or either an express or implied contract with the United States. *See* 28 U.S.C. § 1491(a)(1); *United States v. Testan*, 424 U.S. 392, 397 (1976). Nevertheless, the Tucker Act does not create a substantive right enforceable against the United States for money damages; it merely confers jurisdiction on this court whenever that substantive right exists. *Testan*, 424 U.S. at 398 (*citing Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007-09 (1967)). Consequently, a plaintiff must premise its claim on a separate statute or regulation permitting recovery. *Id.*; *Rinner v. United States*, 50 Fed. Cl. 333, 335 (2001).

Nevertheless, it is well-recognized that an illegal exaction claim may be maintained when "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statue, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605, 372 F.2d 1002, 1007 (1967)); *see also Casa De Cambio Comdiv S.A., DE C.V. v. United States*, 291 F.3d 1356, 1363 (Fed. Cir. 2002); *PSI Energy, Inc. v. United States*, 59 Fed. Cl. 590, 591 n.1 (2004). A serious problem facing Forest Products is that the very same Tucker Act *expressly* precludes this court's jurisdiction over any claims falling within the "exclusive jurisdiction" of the Court of International Trade. 28 U.S.C. § 1491(c).[19] Because the statutory scheme discussed above appears to require Forest Products to exhaust administrative remedies in a challenge to either Customs' classification order or Commerce's scope determination, and then to seek judicial review of either or both in the CIT, it would in truth seem that Forest Products has a very tough road to hoe in meeting its burden under Rule 12 (b)(1).

**D. Which court has jurisdiction?**

It is clear that the genesis of the controversy arises from the fact that liquidation was suspended in response to Commerce's review of the countervailing duties imposed on imported-Canadian lumber products. Not willing to wait until liquidation is lifted or to challenge Commerce's scope determination, Forest Products seeks review of Customs' action in this court on the pretext that liquidation "may not occur for years." Pl.'s Mem. at 27. Forest Products argues that it should not have to wait until liquidation to file a protest with Customs because "[Customs] did not wait until liquidation to assess duties based on the reclassification – even though . . . the agency has no legal authority to assess duties (including estimated duties) before classification of any entry becomes final, *i.e.*, at liquidation." Pl.'s Reply at 11. In other words, Forest Products contends that "[i]f U.S. Customs does not have to wait until liquidation to assess duties based on a reclassification, [Forest Products] should not have to wait until liquidation to obtain judicial review of the reclassification." *Id.* at 11.

But the issue here is not one of perceived fairness. The issue is in which court has Congress conferred jurisdiction to hear Forest Products' claim. As discussed at some length above, it would appear that Congress has vested the Court of International Trade with the *exclusive* jurisdiction to adjudicate any challenge by Forest Products to Customs' classification order or Commerce's scope

---

[19] "Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade ...." 28 U.S.C. § 1491(c).

determination concerning Forest Products' imported lumber merchandise, once Forest Products has exhausted available remedies. And to boot, the Tucker Act precludes this court from hearing cases within the exclusive bailiwick of the CIT. So after literally thousands of pages of submissions in which Forest Products raises what charitably can be called novel theories confusing various doctrines of law, the issues are reduced to this singular one[20] – does Forest Products have to exhaust its available administrative remedies?

It is beyond any doubt that exhaustion of administrative remedies is mandated before relief may be sought in the courts. *See Meyers v. Bethlehem Shipping Co.*, 303 U.S. 41, 51-52 (1938) (holding that exhaustion of administrative remedies mandated before seeking injunctive relief in court); *see also Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) ("The doctrine of exhaustion of administrative remedies ... provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'") (quoting *McKart v. United States,* 395 U.S. 185, 193 (1969); *Myers,* 303 U.S. at 50-51).[21] The purposes of the doctrine are to protect administrative agency authority and to promote judicial efficiency. *Sandvik*, 164 F.3d at 600 (*citing McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). And this is particularly true in the trade arena where Congress has established, pursuant to its Article I power, an intricate administrative scheme to enforce its statutes regulating foreign commerce. *Aida Eng'g, LTD. v. United States*, 19 C.I.T. 147, 149 (1995) (holding that failure to exhaust administrative remedy created by statute to contest Commerce scope determination deprived CIT of jurisdiction since no "case or controversy" existed).

In *Sandvik*, for example, the Federal Circuit concluded that the importers' failure to file for administrative scope rulings deprived them of the right to seek judicial review. 164 F.3d at 602. The court reasoned that the scope of antidumping orders is clearly within the expertise of Commerce and

---

[20] At the August 3 oral argument, plaintiff's counsel, in response to the court's assertion that the real issue in the case was exhaustion of remedies, stated:

MR. STUART: "I agree with you 100 percent. It seems to me, this is really an exhaustion case and not so much a jurisdiction case."

THE COURT: "It goes to jurisdiction, does it not?"

MR. STUART: " My understanding is no, no, absolutely not. It's a prudential doctrine that's discretionary. Absolutely not."

Tr. Oral Argument Aug. 3, Def.'s Motion to Dismiss at 25-26.

[21] "When administrative remedies have not been exhausted, 'judicial review of administrative action is inappropriate,' since it is 'a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.'" *Sandvik Steel Co*, 164 F.3d at 599 (quoting *Sharp Corp. v. United States,* 837 F.2d 1058, 1062 (Fed. Cir.1988); *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37(1952)).

had the importers filed for scope determinations, Commerce may have decided the imports were not covered by the order, thus preventing litigation. *Id.* at 600. Therefore, the Federal Circuit held that the doctrine of exhaustion was particularly appropriate and affirmed the CIT's dismissal of the case. *Id.* at 600. And this court in *Macrotel International Corp.*, 34 Fed. Cl. at 99 n.2, as an alternative ground for dismissing the case, held that it had no jurisdiction because *Macrotel* did not exhaust its administrative remedies in a liquidation dispute with Customs. *Cf. Omni U.S.A., Inc. v. United States*, 840 F.2d 912, 916 (Fed. Cir. 1988) (holding that failure by an importer to timely challenge Customs' failure to hold liquidation of entries in suspense, pending review of countervailing duty order, within a year of the date of liquidation of entries as mandated by statute, negated the importer's claim to a refund of deposit of estimated countervailing duties).

Throughout its pleadings and other voluminous filings, Forest Products' arguments in favor of this court's jurisdiction hopelessly confuse and conflate two different aspects of its case: Customs' purported misclassification of Forest Products' imported lumber products, and an alleged separate Customs investigation relating to the same misclassified wood products, which may or may not result in either civil or criminal penalties. The latter imposition of penalties apparently has not yet occurred, nor is the court privy to any facts as to the investigation's existence, other than the parties' unsupported statements. It is thus irrelevant to this case. As to the former, by mislabeling Customs' alleged misclassification of its lumber products as a "penalty" because it is somehow "non-protestable" (*e.g.*, Pl.'s Opp. at 28), Forest Products seeks to characterize the countervailing duties it paid under protest as an unlawful exaction entitling it to seek relief in the Court of Federal Claims under the Tucker Act. But, it is not a civil or criminal penalty. It is a type of duty or tax levied upon certain imported goods "dumped" below market price. *See* 19 U.S.C. § 1673e(a)(2), (3); *Xerox Corp.*, 289 F.3d at 794.

Forest Products seeks to evade this obvious fact by arguing that it had to pay the assessment or face the imposition of penalties and that, therefore, the Supreme Court's holding in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) applies, which in turn, makes clear that this court has jurisdiction.[22] This adds yet another level of obfuscation. First, even if, *arguendo,* Forest Products faced possible penalties for not paying the levied duties, it would not negate the requirement of exhausting all available administrative remedies either challenging the classification or the scope determination, and then seeking review in the CIT as the law requires. Second, *Abbott Laboratories* actually works against Forest Products because that case makes clear that Forest Products would have a ripeness problem unless the penalties were in fact assessed or were not yet assessed, but all administrative remedies were exhausted.

*Abbott Laboratories* involved the issue of whether plaintiffs could seek declaratory and injunctive relief in federal district court against the enforcement of the 1962 amendment to the Federal Food, Drug, and Cosmetic Act (52 Stat. 1040, as amended by the Drug Amendments of 1962, 76 Stat. 780, 21 U.S.C. s 301 et seq.), which required manufacturers of prescription drugs to prominently print on labels and other printed materials the "established" or generic name of the drug

---

[22] *See, e.g.*, Pl.'s Mot. for *In Limine* Protective Order at 4; Pl.'s Reply. at 23; Pl. Opp. at 19, 30; Transcript Oral Argument April 22, Pl. Motion Protective Order at 17-19. at 35; Tr. Oral Argument Aug. 3., Def. Motion to Dismiss at 35-38.

along with the proprietary name of the drug. *See* 21 U.S.C. s 352(e)(1)(B). The Supreme Court held, among other things, that because the plaintiffs had exhausted all administrative avenues of review, only a pure issue of law remained. *Abbott Laboratories*, 387 U.S. at 149. Consequently, the issue was ripe for declaratory review. *Id.*

In addition to the fact that this case involved Administrative Procedure Act review (5 U.S.C.A. §§ 701-704) and the Declaratory Judgment Act (28 U.S.C.A. § 2201), where certainly this court has no jurisdiction, *Abbott Laboratories* also makes clear that access to the courts is available only when a claim is ripe, that is, only when administrative remedies are fully exhausted. *Abbott Laboratories*, 387 U.S. at 149-50. *See also Apotex v. Gardner*, 347 F. 3d 1335, 1354 (Fed. Cir. 2003) (holding that exhaustion of administrative remedies is mandated to prevent premature adjudication and court interference with complex administrative policies and determinations). Clearly, because neither Customs nor Commerce has ruled on the validity of the antidumping and countervailing duty dispute, Forest Products claim is not yet ripe.

In a twist to its penalty argument, Forest Products maintains that this court, and not the CIT, has jurisdiction because their exists a "gap" in the CIT's exclusive jurisdiction over trade disputes. It cites two cases, *Trayco, Inc. v. United States*, 994 F.2d 832 (Fed. Cir. 1993), and *High Star Toys, Inc. v. United States*, 32 Fed. Cl. 176 (1994), for support. But these cases do not support Forest Products.

Pursuant to 19 U.S.C. § 1592, Customs may impose penalties on parties for their fraud and gross negligence while importing goods into the United States. 19 U.S.C. § 1592(a). Section 1592(b)(2) allows a person incurring a penalty to file with Customs for remission or mitigation pursuant to 19 U.S.C. § 1618. If Customs refuses to mitigate the penalty and the party chooses not to pay, the government may bring an action against the party in the CIT, triggering that court's exclusive jurisdiction. 28 U.S.C. § 1582. The problem arises that although 28 U.S.C. § 1581 provides the CIT's jurisdiction for actions brought against *the government*, it is silent as to situations in which an importer, for example, challenges a § 1592 penalty paid under protest. A jurisdictional "gap," so-to-speak, exists for parties seeking judicial review of § 1592 penalties paid under protest.

This is the situation the Federal Circuit faced in *Trayco, Inc. v. United States.* In *Trayco*, Customs assessed an import penalty against Trayco, Inc. under § 1592. *Id*. at 834. Pursuant to § 1681, Trayco then filed for mitigation with Customs, and thus, unlike Forest Products, exhausted its administrative remedies. Dissatisfied with the result, Trayco paid the penalty "under protest," *id*. at 835, and sought judicial relief in district court. The Federal Circuit concluded that the district court had subject matter jurisdiction under the Little Tucker Act because 28 U.S.C. § 1581 did not explicitly vest jurisdiction with the CIT in refund suits commenced by an importer. *Id.* at 836-37. Because there was not a statutory bar to Trayco's suit in district court, the Federal Circuit elected not to require Trayco to obtain judicial review in the CIT by refusing to pay the penalty and waiting for Customs to bring an action in that forum. *Id*. at 837.

*High Star Toys, Inc.* is also inapplicable. In that case, Customs seized a shipment of toys pursuant to 19 U.S.C. § 1595a(c), the forfeiture statute, because the toys were allegedly imported illegally. *Id*. at 178. Like Trayco, High Star first filed for mitigation under 19 U.S.C. § 1618. *See* Pl.'s Opp. at 28 ("The importer filed a petition for relief with U.S. Customs under 19 U.S.C. § 1618").

Unlike the case at bar, which does not involve the forfeiture of goods, forfeiture claims historically have been adjudicated in this court. *High Star*, 32 Fed. Cl. at 179 (citing *Doherty v. United States*, 500 F.2d 540 (Ct. Cl. 1974)). And most importantly, High Star sought judicial review only *after* exhausting its administrative remedy with Customs, which allowed High Star to return the toys to Taiwan and pay a penalty. *Id*. at 178. Again, this is not what Forest Products did.

Clearly, this case more closely resembles *Sandvik* than *Trayco* or *High Star*. Both Trayco and High Star exhausted their administrative remedies by requesting that Customs mitigate or rescind the penalties; these parties then sought judicial review in the CIT. Regardless of whether the most appropriate remedy for Forest Products is a scope review or a Customs protest, Forest Products has chosen neither. The only issue remaining is whether Forest Products has met its burden under Rule 12(b)(1) by demonstrating that administrative exhaustion is a near impossibility thus making any CIT review a nullity.

Forest Products baldly asserts that liquidation normally takes 314 days, and that exhaustion of any administrative and judicial reviews of the AD/CVD order usually takes about five years from entry. Pl's Mem. at 14; *see also* Compl. at 2-3 n.3. And critical to its case, Forest Products also maintains that liquidation here is "indefinite" because of the Commerce review suspension, and that, therefore, no judicial review of the Customs order in the CIT is possible, at least for the foreseeable future. Pl.'s Mem. at 27. The problem facing the court is that plaintiff's counsel has presented not one iota of evidence to support these *ipse dixit* assertions. None. This, most unfortunately, has become habitual in this case. Forest Products' counsel did not as well present any evidence to support his various submissions for a protective order.

On the other side of the ledger is 19 U.S.C. § 1504, and the entire statutory framework designed to parcel out trade regulation authority between Commerce and Customs. It is helpful to briefly reiterate what was explained above in the prior section on the relevant statutory framework. While liquidation of all imported goods subject to an outstanding countervailing duty order is suspended by operation of law upon Commerce's annual review, *see* 19 U.S.C. § 1504(a), this suspension is not "indefinite," as Forest Products alleges. An entry of imported merchandise which is not liquidated within four years after the date of entry is liquidated by operation of law at the "rate of duty, value, quantity, and amount of duty asserted at the time of entry by the importer..." 19 U.S.C. § 1504(d).

Furthermore, as explained more fully above, the 1993 amendment to § 1504(d) increased the period of time in which Customs could liquidate entries after removal of suspension of liquidation from 90 days to six months. This amendment was designed to address a loophole in the prior version of the statute, which made deemed liquidation available if suspension of liquidation were removed before the expiration of the maximum four-year period for liquidating entries, but not if suspension of liquidation was removed after the expiration of the four-year period. *Int'l Trading Co.*, 281 F.3d at1272. The result of Customs' failure to liquidate within the six-month period was "deemed liquidation" by operation of law. *Id.* at 1273. *See Int'l Trading Co.*, 281 F.3d at1272.

At the very worst, then, it seems that Forest Products can seek CIT review of Commerce's AD/CVD order at the "deemed liquidated" stage. Of course, Forest Products also has the option, as explained, of challenging Commerce's scope determination. Thus, an interested party may file a

challenge with Commerce to determine "whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi). Significantly, as explained above as well, the CIT has exclusive jurisdiction over appeals of scope rulings. 28 U.S.C. § 1581(c).

This entire elaborate scheme, involving dual challenges to Customs and Commerce determinations as to classification and scope matters, assures that once administrative remedies are exhausted importers will be able to obtain judicial review, albeit exclusively in the Court of International Trade. This makes eminent sense since that institution was established by Congress as a special tribunal with the necessary expertise to render decisions involving complex trade and tariff matters.[23] This is why Congress amended the Tucker Act to assure that the CIT would have exclusive jurisdiction in these matters.[24] Indeed, if this court decided it must adjudicate Forest Products' claim for monetary relief, as a predicate to that decision, it must also determine the validity of Customs' AD/CVD order. This not only would interfere with the congressional intent to confer upon the CIT exclusive jurisdiction over the legality of these types of trade claims to assure a uniform body of law, it could very well interfere with Commerce's annual review of countervailing duty orders, and, thus, possibly with the trade policy of the United States because plaintiff will have found a way around the automatic suspension of liquidation. *See Wolfe Shoe Co.*, 141 F.3d at 1118 (observing that Commerce's annual review of scope determinations would be frustrated if liquidation was allowed

---

**23** In 1980, the present CIT was reconstituted pursuant to the Customs Courts Act of 1980, Pub. L. No. 96-417, 94 Stat. 1727 (codified under various provisions in sections 19 and 28 U.S.C.). The court was intended to have broad jurisdiction over trade issues. *See* H.R. Rep. No. 96-1235, at 28 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3729, 3739 ("The emphasis and clarification of Congress' intent that the expertise and national jurisdiction of the Court of International Trade . . . be exclusively utilized in the resolution and conflicts and disputes arising out of the tariff and international trade laws . . . "). The CIT's exclusive jurisdiction encompasses civil actions involving such matters as classification and valuation of imports, charges and exactions by the Treasury Department, and administrative determinations under the antidumping and countervailing duty laws. 28 U.S.C. §§ 1581-1585.

**24** Compare 28 U.S.C. § 1491(c) ("Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade ...") to 28 U.S.C. § 1581, which contains an extensive jurisdictional laundry list of exclusive of trade issues conferred on the Court of International Trade. Particularly interesting is § 1581(I), which is a catch-all or "residual" provision conferring jurisdiction on the CIT for all civil actions commenced against the United States (unless excepted by other miscellaneous provisions of the statute, which are irrelevant here) that arises from trade disputes involving: "(1) revenue from imports or tonnage, and (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." Clearly, antidumping and countervailing duty disputes are encompassed by this latter clause. *See* S. Rep. No. 96-466 at 10 (1979) ("This residual jurisdictional provision should make it clear that all suits of this type specified are properly instituted only in the Court of International Trade . . . ").

to proceed).[25]

In fact, it appears that is exactly what Forest Products is after. It simply does not want to expend the time and capital required by the often burdensome trade and review procedures that Congress created. (For instance, Forest Products complains, perhaps with some justification, that seeking a scope determination "would take a lot of time, and the delay would cause harm to [Forest Products]'s business. Pl.'s Reply at 10.) But, this is the will of Congress. It is not for the courts to second-guess the efficacy and indeed the wisdom of complex legislation, particularly where, as here, the Constitution vests the Congress, a co-equal branch of government, with the plenary regulation of foreign trade. This type of complex legislation is often the product of political compromise reflecting agreement amongst various constituencies representing conflicting societal interests. Courts should tread lightly here, if at all. Simply put, Forest Products' complaint at its root may be a problem for Congress to fix.

Because there is nothing in the record to show that Forest Products is unable to exhaust the administrative remedies available to it and thereafter seek review in the Court of International Trade, it cannot be said that the countervailing duties paid to Customs are unlawful exactions falling within some sort of "jurisdictional gap" conferring upon this court the authority to adjudicate Forest Products' claim. Whether Customs is in error as to the classification is a determination for the Court of International Trade to make, not this court. Finally, because this court finds itself without jurisdiction to adjudicate the complaint, it declines to address Forest Products' numerous other arguments, such as the application of the so-called Mod Act. To do so would be at best *dicta*, and at worst impermissibly rendering an advisory or hypothetical opinion. *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

## IV. Conclusion

For the foregoing reasons, the defendant's motion to dismiss is hereby GRANTED. The Clerk of the Court is hereby ORDERED to enter judgment in favor of the United States. Costs SHALL BE ASSESSED against plaintiff.

Lawrence J. Block

Lawrence J. Block
Judge

---

[25] *Cf. Nichols v. United States,* 74 U.S. (7 Wall.) 122 (1868) ("Can it be supposed that Congress, having carefully constructed a revenue system, with ample provisions to redress wrong, intended to give to the taxpayer and importer a further and different remedy? [¶] The mischiefs that would result, if the aggrieved party could disregard the provisions in the system designed expressly for his security and benefit, and sue at any time in the Court of Claims, forbid the idea that Congress intended to allow any other modes to redress a supposed wrong in the operation of the revenue laws, than such as are particularly given by those laws.").